### LAND DISPOSITION AND DEVELOPMENT AGREEMENT
### [Poppleton Redevelopment Project]

SEP 2 7 2006

THIS LAND DISPOSITION AND DEVELOPMENT AGREEMENT (this "**Agreement**"), is made this _____ day o.Ṣ.ḘṖ .2 .2006. 2006 (the "**Effective Date**"), by and between the MAYOR AND CITY COUNCIL OF BALTIMORE, a body corporate and politic and a political subdivision of the State of Maryland (the "**City**"), acting by and through the Department of Housing and Community Development (the "**Department**"); and POPPLETON DEVELOPMENT I, LLC, a Maryland limited liability company (the "**Developer**"). The Effective Date is the date the Agreement is approved by the Baltimore City Board of Estimates.

### RECITALS

A.      The Developer has developed a plan for the redevelopment of certain property within the Poppleton Urban Renewal Area and the Franklin Square Urban Renewal Area known collectively as the "Poppleton Housing Initiative" (the "**Project Area**"). The Developer intends to redevelop the Project Area into a comprehensive project containing residential and commercial uses, and may also include institutional and public uses (the "**Project**") in accordance with the Developer's Master Plan (as defined in Section 3.4 hereof). The Project Area, consisting of approximately 13.8 acres, is comprised of all of the properties listed on Schedule A attached hereto and incorporated herein (each a "**Property**" and collectively the "**Properties**") and/or shown on the phasing plan attached hereto as Schedule F (as amended from time to time in accordance with this Agreement, the "**Phasing Plan**").

B.      The Project Area is principally within the boundaries of the Poppleton Urban Renewal Area (the "**Renewal Area**") established by Ordinance No. 837 and approved March 31, 1975, as amended from time to time, and is subject to the terms of the Urban Renewal Plan adopted pursuant to said Ordinance as amended from time to time (the "**Renewal Plan**"). A few of the Properties within the Project Area are within the boundaries of the Franklin Square Urban Renewal Area established by Ordinance No. 831 and approved July 19, 1978, as amended from time to time, and the Urban Renewal Plan adopted pursuant to said Ordinance as amended from time to time. With respect to those Properties located within the Franklin Square Urban Renewal Area only, the use of the term "Renewal Plan" shall mean the Franklin Square Urban Renewal Plan.

C.      The City has title to, or will acquire title to in accordance with this Agreement, the Properties listed or shown on the attached Schedule A and Schedule F to be developed in accordance with this Agreement.

D.      The City is authorized to acquire, sell, lease, convey, transfer or otherwise dispose of all of the Properties by virtue of (i) Article II, Section 15 of the Baltimore City Charter, 1996 Edition (the "**Charter**"), (ii) Article 13 of the Baltimore City Code – 2000 Edition (the "**City Code**"), which established the Department pursuant to the Charter, (iii) Ordinance No. 837 approved March 31, 1975 establishing the Poppleton Urban Renewal Area, as amended from time to time, (iv) Ordinance No. 831 approved July 19, 1978 establishing the Franklin Square Urban Renewal Area, as amended from time to time, (v) the provisions of the Renewal Plan, (vi) Ordinance No. 477, approved December 6, 1973 which authorizes the City to dispose of the

285250.11
9/6/2006

Exhibit 1 to
Verified Complaint

1

Properties, (vii) Ordinance No. 95-525 [Article 13, Section 2-7(mm)], approved November 11, 1999 which authorizes the City to dispose of the Properties, and (viii) in accordance with the procedures set out in Ordinance No. 95-525 [Article 13, Section 2-7(h)], approved November 11, 1999 which authorizes the City to dispose of the Properties.

E.      Material assistance has been given to the City by the United States of America in the form of grants or loans in order to further the Renewal Plan and to acquire some or all of the parcels of land located within the Renewal Area.

F.      The City desires that the Developer develop the Project, either directly or through others, in accordance with the Master Plan and this Agreement, and, subject in all cases to the terms and provisions of this Agreement, the Developer is willing to do so.

**AGREEMENT**

NOW, THEREFORE, for and in consideration of the premises and the mutual obligations of the parties hereto, and other good and valuable consideration, the receipt of which is hereby acknowledged, the City and the Developer, for themselves, their successors and assigns, hereby covenant and agree as follows:

**ARTICLE I**

**GENERAL TERMS OF CONVEYANCE**

1.1      Conditions of Conveyance.   Subject to the restrictions, covenants, conditions, terms, and provisions of this Agreement, the City hereby agrees to acquire the Properties and to sell the Properties to the Developer or its Designees (as defined in Article V) in accordance with the Renewal Plan and this Agreement, and the Developer hereby agrees for itself and its Designees to purchase and buy the Properties from the City and to plan, design, market and construct the Project, consistent with the Renewal Plan and this Agreement.

1.2      Land Assemblage and Acquisition.

(a)      The City shall use its best efforts and all legal authority to acquire all of the Properties identified on Schedule A that the City does not already own as of the Effective Date.  In furtherance of the foregoing, and as authorized by the Renewal Plan, the City may purchase and acquire any Properties within the Project Area and listed on Schedule A pursuant to its power of condemnation, through such power of condemnation or under the threat of condemnation as authorized by the Charter and the City Code.  In addition, the City will take all necessary steps to redeem or eliminate ground rents on all Properties to be conveyed to the Developer.  The City will have no obligation to pursue the acquisition of a particular Property if the Developer gives the City written notice that the Developer intends to acquire such Property directly from its owner.

(b)      As of the Effective Date, the parties anticipate that the City will need to exercise its power of condemnation with respect to certain of the Properties.  The City agrees to commence acquisition proceedings with respect to Properties located in Phase I (as identified in

Schedule A) within thirty (30) days of the Effective Date and to diligently proceed with all such acquisition proceedings. The City will use its best efforts to acquire Properties in accordance with the Phasing Plan. The timing of the acquisitions will be dependent upon the City's access to funding sources for the Project. The City will provide at least bi-weekly reports to the Developer regarding the status of each Property acquisition and the schedule for completing any remaining acquisitions.

1.3     Title Review; Notice of Title Defects.

(a)     The City shall cause to be commissioned a title report for certain Properties it will acquire for the purposes of the Project. Upon request from the Developer, the City shall provide a copy of any title reports commissioned for this purpose (together with copies of all instruments noted as exceptions). Notwithstanding the foregoing, the Developer shall bear sole responsibility for commissioning title reports as may be needed by the Developer to obtain title insurance.

(b)     If the Developer claims any title defect or encumbrance is unacceptable or will cause any Property to be unmarketable or uninsurable, said defect or encumbrance shall be brought to the attention of the Department and the City's Law Department in writing at least one hundred twenty (120) days prior to the Closing Date for such Property, and the City shall use its best efforts and all legal authority to eliminate such defect or encumbrance at the earliest possible time prior to Closing.

1.4     Relocation. All relocation of persons and businesses (whether owners or tenants) from the Project Area shall be performed by the City prior to Closing. The City and/or the Department shall be responsible for managing all relocation efforts prior to Closing and shall be responsible for all relocation costs.

1.5     Condition of the Property.

(a)     The parties agree that the buildings located on the Properties identified as **"Rehabilitation"** or **"Scattered Site Rehabilitation"** in Schedule A of this Agreement are to be accepted by the Developer in an "As Is" condition at the time of Closing.

(b)     The Properties identified as **"New Construction"** in Schedule A of this Agreement are to be delivered to the Developer free of all buildings and other structures. All existing utilities will either be removed or capped by the City during the demolition and clearing work and prior to Closing. The City will conduct such clearing activities in accordance with the Phasing Plan. The City will not be required to remove or cap utilities located on those Properties upon which no demolition or clearing activities must be performed by the City pursuant to this Section 1.5(b).

1.6     Improvements. The term "Improvements" as used in this Agreement means the structure or structures to be constructed in accordance with this Agreement, including landscaping and utilities, all as shown in the approved Construction Plans (as defined in Section 3.5).

1.7    Conditions Precedent to Closing.  Closing may proceed in Phases and subphases, at the option of the Developer.  The City shall not be obligated to make conveyance of a given Phase, subphase or other combination of the Properties unless and until the following events have all occurred with respect to such Phase or subphase:

(a)    The Developer has furnished evidence satisfactory to the Department that the Developer has the equity capital and/or commitments for the mortgage financing or other capitalization adequate for the construction of the Improvements.

(b)    The Developer has submitted a Commitment to Comply with Article 5, Subtitle 28 of the Baltimore City Code (2000 Edition) substantially in the form attached hereto as Schedule C and made a part hereof, in which the Developer agrees to carry out all of the provisions of Schedule C.

1.8    Purchase Price.  The Purchase Price for each Property and the Reimbursement Amount for each Property (each as defined in Schedule B) and manner of payment for the Properties are set forth in Schedule B attached hereto and incorporated herein.  No down payment or good faith deposit shall be required.

1.9    Closing.  The purchase and sale of the Properties that the City owns or has acquired in accordance with this Agreement shall close (the "Closing") at a time and date selected by the Developer by sending written notice thereof to the Department at least thirty (30) days prior to each such date (each a "Closing Date").  Closing may take place in Phases or subphases if requested by the Developer.  The City's failure to acquire one or more Properties within a particular Phase or subphase by the Closing Date for that Phase or subphase shall not prevent the Developer from proceeding to Closing for such Phase or subphase, but the Developer shall not be required to go to Closing on any Phase or subphase unless the City is able to convey all of the Properties in such Phase or subphase.  Closing for the entirety of each Phase must occur within 18 months of the City's acquisition of all Properties within a given Phase.  Failure of the Developer to satisfy the conditions precedent to Closing identified in Section 1.7 and proceed to Closing within such timeframe shall be considered an event of default; provided, however, such 18-month timeframe shall be extended if the Developer's inability to satisfy the condition precedent set forth in Section 1.7(a), if applicable, is due to the City's failure to approve the Developer's Construction Plans for the subject Phase in a timely manner, in which case such timeframe shall be extended at the Developer's request until such time as the City has approved such Construction Plans.  Notwithstanding the foregoing, the Developer shall not be required to close on any one Phase until the Developer has closed on the Phase intended to precede such Phase.  The City shall give written notice to the Developer when the City has acquired title to all of the Properties in each Phase.  Closing for all four Phases shall take place no later than fifteen (15) years after the Effective Date, unless otherwise extended in accordance with the terms of this Agreement or by the written consent of the parties hereto, their successors and assigns.

1.10    Conditions of Title.  At the time of Closing, the City shall convey to the Developer or its Designee, by special warranty deed, good and marketable and insurable title to the Properties free and clear of all liens, encumbrances, and title defects but subject to and with the benefit of all terms, conditions, covenants, rights, and restrictions set forth in this Agreement,

any and all municipal utilities, and any easements (both recorded and unrecorded) approved by the Developer and necessary for the full development of the Properties according to the Renewal Plan and this Agreement.

1.11   Insurable Title.   An insurable title is one for which an A.L.T.A. approved title company will issue an owners or mortgagee title insurance policy at standard title insurance premium rates.

1.12   Deed Covenants.   Any deed or deeds conveying the Properties shall contain covenants of special warranty and further assurances against encumbrances other than those permitted by this Agreement.

1.13   Limitation of Covenants.   If any Properties have been acquired by tax sale proceedings, said conveyance shall be without warranty as to those Properties.

1.14   Closing Expenses.   The Developer will pay, with respect to the conveyance of the Properties to the Developer, all applicable transfer taxes, recordation taxes, premiums for any title insurance policies procured by the Developer, and the full expense of the proper recording of documents among the Land Records of Baltimore City (the "**Land Records**").

1.15   Real Estate Taxes.   At least ten (10) Business Days prior to each Closing for the Properties, the City shall submit to the Developer an estimate of the real estate tax equivalency charge to be paid at Closing with respect to the Properties to be conveyed on the basis of a tax assessment of 100% of the Purchase Price of such Properties and calculated at the City and State tax rates and prorated for the remainder of the tax year in which Closing is made. In the event of a nominal Purchase Price, the tax equivalency charge shall be computed on the current assessment of the subject Properties. At Closing, the Developer shall pay the portion of the real estate taxes due for the applicable year for the period after Closing.

1.16   Closing Adjustments.   The City shall pay all taxes, sewer and water charges and other assessments or charges with respect to the applicable Properties accruing during the period before the applicable Closing. Taxes, charges or assessments incurred during the period after the applicable Closing shall be paid by the Developer.

1.17   Financing Support by the City.   The City has committed certain funds to the Project for the acquisition and preparation of the Properties for conveyance to the Developer. The use of such funds for the Project Area will be subject to compliance with all Applicable Law (as defined in Section 3.17). In addition, and in furtherance of the foregoing, the Department will in good faith seek to assist the Project through the following sources. However, the Department shall make no guarantees as to the success of obtaining funding through the following sources:

(a)   Tax Increment Financing.   The City will support the designation of the Project Area as a Development District or other appropriate designation, as needed to finance the Project, that may qualify the Project to benefit from Tax Increment Financing. Upon request from the City, the Developer will provide all information and support necessary to successfully obtain Tax Increment Financing.

(b)    <u>Historic Tax Credits</u>. The City will support approval for the Project Area as part of a Certified Historic Area that will qualify the rehabilitation components of the Project for credits and other incentives from governmental entitles.

(c)    <u>Maryland Priority Places</u>. The Project Area is within an area designed as a "Maryland Priority Place" by the Governor in February 2005. The City will support the Developer and the appropriate State agencies in connection with funding and support under the Priority Place Program.

(d)    <u>HUD Home Program</u>. The City will support the Developer's efforts to obtain funding under the HUD Home Investment Partnership Program.

(e)    <u>Other Financing</u>. The City will consider such other approvals as are needed to implement financing elements that will be of benefit to the Project, consistent with this Agreement, including but not limited to, redevelopment bonds, special tax districts, and enterprise zones.

1.18    <u>HUD Financing Requirements</u>. If the Developer will finance the Project in whole, or in part, with grants or loans from the United States Department of Housing and Community Development (HUD), then the Developer shall comply with all requirements of Title 24, Part 58 of the Code of Federal Regulations, entitled "Environmental Review Procedures for Entities Assuming HUD Environmental Responsibilities."

**END OF ARTICLE I**

**ARTICLE II**

**SITE PREPARATION**

2.1    <u>City's and Developer's Obligations</u>. The Developer agrees that it shall, at its own expense, obtain the approvals set forth in this Article II and provide the Improvements identified in this Article II to be provided by the Developer if necessary for the development of the Properties in accordance with the Renewal Plan and this Agreement. The City agrees that it shall, at is own expense, complete the work identified in this Article II to be completed by the City. The failure of one party to perform its obligations, or deprive the first party of its rights and benefits, with respect to a particular Phase or subphase shall not relieve the other party from its obligations, or deprive the first party of its rights and benefits, with respect to other Phases or subphases, unless specifically provided for in Article VII.

2.2    <u>Land-Use Approvals</u>. The Developer shall be responsible for obtaining any land use approvals and permits for the Project, and the initiation of all necessary ordinances and actions, including all costs relative thereto (including title searches required for any rezoning or conditional use approvals). The Department will support such changes in zoning with respect to the Project Area as may be reasonably necessary, from time to time, in order to implement the Master Plan. The parties contemplate the use of a planned unit development (the **"PUD"**) to allow for the flexible reallocation of floor area within the Project Area.

2.3   Paving. The Developer shall perform or cause to be performed all work related to the installation of new sidewalks, curbs and gutters appurtenant to the Properties conveyed to the Developer, provided the Developer shall not be required to install new sidewalks, curbs or gutters where existing sidewalks, curbs or gutters may be integrated into the Project, subject, however, to approval of the Baltimore City Department of Public Works or other appropriate governmental agency.

2.4   Infrastructure and Utilities. After the City's removal or relocation of existing utilities in accordance with Section 1.5(b), the Developer shall perform or cause to be performed the construction of all new public and private utilities and appurtenances, such as water mains, sanitary sewers, storm drains, and electrical conduits, as necessary to serve the Project and or any applicable portion thereof by private parties. The Developer shall also construct such private streets within the Project Area as necessary to serve the Project. Any infrastructure work shall be conducted in accordance with a customary developer's agreement to be negotiated with the Baltimore City Department of Public Works.

2.5   Construction/Storm Water Management. Except as provided in Section 1.5(b), the Developer shall perform or cause to be performed all work related to construction sediment and erosion control and storm water management procedures.

2.6   Road Closures. The City shall be responsible for the administrative closure (or, if applicable, opening and closure) of any public streets or alleys necessary for the construction of the Project. The Department shall use all reasonable efforts to assist the Developer in obtaining all necessary permits and approvals. The Developer shall identify the public streets and alleys for closure and be responsible for all due diligence activities required for approval. Notwithstanding the foregoing, the Developer shall not be required to pay to the City any application fees, appraisal fees, road abandonment fees, conveyance fees or other consideration for the streets and alleys which are closed.

2.7   City Support and Cooperation. The City shall use all reasonable efforts to assist the Developer in obtaining all necessary permits and approvals and will cooperate with the Developer in each of the undertakings identified in this Article II and in Article III. In furtherance of the foregoing, the City shall identify and designate an individual (the "**City Representative**") to handle all communications from the Developer and all City agencies in connection with the Project. The initial City Representative will be Alastair Smith. The Developer shall also identify and designate an individual (the "**Developer Representative**") to handle all communications from the City in connection with the Project. The initial Developer Representative will be Daniel Bythewood. The City and the Developer may each change their Representative by sending written notice thereof to the other.

2.8   Security. From and after the Effective Date, the City shall use all reasonable efforts to insure that the Project Area receives added attention and security measures from the Baltimore City Police Department, including but not limited to, the manning of the Poppleton substation and utilization of the "police officer next door" program.

**END OF ARTICLE II**

285250.11
9/6/2006

## ARTICLE III

## CONSTRUCTION OF IMPROVEMENTS

    3.1    <u>Design Review</u>.  The Developer shall confer with the Department on the functional and aesthetic aspects of the design development plans and specifications.  The Developer agrees to attend periodic conferences called by the Department for the same purposes while the Preliminary Plans and Construction Plans, as defined in this Article, are being prepared.  The Developer agrees to seek approval of the Urban Design and Architectural Review Panel (**UDARP**) of any material changes to the Developer's Master Plan, as required by the regulations of the Baltimore City Department of Planning.  The design and construction of the Project will be performed in Phases, and subphases, at the Developer's discretion.  The preliminary phasing plan for the Project is attached hereto as <u>Schedule F</u>.  Submission of plans by the Developer and review of plans by the Department will occur according to the Phasing Plan of the Project.  The Developer may change the order of development of the Phases and subphases shown on with the Phasing Plan provided that: (a) the Developer notifies the Department of any and all such changes as they are made; (b) the overall timetable for completing the Phases in accordance with Section 3.13 is not altered; and (c) the changes are compatible with the City's acquisition efforts.  If the amended Phasing Plan is not compatible with the City's acquisition efforts, a revised timetable for Closing on each Phase shall be prepared in consultation between the City and Developer.  Any changes to the Phasing Plan will be identified on an amended Phasing Plan prepared by the Developer and submitted to the Department.  If necessary, a revised timetable for Closing on each Phase will be included in the amended Phasing Plan.  The amended Phasing Plan shall be signed by both parties and serve as a legal grounds for default should either party fail to meet its obligations under this Agreement, as modified by the amended Phasing Plan.

    3.2    <u>Preliminary Plans Defined</u>.  The term "**Preliminary Plans**" shall mean the schematic plans for each Phase or subphase, including but not limited to floor plans and facade elevations, developed to show the architectural character and use of the Improvements, and site plans indicating the location of the Improvements and dimensions of property lines, existing and proposed utilities, landscaping, and vehicular parking and loading areas within each such Phase or subphase.  The Developer will use commercially reasonable efforts to include green building techniques and materials in the design and construction of the Project.

    3.3    <u>Preliminary Plan Submission</u>.  The Developer shall submit to the Department for its approval the Preliminary Plans, which approval shall not be unreasonably withheld, conditioned or delayed. The Developer shall submit the Preliminary Plans for Phase I no later than one hundred twenty (120) days after the Developer has acquired all of the Properties in Phase I.

    3.4    <u>Preliminary Plan Review and Approval</u>.  The Department shall not unreasonably withhold its approval of the Preliminary Plans if such plans conform to the provisions of the Master Plan, Renewal Plan, the PUD and this Agreement.  The Preliminary Plans shall, in any event, be deemed to have been approved by the Department unless rejected, in whole or in part, in writing, within thirty (30) days after their submission, as not being in conformity with said criteria, specifying the reasons for the rejection.  The Department shall not be permitted to

require changes to the Preliminary Plans which do not conform to the conceptual plans and/or architectural drawing prepared for the Developer and approved by UDARP. Such conceptual plans, as they may be implemented and amended from time to time, including without limitation, by zoning changes and the creation of the PUD, are referred to herein as the Developer's **"Master Plan"**. Rejection and resubmission of revised materials hereinabove provided shall continue until the Preliminary Plans have been approved by the Department; provided, that in any event, the Developer shall use commercially reasonable efforts to submit acceptable Preliminary Plans within thirty (30) days after receipt of comments from the Department, and the Department shall renew and approve said revised Preliminary Plans no later than fifteen (15) days after receipt of said revised plans.

3.5     Construction Plans Defined. The term **"Construction Plans"** shall mean complete working drawings suitable for bidding for each Phase or subphase or other combination of Properties (including Properties identified in this Agreement for Scattered Site Rehabilitation).

3.6     Construction Plan Submission. The Developer shall submit to the Department for its approval Construction Plans within two hundred ten (210) days after approval of the Preliminary Plans.

3.7     Construction Plans Review and Approval. The provisions of Section 3.4 regarding approval, rejections and resubmission of Preliminary Plans shall likewise apply to Construction Plans. In any event, however, the Developer shall use commercially reasonable efforts to submit revisions, if necessary, within thirty (30) days of receipt of comments from the Department, and the Department shall approve, in writing, said revised Construction Plans within fifteen (15) days following submission.

3.8     Conformity of Construction Plans.

(a)     Final Construction Plans and all work by the Developer, its Designees and/or its successors and assigns with respect to the Project and the construction of the Improvements within the Project Area shall be in conformity with the Renewal Plan, the PUD, the Master Plan, this Agreement, the Building Code of Baltimore, the Memorandum of Understanding between the Developer and the Maryland Historical Trust, the form of which is attached hereto as Schedule E, and all Applicable Law (as defined in Section 3.17).

(b)     All work performed on the construction of the Improvements shall materially conform with the approved Construction Plans. It is agreed that change orders or modifications which do not materially affect the site plans, facade elevations or other design elements of the Improvements shall not constitute a deviation from the approved Construction Plans. However, any material modification to the site plans, facade elevations or other design elements shall be submitted in writing and approved by the Department before its implementation. If the Department neither approves nor disapproves in writing within twenty (20) days of receipt of such modification then it shall be treated as having been approved.

(c)     In the event the Developer fails to comply with the foregoing requirements of this Section 3.8, the Department may, within a reasonable time after discovery thereof by the Department, direct in writing that the Developer so modify or reconstruct such portion or

285250.11
9/6/2006

portions of the Improvements as are not in conformance with the approved Construction Plans or any approved modifications in order to bring them into conformance. Discovery by the Department shall be deemed to have occurred when non-compliant work is visible for inspection whether or not the Department actually inspects the subject Improvements. In any event, the City may not raise objections to any non-conformity of a particular Improvement after such Improvement has been substantially completed.

3.9 <u>Right of Access</u>. The City hereby grants to the Developer, its consultants, agents, employees and advisors a right of entry onto such Properties that the City owns for the purpose of performing the Developer's tasks in connection with this Agreement, including conducting tests and preparing materials and reports as may be required to enable the Developer or such other parties to plan for and design the Project, or any portion thereof, and/or to commence construction prior to Closing. The Developer shall save the City, or any agent thereof, harmless from any and all claims or damages arising from or connected with the work or operations done or performed by the Developer, its consultants, agents, representatives and employees under the provisions of this Section, unless such claims or damages arise from the indemnified party's own negligence or misconduct or entry onto the Properties. The Developer shall permit access to the Properties by the Department, the United States of America, and the City, or any agent thereof, at reasonable times and to the extent necessary to carry out the provisions of this Agreement; provided that any such parties comply with all construction safety measures, and further provided that each such party shall save the Developer, its officers and agents, harmless from any and all claims or damages arising from or connected with such party's entry onto the Properties. In no event shall there be any compensation payable or charge made in any form to either party for any such access.

3.10 <u>Building Permits</u>. Within sixty (60) days after approval by the Department of the Construction Plans for the buildings within Phase I, and provided that Closing on all of the Properties in Phase I has occurred, the Developer shall apply for all necessary building permits and thereafter the Developer shall diligently pursue such applications and pay all fees and costs associated therewith.

3.11 <u>Commencement of Construction</u>. Within one hundred eighty (180) days after the Developer receives approval of the Construction Plans for Phase I and all necessary building permits, and provided that Closing on all of the Properties in Phase I has occurred, the Developer shall commence the construction of the Improvements within Phase I. Thereafter, the Developer shall cause the Improvements in Phase I and in subsequent Phases to be completed in accordance with the approved Construction Plans.

3.12 <u>Progress Reports</u>. Until issuance of a Certificate of Completion for each Phase, the Developer shall make in such detail as may reasonably be required by the Department, a report in writing to the Department every ninety (90) days as to the actual progress of the Developer with respect to the development and construction of each Phase of the Project. During construction, the work of the Developer shall be available for inspection by representatives of the Department at reasonable times and after at least three (3) Business Days prior notice to the Developer.

3.13   Completion of Construction.   Subject to such adjustments or extensions as otherwise provided in this Agreement, the Developer shall diligently execute to completion the construction of the Improvements on the Properties and shall complete such construction not later than the following dates for each Phase, as identified in Schedule A and described in Schedule D of this Agreement:

(a)   Phase I: Completed not later than thirty (30) months from the date of Closing on all of the Properties within Phase I.

(b)   Phase II: Commenced not later than six (6) months after the later to occur of (i) Closing on all of the Properties in such Phase or (ii) completion of Phase I, provided that the Developer has sold or leased at least eighty percent (80%) of Phase I by such time, and completed not later than thirty (30) months from the date of commencement.

(c)   Phase III: Commenced not later than six (6) months after the later to occur of (i) Closing on all of the Properties in such Phase or (ii) completion of Phase II, provided that the Developer has sold or leased at least eighty percent (80%) of Phase II by such time, and completed not later than thirty (30) months from the date of commencement.

(d)   Phase IV: Commenced not later than six (6) months after the later to occur of (i) Closing on all of the Properties in such Phase or (ii) completion of Phase III, provided that the Developer has sold or leased at least eighty percent (80%) of Phase III by such time, and completed not later than thirty (30) months from the date of commencement.

(e)   Scattered Site Rehabilitation: Construction shall be commenced not later than twelve (12) months from the Closing Date.   Construction on all Scattered Site Rehabilitation Properties shall be completed no later than three (3) years from the Effective Date. The Developer shall consult with the City on the timing of the City's relocation efforts.   The Developer will use commercially reasonable efforts to complete the construction of the Scattered Site Rehabilitation Properties in time to accommodate residents relocated due to the City's acquisition efforts.

Each of the deadlines set forth in Section 3.11 and this Section 3.13 shall be extended by an Event of Force Majeure (as defined in Section 7.9 below).   Each of the deadlines in this Section 3.13 may also be subject to such adjustments as may be warranted by the rate of sales and/or leasing or the findings of an economic feasibility and absorption study conducted by or on behalf of the Developer during the development of the Project in the Developer's reasonable discretion (each a "**Market Demand Study**").   To the extent the goals and benchmarks identified above are not supported by the rate of sales and/or leasing or the Market Demand Study, the Developer may request an extension of the deadlines from the Department.   In addition, the deadline for Phase I shall be extended automatically for twelve (12) months upon the request of the Developer if site preparation and foundations for Phase I Improvements have been completed, and may be extended for longer periods of time by permission of the Department. Failure to complete the Improvements according to this schedule shall constitute an event of default (unless the delay is due to a default of the City under this Agreement).

3.14    Certificate of Completion.

(a)     Promptly after completion of the Improvements in each Phase or subphase, the Department shall issue to the Developer, at no cost to the Developer, an instrument certifying that the Phase, or any then applicable portion thereof, has been completed in accordance with this Agreement, which shall be in such form as will enable it to be recorded among the Land Records (each a "**Certificate of Completion**"). Such Certificate of Completion from the Department shall be a conclusive determination of satisfaction of the agreements and covenants in this Agreement with respect to the obligations of the Developer, its successors and assigns, and every successor in interest to the Property, to construct the Improvements in such Phase, subphase, or other combination of Properties; provided that such Certificate of Completion and such determination shall not constitute evidence of compliance with or satisfaction of any obligation of the Developer to any holder of a mortgage, or any insurer of a mortgage, securing money loaned to finance the Improvements, or any part thereof.

(b)     A Certificate of Completion shall be issued by the Department within a reasonable period of time (not to exceed thirty (30) days) following written notice from the Developer or its successors or assigns that the Phase, subphase, or other combination of Properties has been completed in accordance with this Agreement for the applicable Properties, and the Department agrees to cooperate with the Developer's Representative to expedite the issuance of any such Certificate of Completion. A Certificate of Completion shall be issued by the Department upon request as aforesaid, without further requirement or conditions, with respect to any Improvements in the Project which have been completed pursuant to all required permits and for which a certificate of use and occupancy or other applicable form of acceptance has been issued by the Department. No such Certificate of Completion shall be unreasonably withheld by the Department.

3.15    Partial Completion.

(a)     With respect to such individual parts or parcels of the Properties upon which the Improvements have been completed, the Department will issue a "**Certificate of Partial Completion**" to the Developer or its successors or assigns certifying that such Improvements have been made in accordance with the provisions of this Agreement.

(b)     Such Certificate of Partial Completion shall mean and provide that any party purchasing or leasing such individual part or parcel shall not incur any obligation with respect to the construction of the Improvements relating to such part or parcel of the Properties, and that the Department shall not be entitled to exercise any rights or remedies or controls that it may otherwise be entitled to exercise with respect to such Properties as a result of a default in or breach of any provisions of this Agreement unless such default or breach be by the purchaser or lessee with respect to the covenants and use restrictions set forth in Sections 4.1 and 4.2 of this Agreement and the right, remedy, or control exercised relates to such default or breach.

(c)     Issuance of a Certificate of Partial Completion shall in no way be construed to release the Developer from the obligation to complete the Improvements as indicated in the approved Construction Plans.

3.16   General Liability Insurance.  The Developer, at its sole cost and expense, shall secure or cause to be secured from a company or companies acceptable to the Department, in the Department's reasonable judgment, and shall maintain in full force and effect during the period of time between the Effective Date of this Agreement and the execution of the Deed conveying title to the Properties to the Developer, commercial general liability insurance insuring the Developer and the City, their agents and employees, from any and all claims or damages for personal injuries, including death, or for damages to any property of the City or of the public for risks typically covered by such insurance.  The amounts of such insurance are set forth as follows: One Million Dollars ($1,000,000.00) for injury sustained by any one person; One Million Dollars ($1,000,000.00) for injury sustained by two or more persons in any one accident; and Fifty Thousand Dollars ($50,000.00) for property damage.  A copy of the certificate of insurance, which provides that the policy cannot be cancelled without thirty (30) days prior notice to the Department, and which names the City as an additional insured, shall be furnished to the Department by the Developer for approval by the City Law Department.

3.17   Compliance with Law.  The Developer will comply in every respect with any and all Federal, State and municipal laws, ordinances, rules, regulations, orders, and notices now or hereafter in force or issued which may be applicable to any and all of the work or operations to be done, performed or carried on by the Developer under the provisions of this Agreement ("Applicable Law").

3.18   Extensions of Time.  Subject to the provisions of this Agreement, the times within which the Developer must submit Preliminary Plans, Construction Plans, evidence of equity capital, commitments for mortgage financing, and the times within which the Developer must commence and complete the development of any portion of the Project, and the construction of the Improvements thereon, and the time for Closing as specified in Section 1.9 of this Agreement may be extended in writing by the Department, in its sole discretion, upon good and sufficient cause therefor being shown by the Developer, for such periods of time as the Department deems advisable.  Any such extension of time shall be in writing and in such form as will enable it to be recorded among the Land Records.  In addition, each of the foregoing time periods shall be automatically extended by an Event of Force Majeure.

## END OF ARTICLE III

## ARTICLE IV

## RESTRICTIVE COVENANTS

4.1   General Covenants.  The Developer, its successors and assigns, and every successor in interest to the Properties, or any part thereof, shall comply with each of the following restrictive covenants and include or incorporate by reference the following restrictive covenants as part of any deed, lease, or other conveyance of all or any part of the Properties:

(a)   No Property shall be subject to any covenant, agreement, lease, deed, assignment, conveyance, or any other written instrument, which restricts the sale, lease, use or occupancy of the Property, or any part thereof, or any Improvement placed thereon, upon the basis of national origin, race, religion, sex or color.

(b)     The owner of each Property will comply with all Federal, State and local laws, in effect from time to time, prohibiting discrimination or segregation, and will not discriminate by reason of national origin, race, religion, sex or color in the sale, lease, use or occupancy of the Property.

(c)     The owner of each Property will comply with all applicable rules and orders issued by the Department of Housing and Urban Development which prohibit the use of lead based paint in residential structures undergoing Federally-assisted construction or rehabilitation and requiring the elimination of lead-based paint hazards.

4.2     Use Restrictions.  The following covenants shall be included in any deed, lease, or other conveyance of the Properties:

(a)     The Properties shall be developed in accordance with this Agreement.

(b)     The Properties shall be used only for the uses as allowed in the applicable Zoning and Urban Renewal Ordinances.

(c)     No building or permanent structure or parking area shall be constructed over a public utility easement without the prior consent of the Commissioner of the Department of Housing and Community Development and the Director of Public Works, which consent shall not be unreasonably withheld.

(d)     All land not covered by structures, paved parking, loading or related service areas, paved areas for pedestrian circulation, or decorative surface treatment must include the planting of any, all or a combination of the following:  trees, shrubs, ground cover, grass, or flowers.     The kind of landscape treatment should be determined by the nature of the Improvements and the impact of the Improvements on the surrounding area, and should serve to improve the appearance of the site, to soften and relieve the effects of structure and pavement and provide a visual harmony.  All landscaping shall be maintained in good condition.

(e)     Off-street parking shall be provided to meet the requirements established in the Zoning Ordinance of Baltimore City or in such lesser amount as may be authorized by the PUD and/or the Board of Municipal and Zoning Appeals as a special exception.

(f)     Unless otherwise limited by the provisions of the Renewal Plan, all signs shall comply with the standards set forth by the Baltimore City Zoning Ordinance and/or PUD. These standards regulate the size, type, placement, permanence and non-conformance of signs.

(g)     The owner of each Property, at its sole cost and expense, at all times, shall keep all buildings, structures, improvements, fixtures, equipment, machinery, and walkways and other paved areas constructed, installed, erected, or located on the Property, in good and safe order and condition and in full and complete repair, both inside and outside, structurally and otherwise, including the necessary and proper painting.  All parking spaces, walkways, trees and shrubs, landscaped and other open and paved areas constructed, erected or installed on each Property shall be kept by the owner thereof in a neat, clean, orderly and sanitary condition including the removal of refuse, rubbish, snow and ice.

4.3     Additional Restrictions.   In addition to the restrictive covenants set forth in Sections 4.1 and 4.2 above, the Properties shall be subjected to such reasonable and customary ownership covenants for a residential, commercial and/or mixed-use development as the Developer deems necessary, including by way of example and not limitation, restrictions upon exterior alterations.

4.4     Covenant Time Limitations.   It is intended and agreed, and each Deed shall so expressly provide, that the covenants provided in Section 4.1 shall run with and bind the land forever; and the covenants provided in Sections 4.2 shall remain in effect for forty (40) years from the date of such deed or until the expiration of the Renewal Plan as it may be extended and amended, whichever is later.

**END OF ARTICLE IV**

**ARTICLE V**

**ASSIGNMENT PROVISIONS**

5.1     General.   The Developer acknowledges and agrees that its acquisition of all or a portion of the Properties, and its other undertakings pursuant to this Agreement are, and will be used, for the purpose of the development of the Project.  The Developer further recognizes that, in view of:  (a) the Developer's commitment to the redevelopment of an area that has suffered from neglect, and (b) the Project's goal of providing the Poppleton community with first-class residential and commercial benefits, opportunities and facilities, the City agreed to enter into this Agreement with the Developer.   The City acknowledges and expects that the Developer will acquire title to certain Properties in companies which are affiliates or subsidiaries of the Developer (each a "**Designee**"), conduct some of its activities under this Agreement through agreements with one or more Builders (hereinafter defined), and/or convey certain of the Properties to Builders who will construct the Improvements on the Properties conveyed to them, and that all such situations or agreements do not constitute a prohibited transfer on the part of the Developer.  The City acknowledges and agrees that the Developer expects to earn a profit from the Project and such agreements.

5.2     Permitted Transfers.   Notwithstanding any provisions of this Agreement to the contrary, the Developer shall be entitled to do any and all of the following without the prior consent of the City or Department and to retain any profit earned in connection with the same:

(a)     convey any or all of the Properties by way of security for and only for the purpose of obtaining financing necessary to enable the Developer or its successors in interest to perform their obligations with respect to constructing, owning, holding or operating the Improvements under this Agreement;

(b)     sell, assign, convey or ground lease combinations of the Properties (each a "**Development Parcel**") to one or more homebuilders or commercial builders (each a "**Builder**") to construct the Improvements upon the Development Parcel sold, assigned, conveyed or leased to such Builder; provided the Developer shall notify the City of such sale, assignment, conveyance or ground lease and the name of the Builder and each such Builder shall assume the

Developer's obligations under this Agreement with respect to the Development Parcel conveyed to such Builder, and provided further that the Developer may not sell, assign, convey or ground lease (i) any of the Properties to Builders without the City's prior consent until the Developer has obtained approval of the PUD, and (ii) more than forty-nine percent (49%) of all of the Properties subject to this Agreement to Builders without the City's prior consent until construction of the Improvements within Phase I have been substantially completed;

(c)  sell, assign, convey and lease any Properties after the Improvements on such Properties have been completed and a Certificate of Completion has been issued;

(d)  lease portions of the Properties during construction of the Improvements on such Properties;

(e)  transfer or sell membership interests in the Developer or its Designees (i) among existing members and (ii) for estate planning purposes;

(f)  transfer or sell membership interests in the Developer or its Designees to persons or companies who are not members on the Effective Date of this Agreement, provided that the Developer shall not transfer or assign more than forty-nine percent (49%) in the aggregate of the membership interests to any such third parties until construction of the Improvements within Phase I have been substantially completed; and

(g)  take title to the Properties from the City in one or more Designees, which Designees will be subject to the terms of this Agreement.

5.3    Conditions to the Approval of Assignment or Transfer.  The City shall be entitled to require, but shall not be obligated to require, as a condition to the approval of any transfer or assignment which is not otherwise permitted under this Article V, that:

(a)  any proposed transferee shall have the qualifications and financial responsibility, in the reasonable opinion of the City, to fulfill the obligations undertaken in this Agreement by the Developer; and

(b)  any proposed transferee, by instrument in writing, shall, for itself, its successors and assigns and expressly for the benefit of the City and the Department have expressly assumed all the obligations of the Developer not previously performed under this Agreement related to the Properties to be transferred to such transferee, and shall have agreed to be subject to all of the conditions and restrictions to which the Developer is subject hereunder with respect to such Properties; and

(c)  the proposed transferee shall not then be in default (beyond applicable notice and cure periods) under this Agreement with respect to another Phase or subphase.

5.4    Representation as to OFAC List.  The Developer hereby certifies to the City that none of its principals are identified on the "OFAC List" of specially designated nationals and sanctioned persons that is maintained by the U.S. Treasury Department, Office of Foreign Assets Control.  The Developer agrees that it shall not sell, assign, convey or ground lease portions of

the Properties or transfer or sale membership interests in the Developer or its Designees to any persons identified on the OFAC List.

## END OF ARTICLE V

## ARTICLE VI

## MORTGAGE FINANCING AND RIGHTS OF MORTGAGEES

6.1     Encumbrances.  Prior to the completion of the Improvements as evidenced by the issuance of a final Certificate of Completion by the Department on any particular Property, only the following types of encumbrances shall be permitted on such Property:

(a)     Mortgages securing purchase money financing and refinancing; and

(b)     Mortgages securing construction and other development financing; and

(c)     Mortgages securing permanent financing (or refinancing) which replaces the financing contemplated in Subsections 6.1 (a) and (b) above; and

(d)     Such easements, covenants, or other encumbrances which are necessary for the development of the Property and do not conflict with or violate the terms of the Renewal Plan and this Agreement, including by way of example and not limitation, condominium documents.

The term "**Mortgages**" includes within it Deeds of Trust and other similar evidences of a lien.  The Developer shall forward written details of any financing, easements, covenants, or other encumbrances to the Department at least ten (10) Business Days after recordation of the same among the Land Records.  Any encumbrances which are not permitted by this Section shall be promptly removed by the Developer, including judgments and mechanics liens which must be discharged or bonded off within sixty (60) days.

6.2     Holders of Permitted Mortgages.  No holder of a Mortgage (each a "**Mortgagee**") authorized by this Agreement shall be obligated to construct or complete the Improvements or to guarantee such construction or completion except as provided in Section 6.3.   The term "**Mortgagee**", as used in this Agreement, shall be deemed to include any insurer or guarantor of any obligation or condition secured by such Mortgage or other encumbrance.

6.3     Rights and Duties of Mortgagee Upon Acquisition Prior to Completion.  If a Mortgagee, through the operation of its financing agreement or by assignment, foreclosure, or deed in lieu of foreclosure acquires fee simple title to the Properties or any part thereof prior to the completion of such Improvements, the Mortgagee shall have the following options:

(a)     Complete construction of such Improvements in accordance with the approved Construction Plans and in all respects comply with the provisions of this Agreement regarding such completion , or

(b)     Sell, assign, or transfer, with the prior written consent of the Department, which consent shall not be unreasonably withheld, fee simple title to the Properties or any part thereof to a purchaser, assignee or transferee who shall expressly assume all of the covenants, agreements and obligations of the Developer under this Agreement with respect to the Properties or part thereof, by written instrument satisfactory to the Department and recorded in the Land Records of Baltimore City, or

(c)     Reconvey fee simple title to the Properties or part thereof to the City, in which event the provisions of Section 7.7 relative to resale shall apply.

6.4     <u>Mortgagee Time Extensions</u>.  In the event that a Mortgagee elects to complete construction pursuant to Section 6.3(a) above, or sells, assigns or transfers pursuant to Section 6.3(b) above, the Department shall extend the time limits set forth in this Agreement as shall be reasonably necessary to complete construction of the Improvements, and upon such completion, the Mortgagee or purchaser, as the case may be, shall be entitled to the Certificate(s) of Completion or Certificate(s) of Partial Completion in accordance with Sections 3.14 and 3.15.

6.5     <u>Notice to Mortgagees</u>.  Whenever the Department shall deliver any notice or demand to the Developer with respect to any breach or default by the Developer in its obligations or covenants under this Agreement, the Department shall endeavor at the same time to forward a copy of such notice or demand to each Mortgagee at the last address of such Mortgagee at the last address of such Mortgagee either (i) as supplied by the Developer and as shown in the records of the Department or (ii) as shown in the Land Records.

**END OF ARTICLE VI**

**ARTICLE VII**

**DEFAULT; REMEDIES**

7.1     <u>Duty to Cure Default</u>.  In the event of any default in or breach of this Agreement, or any of its terms or conditions, at any time, by either party hereto or any successor to any party, such party or its successor shall, upon written notice from the other, proceed immediately to cure or remedy such default or breach and, in any event, within ten (10) days if the cure or remedy requires the payment of money, or otherwise within sixty (60) days after receipt of such notice (or such longer period of time as may be reasonably necessary if such default cannot be cured in sixty (60) days provided that the defaulting party is proceeding with due diligence to effect a cure).  In case such action is not expeditiously taken or diligently pursued or the default or breach shall not be cured or remedied within a reasonable time, the aggrieved party may institute such proceedings at law or in equity which it may deem proper, including but not limited to proceedings to obtain a writ of mandamus or compel specific performance by the party in default or breach of its obligations.  This Section 7.1 is subject to the provisions of Section 2.1.

7.2     <u>City Default</u>.  In the event that the City does not close on all of the Properties in each Phase or subphase in the manner and condition, and by the date or dates provided in Article I of this Agreement, for any reason other than the Developer's uncured default under this Agreement, and such default is not cured within one hundred twenty (120) days after written

demand, then the Developer shall have available to it any remedy under law, including the right to seek a writ of mandamus or, to the extent legally available, specific performance, and the Developer shall have the option, in addition to the remedies specified in Section 7.1, to terminate this Agreement with respect to one or more Phases of the Project, in which case the Developer shall be entitled to reimbursement for all of the Developer's cash expenditures for the Phases for which this Agreement is terminated, but not to exceed $100,000.00 for each such Phase except as otherwise provided herein, including but not limited to engineering and architectural fees, bond underwriting fees, mortgage commitment fees, insurance premiums, subsoil investigations and permits, costs of reimbursement for personnel of the Developer, and attorney's fees, all to the extent as such costs are established by written statements certified by an officer of the Developer and provided to the Department in writing within sixty (60) days after the cancellation of this Agreement with respect to such Phase(s) pursuant to this Section 7.2. Notwithstanding but in addition to the foregoing, if the City defaults and subsequently sells the Properties within the given Phase or subphase, the proceeds from the sale on a per Property basis will be disbursed as follows: (1) first, to the City to reimburse the City for its site assemblage costs (acquisition, relocation, and demolition if completed), and (2) second, the remainder of the proceeds to the Developer to reimburse the Developer for third party costs as documented through the Project's cost certification procedure performed by a third party accountant. The arrangement set forth in the preceding sentence shall expire ten (10) years after the date of the City's default. After termination and except as otherwise provided herein, neither the Department nor the Developer shall have any further rights against or liability to the other under this Agreement with respect to such Phase(s). The provisions of this Section 7.2 do not preclude the Developer from exercising any of its rights set forth in Article I. This Section 7.2 is subject to the provisions of Section 2.1.

7.3     City - A Municipal Corporation. The City is a municipal corporation and can exercise only those powers granted it by law, and in the event the City is prevented, restricted, or delayed in any of the duties and obligations imposed upon it or assumed by it under the terms and provisions of this Agreement as a result of any legal proceedings, unless instituted by the City (excluding a condemnation contemplated by this Agreement), or instituted as a result of the City's failure to comply with any federal, state, or local law, ordinance, or regulation, the City shall not be liable for any costs, damages, injuries, or liabilities caused to or suffered or incurred by the Developer, its successors or assigns in connection with, or as a result of, any such legal proceedings or any such prevention, restriction or delay. Subject to the time provisions of Section 7.1, the Developer shall have the right to terminate this Agreement with respect to any Phase or subphase if the City is prevented, restricted or delayed in any of the City's duties and obligations imposed on it or assumed by it under this Agreement with respect to such Phase or subphase.

7.4     Failure of Developer to Cure Specific Default Prior to Conveyance. In the event that at Closing on each Phase or subphase of the Project, the Developer does not pay the Purchase Price, advance the Reimbursement Amount, and take title to the Properties within such Phase or subphase at Closing and upon the conditions specified in this Agreement, and provided that in all cases the City is not in default under this Agreement, and any such default by the Developer is not cured within sixty (60) days after written demand by the Department, then the City, in addition to the remedies specified in Section 7.1 of this Article, shall have the right to terminate this Agreement with respect to such Phase or subphase only, in which event neither the Developer, its assignee or transferee, nor the City and the Department shall have any further

rights against or liability to the other under this Agreement with respect to such Phase or subphase of the Project.  For purposes of this Section 7.4 and notwithstanding the provisions of Section 7.12, if the defaulting party is the Poppleton Development I, LLC, then the City may terminate this Agreement with respect to any Phase or subphase the rights to which has not been assigned or conveyed to any other party.

7.5    Default by Developer Subsequent to Conveyance and Prior to Completion.  In the event that subsequent to the conveyance of a Phase or subphase of the Project to the Developer and prior to substantial completion of the Improvements within such Phase or subphase:

(a)    The Developer, or its successor in interest, shall default in or materially violate its obligations with respect to the construction of the Improvements within such Phase or subphase, including the nature thereof and the dates for beginning and completion thereof (unless extended by the Department or in accordance with this Agreement), or shall abandon or substantially suspend construction for more than twelve (12) months (unless suspension of construction is caused by a City default or an Event of Force Majeure) and any such default, violation, abandonment, or suspension shall not be cured or remedied within the cure periods provided in Section 7.1; or

(b)    The Developer, or its successor in interest, shall fail to pay real estate taxes or assessments on the Properties within such Phase or subphase when due without penalty, or shall place on the Properties within such Phase or subphase any encumbrance or lien unauthorized by this Agreement, or shall suffer any levy or attachment to be made or any materialman's or mechanic's lien or any other unauthorized encumbrance or lien to attach and such taxes or assessments shall not have been paid, or the encumbrance or lien shall not have been waived or discharged or provision satisfactory to the Department made for such payments, waiver or discharge, within sixty (60) days after written demand by the Department to do so; or

(c)    There is, in violation of this Agreement, any transfer of the Properties which is not permitted by the terms of this Agreement or approved by the Department if such approval is required by this Agreement and such violation is not cured within sixty (60) days after written demand by the Department to the Developer;

and provided that in all cases the City is not in default under this Agreement, then the City, in addition to the remedies specified in Section 7.1 of this Article, shall have the right, at its option, to re-enter and take possession of the Properties within such Phase or subphase only and upon which the Improvements have not been substantially completed and to terminate, and revest in the City, the estate to the Properties within such Phase or subphase upon which the Improvements have not been substantially completed.  It being the intent hereof that the conveyance pursuant to this Agreement of the Properties in any one Phase or subphase to the Developer shall be made upon a condition subsequent to the effect that, in the event of any default, failure, violation or other action or inaction by the Developer or its successors and assigns specified in clauses (a), (b), and (c) of this Section 7.5 with respect to such Phase or subphase and failure on the part of the Developer or its successors and assigns to remedy, end or abrogate such default, failure, violation, or other action or inaction within the period and in the manner stated in said clauses, the City, at its option, may declare a termination in its favor of the title and all of the rights and interest in the Properties within such Phase or subphase (provided

that the Improvements have not been substantially completed within such Phase or subphase), and that such title and all rights and interest of the Developer, and any of its assigns or successors in interest in such Properties in such Phase or subphase, shall revert to the City; provided, that such condition subsequent and any revesting of title as a result thereof in the City shall always be subject and subordinate to any leases for such Phase or subphase and further subject to and limited by, and shall not defeat, render invalid, or limit in any way the lien of any Mortgage authorized by the terms of this Agreement and executed for the sole purpose of obtaining funds for the acquisition or development of the Properties or any rights under any other document further securing or protecting the legal rights of any Mortgagee authorized in accordance with this Agreement, or any rights or interest provided in this Agreement for the protection of such Mortgagees.

Provided, however, in the event of the revesting of title hereunder, the City shall pay to the appropriate parties the amount set forth in Section 7.7(c) upon the sale of such Properties in such Phase or subphase.

7.6    City's Right to Institute Proceedings.   The City shall have the right to institute such actions or proceedings as it may deem desirable for effectuating the purposes of this Article, including without limitation the right to execute and record among the Land Records a written declaration of the termination of all rights and title of the Developer, its successors and assigns, in the specific Properties for which the City has exercised its right of termination in accordance with this Article and the revesting of title thereto in the City, subject to leases and authorized Mortgage liens as provided for in Section 6.1; provided, however, that any delay by the City in instituting or prosecuting any such actions or proceedings or otherwise asserting its rights under this Article shall not operate as a waiver of its rights, or deprive it of any such rights in any way, it being the intention hereof that the City should not be constrained so as to avoid the risk of being deprived of the exercise of any remedy provided in this Article because of concepts of waiver, laches or otherwise to exercise such remedy at a time when it may still hope otherwise to resolve the problems created by the default involved, nor shall any waiver in fact made by the City or the Department with respect to any specific default by the Developer under this Section be considered or treated as a waiver of the rights of the City and the Department with respect to the particular default except to the extent specifically waived.

7.7    Resale by the City.   In the event that title to any of the Properties shall revert to the City in accordance with Sections 6.3(c) or 7.5, the City shall, pursuant to its responsibilities under the laws of the State of Maryland and the ordinances of the City relating to urban redevelopment and renewal, use all reasonable efforts to resell such Properties and unfinished Improvements or such part thereof as soon and in such manner as the Department shall find feasible and consistent with the objectives of such laws and ordinances and of the Renewal Plan, as hereafter may be amended from time to time; provided, that the City shall sell the Properties in a commercially reasonable manner, and use all reasonable efforts to obtain the highest price that is compatible with the objectives and restrictions applicable to the Properties in the Renewal Plan, from a qualified and responsible party or parties, whose qualifications shall be determined by the Department in its sole discretion, and who will assume the obligation of making or completing the Improvements, or such other improvements in their stead as shall be satisfactory to the Department and in accordance with the Renewal Plan, as hereafter may be amended from

time to time, and this Agreement.  Upon such resale of such Properties, the proceeds thereof shall be applied as follows:

(a)     First, to reimburse any Mortgagee authorized by this Agreement or otherwise approved by the City in an amount equal to (i) the Mortgage debt and the interest accrued at the time of revesting title to the subject Properties to the City; (ii) the net expenses, if any, exclusive of general overhead and less any rentals or other revenue received while in possession of such Properties, incurred by the Mortgagee as a direct result of foreclosure proceedings or proceedings in lieu of foreclosure and subsequent management of such Properties; and (iii) expenditures made with respect to construction or completion of the Improvements and/or ensuring that any partially completed Improvements have been rendered safe and closed to public access;

(b)     Second, to reimburse the City on its own behalf and on behalf of the Department for (i) any payments made or necessary to be made to discharge any encumbrances or liens existing on the subject Properties, or any part thereof, at the time of revesting of title thereto in the City or to discharge or prevent from attaching or being made any subsequent encumbrances or liens on such Properties due to obligations, defaults or acts of the Developer, its successors or transferees, (ii) any expenditures made or obligations incurred with respect to ensuring that any partially completed Improvements on such Properties have been rendered safe and closed to public access or any amounts otherwise owing to the City or the Department by the Developer, its successors or transferees, with respect to such Properties and in accordance with this Agreement, (iii) all reasonable costs and expenses incurred by either the City or the Department in connection with the recapture, management and resale of the subject Properties or any part thereof (but less any income derived by the City from such Properties, or any part thereof, in connection with such management), including, but not limited to, salaries of personnel and all taxes, assessments, and other charges with respect to such Properties, or any part thereof, and (iv) a sum equal to ten percent (10%) of the Reimbursement Amount applicable to such Properties (determined on a pro rata basis in accordance with Schedule B) vested in the City as liquidated damages for said default; and

(c)     Third, to reimburse the Developer, its successors or transferees, up to the amount equal to (i) all reasonable costs and expenses incurred by the Developer or its Designees, exclusive of the Mortgage or other loan proceeds represented by an encumbrance or lien on the Properties (to the extent repaid in full under Section 7.7(a)), in purchasing the Properties, preparing for the development of the Project (e.g. engineering, architectural and other fees), and/or making any of the Improvements on such Properties; and

(d)     Fourth, any balance remaining after such reimbursements shall be retained by the City.

7.8     Mortgagee Notice and Right to Cure.  Prior to the City pursuing its remedies under Sections 7.6 and 7.7, all Mortgagees shall be given notice and a reasonable opportunity to (a) cure any default, or (b) acquire title to the subject Properties and exercise the Mortgagee's rights under Section 6.3 above.

7.9   Force Majeure.  For the purpose of any of the provisions of this Agreement, neither the City (including the Department) nor the Developer, as the case may be, nor any successor in interest, shall be considered in breach of or default in its obligations, including, but not limited to, the preparation of the Properties for development, or the beginning and completion of construction of the Improvements, or progress with respect thereto, if the delay in the performance of such obligations is due to causes beyond its control or without its fault or negligence, including but not restricted to acts of God or of the public enemy, acts of government, acts of terrorism, riots, insurrection, civil commotion, sabotage, malicious mischief, vandalism, acts of the other party, fires, storms, floods, explosions, epidemics, quarantine restrictions, strikes, lockouts, actions of labor unions, boycotts, freight embargoes, shortages of labor, equipment, materials or supplies, material economic downturn, unusually severe weather, delays of contractors, subcontractors or suppliers, and inability to obtain governmental permits or approvals (notwithstanding good faith and diligent efforts) (each an **"Event of Force Majeure"**); it being the purpose and intent of this Section that in the event of the occurrence of any such delays, the time or times for the performance of the obligations of the parties hereto shall be extended for the period of the delay (including any time reasonably required to recommence performance due to such delay); provided, however, that the party seeking the benefit of the provisions of this Section shall, within thirty (30) days after said party has knowledge of the beginning of any such delay, have first notified the other party thereof in writing of the cause or causes thereof, which entitles such party to an extension of time.  The affected party shall use commercially reasonable efforts to remedy with all reasonable dispatch the cause or causes preventing it from carrying out this Agreement; and provided further, that the settlement of strikes, lock outs and other industrial disturbances shall be entirely within the discretion of the affected party, and the affected party shall not be required to make settlement of strikes, lock outs and other industrial disturbances by acceding to the demands of the opposing party or parties when such course is, in the judgment of the affected party, unfavorable to the affected party.  Any failure to provide notice within the timeframe provided above shall not deny the benefit of this provision to the party seeking its protection; however the delay in delivery of such notice beyond such timeframe shall be deemed to reduce the period for performance of any provisions delayed by the Event of Force Majeure.

7.10   Rights and Remedies - Cumulative.  The rights and remedies of the parties to this Agreement, whether provided by law or by this Agreement, shall be cumulative, and the exercise by either party of any one or more of such remedies shall not preclude the exercise by it, at the same or different times, of any other such remedies for the same default or breach or of any of its remedies for any other default or breach by the other party.  Any waiver by either party with respect to performance, or the manner or time thereof, shall be limited to the specific event unless otherwise stated in writing.

7.11   Liability Terminated.  Except as specifically provided herein, neither the Developer, its Designees, assignees or transferees, nor the City and the Department shall have any further rights against, or liability to, each other under this Agreement, following termination of this Agreement.

7.12   Separation of Phases.  Notwithstanding any provision of this Agreement to the contrary, the City and the Department acknowledge that, in light of the proposed development of the Project in Phases or subphases, (i) any default by the Developer shall not affect any Phase or

subphase as to which a Certificate of Completion has been issued, (ii) any default by the Developer under this Agreement shall not affect the rights hereunder of any successor, assignee or other transferee from the Developer with respect to the Phase(s) or subphase(s) held by such successor, assignee or other transferee and this Agreement shall be applied to such Phase(s) or subphase(s) as though an independent agreement had been entered into with respect to each such Phase or subphase, and (iii) any default by any successor, assignee or other transferee from the Developer with respect to the Phase(s) or subphase(s) held by such successor, assignee or other transferee shall not affect the rights of the Developer under this Agreement and this Agreement shall be applied to such Phase(s) or subphase(s) as though an independent agreement had been entered into with respect to each such Phase or subphase.

**END OF ARTICLE VII**

**ARTICLE VIII**

**REPRESENTATIONS**

8.1    <u>Representations by the City.</u>    The City makes the following affirmative representations as of the Effective Date of this Agreement, each of which shall be deemed remade as of each Closing Date:

(a)    the City is a political subdivision of the State of Maryland and a body politic and corporate, duly organized and validly existing under the Constitution and laws of the State of Maryland, with full legal right, power, and authority to enter into and perform its obligations under this Agreement;

(b)    the City has duly authorized the execution and delivery of this Agreement, and this Agreement has been duly executed and delivery by the City and constitutes legal, valid, and binding obligations of the City, enforceable in accordance with their terms, but subject to applicable bankruptcy laws, insolvency, reorganization, moratorium or similar laws affecting creditors' rights, or, to the extent that certain remedies require enforcement by a court of equity, such principles of equity as the court having jurisdiction may apply;

(c)    to the best of its knowledge, the execution, delivery, and performance by the City of this Agreement will not violate any provision of Applicable Law, rule, or regulation pertaining to the City's ability to enter into this Agreement, or any judgment, order, or decree binding upon the City, the violation of which might have a materially adverse effect upon the City; and

(d)    there are no actions, suits, or proceedings pending against the City or threatened against the City, before or by any court, governmental body or agency, or other tribunal or authority that would, if adversely determined, have a materially adverse effect on the authority or ability of the City to perform its obligations under this Agreement, or which question the legality, validity, or enforceability hereof.

8.2     Representations by Developer.     Developer makes the following affirmative representations as of the Effective Date of this Agreement, each of which shall be deemed remade as of each Closing Date:

(a)     the Developer (i) is a limited liability company which is (A) duly organized under the laws of the State of Maryland and is authorized and in good standing to engage in business in the State of Maryland, (ii) has the full legal capacity to perform its obligations described herein and has all necessary right and lawful authority to enter into this Agreement for the full term hereof, and (iii) has been duly authorized by all proper and necessary company action as may be required, to execute and deliver this Agreement;

(b)     this Agreement, when executed and delivered on behalf of the Developer, will constitute the legal, valid, and binding obligation of the Developer enforceable in accordance with its terms, except as the same may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting creditors' rights, or, to the extent that certain remedies hereunder require or may require enforcement by a court of equity such principles of equity as the court having jurisdiction may apply;

(c)     to the best of its knowledge, the execution, delivery, and performance by the Developer of this Agreement will not violate any provision of Applicable Law, rule, or regulation pertaining to Developer's ability to enter into this Agreement, or any judgment, order, or decree binding upon it, the violation of which might have a materially adverse effect upon the Developer, the construction of the Improvements, or the Project;

(d)     there are no actions, suits, or proceeding pending against the Developer or, to the knowledge of the Developer, threatened against the Developer before or by any court, governmental body or agency, or other tribunal or authority which would, if adversely determined, have a materially adverse effect on the authority or ability of the Developer to perform its obligations under this Agreement, or which question the legality, validity, or enforceability hereof or thereof;

(e)     neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby nor the fulfillment of or compliance with the terms and conditions of this Agreement, conflicts with or will result in a breach of any of the terms, conditions, or provisions of any restriction or any agreement or instrument to which the Developer is now a party or by which it is bound, or constitutes a default under the terms of any of the foregoing; and

(f)     the Developer is not a "foreign person" as such term is defined in Section 897 of the Internal Revenue Code of 1986, as amended.

**END OF ARTICLE VIII**

## ARTICLE IX

## MISCELLANEOUS PROVISIONS

9.1     No Partnership or Joint Venture.   It is mutually understood and agreed that nothing contained in this Agreement is intended or shall be construed in any manner or under any circumstances whatsoever as creating or establishing the relationship of co-partners, or creating or establishing the relationship of a joint venture, between the City and the Developer or as constituting the Developer as the agent or representative of the City for any purpose or in any manner whatsoever, it being understood that the Developer is an independent contractor hereunder.

9.2     Recording, Documentary Stamps.   This Agreement or a memorandum of this Agreement, and any modification thereof, may be recorded among the Land Records, at the expense of the Developer.

9.3     Executed in Maryland.   This Agreement shall be taken and deemed to have been fully made and executed by the parties hereto as an instrument under seal in the State of Maryland for all purposes and intent.

9.4     Conflicts of Interest; Department Representatives Not Individually Liable.   No member, official, representative, or employee of the City or the Department shall have any personal interest, direct or indirect, in this Agreement, nor shall any such member, official, representative, or employee participate in any decision relating to this Agreement which affects his personal interest or the interests of any corporation, partnership, or association in which he is, directly or indirectly, interested.   No member, official, representative, or employee of the City or the Department shall be personally liable to the Developer or any successor in interest in the event of any default or breach by the City or the Department or for any amount which may become due to the Developer or successor or on any obligations under the terms of the Agreement.

9.5     Notice.   Unless otherwise specified in this Agreement, a notice, communication or request under this Agreement by either the City or the Department to the Developer, or by the Developer to the City or the Department shall be sufficiently given or delivered if sent by either (a) certified mail, postage prepaid, return receipt requested, (b) overnight delivery service, or (c) hand delivery (if receipt is evidenced by a signature of the addressee or authorized agent), and addressed:

(a)     Developer.   In the case of notice or communication to the Developer, as follows:

Poppleton Development I, LLC
La Cite Development
520 Franklin Avenue
Garden City, New York 11530
Attn:  Mr. Daniel Bythewood, President

with a copy to:
Gordon, Feinblatt, Rothman,
Hoffberger & Hollander, LLC
The Garrett Building
233 East Redwood Street
Baltimore, Maryland  21202-3332
Attn:  C. Edward Hitchcock, Esq.

and to:
Ballard Spahr Andrews & Ingersoll, LLP
300 East Lombard Street, 18th Floor
Baltimore, Maryland 21202-3268
Attn:  Raymond G. Truitt, Esq.

      (b)    Department.  In the case of a notice or communication to the City or the Department, as follows:

Department of Housing and Community Development
417 East Fayette Street
Baltimore, Maryland  21202
Attn:  Commissioner

with a copy to:

Department of Housing and Community Development
417 East Fayette Street, Suite 301
Baltimore, Maryland  21202
Attn:  Alastair Smith

or if such notice is addressed in such other way in respect to any of the foregoing parties as that party may, from time to time, designate in writing, dispatched as provided in this Section. Notice sent by mail shall be deemed given three (3) days after being deposited with the U.S. Mail, notice sent by overnight delivery shall be deemed given one (1) Business Day after being deposited with the overnight carrier, and notice sent by hand delivery shall be deemed given when delivered.  .

The submission of plans and other design related or construction related communications in accordance with Article III may be delivered directly and only to the Department, as the Developer may be instructed from time to time.

    9.6    Interpretation.  In the event of any question regarding the meaning of any of the restrictive covenants, agreements, or provisions contained in this Agreement or the Renewal Plan, the interpretation placed thereon by the Department shall be final and binding on the parties hereto; provided, that any such interpretation shall not be unreasonable or arbitrary.

    9.7    City Disclaimer.  While it is the present intention of the City to carry out the Renewal Plan as soon as practicable, nothing contained in this Agreement shall be construed as a

estoppel certificate, it being intended that any such statement delivered hereunder may be relied upon by the party or the Mortgagee requesting such statement. The Mayor and the Commissioner, or the designee of either of them, are each hereby authorized to execute, acknowledge and deliver such certificates on behalf of the City.

9.16   Payment or Performance on Saturday, Sunday or Holiday.   Whenever the provisions of this Agreement call for any payment or the performance of any act on or by a date that is not a Business Day, including the expiration date of any cure periods provided herein, then such payment or such performance shall be required on or by the immediately succeeding Business Day. For the purposes of this Agreement, the term "**Business Day**" shall mean a day other than a Saturday, Sunday or legal holiday in the State of Maryland or in Baltimore City.

9.17   Entire Understanding.   This Agreement expresses the entire understanding between the City, the Department and the Developer with respect to the matters set forth herein and supersedes any and all prior agreements by and between the City, the Department and the Developer. Neither party shall be bound by any terms, covenants or agreements not herein contained.

9.18   Successors and Assigns.   This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, this Agreement is binding on, and shall inure to the benefit of, such successors and assigns (including any Designees) only to the extent such benefits, obligations and burdens relate to the portions of the Project Area in which such successors and assigns shall have either acquired title, or have contractual rights to acquire, such title.

9.19   Reasonableness.   Wherever in this Agreement a party's consent is required, that consent will not be unreasonably withheld, conditioned or delayed.

9.20   Incorporation into Agreement.   All exhibits, schedules, and recitals form a part of this Agreement. In particular, the following Schedules are attached to and made a part of this Agreement:

| | |
|---|---|
| Schedule A | Property Description |
| Schedule B | Purchase Price, Reimbursement Amount and Affordable Housing Credits |
| Schedule C | Form of Commitment to Comply with the Minority and Women's Business Enterprise Program |
| Schedule D | Project Description |
| Schedule E | Form of Memorandum of Understanding |
| Schedule F | Phasing Plan |

**END OF ARTICLE IX**

## ARTICLE X

## PROJECT DESCRIPTION

10.1    <u>The Project</u>.  A description of the work to be done by the Developer, the financing therefor, the method of conveyance by the City and all other relevant details of the Project are further described on <u>Schedule D</u>.

## END OF ARTICLE X

## [THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]

IN WITNESS WHEREOF, the City has caused this Agreement to be duly executed in its name and behalf by the Commissioner of the Department of Housing and Community Development, and its seal to be hereunto duly affixed and attested by its Custodian of the City Seal, and the Developer has caused this Agreement to be duly executed and attested by its Members, on the day and year first above written.

ATTEST:                                MAYOR AND CITY COUNCIL OF BALTIMORE

_____                By: _____ (SEAL)
                                           Paul T. Graziano, Commissioner
                                           Department of Housing and Community
                                           Development

ATTEST:                                POPPLETON DEVELOPMENT I, LLC

                                       By: La Cite, LLC, Member

_____                By: _____ (SEAL)
                                           Daniel Bythewood, President

                                       By: BIH Holdings, LLC, Member

                                       By: _____ (SEAL)
                                           Patrick Smith, Manager

Cynthia K Kerr
9/1/06
Term Expires 1/13/2010

APPROVED AS TO FORM AND LEGAL SUFFICIENCY:

_____                9/5/06
Chief Solicitor                        Date

THIS IS TO CERTIFY, that the Commissioner of the Department of Housing and Community Development has approved all the terms and conditions contained in the foregoing Agreement between POPPLETON DEVELOPMENT I, LLC, and the MAYOR AND CITY COUNCIL OF BALTIMORE and recommends that the foregoing Agreement be approved by the Board of Estimates.

DEPARTMENT OF HOUSING AND
COMMUNITY DEVELOPMENT

By:_____

Paul T. Graziano, Commissioner

The Board of Estimates this _____ day of _____, 2006, acting upon the approval and recommendation of the Commissioner of the Department of Housing and Community Development hereby approves the foregoing Agreement between POPPLETON DEVELOPMENT I, LLC, and the MAYOR AND CITY COUNCIL OF BALTIMORE.

BOARD OF ESTIMATES        SEP 2 7 2006

_____
Clerk

STATE OF MARYLAND, COUNTY OF BALTIMORE, to wit:

I HEREBY CERTIFY that, on the 2nd day of September, 2006, before the subscriber, a Notary Public of the State of Maryland, personally appeared Daniel Bythewood, the President of LaCite, LLC, a Member of Poppleton Development I, LLC, and that he, being authorized to do so, acknowledged the foregoing Agreement to be the act and deed of said company.

AS WITNESS my hand and Notarial Seal.

_____
Notary Public

My Commission expires: June 1, 2007

STATE OF MARYLAND, COUNTY OF BALTIMORE, to wit:

I HEREBY CERTIFY that, on the 2nd day of September, 2006, before the subscriber, a Notary Public of the State of Maryland, personally appeared Patrick Smith, the Manager of BIH Holdings, LLC, a Member of Poppleton Development I, LLC, and that he, being authorized to do so, acknowledged the foregoing Agreement to be the act and deed of said company.

AS WITNESS my hand and Notarial Seal.

Danita Myles-Henderson
Notary Public

My Commission expires: June 1, 2007


STATE OF MARYLAND, CITY OF BALTIMORE, to wit:

I HEREBY CERTIFY that, on this _____ day of _____, 2006, before the subscriber, a Notary Public of the State of Maryland, aforesaid, personally appeared Paul T. Graziano, Commissioner of the Department of Housing and Community Development, and he acknowledged the foregoing Agreement to be the corporate act and deed of the MAYOR AND CITY COUNCIL OF BALTIMORE.

AS WITNESS my hand and Notarial Seal.

_____
Notary Public

My Commission expires:

STATE OF MARYLAND, CITY OF BALTIMORE, to wit:

I HEREBY CERTIFY that, on this _12th_ day of _September_, 2006, before the subscriber, a Notary Public of the State of Maryland, aforesaid, personally appeared Paul T. Graziano, Commissioner of the Department of Housing and Community Development, and he acknowledged the foregoing Agreement to be the corporate act and deed of the MAYOR AND CITY COUNCIL OF BALTIMORE.

AS WITNESS my hand and Notarial Seal.

Notary Public

My Commission expires: 9/16/2007

## Attorney Certification

This Land Disposition and Development Agreement has been prepared under the supervision of the undersigned, an attorney admitted to practice before the Court of Appeals of Maryland.

_____
Danielle Stager Zoller, Esquire

**Schedule A**

Poppleton Development I, LLC

Poppleton Neighborhood

### PROPERTY DESCRIPTION

The legal description for each Property shall be prepared by the title company conducting Closing and the cost thereof shall be paid by the Developer. Upon the title company's completion of each legal description, a copy shall be provided to the City for review and approval.

The City shall use its best efforts and all legal authority to acquire all of the Properties listed under "Project Site" and "Scattered Site Rehabilitation" in this Schedule A of the Agreement and/or shown on the Phasing Plan attached as Schedule G. The City may remove Properties from the Project Area only in connection with the construction of public works. If the removal of any such Properties may cause a decrease in the total density of the Project, then the Department will offer its assistance to allow the Developer to compensate any lost density in one area by allowing for additional density in other areas within the Project Area. An example of this would be construction of the new Red Line of mass transit.

### PROJECT SITE

| PHASE | BLOCK LOT | ADDRESS | DEVELOPMENT OUTCOME |
|---|---|---|---|
| **PHASE 1 – BLOCK 0202** | | | |
| Phase 1 - Block 0202 | 0202 108 | 18 N Amity St | New Construction |
| Phase 1 - Block 0202 | 0202 107 | 20 N Amity St | New Construction |
| Phase 1 - Block 0202 | 0202 106 | 22 N Amity St | New Construction |
| Phase 1 - Block 0202 | 0202 105 | 24 N Amity St | New Construction |
| Phase 1 - Block 0202 | 0202 104 | 26 N Amity St | New Construction |
| Phase 1 - Block 0202 | 0202 103 | 28 N Amity St | New Construction |
| Phase 1 - Block 0202 | 0202 081 | 922 W Fairmount Ave | New Construction |
| Phase 1 - Block 0202 | 0202 080 | 924 W Fairmount Ave | New Construction |
| Phase 1 - Block 0202 | 0202 044 | 929 W Fayette St | New Construction |
| Phase 1 - Block 0202 | 0202 043 | 931 W Fayette St | New Construction |
| Phase 1 - Block 0202 | 0202 042 | 933 W Fayette St | New Construction |
| Phase 1 - Block 0202 | 0202 041 | 935 W Fayette St | New Construction |
| Phase 1 - Block 0202 | 0202 040 | 937 W Fayette St | New Construction |
| Phase 1 - Block 0202 | 0202 039 | 939 W Fayette St | New Construction |
| Phase 1 - Block 0202 | 0202 038 | 941 W Fayette St | New Construction |
| Phase 1 - Block 0202 | 0202 037 | 943 W Fayette St | New Construction |
| Phase 1 - Block 0202 | 0202 036 | 945 W Fayette St | New Construction |
| Phase 1 - Block 0202 | 0202 035 | 947 W Fayette St | New Construction |
| Phase 1 - Block 0202 | 0202 034 | 949 W Fayette St | New Construction |
| Phase 1 - Block 0202 | 0202 115 | 931 Page Ct | New Construction |

| PHASE | BLOCK LOT | ADDRESS | DEVELOPMENT OUTCOME |
|---|---|---|---|
| Phase 1 - Block 0202 | 0202 116 | 933 Page Ct | New Construction |
| Phase 1 - Block 0202 | 0202 117 | 935 Page Ct | New Construction |
| Phase 1 - Block 0202 | 0202 118 | 937 Page Ct | New Construction |
| Phase 1 - Block 0202 | 0202 029 | 13 N Schroeder St | New Construction |
| Phase 1 - Block 0202 | 0202 030 | 15 N Schroeder St | New Construction |
| Phase 1 - Block 0202 | 0202 031 | 17 N Schroeder St | New Construction |
| Phase 1 - Block 0202 | 0202 032 | 19 N Schroeder St | New Construction |
| Phase 1 - Block 0202 | 0202 033 | 21 N Schroeder St | New Construction |
| Phase 1 - Block 0202 | 0202 077 | No Address | New Construction |
| **PHASE 1 – BLOCK 0200** | | | |
| Phase 1 - Block 0200 | 0200 096 | 14 N Schroeder St | New Construction |
| Phase 1 - Block 0200 | 0200 097 | 24 N Schroeder St | New Construction |
| **PHASE 1 - BLOCK 0187** | | | |
| Phase 1 - Block 0187 | 0187 092 | 104 N Amity St | New Construction |
| Phase 1 - Block 0187 | 0187 093 | 106 N Amity St | New Construction |
| Phase 1 - Block 0187 | 0187 094 | 108 N Amity St | New Construction |
| Phase 1 - Block 0187 | 0187 095 | 110 N Amity St | New Construction |
| Phase 1 - Block 0187 | 0187 096 | 112 N Amity St | New Construction |
| Phase 1 - Block 0187 | 0187 098 | 116 N Amity St | New Construction |
| Phase 1 - Block 0187 | 0187 099 | 118 N Amity St | New Construction |
| Phase 1 - Block 0187 | 0187 100 | 120 N Amity St | New Construction |
| Phase 1 - Block 0187 | 0187 101 | 122 N Amity St | New Construction |
| Phase 1 - Block 0187 | 0187 102 | 124 N Amity St | New Construction |
| Phase 1 - Block 0187 | 0187 103 | 126 N Amity St | New Construction |
| Phase 1 - Block 0187 | 0187 090 | 127 N Amity St | New Construction |
| Phase 1 - Block 0187 | 0187 104 | 128 N Amity St | New Construction |
| Phase 1 - Block 0187 | 0187 091 | 129 N Amity St | New Construction |
| Phase 1 - Block 0187 | 0187 105 | 130 N Amity St | New Construction |
| Phase 1 - Block 0187 | 0187 064 | 926 W Fayette St | New Construction |
| Phase 1 - Block 0187 | 0187 063 | 928 W Fayette St | New Construction |
| Phase 1 - Block 0187 | 0187 062 | 930 W Fayette St | New Construction |
| Phase 1 - Block 0187 | 0187 061 | 932 W Fayette St | New Construction |
| Phase 1 - Block 0187 | 0187 060 | 934 W Fayette St | New Construction |
| Phase 1 - Block 0187 | 0187 059 | 936 W Fayette St | New Construction |
| Phase 1 - Block 0187 | 0187 058 | 938 W Fayette St | New Construction |
| Phase 1 - Block 0187 | 0187 057 | 940 W Fayette St | New Construction |
| Phase 1 - Block 0187 | 0187 056 | 942 W Fayette St | New Construction |
| Phase 1 - Block 0187 | 0187 055 | 944 W Fayette St | New Construction |
| Phase 1 - Block 0187 | 0187 054 | 946 W Fayette St | New Construction |
| Phase 1 - Block 0187 | 0187 106 | 938 Kierle Ct | New Construction |
| Phase 1 - Block 0187 | 0187 107 | 939 Kierle Ct | New Construction |
| Phase 1 - Block 0187 | 0187 015 | 901 W Lexington St | New Construction |
| Phase 1 - Block 0187 | 0187 016 | 903 W Lexington St | New Construction |
| Phase 1 - Block 0187 | 0187 017 | 905 W Lexington St | New Construction |
| Phase 1 - Block 0187 | 0187 018 | 907 W Lexington St | New Construction |

| PHASE | BLOCK LOT | ADDRESS | DEVELOPMENT OUTCOME |
|---|---|---|---|
| Phase 1 - Block 0187 | 0187 019 | 909 W Lexington St | New Construction |
| Phase 1 - Block 0187 | 0187 020 | 911 W Lexington St | New Construction |
| Phase 1 - Block 0187 | 0187 021 | 913 W Lexington St | New Construction |
| Phase 1 - Block 0187 | 0187 022 | 915 W Lexington St | New Construction |
| Phase 1 - Block 0187 | 0187 023 | 917 W Lexington St | New Construction |
| Phase 1 - Block 0187 | 0187 024 | 919 W Lexington St | New Construction |
| Phase 1 - Block 0187 | 0187 025 | 921 W Lexington St | New Construction |
| Phase 1 - Block 0187 | 0187 026 | 923 W Lexington St | New Construction |
| Phase 1 - Block 0187 | 0187 027 | 925 W Lexington St | New Construction |
| Phase 1 - Block 0187 | 0187 029 | 929 W Lexington St | New Construction |
| Phase 1 - Block 0187 | 0187 030 | 931 W Lexington St | New Construction |
| Phase 1 - Block 0187 | 0187 031 | 933 W Lexington St | New Construction |
| Phase 1 - Block 0187 | 0187 032 | 935 W Lexington St | New Construction |
| Phase 1 - Block 0187 | 0187 033 | 937 W Lexington St | New Construction |
| Phase 1 - Block 0187 | 0187 034 | 939 W Lexington St | New Construction |
| Phase 1 - Block 0187 | 0187 035 | 941 W Lexington St | New Construction |
| Phase 1 - Block 0187 | 0187 036 | 943 W Lexington St | New Construction |
| Phase 1 - Block 0187 | 0187 037 | 945 W Lexington St | New Construction |
| Phase 1 - Block 0187 | 0187 038 | 947 W Lexington St | New Construction |
| Phase 1 - Block 0187 | 0187 039 | 949 W Lexington St | New Construction |
| Phase 1 - Block 0187 | 0187 053a | 101 N Schroeder St | New Construction |
| Phase 1 - Block 0187 | 0187 053 | 103 N Schroeder St | New Construction |
| Phase 1 - Block 0187 | 0187 052 | 105 N Schroeder St | New Construction |
| Phase 1 - Block 0187 | 0187 051 | 107 N Schroeder St | New Construction |
| Phase 1 - Block 0187 | 0187 050 | 109 N Schroeder St | New Construction |
| Phase 1 - Block 0187 | 0187 049 | 111 N Schroeder St | New Construction |
| Phase 1 - Block 0187 | 0187 048 | 113 N Schroeder St | New Construction |
| Phase 1 - Block 0187 | 0187 047 | 115 N Schroeder St | New Construction |
| Phase 1 - Block 0187 | 0187 046 | 117 N Schroeder St | New Construction |
| Phase 1 - Block 0187 | 0187 045 | 119 N Schroeder St | New Construction |
| Phase 1 - Block 0187 | 0187 044 | 121 N Schroeder St | New Construction |
| Phase 1 - Block 0187 | 0187 043 | 123 N Schroeder St | New Construction |
| Phase 1 - Block 0187 | 0187 042 | 125 N Schroeder St | New Construction |
| Phase 1 - Block 0187 | 0187 041 | 127 N Schroeder St | New Construction |
| Phase 1 - Block 0187 | 0187 040 | 129 N Schroeder St | New Construction |
| Phase 1 - Block 0187 | 0187 121 | 913 Vine St | New Construction |
| Phase 1 - Block 0187 | 0187 119 | 920 Vine St | New Construction |
| Phase 1 - Block 0187 | 0187 120 | 921 Vine St | New Construction |
| **PHASE 1 - BLOCK 0172** | | | |
| Phase 1 - Block 0172 | 0172 141 | 202 N Amity St | New Construction |
| Phase 1 - Block 0172 | 0172 140 | 204 N Amity St | New Construction |
| Phase 1 - Block 0172 | 0172 139 | 206 N Amity St | New Construction |
| Phase 1 - Block 0172 | 0172 138 | 208 N Amity St | New Construction |
| Phase 1 - Block 0172 | 0172 137 | 210 N Amity St | New Construction |
| Phase 1 - Block 0172 | 0172 136 | 212 N Amity St | New Construction |
| Phase 1 - Block 0172 | 0172 135 | 214 N Amity St | New Construction |

| PHASE | BLOCK LOT | ADDRESS | DEVELOPMENT OUTCOME |
|---|---|---|---|
| Phase 1 - Block 0172 | 0172 134 | 216 N Amity St | New Construction |
| Phase 1 - Block 0172 | 0172 133 | 218 N Amity St | New Construction |
| Phase 1 - Block 0172 | 0172 132 | 220 N Amity St | New Construction |
| Phase 1 - Block 0172 | 0172 131 | 222 N Amity St | New Construction |
| Phase 1 - Block 0172 | 0172 130 | 224 N Amity St | New Construction |
| Phase 1 - Block 0172 | 0172 129 | 226 N Amity St | New Construction |
| Phase 1 - Block 0172 | 0172 128 | 228 N Amity St | New Construction |
| Phase 1 - Block 0172 | 0172 127 | 230 N Amity St | New Construction |
| Phase 1 - Block 0172 | 0172 126 | 232 N Amity St | New Construction |
| Phase 1 - Block 0172 | 0172 125 | 234 N Amity St | New Construction |
| Phase 1 - Block 0172 | 0172 124 | 236 N Amity St | New Construction |
| Phase 1 - Block 0172 | 0172 123 | 238 N Amity St | New Construction |
| Phase 1 - Block 0172 | 0172 122 | 240 N Amity St | New Construction |
| Phase 1 - Block 0172 | 0172 121 | 242 N Amity St | New Construction |
| Phase 1 - Block 0172 | 0172 120 | 244 N Amity St | New Construction |
| Phase 1 - Block 0172 | 0172 119 | 246 N Amity St | New Construction |
| Phase 1 - Block 0172 | 0172 001 | 928 W Lexington St | New Construction |
| Phase 1 - Block 0172 | 0172 016 | 930 W Lexington St | New Construction |
| Phase 1 - Block 0172 | 0172 017 | 932 W Lexington St | New Construction |
| Phase 1 - Block 0172 | 0172 018 | 934 W Lexington St | New Construction |
| Phase 1 - Block 0172 | 0172 019 | 936 W Lexington St | New Construction |
| Phase 1 - Block 0172 | 0172 020 | 938 W Lexington St | New Construction |
| Phase 1 - Block 0172 | 0172 021 | 940 W Lexington St | New Construction |
| Phase 1 - Block 0172 | 0172 022 | 942 W Lexington St | New Construction |
| Phase 1 - Block 0172 | 0172 023 | 944 W Lexington St | New Construction |
| Phase 1 - Block 0172 | 0172 024 | 946 W Lexington St | New Construction |
| Phase 1 - Block 0172 | 0172 156 | 211 Osing Ct | New Construction |
| Phase 1 - Block 0172 | 0172 157 | 213 Osing Ct | New Construction |
| Phase 1 - Block 0172 | 0172 061 | 929 W Saratoga St | New Construction |
| Phase 1 - Block 0172 | 0172 060 | 931 W Saratoga St | New Construction |
| Phase 1 - Block 0172 | 0172 059 | 933 W Saratoga St | New Construction |
| Phase 1 - Block 0172 | 0172 058 | 935 W Saratoga St | New Construction |
| Phase 1 - Block 0172 | 0172 057 | 937 W Saratoga St | New Construction |
| Phase 1 - Block 0172 | 0172 056 | 939 W Saratoga St | New Construction |
| Phase 1 - Block 0172 | 0172 055 | 941 W Saratoga St | New Construction |
| Phase 1 - Block 0172 | 0172 026 | 207 N Schroeder St | New Construction |
| Phase 1 - Block 0172 | 0172 027 | 209 N Schroeder St | New Construction |
| Phase 1 - Block 0172 | 0172 028 | 211 N Schroeder St | New Construction |
| Phase 1 - Block 0172 | 0172 029 | 213 N Schroeder St | New Construction |
| Phase 1 - Block 0172 | 0172 030 | 215 N Schroeder St | New Construction |
| Phase 1 - Block 0172 | 0172 031 | 217 N Schroeder St | New Construction |
| Phase 1 - Block 0172 | 0172 032 | 219 N Schroeder St | New Construction |
| Phase 1 - Block 0172 | 0172 033 | 221 N Schroeder St | New Construction |
| Phase 1 - Block 0172 | 0172 034 | 223 N Schroeder St | New Construction |
| Phase 1 - Block 0172 | 0172 035 | 225 N Schroeder St | New Construction |
| Phase 1 - Block 0172 | 0172 036 | 227 N Schroeder St | New Construction |
| Phase 1 - Block 0172 | 0172 037 | 229 N Schroeder St | New Construction |

| PHASE | BLOCK LOT | ADDRESS | DEVELOPMENT OUTCOME |
|---|---|---|---|
| Phase 1 - Block 0172 | 0172 038 | 231 N Schroeder St | New Construction |
| Phase 1 - Block 0172 | 0172 039 | 233 N Schroeder St | New Construction |
| Phase 1 - Block 0172 | 0172 040 | 235 N Schroeder St | New Construction |
| Phase 1 - Block 0172 | 0172 041 | 237 N Schroeder St | New Construction |
| Phase 1 - Block 0172 | 0172 042 | 239 N Schroeder St | New Construction |
| Phase 1 - Block 0172 | 0172 043 | 241 N Schroeder St | New Construction |
| Phase 1 - Block 0172 | 0172 044 | 243 N Schroeder St | New Construction |
| Phase 1 - Block 0172 | 0172 045 | 245 N Schroeder St | New Construction |
| Phase 1 - Block 0172 | 0172 046 | 247 N Schroeder St | New Construction |
| Phase 1 - Block 0172 | 0172 047 | 249 N Schroeder St | New Construction |
| Phase 1 - Block 0172 | 0172 048 | 251 N Schroeder St | New Construction |
| Phase 1 - Block 0172 | 0172 049 | 253 N Schroeder St | New Construction |
| Phase 1 - Block 0172 | 0172 050 | 255 N Schroeder St | New Construction |
| Phase 1 - Block 0172 | 0172 051 | 257 N Schroeder St | New Construction |
| Phase 1 - Block 0172 | 0172 052 | 259 N Schroeder St | New Construction |
| Phase 1 - Block 0172 | 0172 053 | 261 N Schroeder St | New Construction |
| Phase 1 - Block 0172 | 0172 054 | 263 N Schroeder St | New Construction |
| Phase 1 - Block 0172 | 0172 148a | | New Construction |

**PHASE 2 - BLOCK 0200**

| PHASE | BLOCK LOT | ADDRESS | DEVELOPMENT OUTCOME |
|---|---|---|---|
| Phase 2 - Block 0200 | 0200 057 | 9 N Carrollton Ave | New Construction |
| Phase 2 - Block 0200 | 0200 056 | 11 N Carrollton Ave | New Construction |
| Phase 2 - Block 0200 | 0200 055 | 13 N Carrollton Ave | New Construction |
| Phase 2 - Block 0200 | 0200 054 | 15 N Carrollton Ave | New Construction |
| Phase 2 - Block 0200 | 0200 053 | 17 N Carrollton Ave | New Construction |
| Phase 2 - Block 0200 | 0200 052 | 19 N Carrollton Ave | New Construction |
| Phase 2 - Block 0200 | 0200 051 | 21 N Carrollton Ave | New Construction |
| Phase 2 - Block 0200 | 0200 050 | 23 N Carrollton Ave | New Construction |
| Phase 2 - Block 0200 | 0200 112 | 1066 W Fairmount Ave | New Construction |
| Phase 2 - Block 0200 | 0200 113 | 1068 W Fairmount Ave | New Construction |
| Phase 2 - Block 0200 | 0200 114 | 1070 W Fairmount Ave | New Construction |
| Phase 2 - Block 0200 | 0200 115 | 1072 W Fairmount Ave | New Construction |
| Phase 2 - Block 0200 | 0200 116 | 1074 W Fairmount Ave | New Construction |
| Phase 2 - Block 0200 | 0200 117 | 1076 W Fairmount Ave | New Construction |
| Phase 2 - Block 0200 | 0200 118 | 1078 W Fairmount Ave | New Construction |
| Phase 2 - Block 0200 | 0200 119 | 1080 W Fairmount Ave | New Construction |
| Phase 2 - Block 0200 | 0200 120 | 1082 W Fairmount Ave | New Construction |
| Phase 2 - Block 0200 | 0200 121 | 1100 W Fairmount Ave | New Construction |
| Phase 2 - Block 0200 | 0200 038 | 1077 W Fayette St | New Construction |
| Phase 2 - Block 0200 | 0200 039 | 1079 W Fayette St | New Construction |
| Phase 2 - Block 0200 | 0200 040 | 1081 W Fayette St | New Construction |
| Phase 2 - Block 0200 | 0200 041 | 1083 W Fayette St | New Construction |
| Phase 2 - Block 0200 | 0200 042 | 1085 W Fayette St | New Construction |
| Phase 2 - Block 0200 | 0200 043 | 1087 W Fayette St | New Construction |
| Phase 2 - Block 0200 | 0200 044 | 1089 W Fayette St | New Construction |
| Phase 2 - Block 0200 | 0200 045 | 1091 W Fayette St | New Construction |
| Phase 2 - Block 0200 | 0200 046 | 1093 W Fayette St | New Construction |

| PHASE | BLOCK LOT | ADDRESS | DEVELOPMENT OUTCOME |
|---|---|---|---|
| Phase 2 - Block 0200 | 0200 047 | 1095 W Fayette St | New Construction |
| Phase 2 - Block 0200 | 0200 048 | 1097 W Fayette St | New Construction |
| Phase 2 - Block 0200 | 0200 049 | 1099 W Fayette St | New Construction |
| **PHASE 2 - BLOCK 0199** | | | |
| Phase 2 - Block 0199 | 0199 023 | 16 N Carrollton Ave | New Construction |
| Phase 2 - Block 0199 | 0199 046 | 1210 W Fairmount Ave | New Construction |
| Phase 2 - Block 0199 | 0199 022 | 1201 W Fayette St | New Construction |
| Phase 2 - Block 0199 | 0199 021 | 1203 W Fayette St | New Construction |
| Phase 2 - Block 0199 | 0199 020 | 1205 W Fayette St | New Construction |
| Phase 2 - Block 0199 | 0199 019 | 1207 W Fayette St | New Construction |
| Phase 2 - Block 0199 | 0199 018 | 1209 W Fayette St | New Construction |
| Phase 2 - Block 0199 | 0199 017 | 1211 W Fayette St | New Construction |
| Phase 2 - Block 0199 | 0199 015 | 1213 W Fayette St | New Construction |
| **PHASE 2 - BLOCK 0185** | | | |
| Phase 2 - Block 0185 | 0185 196 | 102 N Carlton St | New Construction |
| Phase 2 - Block 0185 | 0185 197 | 104 N Carlton St | New Construction |
| Phase 2 - Block 0185 | 0185 198 | 106 N Carlton St | New Construction |
| Phase 2 - Block 0185 | 0185 199 | 108 N Carlton St | New Construction |
| Phase 2 - Block 0185 | 0185 200 | 110 N Carlton St | New Construction |
| Phase 2 - Block 0185 | 0185 201 | 112 N Carlton St | New Construction |
| Phase 2 - Block 0185 | 0185 202 | 114 N Carlton St | New Construction |
| Phase 2 - Block 0185 | 0185 203 | 116 N Carlton St | New Construction |
| Phase 2 - Block 0185 | 0185 204 | 118 N Carlton St | New Construction |
| Phase 2 - Block 0185 | 0185 205 | 120 N Carlton St | New Construction |
| Phase 2 - Block 0185 | 0185 206 | 122 N Carlton St | New Construction |
| Phase 2 - Block 0185 | 0185 207 | 124 N Carlton St | New Construction |
| Phase 2 - Block 0185 | 0185 208 | 126 N Carlton St | New Construction |
| Phase 2 - Block 0185 | 0185 209 | 128 N Carlton St | New Construction |
| Phase 2 - Block 0185 | 0185 211 | 132 N Carlton St | New Construction |
| Phase 2 - Block 0185 | 0185 049 | 103 N Carrollton Ave | New Construction |
| Phase 2 - Block 0185 | 0185 050 | 105 N Carrollton Ave | New Construction |
| Phase 2 - Block 0185 | 0185 051 | 107 N Carrollton Ave | New Construction |
| Phase 2 - Block 0185 | 0185 052 | 109 N Carrollton Ave | New Construction |
| Phase 2 - Block 0185 | 0185 053 | 111 N Carrollton Ave | New Construction |
| Phase 2 - Block 0185 | 0185 054 | 113 N Carrollton Ave | New Construction |
| Phase 2 - Block 0185 | 0185 055 | 115 N Carrollton Ave | New Construction |
| Phase 2 - Block 0185 | 0185 056 | 117 N Carrollton Ave | New Construction |
| Phase 2 - Block 0185 | 0185 057 | 119 N Carrollton Ave | New Construction |
| Phase 2 - Block 0185 | 0185 058 | 121 N Carrollton Ave | New Construction |
| Phase 2 - Block 0185 | 0185 059 | 123 N Carrollton Ave | New Construction |
| Phase 2 - Block 0185 | 0185 060 | 125 N Carrollton Ave | New Construction |
| Phase 2 - Block 0185 | 0185 038 | 1100 W Fayette St | New Construction |
| Phase 2 - Block 0185 | 0185 039 | 1102 W Fayette St | New Construction |
| Phase 2 - Block 0185 | 0185 040 | 1104 W Fayette St | New Construction |
| Phase 2 - Block 0185 | 0185 041 | 1106 W Fayette St | New Construction |

| PHASE | BLOCK/LOT | ADDRESS | DEVELOPMENT OUTCOME |
|---|---|---|---|
| Phase 2 - Block 0185 | 0185 042 | 1108 W Fayette St | New Construction |
| Phase 2 - Block 0185 | 0185 043 | 1110 W Fayette St | New Construction |
| Phase 2 - Block 0185 | 0185 044 | 1112 W Fayette St | New Construction |
| Phase 2 - Block 0185 | 0185 045 | 1114 W Fayette St | New Construction |
| Phase 2 - Block 0185 | 0185 046 | 1116 W Fayette St | New Construction |
| Phase 2 - Block 0185 | 0185 047 | 1118 W Fayette St | New Construction |
| Phase 2 - Block 0185 | 0185 048 | 1120 W Fayette St | New Construction |
| Phase 2 - Block 0185 | 0185 069 | 1101 W Lexington St | New Construction |
| Phase 2 - Block 0185 | 0185 068 | 1103 W Lexington St | New Construction |
| Phase 2 - Block 0185 | 0185 067 | 1105 W Lexington St | New Construction |
| Phase 2 - Block 0185 | 0185 066 | 1107 W Lexington St | New Construction |
| Phase 2 - Block 0185 | 0185 065 | 1109 W Lexington St | New Construction |
| Phase 2 - Block 0185 | 0185 064 | 1111 W Lexington St | New Construction |
| Phase 2 - Block 0185 | 0185 063 | 1113 W Lexington St | New Construction |
| Phase 2 - Block 0185 | 0185 062 | 1115 W Lexington St | New Construction |
| Phase 2 - Block 0185 | 0185 061 | 1117 W Lexington St | New Construction |
| Phase 2 - Block 0185 | 0185 192 | 1101 Vine St | New Construction |
| Phase 2 - Block 0185 | 0185 193 | 1103 Vine St | New Construction |
| Phase 2 - Block 0185 | 0185 194 | 1105 Vine St | New Construction |
| Phase 2 - Block 0185 | 0185 195 | 1107 Vine St | New Construction |

### PHASE 2 - BLOCK 0184

| PHASE | BLOCK/LOT | ADDRESS | DEVELOPMENT OUTCOME |
|---|---|---|---|
| Phase 2 - Block 0184 | 0184 019 | 106 N Carrollton Ave | New Construction |
| Phase 2 - Block 0184 | 0184 020 | 108 N Carrollton Ave | New Construction |
| Phase 2 - Block 0184 | 0184 021 | 110 N Carrollton Ave | New Construction |
| Phase 2 - Block 0184 | 0184 022 | 112 N Carrollton Ave | New Construction |
| Phase 2 - Block 0184 | 0184 018 | 1200 W Fayette St | New Construction |
| Phase 2 - Block 0184 | 0184 017 | 1202 W Fayette St | New Construction |
| Phase 2 - Block 0184 | 0184 016 | 1204 W Fayette St | New Construction |
| Phase 2 - Block 0184 | 0184 023 | 1201 W Lexington St | New Construction |
| Phase 2 - Block 0184 | 0184 024 | 1203 W Lexington St | New Construction |
| Phase 2 - Block 0184 | 0184 025 | 1205 W Lexington St | New Construction |
| Phase 2 - Block 0184 | 0184 026 | 1207 W Lexington St | New Construction |

### PHASE 3 - BLOCK 0170

| PHASE | BLOCK/LOT | ADDRESS | DEVELOPMENT OUTCOME |
|---|---|---|---|
| Phase 3 - Block 0170 | 0170 114 | 218 N Carlton St | New Construction |
| Phase 3 - Block 0170 | 0170 115 | 220 N Carlton St | New Construction |
| Phase 3 - Block 0170 | 0170 116 | 222 N Carlton St | New Construction |
| Phase 3 - Block 0170 | 0170 117 | 224 N Carlton St | New Construction |
| Phase 3 - Block 0170 | 0170 118 | 226 N Carlton St | New Construction |
| Phase 3 - Block 0170 | 0170 119 | 228 N Carlton St | New Construction |
| Phase 3 - Block 0170 | 0170 120 | 230 N Carlton St | New Construction |
| Phase 3 - Block 0170 | 0170 121 | 232 N Carlton St | New Construction |
| Phase 3 - Block 0170 | 0170 122 | 234 N Carlton St | New Construction |
| Phase 3 - Block 0170 | 0170 123 | 236 N Carlton St | New Construction |
| Phase 3 - Block 0170 | 0170 124 | 238 N Carlton St | New Construction |
| Phase 3 - Block 0170 | 0170 125 | 240 N Carlton St | New Construction |

| PHASE | BLOCK LOT | ADDRESS | DEVELOPMENT OUTCOME |
|---|---|---|---|
| Phase 3 - Block 0170 | 0170 126 | 242 N Carlton St | New Construction |
| Phase 3 - Block 0170 | 0170 017 | 201 N Carrollton Ave | New Construction |
| Phase 3 - Block 0170 | 0170 018 | 211 N Carrollton Ave | New Construction |
| Phase 3 - Block 0170 | 0170 019 | 213 N Carrollton Ave | New Construction |
| Phase 3 - Block 0170 | 0170 020 | 215 N Carrollton Ave | New Construction |
| Phase 3 - Block 0170 | 0170 021 | 217 N Carrollton Ave | New Construction |
| Phase 3 - Block 0170 | 0170 022 | 219 N Carrollton Ave | New Construction |
| Phase 3 - Block 0170 | 0170 023 | 221 N Carrollton Ave | New Construction |
| Phase 3 - Block 0170 | 0170 024 | 223 N Carrollton Ave | New Construction |
| Phase 3 - Block 0170 | 0170 025 | 225 N Carrollton Ave | New Construction |
| Phase 3 - Block 0170 | 0170 026 | 227 N Carrollton Ave | New Construction |
| Phase 3 - Block 0170 | 0170 014 | 1132 W Lexington St | New Construction |
| Phase 3 - Block 0170 | 0170 015 | 1134 W Lexington St | New Construction |
| Phase 3 - Block 0170 | 0170 016 | 1136 W Lexington St | New Construction |
| Phase 3 - Block 0170 | 0170 039 | 1121 W Saratoga St | New Construction |
| Phase 3 - Block 0170 | 0170 038 | 1123 W Saratoga St | New Construction |
| Phase 3 - Block 0170 | 0170 037 | 1125 W Saratoga St | New Construction |
| Phase 3 - Block 0170 | 0170 036 | 1127 W Saratoga St | New Construction |
| Phase 3 - Block 0170 | 0170 035 | 1129 W Saratoga St | New Construction |
| Phase 3 - Block 0170 | 0170 034 | 1131 W Saratoga St | New Construction |
| Phase 3 - Block 0170 | 0170 033 | 1133 W Saratoga St | New Construction |
| Phase 3 - Block 0170 | 0170 032 | 1135 W Saratoga St | New Construction |
| Phase 3 - Block 0170 | 0170 031 | 1137 W Saratoga St | New Construction |
| Phase 3 - Block 0170 | 0170 030 | 1139 W Saratoga St | New Construction |
| Phase 3 - Block 0170 | 0170 029 | 1141 W Saratoga St | New Construction |
| Phase 3 - Block 0170 | 0170 028 | 1143 W Saratoga St | New Construction |
| Phase 3 - Block 0170 | 0170 027 | 1145 W Saratoga St | New Construction |
| Phase 3 - Block 0170 | 0170 093 | No Address | New Construction |
| Phase 3 - Block 0170 | 0170 094 | No Address | New Construction |
| Phase 3 - Block 0170 | 0170 095 | No Address | New Construction |
| Phase 3 - Block 0170 | 0170 096 | No Address | New Construction |
| **PHASE 3 - BLOCK 0169** | | | |
| Phase 3 - Block 0169 | 0169 012 | 204 N Carrollton Ave | New Construction |
| Phase 3 - Block 0169 | 0169 013 | 206 N Carrollton Ave | New Construction |
| Phase 3 - Block 0169 | 0169 014 | 208 N Carrollton Ave | New Construction |
| Phase 3 - Block 0169 | 0169 015 | 222 N Carrollton Ave | New Construction |
| Phase 3 - Block 0169 | 0169 016 | 226 N Carrollton Ave | New Construction |
| Phase 3 - Block 0169 | 0169 011 | 1200 W Lexington St | New Construction |
| Phase 3 - Block 0169 | 0169 010 | 1202 W Lexington St | New Construction |
| Phase 3 - Block 0169 | 0169 009 | 1204 W Lexington St | New Construction |
| Phase 3 - Block 0169 | 0169 008 | 1206 W Lexington St | New Construction |
| Phase 3 - Block 0169 | 0169 007 | 1208 W Lexington St | New Construction |
| Phase 3 - Block 0169 | 0169 017 | 1215 W Saratoga St | New Construction |
| **PHASE 3 - BLOCK 0155** | | | |
| Phase 3 - Block 0155 | 0155 056 | 304 N Arlington Ave | New Construction |

| PHASE | BLOCK LOT | ADDRESS | DEVELOPMENT OUTCOME |
|---|---|---|---|
| Phase 3 - Block 0155 | 0155 055 | 306 N Arlington Ave | New Construction |
| Phase 3 - Block 0155 | 0155 054 | 310 N Arlington Ave | New Construction |
| Phase 3 - Block 0155 | 0155 053 | 312 N Arlington Ave | New Construction |
| Phase 3 - Block 0155 | 0155 052 | 314 N Arlington Ave | New Construction |
| Phase 3 - Block 0155 | 0155 051 | 316 N Arlington Ave | New Construction |
| Phase 3 - Block 0155 | 0155 088 | 300 N Carlton St | New Construction |
| Phase 3 - Block 0155 | 0155 087 | 302 N Carlton St | New Construction |
| Phase 3 - Block 0155 | 0155 086 | 304 N Carlton St | New Construction |
| Phase 3 - Block 0155 | 0155 019 | 301 N Carrollton Ave | New Construction |
| Phase 3 - Block 0155 | 0155 020 | 303 N Carrollton Ave | New Construction |
| Phase 3 - Block 0155 | 0155 021 | 305 N Carrollton Ave | New Construction |
| Phase 3 - Block 0155 | 0155 022 | 307 N Carrollton Ave | New Construction |
| Phase 3 - Block 0155 | 0155 023 | 309 N Carrollton Ave | New Construction |
| Phase 3 - Block 0155 | 0155 024 | 311 N Carrollton Ave | New Construction |
| Phase 3 - Block 0155 | 0155 025 | 313 N Carrollton Ave | New Construction |
| Phase 3 - Block 0155 | 0155 026 | 315 N Carrollton Ave | New Construction |
| Phase 3 - Block 0155 | 0155 027 | 317 N Carrollton Ave | New Construction |
| Phase 3 – Block 0155 | 0155 028 | 319 N Carrollton Ave | New Construction |
| Phase 3 – Block 0155 | 0155 029 | 321 N Carrollton Ave | New Construction |
| Phase 3 - Block 0155 | 0155 030 | 323 N Carrollton Ave | New Construction |
| Phase 3 - Block 0155 | 0155 031 | 325 N Carrollton Ave | New Construction |
| Phase 3 - Block 0155 | 0155 032 | 327 N Carrollton Ave | New Construction |
| Phase 3 - Block 0155 | 0155 033 | 329 N Carrollton Ave | New Construction |
| Phase 3 - Block 0155 | 0155 034 | 331 N Carrollton Ave | New Construction |
| Phase 3 - Block 0155 | 0155 050 | 1101 W Mulberry St | New Construction |
| Phase 3 - Block 0155 | 0155 049 | 1103 W Mulberry St | New Construction |
| Phase 3 - Block 0155 | 0155 048 | 1105 W Mulberry St | New Construction |
| Phase 3 - Block 0155 | 0155 047 | 1107 W Mulberry St | New Construction |
| Phase 3 - Block 0155 | 0155 046 | 1109 W Mulberry St | New Construction |
| Phase 3 - Block 0155 | 0155 045 | 1111 W Mulberry St | New Construction |
| Phase 3 - Block 0155 | 0155 044 | 1113 W Mulberry St | New Construction |
| Phase 3 - Block 0155 | 0155 043 | 1115 W Mulberry St | New Construction |
| Phase 3 - Block 0155 | 0155 042 | 1117 W Mulberry St | New Construction |
| Phase 3 - Block 0155 | 0155 041 | 1119 W Mulberry St | New Construction |
| Phase 3 - Block 0155 | 0155 040 | 1121 W Mulberry St | New Construction |
| Phase 3 - Block 0155 | 0155 039 | 1123 W Mulberry St | New Construction |
| Phase 3 - Block 0155 | 0155 038 | 1125 W Mulberry St | New Construction |
| Phase 3 - Block 0155 | 0155 037 | 1127 W Mulberry St | New Construction |
| Phase 3 - Block 0155 | 0155 036 | 1129 W Mulberry St | New Construction |
| Phase 3 - Block 0155 | 0155 035 | 1131 W Mulberry St | New Construction |
| Phase 3 - Block 0155 | 0155 085 | 1102 Sarah Ann St | Rehabilitation |
| Phase 3 - Block 0155 | 0155 057 | 1103 Sarah Ann St | New Construction |
| Phase 3 - Block 0155 | 0155 084 | 1104 Sarah Ann St | Rehabilitation |
| Phase 3 - Block 0155 | 0155 058 | 1105 Sarah Ann St | New Construction |
| Phase 3 - Block 0155 | 0155 083 | 1106 Sarah Ann St | Rehabilitation |
| Phase 3 - Block 0155 | 0155 059 | 1107 Sarah Ann St | New Construction |
| Phase 3 - Block 0155 | 0155 082 | 1108 Sarah Ann St | Rehabilitation |

| PHASE | BLOCK LOT | ADDRESS | DEVELOPMENT OUTCOME |
|---|---|---|---|
| Phase 3 - Block 0155 | 0155 060 | 1109 Sarah Ann St | New Construction |
| Phase 3 - Block 0155 | 0155 081 | 1110 Sarah Ann St | Rehabilitation |
| Phase 3 - Block 0155 | 0155 061 | 1111 Sarah Ann St | New Construction |
| Phase 3 - Block 0155 | 0155 080 | 1112 Sarah Ann St | Rehabilitation |
| Phase 3 - Block 0155 | 0155 062 | 1113 Sarah Ann St | New Construction |
| Phase 3 - Block 0155 | 0155 079 | 1114 Sarah Ann St | Rehabilitation |
| Phase 3 - Block 0155 | 0155 063 | 1115 Sarah Ann St | New Construction |
| Phase 3 - Block 0155 | 0155 078 | 1116 Sarah Ann St | Rehabilitation |
| Phase 3 - Block 0155 | 0155 064 | 1117 Sarah Ann St | New Construction |
| Phase 3 - Block 0155 | 0155 077 | 1118 Sarah Ann St | Rehabilitation |
| Phase 3 - Block 0155 | 0155 076 | 1120 Sarah Ann St | Rehabilitation |
| Phase 3 - Block 0155 | 0155 075 | 1122 Sarah Ann St | Rehabilitation |
| Phase 3 - Block 0155 | 0155 067 | 1123 Sarah Ann St | New Construction |
| Phase 3 - Block 0155 | 0155 074 | 1124 Sarah Ann St | Rehabilitation |
| Phase 3 - Block 0155 | 0155 068 | 1125 Sarah Ann St | New Construction |
| Phase 3 - Block 0155 | 0155 069 | 1127 Sarah Ann St | New Construction |
| Phase 3 - Block 0155 | 0155 070 | 1129 Sarah Ann St | New Construction |
| Phase 3 - Block 0155 | 0155 071 | 1131 Sarah Ann St | New Construction |
| Phase 3 - Block 0155 | 0155 072 | 1133 Sarah Ann St | New Construction |
| Phase 3 - Block 0155 | 0155 073 | 1135 Sarah Ann St | New Construction |
| Phase 3 - Block 0155 | 0155 001 | 1100 W Saratoga St | New Construction |
| Phase 3 - Block 0155 | 0155 002 | 1102 W Saratoga St | To Be Determined |
| Phase 3 - Block 0155 | 0155 003 | 1104 W Saratoga St | To Be Determined |
| Phase 3 - Block 0155 | 0155 004 | 1106 W Saratoga St | Rehabilitation |
| Phase 3 - Block 0155 | 0155 005 | 1108 W Saratoga St | To Be Determined |
| Phase 3 - Block 0155 | 0155 006 | 1110 W Saratoga St | To Be Determined |
| Phase 3 - Block 0155 | 0155 007 | 1112 W Saratoga St | To Be Determined |
| Phase 3 - Block 0155 | 0155 008 | 1114 W Saratoga St | To Be Determined |
| Phase 3 - Block 0155 | 0155 009 | 1116 W Saratoga St | To Be Determined |
| Phase 3 - Block 0155 | 0155 010 | 1118 W Saratoga St | To Be Determined |
| Phase 3 - Block 0155 | 0155 011 | 1120 W Saratoga St | To Be Determined |
| Phase 3 - Block 0155 | 0155 012 | 1122 W Saratoga St | New Construction |
| Phase 3 - Block 0155 | 0155 013 | 1124 W Saratoga St | New Construction |
| Phase 3 - Block 0155 | 0155 015 | 1128 W Saratoga St | New Construction |
| Phase 3 - Block 0155 | 0155 016 | 1130 W Saratoga St | New Construction |
| Phase 3 - Block 0155 | 0155 017 | 1132 W Saratoga St | New Construction |
| Phase 3 - Block 0155 | 0155 018 | 1134 W Saratoga St | New Construction |
| **PHASE 4 - BLOCK 0156** | | | |
| Phase 4 - Block 0156 | 0156 025 | 303 N Arlington Ave | New Construction |
| Phase 4 - Block 0156 | 0156 024 | 305 N Arlington Ave | New Construction |
| Phase 4 - Block 0156 | 0156 023 | 307 N Arlington Ave | New Construction |
| Phase 4 - Block 0156 | 0156 022 | 309 N Arlington Ave | New Construction |
| Phase 4 - Block 0156 | 0156 021 | 311 N Arlington Ave | New Construction |
| Phase 4 - Block 0156 | 0156 020 | 313 N Arlington Ave | New Construction |
| Phase 4 - Block 0156 | 0156 019 | 315 N Arlington Ave | New Construction |
| Phase 4 - Block 0156 | 0156 018 | 317 N Arlington Ave | New Construction |

| PHASE | BLOCK LOT | ADDRESS | DEVELOPMENT OUTCOME |
|---|---|---|---|
| Phase 4 - Block 0156 | 0156 017 | 319 N Arlington Ave | New Construction |
| Phase 4 - Block 0156 | 0156 016 | 321 N Arlington Ave | New Construction |
| Phase 4 - Block 0156 | 0156 001 | 1005 W Mulberry St | New Construction |
| Phase 4 - Block 0156 | 0156 002 | 1007 W Mulberry St | New Construction |
| Phase 4 - Block 0156 | 0156 003 | 1009 W Mulberry St | New Construction |
| Phase 4 - Block 0156 | 0156 004 | 1011 W Mulberry St | New Construction |
| Phase 4 - Block 0156 | 0156 005 | 1013 W Mulberry St | New Construction |
| Phase 4 - Block 0156 | 0156 006 | 1015 W Mulberry St | New Construction |
| Phase 4 - Block 0156 | 0156 007 | 1025 W Mulberry St | New Construction |
| Phase 4 - Block 0156 | 0156 008 | 1031 W Mulberry St | New Construction |
| Phase 4 - Block 0156 | 0156 009 | 1033 W Mulberry St | New Construction |
| Phase 4 - Block 0156 | 0156 010 | 1035 W Mulberry St | New Construction |
| Phase 4 - Block 0156 | 0156 011 | 1037 W Mulberry St | New Construction |
| Phase 4 - Block 0156 | 0156 012 | 1039 W Mulberry St | New Construction |
| Phase 4 - Block 0156 | 0156 013 | 1041 W Mulberry St | New Construction |
| Phase 4 - Block 0156 | 0156 014 | 1043 W Mulberry St | New Construction |
| Phase 4 - Block 0156 | 0156 015 | 1045 W Mulberry St | New Construction |
| Phase 4 - Block 0156 | 0156 062 | 1002 Sarah Ann St | New Construction |
| Phase 4 - Block 0156 | 0156 063 | 1004 Sarah Ann St | New Construction |
| Phase 4 - Block 0156 | 0156 084 | 1005 Sarah Ann St | New Construction |
| Phase 4 - Block 0156 | 0156 064 | 1006 Sarah Ann St | New Construction |
| Phase 4 - Block 0156 | 0156 083 | 1007 Sarah Ann St | New Construction |
| Phase 4 - Block 0156 | 0156 065 | 1008 Sarah Ann St | New Construction |
| Phase 4 - Block 0156 | 0156 082 | 1009 Sarah Ann St | New Construction |
| Phase 4 - Block 0156 | 0156 065a | 1010 Sarah Ann St | New Construction |
| Phase 4 - Block 0156 | 0156 081 | 1013 Sarah Ann St | New Construction |
| Phase 4 - Block 0156 | 0156 080 | 1019 Sarah Ann St | New Construction |
| Phase 4 - Block 0156 | 0156 079 | 1021 Sarah Ann St | New Construction |
| Phase 4 - Block 0156 | 0156 078 | 1023 Sarah Ann St | New Construction |
| Phase 4 - Block 0156 | 0156 077 | 1025 Sarah Ann St | New Construction |
| Phase 4 - Block 0156 | 0156 076 | 1027 Sarah Ann St | New Construction |
| Phase 4 - Block 0156 | 0156 075 | 1029 Sarah Ann St | New Construction |
| Phase 4 - Block 0156 | 0156 074 | 1031 Sarah Ann St | New Construction |
| Phase 4 - Block 0156 | 0156 073 | 1033 Sarah Ann St | New Construction |
| Phase 4 - Block 0156 | 0156 066 | 1034 Sarah Ann St | New Construction |
| Phase 4 - Block 0156 | 0156 072 | 1035 Sarah Ann St | New Construction |
| Phase 4 - Block 0156 | 0156 067 | 1036 Sarah Ann St | New Construction |
| Phase 4 - Block 0156 | 0156 071 | 1037 Sarah Ann St | New Construction |
| Phase 4 - Block 0156 | 0156 068 | 1038 Sarah Ann St | New Construction |
| Phase 4 - Block 0156 | 0156 070 | 1039 Sarah Ann St | New Construction |
| Phase 4 - Block 0156 | 0156 069 | 1041 Sarah Ann St | New Construction |
| Phase 4 - Block 0156 | 0156 048 | 1010 W Saratoga St | New Construction |
| Phase 4 - Block 0156 | 0156 047 | 1012 W Saratoga St | New Construction |
| Phase 4 - Block 0156 | 0156 046 | 1014 W Saratoga St | New Construction |
| Phase 4 - Block 0156 | 0156 045 | 1016 W Saratoga St | New Construction |
| Phase 4 - Block 0156 | 0156 044 | 1018 W Saratoga St | New Construction |
| Phase 4 - Block 0156 | 0156 043 | 1020 W Saratoga St | New Construction |

| PHASE | BLOCK LOT | ADDRESS | DEVELOPMENT OUTCOME |
|---|---|---|---|
| Phase 4 - Block 0156 | 0156 042 | 1022 W Saratoga St | New Construction |
| Phase 4 - Block 0156 | 0156 041 | 1024 W Saratoga St | New Construction |
| Phase 4 - Block 0156 | 0156 040 | 1026 W Saratoga St | New Construction |
| Phase 4 - Block 0156 | 0156 039 | 1028 W Saratoga St | New Construction |
| Phase 4 - Block 0156 | 0156 038 | 1030 W Saratoga St | New Construction |
| Phase 4 - Block 0156 | 0156 037 | 1032 W Saratoga St | New Construction |
| Phase 4 - Block 0156 | 0156 036 | 1034 W Saratoga St | New Construction |
| Phase 4 - Block 0156 | 0156 035 | 1036 W Saratoga St | New Construction |
| Phase 4 - Block 0156 | 0156 034 | 1038 W Saratoga St | New Construction |
| Phase 4 - Block 0156 | 0156 033 | 1040 W Saratoga St | New Construction |
| Phase 4 - Block 0156 | 0156 032 | 1042 W Saratoga St | New Construction |
| Phase 4 - Block 0156 | 0156 031 | 1044 W Saratoga St | New Construction |
| Phase 4 - Block 0156 | 0156 030 | 1046 W Saratoga St | New Construction |
| Phase 4 - Block 0156 | 0156 029 | 1048 W Saratoga St | New Construction |
| Phase 4 - Block 0156 | 0156 028 | 1050 W Saratoga St | New Construction |
| Phase 4 - Block 0156 | 0156 027 | 1052 W Saratoga St | New Construction |
| Phase 4 - Block 0156 | 0156 026 | 1054 W Saratoga St | New Construction |
| Phase 4 - Block 0156 | 0156 051 | 308 N Schroeder St | New Construction |
| Phase 4 - Block 0156 | 0156 052 | 310 N Schroeder St | New Construction |
| Phase 4 - Block 0156 | 0156 053 | 312 N Schroeder St | New Construction |
| Phase 4 - Block 0156 | 0156 054 | 314 N Schroeder St | New Construction |
| Phase 4 - Block 0156 | 0156 055 | 316 N Schroeder St | New Construction |
| Phase 4 - Block 0156 | 0156 056 | 318 N Schroeder St | New Construction |
| Phase 4 - Block 0156 | 0156 057 | 320 N Schroeder St | New Construction |
| Phase 4 - Block 0156 | 0156 058 | 322 N Schroeder St | New Construction |
| Phase 4 - Block 0156 | 0156 059 | 324 N Schroeder St | New Construction |
| Phase 4 - Block 0156 | 0156 060 | 326 N Schroeder St | New Construction |
| Phase 4 - Block 0156 | 0156 061 | 328 N Schroeder St | New Construction |
| **PHASE 4 - BLOCK 0157 \*\*** | | | |
| Phase 4 - Block 0157 | 0157 040a | 900 W Saratoga St | New Construction |
| Phase 4 - Block 0157 | 0157 041 | 902 W Saratoga St | Rehabilitation |
| Phase 4 - Block 0157 | 0157 045 | 906 W Saratoga St | New Construction |
| Phase 4 - Block 0157 | 0157 049 | 914 W Saratoga St | New Construction |
| Phase 4 - Block 0157 | 0157 060 | 936 W Saratoga St | New Construction |
| Phase 4 - Block 0157 | 0157 061 | 936 1/2 W Saratoga St | New Construction |
| Phase 4 - Block 0157 | 0157 062 | 938 W Saratoga St | New Construction |
| Phase 4 - Block 0157 | 0157 063 | 940 W Saratoga St | New Construction |
| Phase 4 - Block 0157 | 0157 064 | 942 W Saratoga St | New Construction |
| Phase 4 - Block 0157 | 0157 065 | 944 W Saratoga St | New Construction |
| Phase 4 - Block 0157 | 0157 066 | 946 W Saratoga St | New Construction |
| Phase 4 - Block 0157 | 0157 067 | 948 W Saratoga St | New Construction |
| Phase 4 - Block 0157 | 0157 068 | 950 W Saratoga St | New Construction |
| Phase 4 - Block 0157 | 0157 069 | 952 W Saratoga St | New Construction |
| Phase 4 - Block 0157 | 0157 070 | 954 W Saratoga St | New Construction |
| Phase 4 - Block 0157 | 0157 071 | 956 W Saratoga St | New Construction |
| Phase 4 - Block 0157 | 0157 078 | 939 Sarah Ann St | New Construction |

| PHASE | BLOCK LOT | ADDRESS | DEVELOPMENT OUTCOME |
|---|---|---|---|
| Phase 4 - Block 0157 | 0157 077 | 941 Sarah Ann St | New Construction |
| Phase 4 - Block 0157 | 0157 076 | 943 Sarah Ann St | New Construction |
| Phase 4 - Block 0157 | 0157 075 | 945 Sarah Ann St | New Construction |
| Phase 4 - Block 0157 | 0157 074 | 947 Sarah Ann St | New Construction |
| Phase 4 - Block 0157 | 0157 073 | 949 Sarah Ann St | New Construction |
| Phase 4 - Block 0157 | 0157 072 | 951 Sarah Ann St | New Construction |
| Phase 4 - Block 0157 | 0157 001 | 303 N Schroeder St | New Construction |
| Phase 4 - Block 0157 | 0157 002 | 305 N Schroeder St | New Construction |
| Phase 4 - Block 0157 | 0157 003 | 307 N Schroeder St | New Construction |
| Phase 4 - Block 0157 | 0157 004 | 309 N Schroeder St | New Construction |
| Phase 4 - Block 0157 | 0157 005 | 311 N Schroeder St | New Construction |
| Phase 4 - Block 0157 | 0157 006 | 313 N Schroeder St | New Construction |
| Phase 4 - Block 0157 | 0157 007 | 315 N Schroeder St | New Construction |

**   Notwithstanding the fact that the Properties located in Block 0157 and listed immediately above are in Phase 4, the City will acquire such Properties and conduct clearing activities with respect to such Properties in connection with Phase 1 for purposes of neighborhood safety.

## SCATTERED SITE REHABILITATION

| BLOCK LOT | ADDRESS | INTENDED DEVELOPMENT OUTCOME |
|---|---|---|
| 0169 037 | 209 N Carey St | Scattered Site Rehabilitation |
| 0168 024 | 212 N Carey St | Scattered Site Rehabilitation |
| 0168 026 | 216 N Carey St | Scattered Site Rehabilitation |
| 0168 030 | 224 N Carey St | Scattered Site Rehabilitation |
| 0154 001 | 329 N Carey St | Scattered Site Rehabilitation |
| 0200 010 | 1019 W Fayette St | Scattered Site Rehabilitation |
| 0185 017 | 1032 W Fayette St | Scattered Site Rehabilitation |
| 0185 018 | 1034 W Fayette St | Scattered Site Rehabilitation |
| 0200 018 | 1035 W Fayette St | Scattered Site Rehabilitation |
| 0185 019 | 1036 W Fayette St | Scattered Site Rehabilitation |
| 0185 021 | 1040 W Fayette St | Scattered Site Rehabilitation |
| 0200 021 | 1041 W Fayette St | Scattered Site Rehabilitation |
| 0185 021 | 1042 W Fayette St | Scattered Site Rehabilitation |
| 0185 021 | 1044 W Fayette St | Scattered Site Rehabilitation |
| 0185 021 | 1046 W Fayette St | Scattered Site Rehabilitation |
| 0185 026 | 1050 W Fayette St | Scattered Site Rehabilitation |
| 0185 027 | 1052 W Fayette St | Scattered Site Rehabilitation |
| 0185 028 | 1054 W Fayette St | Scattered Site Rehabilitation |
| 0185 030 | 1058 W Fayette St | Scattered Site Rehabilitation |
| 0185 035 | 1068 W Fayette St | Scattered Site Rehabilitation |
| 0181 010 | 1519 W Lexington St | Scattered Site Rehabilitation |
| 0166 064 | 1526 W Lexington St | Scattered Site Rehabilitation |
| 0154 043 | 1211 W Mulberry St | Scattered Site Rehabilitation |
| 0152 025 | 1425 W Mulberry St | Scattered Site Rehabilitation |
| 0169 044 | 1228 Rankin Pl | Scattered Site Rehabilitation |
| 0151 024 | 1507 W. Mulberry St. | Scattered Site Rehabilitation |
| 0151 023 | 1509 W. Mulberry St. | Scattered Site Rehabilitation |
| 0151 031 | 324 N Stricker St | Scattered Site Rehabilitation |

**Schedule B**

Poppleton Development I, LLC

Poppleton Neighborhood

## PURCHASE PRICE, THE REIMBURSEMENT AMOUNT
## AND AFFORDABLE HOUSING CREDITS

**A.    Purchase Price and Reimbursement Amount**

At each Closing, the Developer shall pay to the City the following amounts:

1.    One Dollar ($1.00) per Property purchased at such Closing (the **"Purchase Price"**); plus

2.    An amount (the **"Reimbursement Amount"**) equal to the following:

(a)    $16.00 per square foot of the land comprising the Properties purchased at such Closing, minus

(b)    The "Affordable Housing Credit" (defined below) attributable to the Properties purchased at such Closing, plus

(c)    A pro rata portion of One Million Dollars ($1,000,000.00) attributable to the Properties purchased at such Closing, such pro rata portion to be determined by (i) dividing the square footage of the Properties acquired at the Closing by the total square footage of all Properties listed on Schedule A, and (ii) multiplying that number by $1,000,000.

The Purchase Price plus the Reimbursement Amount represent the total value negotiated between the City and the Developer.   The parties agree that the Reimbursement Amount is intended to reimburse the City for certain expenses incurred by the City with respect to the acquisition and preparation of the Properties for conveyance to the Developer.   Notwithstanding the calculation set forth in Section A.2 above, if at any Closing the number reached by subtracting the amount for Section A.2(b) from the amount for Section A.2(a) is a negative amount, then such number shall be deemed to be zero, so that the Reimbursement Amount at such Closing shall equal the pro rata portion of One Million Dollars attributable to the Properties purchased at such Closing, and the Developer shall pay that Reimbursement Amount at that Closing plus One Dollar ($1.00) per Property.

**B.    Consideration for Provision of Affordable Housing**

The Developer shall receive a credit (the **"Affordable Housing Credit"**) at each Closing in consideration for the Developer's provision of affordable housing, which credit shall reduce the total amount payable by the Developer at each Closing as set forth in Section A.2 of this Schedule B.   The Affordable Housing Credit shall be calculated by

multiplying the number of rental and homeownership properties to be provided with respect to the Properties conveyed at a Closing by the consideration for each unit type (size and affordability level) according to the charts entitled "Affordable Housing Credit - Rentals" and "Affordable Housing Credit - Homeownership" set forth below in this Schedule B.

## AFFORDABLE HOUSING CREDIT – RENTAL

| Affordable Housing Credit – Rental | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| % AMI | Studio | | 1 BR | | 2 BR | | 3 BR | | 4 BR | |
| 30 | $ | 90,225 | $ | 80,325 | $ | 70,650 | $ | 60,975 | $ | 53,100 |
| 50 | $ | 44,775 | $ | 28,275 | $ | 12,150 | $ | 0 | $ | 0 |
| 60 | $ | 22,050 | $ | 2,250 | $ | 0 | $ | 0 | $ | 0 |
| 80 | $ | 0 | $ | 0 | $ | 0 | $ | 0 | $ | 0 |
| 100 | $ | 0 | $ | 0 | $ | 0 | $ | 0 | $ | 0 |
| 120 | $ | 0 | $ | 0 | $ | 0 | $ | 0 | $ | 0 |
| 150 | $ | 0 | $ | 0 | $ | 0 | $ | 0 | $ | 0 |

## AFFORDABLE HOUSING CREDIT - HOMEOWNERSHIP

| Affordable Housing Credit – Homeownership | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| % AMI | Studio | | 1 BR | | 2 BR | | 3 BR | | 4 BR | |
| 30 | $ | 158,503 | $ | 223,847 | $ | 264,410 | $ | 279,973 | $ | 297,292 |
| 50 | $ | 114,172 | $ | 173,078 | $ | 207,349 | $ | 216,621 | $ | 228,819 |
| 60 | $ | 92,006 | $ | 147,693 | $ | 178,819 | $ | 184,946 | $ | 194,583 |
| 80 | $ | 47,674 | $ | 96,924 | $ | 121,759 | $ | 121,594 | $ | 126,111 |
| 100 | $ | 3,343 | $ | 46,155 | $ | 64,699 | $ | 58,242 | $ | 57,638 |
| 120 | $ | 0 | $ | 0 | $ | 7,638 | $ | 0 | $ | 0 |
| 150 | $ | 0 | $ | 0 | $ | 0 | $ | 0 | $ | 0 |

## C.   Affordable Housing Restrictions

1.   Rental. For each Phase or subphase, the deed to the Developer will include a restriction requiring the specified number of units for each bedroom size to be affordable to households with incomes of the specified percentage of the Baltimore Area Median Income (AMI) as defined by the federal Department of Housing and Urban Development. The deed restriction will automatically terminate after a period of 15 years from the date of the applicable deed.

2.   Homeownership. The Developer will sell a specified number of units for each bedroom size to be affordable to households with incomes of the specified percentage of the Baltimore Area Median Income (AMI) as defined by the federal Department of Housing and Urban Development at the time of sale. Each deed to a purchaser of an affordable unit shall identify the Affordable Housing Credit attributable to the purchaser's unit and shall provide that the purchaser must pay to the City at settlement an amount equal to such Affordable Housing Credit if the purchaser sells the

unit to an unrelated party at any time during the first 24 months after the date of the deed. Thereafter, the amount to be paid by the purchaser to the City upon a sale of the unit shall be decreased by 20% each year over the following 5 years, so that, for example, if the purchaser sells the unit to an unrelated party during the 73rd through 84th months, then the purchaser shall pay to the City an amount equal to 20% of the Affordable Housing Credit for the unit.

Prior to each sale of an affordable housing unit, the Developer shall provide a copy of the proposed deed to the Department.

**D.      Affordable Housing Reporting and Compliance**

The Developer will provide an annual report to the Department identifying the number of affordable housing units constructed within the previous 12-month period and listing the following information:

1. Addresses and/or unit numbers;

2. Rental and/or sales price;

3. The qualifying income attributable to each unit based on HUD's then current AMI chart;

4. The name of the person(s) who have purchased affordable housing units;

5. Copy of the HUD-1 for each sale of an affordable housing unit; and

6. Copy of the deed for each sale of an affordable housing unit.

In addition to the foregoing, the Developer shall provide to the Department such other information concerning the provision of affordable housing units as the Department may reasonably request.

**E.      Provision of Affordable Housing Units**

At least twenty percent (20%) of the entire Project will be comprised of affordable housing units.  In addition, the Developer will use commercially reasonable efforts to meet the following goals for the provision of affordable housing units, provided however, the Developer's failure to meet the following specific goals shall not constitute an event of default under the Agreement:

1. Phase 1:  Approximately 59 rental units will be affordable at 60-80% AMI and approximately 68 homeownership units will be affordable at 60-80% AMI.

2. Phase 2:  Approximately 88 homeownership units will be affordable at 80% AMI.

3.   Phase 3:  Approximately 33 homeownership units will be affordable at 80-100% AMI.

4.   Phase 4:  Approximately 84 homeownership units will be affordable at 80-100% AMI.

In addition to the foregoing, the Developer will use commercially reasonable efforts to make additional rental and homeownership units affordable to lower income households, but not to exceed 50% AMI, and provided the City provides financial subsidies for such additional affordable units.

Schedule C

## COMMITMENT TO COMPLY
## WITH THE
## MINORITY AND WOMEN'S BUSINESS ENTERPRISE PROGRAM
## OF THE CITY OF BALTIMORE

In consideration for receiving fiscal assistance from or through the City of Baltimore, the Developer covenants and agrees to comply with Article 5, Subtitle 28 of the Baltimore City Code (2000 Edition) regarding participation by Minority Business Enterprises (MBE) and Women's Business Enterprises (WBE) in its development of the project known as, as defined in the Agreement commonly known as the Poppleton Housing Initiative.  Developer covenants and agrees to use all reasonable good faith efforts to meet the following MBE and WBE participation goals for this project as applicable:

CONSTRUCTION
MBE goal is 27%
WBE goal is  8%

SERVICES
MBE goal is 17%
WBE goal is  9%

ARCHITECTURAL AND ENGINEERING
MBE goal is 21%
WBE goal is 13%

Prior to the commencement of construction, Developer agrees to submit to the City written documentation, including executed contracts, service agreements, or utilization commitment forms which shall identify the particular minority and women's business enterprises (i) contracting directly with the Developer, or (ii) subcontracting with prime contractors who have contracted directly with the Developer.  The executed contracts, service agreements, or utilization commitment forms submitted to the City shall specify the dollar value of the participation, the type of work to be performed, and such other information as may be reasonably required by the City.

The City's Minority and Women's Business Opportunity Office (MWBOO), or its successor, is designated to administer the provisions of the law on behalf of the City. Developer shall comply with the rules and regulations of the MWBOO or its successor in meeting the requirements of the law.

THE UNDERSIGNED DO SOLEMNLY DECLARE AND AFFIRM THAT THEY ARE AUTHORIZED TO MAKE THIS COMMITMENT.

FOR: _Poppleton Development I, LLC_

BY: _____

BY: _____

DATE: _9/12/06_

_____
Chief, Minority and Women's Business Opportunity Office

Anticipated Starting Date of Construction

Date: _____

Schedule C

COMMITMENT TO COMPLY
WITH THE
MINORITY AND WOMEN'S BUSINESS ENTERPRISE PROGRAM
OF THE CITY OF BALTIMORE

In consideration for receiving fiscal assistance from or through the City of Baltimore, the Developer covenants and agrees to comply with Article 5, Subtitle 28 of the Baltimore City Code (2000 Edition) regarding participation by Minority Business Enterprises (MBE) and Women's Business Enterprises (WBE) in its development of the project known as, as defined in the Agreement commonly known as the Poppleton Housing Initiative.  Developer covenants and agrees to use all reasonable good faith efforts to meet the following MBE and WBE participation goals for this project as applicable:

CONSTRUCTION
MBE goal is 27%
WBE goal is  8%

SERVICES
MBE goal is 17%
WBE goal is  9%

ARCHITECTURAL AND ENGINEERING
MBE goal is 21%
WBE goal is 13%

Prior to the commencement of construction, Developer agrees to submit to the City written documentation, including executed contracts, service agreements, or utilization commitment forms which shall identify the particular minority and women's business enterprises (i) contracting directly with the Developer, or (ii) subcontracting with prime contractors who have contracted directly with the Developer.  The executed contracts, service agreements, or utilization commitment forms submitted to the City shall specify the dollar value of the participation, the type of work to be performed, and such other information as may be reasonably required by the City.

The City's Minority and Women's Business Opportunity Office (MWBOO), or its successor, is designated to administer the provisions of the law on behalf of the City. Developer shall comply with the rules and regulations of the MWBOO or its successor in meeting the requirements of the law.


THE UNDERSIGNED DO SOLEMNLY DECLARE AND AFFIRM THAT THEY
ARE AUTHORIZED TO MAKE THIS COMMITMENT.

FOR: _Poppleton Development I, LLC_____

BY: _____

BY: _____

DATE: _9 | 12 | 06_____

_____
Chief, Minority and Women's Business Opportunity Office

Anticipated Starting Date of Construction

Date: _____

**Schedule D**

Poppleton Development I, LLC

Poppleton Neighborhood

## PROJECT DESCRIPTION

### A.  General

The Project shall include the new construction of a minimum of 1,200 rental and "for sale" housing units, totaling a minimum of 2,000,000 square feet of housing, and a minimum of 80,000 square feet of retail space within the Project Area.  In addition to any time extensions provided by the Agreement, the Commissioner of the Department shall have the right to grant an extension to any timeline described in the Agreement and/or this Schedule upon a timely written request from the Developer and solely upon his or her reasonable discretion.

### B.  Site Plan

All Properties included in the Project Area are located within the Poppleton neighborhood, except those Properties identified for Scattered Site Rehabilitation are located in both the Poppleton and adjacent Franklin Square neighborhoods. - The Project Area includes all of the Properties identified in Schedule A of this Agreement. The Developer may add additional properties acquired privately to the Project Area at its discretion.

### C.  Building Plan

The Project shall include the following components:

1.      Rehabilitation of Properties Within Project Site.  The Developer will rehabilitate all of the Properties identified in Schedule A for Rehabilitation.  Such Properties are to be offered for homeownership.  Rehabilitation will be done in accordance with the Memorandum of Agreement executed between the Developer, the City, and the Maryland Historical Trust, a copy of which is attached to the Agreement as Schedule F.

2.      Rehabilitation of Scattered Site Properties.  The Developer will rehabilitate all of the Properties identified in Schedule A for Scattered Site Rehabilitation.  Such Properties are to be offered for homeownership or residential lease.

3.      New Construction of Housing and Retail on Project Site.  The Developer will construct a minimum of twelve hundred (1,200) rental and "for sale" housing units, totaling a minimum of two million (2,000,000) square feet of housing, and approximately eighty thousand (80,000) square feet of retail space within the Project Area.  Development is expected to proceed in four (4) Phases, as shown on the Phasing Plan attached to the Agreement as Schedule G.  Phases are expected to proceed in 30 or more month increments, with completion anticipated in the year 2016.

**D.    Method of Conveyance**

The City shall convey all of its rights, title and interest in the Properties to the Developer by Deed in accordance with Article II and Schedule B of this Agreement.

**E.    Financing**

Except as otherwise provided in the Agreement, the purchase of the Properties and the construction of the Improvements will be financed through private sources.

**F.    Down Payment and Credit**

No down payment is required for this transaction.

**G.    Good Faith Deposit**

No good faith deposit shall be required for this transaction.

**H.    Marketing**

The Developer agrees to affirmatively market all housing units to current residents of West Baltimore. All Properties conveyed to the Developer for rehabilitation will be actively marketed to residents that have been, or will be, relocated for the purposes of the Project. Residents that have been, or will be, relocated for the purposes of the Project will be provided with first preference for the purchase or lease of rehabilitated or newly constructed housing units; provided, however, such prospective purchasers or renters meet the same objective eligibility standards as other prospective purchasers or renters. The Developer shall provide the City with a marketing plan for Phase I within six months of the Effective Date of this Agreement.

**I.    Additions to Development Site**

The City recognizes that the Developer has initiated negotiations to add the following two parcels, or some portion of the parcels, to the Project Area:

**1.    Harbor City High School and adjacent land (1001 W. Saratoga Street).** This property is owned by the Mayor and City Council of Baltimore City, under the jurisdiction of the Baltimore City Public School System. The City will make all reasonable efforts to support improvements to the physical conditions and academic environment at this property.

**2.    North side of 900 block of W. Baltimore Street.** This block is bounded by Baltimore Street to the south, Fairmount Street to the north, Amity Street to the east, and Schroeder Street to the west. These properties are currently owned by the State of Maryland.

The City and the Department will make all reasonable efforts to assist in the conveyance of these properties to the Developer.

<u>**Schedule E**</u>

Poppleton Development I, LLC

Poppleton Neighborhood

# FORM OF MEMORANDUM OF UNDERSTANDING

**MEMORANDUM OF AGREEMENT**
**AMONG**
**THE MARYLAND DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT,**
**THE BALTIMORE CITY DEPARTMENT OF HOUSING AND COMMUNITY**
**DEVELOPMENT,**
**POPPLETON DEVELOPMENT I, LLC,**
**THE BALTIMORE COMMISSION FOR HISTORICAL AND ARCHITECTURAL**
**PRESERVATION**
**AND**
**THE MARYLAND HISTORICAL TRUST**
**REGARDING**
**THE POPPLETON HOUSING INITIATIVE**
**BALTIMORE, MARYLAND**

**WHEREAS**, the Baltimore City Department of Housing and Community Development (Baltimore DCHD) has requested funding from the Maryland Department of Housing and Community Development (MD DHCD) Community Legacy Program in order to acquire properties within the Poppleton Neighborhood of Baltimore, Maryland (Undertaking); and

**WHEREAS**, the properties acquired by the Baltimore DHCD will be transferred to Poppleton Development I, LLC (Poppleton Development), a private real estate development corporation, in order to assist in the implementation of Poppleton Development's redevelopment of the Poppleton Neighborhood; and

**WHEREAS**, the MD DHCD, the Baltimore Commission for Historical and Architectural Preservation (CHAP) and all other parties to this Memorandum of Agreement (Agreement) have consulted with the Maryland Historical Trust (Trust) pursuant to the Maryland Historical Trust Act of 1985, as amended, State Finance and Procurement Article §§ 5A-325 and 5A-326 of the Annotated Code of Maryland, in order to assess the effects of the Undertaking on historic properties; and

**WHEREAS**, the Trust has determined that the Undertaking will constitute an adverse effect on the National Historic Landmark/Maryland Register of Historic Properties (MIHP) listed Edgar Allan Poe House (MIHP Number B-50) at 203 N. Amity St., and the Maryland Register of Historic Properties-listed Sarah Ann Row Houses (MIHP Number B-2427) at 1102-1122 Sarah Ann St. and the Metro Metals Building (MIHP Number B-2444) at 900-902 W. Saratoga St.; and

**WHEREAS**, the Trust has also determined that the Undertaking will constitute an adverse effect on an adjacent Maryland Register of Historic Properties-listed historic district that was identified in a 1975 survey of the Poppleton Neighborhood (MIHP Number to be determined); and

**WHEREAS**, the Trust has also determined that the Undertaking has the potential to affect archeological site 18BC151, an archeological resource that may be eligible for listing in the Maryland Register of Historic Properties pending the results of site evaluation; and

**WHEREAS**, this Agreement establishes a process to consider the effects of the Undertaking on archeological resources in consultation with the Trust;

**NOW, THEREFORE**, the MD DHCD, the Baltimore DHCD, Poppleton Development, CHAP and the Trust agree that the Undertaking shall be implemented in accordance with the following stipulations in order to take into account its effects on historic properties.

**Stipulations**

The MD DHCD shall ensure that the following measures are carried out:

## PART ONE:  TREATMENT OF THE HISTORIC BUILT ENVIRONMENT

### A.    REVIEW OF NEW CONSTRUCTION:

Poppleton Development shall provide the Trust with an opportunity to review the design of all new construction projects within the redevelopment area by complying with the following stipulations:

1. Poppleton Development or its architects shall submit site plans and elevations to the Trust for a thirty (30) day review and comment period.

2. The review and comment period shall commence upon the date the Trust receives the site plans and elevations.

3. Trust comments may include recommendations for how the designs should be revised to better relate to the surrounding historic buildings and districts – especially with regard to how they relate to the National Historic Landmark Edgar Allan Poe House.

4. Poppleton Development shall incorporate and/or comply with all Trust comments to the maximum extent practicable.

5. Poppleton Development may assume that the Trust approves of the site plans and elevations if no comments are received within the review and comment period.

### B.    NATIONAL REGISTER OF HISTORIC PLACES NOMINATIONS:

Poppleton Development shall hire a historian or an architectural historian who meets *The Secretary of the Interior's Professional Qualification Standards* (36 CFR Part 61) and who has demonstrated experience in Maryland to complete National Register of Historic Places nominations (Nominations) in accordance with the following stipulations:

1. Nominations shall be completed for the Sarah Ann Row Houses, the Metro Metals Building and the historic district that was included in a 1975 survey of the Poppleton Neighborhood (see Attachment A for additional information)

2. Work on all Nominations shall begin no later than three (3) months from the date of the last signature on this Agreement.

3. All Nominations shall be completed within two (2) years from the date that work begins.

4. All Nominations shall be completed in accordance with *National Register Bulletin 16A* and all other applicable National Register guidance and Trust standards.

5. All Nominations shall be submitted to the Trust for review and comment.

6. All Nominations shall be revised per any Trust comments until such time that they are approved by the Trust.

7. Once approved by the Trust, all Nominations shall be submitted to the Keeper of the National Register of Historic Places for consideration and inclusion in the National Register of Historic Places.

8. Copies of each of the completed Nominations shall be submitted to the Trust and the Baltimore Commission for Historical and Architectural Preservation for accessioning into their libraries.

## C.   LOCAL DISTRICT DESIGNATION:

In order to provide additional protections and make the Sarah Ann Row Houses, the Metro Metals Building and the historic district identified in the 1975 survey of Poppleton eligible for historic preservation tax credits, CHAP shall begin actively pursuing local historic district designation of these three historic properties within three (3) months of the last signature on this Agreement. Local designation shall be carried out in accordance with established CHAP procedures. In the interest of finality with respect to the planning process, the Sarah Ann Row Houses and the Metro Metals Building are the only two properties within the Poppleton Housing Initiative Project Area boundaries that qualify as "historic properties" pursuant to State and/or Federal Historic Preservation Law and, therefore, these two properties, along with the historic district identified in the 1975 survey of Poppleton as shown on Attachement A comprise the entire list of properties for which local historic district designation shall be pursued. The Edgar Allan Poe House has already been designated a local historic landmark.

## D.   REHABILITATION OF THE SARAH ANN ROWHOUSES:

Poppleton Development shall preserve and rehabilitate the Sarah Ann Row Houses in strict accordance with *The Secretary of the Interior's Standards for the Treatment of Historic Properties* (36 CFR Part 68) by complying with the following stipulations:

1. Poppleton Development or its architects shall submit rehabilitation plans for the Sarah Ann Row Houses to the Trust for a thirty (30) day review and approval period.

2. The review and approval period shall commence upon the date the Trust receives the rehabilitation plans.

3. Poppleton Development shall revise the rehabilitation plans in accordance with all Trust comments until such time that the rehabilitation plans are approved by the Trust.

4.   Poppleton Development may assume Trust approval if the approval is not expressed in writing within forty-five (45) days.

5.   Alternately, should the Sarah Ann Row Houses rehabilitation project be eligible for the Federal and/or State historic preservation tax credit programs, Poppleton Development's full compliance with the requirements of those programs shall constitute Trust approval of the rehabilitation plans for purposes of this Agreement.

## E.   REHABILITATION OF THE METRO METALS BUILDING:

Poppleton Development shall preserve and rehabilitate the façades of the Metro Metals Building in accordance with *The Secretary of the Interior's Standards for the Treatment of Historic Properties* (36 CFR Part 68) by complying with the following stipulations:

1.   Poppleton Development or its architects shall submit rehabilitation plans for the façades of the Metro Metals Building to the Trust for a thirty (30) day review and comment period.

2.   The review and comment period shall commence upon the date the Trust receives the rehabilitation plans.

3.   Poppleton Development shall incorporate and/or comply with all Trust comments to the maximum extent feasible.

4.   Poppleton Development may assume that the Trust approves of the rehabilitation plans if no comments are received within the review and comment period.

5.   Alternately, should the Metro Metals Building rehabilitation project be eligible for the Federal and/or State historic preservation tax credit programs, Poppleton Development's full compliance with the requirements of those programs shall constitute Trust approval of the rehabilitation plans for purposes of this Agreement.

## PART TWO:  TREATMENT OF ARCHEOLOGICAL RESOURCES

### A.   EVALUATION OF SITE 18BC151:

Prior to initiation of any redevelopment ground disturbing or construction activities within the block containing site 18BC151 (the block bordered by North Schroeder St., West Baltimore St. West Fairmount Ave., and North Amity) , Poppleton Development shall evaluate the National Register/Maryland Register eligibility of archeological site 18BC151, in consultation with the Trust and in accordance with 36 CFR 800.4(c). Poppleton Development shall ensure that all work adheres to the relevant performance standards in this Agreement and shall provide a copy of the resulting draft report to the Trust for a thirty (30) day review and comment period.

### B.   TREATMENT OF SITE 18BC151:

If the Evaluation efforts outlined above identify any National Register/Maryland Register eligible archeological resources, Poppleton Development shall develop a plan for their avoidance, protection,

recovery, or destruction without recovery, and public education/interpretation in consultation with the Trust. Poppleton Development shall submit the treatment plan to the Trust for a thirty (30) day review period. Unless the Trust objects within 30 days after receipt of the plan, Poppleton Development shall implement the plan prior to the start of project ground disturbing activities within or immediately adjacent to the site area. Should data recovery investigations be warranted, Poppleton Development shall ensure that a data recovery plan is developed in consultation with the Trust, consistent with the performance standards outlined in this Agreement. The plan shall specify, at a minimum:

1. The property, properties, or portions of properties where data recovery is to be carried out, and any property that will be destroyed without data recovery;

2. Research questions to be addressed through data recovery, with an explanation of their relevance and importance;

3. The research methods to be used, with an explanation of their relevance to the research questions;

4. The methods to be used in analysis, data management, and data dissemination, including a schedule;

5. Proposed disposition of recovered materials and records;

6. Proposed methods for involving the interested public in the data recovery, and for disseminating the results of the work to the interested public; and

7. A proposed schedule for the submission of progress reports to the Trust.

Poppleton Development and the Trust will meet on-site to evaluate the success of the fieldwork phase of any data recovery program, near the end of the fieldwork efforts. Poppleton Development shall submit a management summary to the Trust documenting the completion of fieldwork for a fifteen (15) day review. Upon receipt of the written concurrence from the Trust, Poppleton Development may proceed with construction activities in the site areas concurrently with completion of the remaining laboratory, analyses, and reporting phases of the data recovery work.

### C.    PROFESSIONAL QUALIFICATIONS:

Poppleton Development shall ensure that all archeological work carried out pursuant to this Agreement is carried out by or under the direct supervision of a person or persons meeting, at a minimum, the *Secretary of the Interior's Professional Qualification Standards* (36 CFR Part 61, Appendix A).

### D.    STANDARDS AND GUIDELINES:

Poppleton Development shall ensure that all cultural resources investigations and work performed pursuant to this Agreement shall be conducted consistent with the principles and standards contained in the documents (and subsequent revisions thereof) listed below:

1. *Standards and Guidelines for Archeological Investigations in Maryland* (Shaffer and Cole 1994); and

2.   *Recommended Approach for Consultation on Recovery of Significant Information from Archeological Sites*, ACHP 1999 (64 FR 27085-27087).

### F.   CURATION:

All materials and records resulting from cultural resources investigations conducted pursuant to this Agreement shall be curated in accordance with 36 CFR 79 at the Maryland Archeological Conservation Laboratory, unless clear title or Deed of Gift to the collection can not be obtained.

### PART THREE: ADMINISTRATIVE CLAUSES

### A.   AMENDMENTS:

1.   Any party to this Agreement may request that it be amended, whereupon all parties will consult to consider such amendment.

2.   No amendment to this Agreement shall be valid unless all parties have agreed in writing.

### B.   DISPUTE RESOLUTION:

1.   Should any party to this Agreement object in writing to any action carried out or proposed in connection with the implementation of this Agreement, the signatories shall consult with the objecting party to resolve the objection. If, after initiating such consultation, the Trust determines that the objection cannot be resolved through consultation, the Director of the Trust shall identify what additional actions, if any, are necessary to maintain or achieve compliance with the Act.

2.   MD DHCD shall ensure that any actions identified by the Director of the Trust are carried out with reference only to the subject of the objection; the responsibility of MD DHCD to carry out all actions under this Agreement that are not the subjects of the objection shall remain unchanged.

### C.   TERMINATION:

1.   Any party to this Agreement may terminate it, for cause by providing thirty days notice to the other parties, provided that the parties will consult during the period prior to termination to seek agreement on amendments or other actions that would avoid termination.

2.   In the event of termination, the Director of the Trust shall identify what additional actions, if any, are necessary to maintain or achieve compliance with the Act.

3.   MD DHCD shall ensure that any actions identified by the Director of the Trust are carried out.

### D.   APPLICABILITY OF THIS AGREEMENT FOR POSSIBLE FUTURE FEDERAL OR STATE INVOVLEMENT:

This Agreement may be used to constitute compliance with all applicable Federal and State historic preservation legislation for any possible future Federal or State involvement (e.g. funding, licensing, permitting etc.) necessary to fulfill the goals of Poppleton Development's current Poppleton redevelopment plan provided that the following measures are carried out:

1.  Poppleton Development or the potentially involved Federal or State agency shall forward a written description of the proposed involvement and supporting documentation that fully explains what actions will result from said involvement.

2.  Within thirty (30) days of the receipt of the description and supporting documentation, the Trust shall provide a written response that 1.) requests additional information; or 2.) indicates that continued implementation of the review, comment and approval terms of this Agreement shall constitute a "conditional no adverse effect" on historic properties.

3.  The involved parties shall consult according to applicable regulations if the Trust determines that this Agreement is insufficient to constitute compliance with applicable Federal or State historic preservation legislation for the proposed Federal or State involvement.

## E.   DURATION:

This Agreement shall remain in effect for ten (10) years from the date of the last signature on this Agreement.

### SIGNATURES FOLLOW ON NEXT PAGE

Memorandum of Agreement
Poppleton Housing Initiative
Page 9

## PART FOUR: SIGNATURES

BY: _____ DATE: _____
    Victor Hoskins
    Secretary, Maryland Department of Housing and Community Development

BY: _____ DATE: 8/11/06
    Paul T. Graziano
    Commissioner, Baltimore Department of Housing and Community Development

BY: _____ DATE: July 11, 2006
    Dan Bythewood
    Managing Member, Poppleton Development I, LLC

BY: _____ DATE: 7/18/06
    Kathleen Kotarba,
    Executive Director, Baltimore Commission for Historical and Architectural Preservation

BY: _____ DATE: _____
    J. Rodney Little
    Director/State Historic
    Preservation Officer

APPROVED AS TO FORM AND LEGAL SUFFICIENCY

BY: _____ DATE: 7/28/06
    Chief Solicitor

**ATTACHMENT A**
**THE HISTORIC DISTRICT ADJACENT TO**
**THE POPPLETON HOUSING INITIATIVE PROJECT AREA**
**AS DEFINED IN THE 1975 POPPLETON HISTORIC SURVEY**
**BALTIMORE, MARYLAND**

The Maryland Historical Trust has determined that only the ***southern portion*** of the 1975 Poppleton Historic Study Area is eligible for listing in the National Register of Historic Places and is, therefore, listed in the Maryland Register of Historic Properties. The historic district has not yet been named in order to avoid any confusion with the current redevelopment efforts being undertaken in the northern portion of the Poppleton Historic Survey Area (which was determined ineligible for listing in the National Register/Maryland Register). Although the Poppleton Housing Initiative will not directly affect the historic district, it will introduce new visual and audible elements and it has the potential to spark new development that may extend within the boundaries of the historic district. Those boundaries are generally defined as follows:

Northern Boundary – West Baltimore Street
Southern Boundary – West Pratt Street
Western Boundary – the boundaries of the Union Square and Franklin Square National Register Historic
        Districts.
Eastern Boundary – Martin Luther King Jr. Boulevard and the boundaries of the Barre Circle National
        Register Historic District.

The National Register of Historic Places Nomination that will be prepared for the historic district should also include the few properties within the 900 Block of Lemmon Street that compose the small, local Railroad Historic District.

<u>**Schedule F**</u>

Poppleton Development I, LLC

Poppleton Neighborhood

**PHASING PLAN**

