**IN THE**
**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Northern Division**

| | | |
|---|---|---|
| **POPPLETON DEVELOPMENT I, LLC,** | * | |
| | * | |
| **PLAINTIFF,** | * | |
| | * | |
| **v.** | * | **Case No. _____** |
| | * | |
| **THE MAYOR AND CITY COUNCIL** | * | |
| **OF BALTIMORE,** *et al.,* | * | |
| | * | |
| **DEFENDANTS.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OF LAW**
**IN SUPPORT OF PLAINTIFF POPPLETON**
**DEVELOPMENT I, LLC'S APPLICATION FOR TEMPORARY**
**RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION**

Charles S. Fax, Fed. Bar No. 02490
Scott A. Livingston, Fed. Bar No. 03246
Liesel Schopler, Fed. Bar No. 17280
Rifkin, Livingston, Levitan & Silver, LLC
7979 Old Georgetown Road
Suite 400
Bethesda, Maryland 20814
Telephone: (301) 951-0150
Facsimile: (301) 951-0172
Email: cfax@rlls.com
scottlivingston@rlls.com
lschopler@rlls.com

June 27, 2012

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   iii

I.     INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

II.    FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

       A.    Background And Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

       B.    The RFQ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

       C.    The LDDA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

       D.    The City Failed To Fulfill Its Commitments And Obligations
             Under The LDDA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

             1.    The City delayed in acquiring all of the properties, in violation
                   of Sections 1.2(a) and 1.2(b) of the LDDA. . . . . . . . . . . . . . . . . . .   12

             2.    The City failed to clear timely all buildings and other structures,
                   in violation of Section 1.5(b) of the LDDA. . . . . . . . . . . . . . . . . . .   13

             3.    The City failed to acquire all properties in Phase I
                   before requiring that Poppleton I close on Phase I,
                   in violation of Section 1.9 of the LDDA.  . . . . . . . . . . . . . . . . . . .   14

             4.    The City failed to assist Poppleton in good faith in obtaining
                   financing, in violation of Section 1.17 of the LDDA. . . . . . . . . . . .   15

             5.    The City failed to use all reasonable efforts to insure adequate
                   security for the area, in violation of Section 2.8 of the LDDA. . . . . .   17

       E.    The City's Failure To Fulfill Timely Its Commitments And Obligations
             Under The LDDA, Together With The Economic Recession, Have
             Triggered Its *Force Majeure* Clause, LDDA Section 7.9, Deferring
             The Date By Which Poppleton I Must Close on Subphase IA . . . . . . . . . . .   18

       F.    The City's Unlawful Declaration Of Default . . . . . . . . . . . . . . . . . . . . . .   20

III.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

       A.    The Court Has Federal Diversity Jurisdiction In This Case . . . . . . . . . . . .   26

B.    The Standards For Granting A Temporary Restraining Order
      And A Preliminary Injunction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    27

C.    Poppleton I Meets The Standards For Issuance Of A Temporary
      Restraining Order And A Preliminary Injunction . . . . . . . . . . . . . . . . . . . . .    28

      1.    Poppleton I Will Suffer Irreparable Injury Absent Interlocutory
            Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    28

      2.    Poppleton I Is Likely To Succeed On The Merits Of Its Claims
            For Breach of Contract and Declaratory Judgment . . . . . . . . . . . . . .    31

            a.    Breach of Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    31

            b.    Specific Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    34

      3.    The Balancing Of Equities Favors The Issuance Of
            Emergency Equitable Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    37

      4.    The Public Interest Strongly Favors The Issuance Of
            Emergency Equitable Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    38

IV.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    39

# TABLE OF AUTHORITIES

<u>CASES</u>

*Ady v. Jenkins*, 133 Md. 36, 104 A. 178 (1918) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36-37

*Baltimore Teachers Union v. Mayor and City Council of Baltimore,*
108 Md. App. 167, 671 A.2d 80 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

*Bey v. Moorish Sci. Temple of Am.,* 362 Md. 339, 765 A.2d 132 (2001) . . . . . . . . . . . . . .   28-29

*Board of County Comm'rs. v. MacPhail*, 214 Md. 192, 133 A.2d 96 (1957) . . . . . . . . . . .   34

*Central W. Virginia Energy Co., Inc. v. Mountain State Carbon, LLC,*
636 F. 3d 101 (4th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

*City of Tucson v. United States W. Communs*., 284 F.3d 1128 (9th Cir. 2002) . . . . . . . . .   27

*Clark v. O'Malley*, 186 Md. App. 194, 973 A.2d 821 (2009) . . . . . . . . . . . . . . . . . . . . . . .   27

*Cohen v. Baltimore County*, 229 Md. 519, 185 A.2d 185 (1962) . . . . . . . . . . . . . . . . . . . .   35

*Columbia Gas Transmission, LLC v. Caiman Energy, LLC,*
2011 U.S. Dist. LEXIS 69833 (N.D. W. Va. June 27, 2011) . . . . . . . . . . . . . . . . . . . . . . .   37

*Dudley and Carpenter v. Hurst*, 67 Md. 44, 8 A. 901 (1887) . . . . . . . . . . . . . . . . . . . . . . .   29

*Harper v. Kloster*, 486 F.2d 1134 (4th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

*Illinois v. Kerr-McGee Chemical Corp*., 677 F.2d 571 (7th Cir. 1982) . . . . . . . . . . . . . . . .   27

*Int'l Fid. Ins. Co. v. Waterfront Group NC, LLC,* 2011 U.S. Dist. LEXIS 116311
(W.D.N.C. Oct. 6, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38

*Jackson v. Volunteers of Am. Chesapeake, Inc*., 2011 U.S. Dist. LEXIS 68934
(D. Md. June 27, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

*JBG/JER Shady Grove, LLC v. Eastman Kodak Co.*, 127 F. Supp. 2d 700
(D. Md. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

*Kelly v. Debelius*, 2010 U.S. Dist. LEXIS 92046 (D. Md. Sept. 3, 2010) . . . . . . . . . . . . .   28

*Maryland-Nat'l Capital Park and Planning Comm'n v. Washington Nat'l Arena,*
282 Md. 588, 386 A.2d 1216 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

*Maslow v. Vanguri*, 168 Md. App. 298, 896 A.2d 408 (2006) . . . . . . . . . . . . . . . . . . . . . .   35

*Mathis v. Hargrove*, 166 Md. App. 286, 888 A.2d 377 (2005) . . . . . . . . . . . . . . . . . . . . . . 31

*Moor v. County of Alameda*, 411 U.S. 693 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*NaturaLawn of Am., Inc. v. West Group, LLC*, 484 F. Supp. 2d 392 (D. Md. 2007) . . . . . . 34

*Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342
(4th Cir. 2009), *vacated on other grounds*, 130 S. Ct. 2371 (2010),
*reissued in relevant part on remand*, 607 F.3d 355 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . 27-28

*Rieser v. District of Columbia*, 563 F.2d 462 (D.C. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Rockville v. Brookeville Turnpike Constr. Co.*, 246 Md. 117, 228 A.2d 263 (1967) . . . . . . 35

*Rockville Pike Joint Venture L.P. v. Thermopylae, LLC*, 2011 Bankr. LEXIS 3029
(Bankr. D. Md. Aug. 5, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Schaftel v. Highpointe Business Trust*, 2012 U.S. Dist. LEXIS 8118
(D. Md. Jan. 24, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Scott v. Bierman*, 2011 U.S. App. LEXIS 9773 (4th Cir. May 12, 2011) . . . . . . . . . . . . . . 27

*Speed v. Bailey*, 153 Md. 655, 139 A. 534 (1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35-36

*Taylor v. Nationsbank, N.A.*, 365 Md. 166, 776 A.2d 645 (2001) . . . . . . . . . . . . . . . . . . . . 31

*Wachovia Ins. Serv., Inc. v. Hinds,* 2007 U.S. Dist. LEXIS 82103
(D. Md. Aug. 30, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Washington Metro Transit Auth. & Potomac Inv. Props., Inc.*, 476 F.3d 231
(4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Wilcom v. Wilcom*, 66 Md. App. 84, 502 A.2d 1076 (1986) . . . . . . . . . . . . . . . . . . . . . . . . 33

*Williams v. Maryland*, 2011 U.S. Dist LEXIS 85619 (D. Md. Aug. 3, 2011). . . . . . . . . . . 28

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) . . . . . . . . . . . . . . . 37

## STATUTES

28 U.S.C. § 1332(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## RULES

Fed.R.Civ.P. 65 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Local Rule (D. Md.) 105 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

OTHER AUTHORITIES

Restatement (Second) of Contracts, § 237 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

POPPLETON DEVELOPMENT I, LLC,     *
                                     *
      PLAINTIFF,                *
                                     *
v.                                 *      Case No. _____
                                     *
THE MAYOR AND CITY COUNCIL     *
OF BALTIMORE, *et al.*,            *
                                     *
      DEFENDANTS.         *
                                     *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

MEMORANDUM OF LAW
IN SUPPORT OF PLAINTIFF POPPLETON
DEVELOPMENT I, LLC'S APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

**I.     INTRODUCTION**

     Plaintiff Poppleton Development I, LLC (hereinafter "Plaintiff," "Poppleton I" or "the Developer"), through its undersigned attorneys, in accordance with Fed. R. Civ. P. 65 and Rule 105 of the Rules of this Court, submits this Memorandum of Law in Support of its Application for Temporary Restraining Order and Motion for Preliminary Injunction. The Defendants are the Mayor and City Council of Baltimore, a Body Corporate and Politics and a Political Subdivision of the State of Maryland; the Baltimore City Department of Housing and Community Development ("HCD"); and Paul T. Graziano, in his official capacity as Commissioner of HCD (hereinafter collectively "Defendants," "Baltimore City" or "the City").

     Poppleton I and the City are the parties to a real estate development contract entered into by a prior mayoral administration in 2006 – the Land Disposition and Development Agreement ("LDDA" or "Project") (**Exhibit 1** to the Verified Complaint filed herewith). The LDDA

provides for Poppleton I's redevelopment of a 13.8 acre portion of the Poppleton neighborhood that lies west of Martin Luther King Boulevard on the west side of downtown Baltimore City, adjacent to the University of Maryland Biopark.  Poppleton I has been performing under the LDDA for six years, and thus far has invested over $7.5 million of its own money in the Project.

On May 2, 2012, under its current administration, the City peremptorily issued a notice of default to Poppleton I, to take effect on July 2, 2012, absent performance of certain commercially untenable conditions that violate the plain meaning and intent of the LDDA, and which cannot reasonably be met by Poppleton I.  The notice of default clearly violates the LDDA.

Poppleton I's application for temporary restraining order and preliminary injunction, filed herewith, asks the Court to temporarily restrain and preliminarily enjoin the City from terminating Poppleton I's performance of the LDDA pursuant to the City's notice of default, pending a plenary hearing on the merits of Poppleton I's claim.

As shown by the facts and discussion of law hereinbelow, Poppleton I – as well as the entire Poppleton community – will be immediately and irreparably injured if the City's unwarranted, peremptory notice of default is not suspended *pendente lite*.   As further demonstrated below, Poppleton I is likely to prevail on the merits of its case.  Moreover, the balancing of equities supports the issuance of emergency, temporarily relief; the harm to Poppleton I will be immediate and irreparable if temporary injunctive relief does not issue, but any harm to the City will be negligible at best if the emergency relief sought herein is later determined to have been improvidently granted.  Finally, it is abundantly clear that the public interest strongly favors the issuance of the temporary emergency relief sought herein.

II.   **FACTS**

A.   **Background And Overview**

Although only minutes from downtown, the Poppleton neighborhood in West Baltimore – among the oldest parts of the City – was, as recently as 2008, a terribly blighted area with open-air drug markets flourishing twenty-four hours a day and one of the highest homicide and overall crime rates in Baltimore.  Since 1975 Poppleton has been designated as an urban renewal zone.  In 2006, under a previous mayoral administration, Baltimore City developed an ambitious plan to redevelop a 13.8 acre site within the Poppleton neighborhood, part of which the City already owned, to make it a thriving, safe and secure community within which to live near the major employment opportunities and amenities of downtown.  Through HCD, the City proposed to acquire the rest of the property through condemnation; clear the properties of structures and obstructions; sell the land to a developer; and work with the developer to rebuild the area with mixed use buildings including single-family homes, apartments, commercial units and all of the amenities expected in a new, thriving middle-class neighborhood.   Verified Complaint (hereinafter "Compl."), ¶ 1.

Through HCD, the City issued a Request for Qualifications ("RFQ"), to which a number of national and regional developers, including Poppleton I, responded.  Poppleton I was chosen as the most qualified respondent on the strength of its superior qualifications and its comprehensive plan for a modern, progressive, mixed-income community including a robust commercial corridor.  Thereafter, Baltimore City and Poppleton I negotiated the LDDA, an agreement detailing the rights and obligations of the Developer and the City regarding development of the awarded properties, Compl., Ex. 1.  The LDDA was approved by the Baltimore City Board of Estimates on September 27, 2006.  Compl., ¶ 2.

As envisioned by Poppleton I, Subphase IA of the Project will include the development of approximately 60,000-90,000 square feet of commercial space to serve the neighborhood, which currently is grossly underserved by retail and food services.  Poppleton I –committed to attracting a strong, healthy grocer as an anchor tenant for the Project – has received a letter of intent from and is in active negotiations with Praxis Marketplace, an urban grocery retailer that is dedicated to bringing fresh-food grocery stores to underserved urban centers.  Poppleton I has also received a letter of interest from LVMH, a multinational apparels and accessories company that is interested in placing one of its international retail brands in Poppleton.  Further, Poppleton I is partnering with Jonathan Stern of Stern Holdings, LLC, whose family is the founder of TJ Maxx, BJ's, Marshalls, Home Goods, and other national retail chains.  Mr. Stern has expressed an interest in bringing these national retail brands to the Poppleton development.   Other anticipated retail uses include restaurants, retail shops, business services shops such as a FedEx or UPS store, and neighborhood services such as dry cleaners, nail salons, hardware shops, and pharmacies.  The Project will also involve the development of parking, municipal services, a charter school, and active and passive green space, including the complete redevelopment of a six-acre park located in the center of the Project site, as well as street beautification and landscaping.  Compl. ¶¶ 3-5.

Subphase IA of the Project will involve the development of a variety of green spaces, as well as a public park to be located opposite the Edgar Allen Poe House.  The Poe House, where the famed author lived between approximately 1832 and 1835, is a National Historic Landmark open to the public.  The public park is intended to complement this historic property, allow access and provide a gathering space in proximity to the historic site.  Phase II of the Project will also involve the creation of a neighborhood charter school to be housed at the site of the current

Francis M. Wood School.  The Poppleton I development team has partnered with the Shuren-Ribet Private School, a highly successful program located in Beijing, China.  Shuren Ribet was founded in 1993 on the principles of creativity and encouragement of international exchange, cultural understanding and strong language skills.  Through various collaborations with schools and institutes overseas, Shuren-Ribet offers students a gateway to the world through a variety of cultural exchange programs.  Compl., ¶¶ 6, 7.[1]

Between the execution of the LDDA and now – for the past six years – Poppleton I has diligently sought to perform its obligations under the LDDA, spending over $7.5 million of its own money in the process.  The City, however, has dragged its feet from the outset, failing to meet many of its obligations on time, and in some instances failing to meet them altogether.  Financing – which would have been much more readily available before 2008, when the worst recession since the Great Depression began – became more tenuous due to the City's delays, putting the Project back by several years and setting it squarely in the trough of the terrible economic downturn.  Compl., ¶ 9.

Municipal winds have now shifted, and Baltimore City has recently decided to renege on its commitments and try to remove Poppleton I from the Project.  As a condition of closing on the first phase of the Project, Poppleton I was required to produce evidence that it had obtained adequate financing for construction of the Improvements (defined in Section 1.6 of the LDDA to include the structures to be constructed, landscaping and utilities).  Poppleton I produced financial commitment letters from major lenders that were commercially reasonable and

---

[1] Additionally, the Project will involve the creation of a state of the art tennis facility owned and operated by the United States Tennis Association ("USTA").  The USTA tennis training and High Performance Tennis Center will provide programming to target and develop tennis skills among Baltimore youth, and will be the next training site for tennis's rising stars.   This facility will also become a home for league play, tournaments, and recreational pay-to-play, and an entertainment and recreation destination for the community.  Compl., ¶ 8.

appropriate at that stage of the Project.  In a letter dated April 18, 2012, however, HCD, for the first time, challenged the sufficiency of those letters, asserting that Poppleton I appeared to lack the financial resources to close on the first phase of the Project.  Compl. ¶ 10.

This is a demonstrably false and pretextual excuse for ignoring the City's responsibilities in the LDDA, and is a clear violation of its terms.  Under the LDDA, preliminary plans for the properties are not due to be submitted to the City until 120 days after Poppleton I's acquisition of the property, and the City is not obligated to approve such plans until 30 days later.  Moreover, construction plans are not due to be submitted by Poppleton I to the City until 210 days after approval of the preliminary plans – and approval of construction plans would not occur until 30 days later.  No responsible lender would issue a final commitment letter to provide financing absent prior approval of construction plans, among other prerequisites.  The evidence of financing that Poppleton I submitted to the City was commercially reasonable and appropriate in accordance with the construction timetable set forth in the LDDA.  Compl. ¶ 11.

On May 2, 2012, Baltimore City peremptorily and wrongfully declared Poppleton I in default of the LDDA, based on the pretext that Poppleton I had failed to obtain adequate financing.  The City announced that it would terminate the LDDA on July 1 unless Poppleton I met certain unreasonable and unattainable conditions by that date.  Compl., **Exhibit 2**.

This suit arises out of the City's breach of and failure to perform its obligations under the LDDA; the City's unlawful effort to terminate Poppleton I's performance; and the immediate and irreparable injury that Poppleton will suffer if the City is not preliminarily and permanently enjoined from doing so.  Moreover, absent the issuance of preliminary and permanent relief from this Court, the Poppleton community itself will be irreparably injured by Baltimore City's unjust and unlawful declaration of default.  Thus, this suit seeks not only to protect and vindicate

Poppleton I's rights and interests, but also to insure that the Poppleton neighborhood is redeveloped in accordance with the LDDA and the interests of all citizens of Baltimore.

**B.      The RFQ**

The Poppleton neighborhood is located in West Baltimore on the fringe of Baltimore's central business district.  The area is bounded by Franklin Street on the north, West Baltimore Street on the south, Martin Luther King, Jr. Boulevard on the east and Carey Street on the west. Annexed by Baltimore City in 1816, much of Poppleton's housing stock is among the oldest in the City.  Poppleton abuts the burgeoning University of Maryland Biotech Center, which is located on the north side of West Baltimore Street from Martin Luther King, Jr. Boulevard on the east to North Schroeder Street on the west.  In 2003, anticipating the construction of the Biotech Center, a new housing development in Poppleton was proposed to capitalize on that proximity and improve the quality of housing and life in that neighborhood.  Compl., ¶¶ 24, 25.

On July 30, 2004, Baltimore City issued a Request for Qualifications (hereinafter "RFQ") for redevelopment of the Poppleton neighborhood by qualified developers into housing or other compatible uses.  Compl., **Exhibit 3**.  The portion of the Poppleton neighborhood slated for redevelopment (hereinafter "the Site") consisted of 13.8 acres and 526 properties bounded roughly by West Mulberry Street on the north, North Amity Street on the east, West Fairmount Street on the south and North Carrollton Avenue on the west.  A schematic drawing showing the area slated for redevelopment is attached to the Verified Complaint as **Exhibit 4**.

The RFQ announced that it was seeking to identify a development team to "participate in the planning and design phases, redevelopment, and ownership and management of properties to be developed on the Site . . . The development team must be able to create a bold program that can play a role in transforming the neighborhood.   There must be a commitment and

demonstrated ability to retain the urban fabric of the neighborhood, while providing housing that can compete in the regional market place."  Compl., Ex. 2, RFQ at II.  The RFQ further specified that the Site included 207 properties then owned by the City; 171 properties for which acquisition by the City was then underway; and 168 properties that the City committed to "us[ing] its authority to acquire."  *Id.*.  The RFQ contemplated that the City would acquire all of the properties within the Site and convey them to the developer with clear title.  A number of national and regional developers competed in response to the City's RFQ.  Poppleton I was selected by the City as the awardee based on Poppleton I's strong, successful track record in urban redevelopments of this type. *Id.*, ¶¶ 27-29.

> **C.**   **The LDDA**

Negotiations then ensued between Poppleton I and Baltimore City over the terms of the LDDA.  The parties agreed that development would progress, at the option of the Developer, in phases and subphases – including, as to Phase I, Subphases IA and IB – until the Project was complete.  Poppleton I would not be required to start construction in any given phase until the City had acquired, and conveyed to Poppleton I, all properties within that phase, and had cleared them of all buildings and other structures.  Final agreement was reached between the parties, and the LDDA was executed by Poppleton I, on or about September 2, 2006.  It was then approved by Defendant Graziano on behalf of HCD and signed by him on behalf of Baltimore City. Thereafter, upon his formal recommendation (the "Memorandum"), the Baltimore City Board of Estimates approved the LDDA on September 27, 2006.  Compl., **Exhibit 5.**  The Memorandum alerted the Board that "[t]he developer expects to begin construction on the first phase of the project in 2007." *Id*.

Material provisions in the LDDA (Compl., Ex. 1), include the following:

1.  Article I (General Terms of Conveyance), at Section 1.2 (a) (Land Assemblage and Acquisition) on Page 2 of the LDDA, Compl., Ex. 1, requires that Baltimore City "shall use its **best efforts and all legal authority** to acquire all of the Properties identified on Schedule A that the City does not already own as of the Effective Date [of the agreement] . . . In addition, the City will take **all necessary steps to redeem or eliminate ground rents on all Properties** to be conveyed to the Developer."   (Bold-face has been added to this subparagraph and those that follow in order to emphasize key language within the quotes.).

2.  Section 1.2(b) on Page 2 of the LDDA, Compl., Ex. 1, reinforces the City's duty of best efforts to acquire the subject properties:

> The City agrees to commence acquisition proceedings with respect to Properties located in Phase I (as identified in Schedule A) within thirty (30) days of the Effective Date **and to diligently proceed with all such acquisition proceedings**.  **The City will use its best efforts to acquire Properties in accordance with the Phasing Plan**.  The timing of the acquisitions will be dependent upon the City's access to funding sources for the Project.  **The City will provide at least bi-weekly reports to the Developer regarding the status of each Property acquisition and the schedule for completing any remaining acquisitions.**

3.  Section 1.5(b) ("Condition of the Property"), Ex. 1 at page 3,  states:

> The Properties identified as "New Construction" in Schedule A of this Agreement are to be delivered to the Developer **free of all buildings and other structures.  All existing utilities will either be removed or capped by the City during the demolition and clearing work and prior to closing**.

4.  Section 1.9 ("Closing"), Ex. 1 at p. 4, recites that:

> . . . the Developer shall not be required to go to Closing on any Phase or subphase unless the City is able to convey all of the Properties in such Phase or subphase.  Closing for the entirety of each Phase must occur with 18 months of **the City's acquisition of all Properties within a given Phase**. . . . The City shall give written notice to the Developer when the City has acquired title to all of the Properties in each Phase.

The significance of these provisions is that the 18-month deadline for closing a particular Phase or Subphase, including all of the obligations of the Developer pursuant thereto (*e.g*., adequate demonstration of financing), does not start to run until (a) the City had acquired *all* of the properties within that Phase or Subphase (including, as to Phase I, the properties in Block 157, per Exhibit A to the LDDA); and (b) the City has then given *proper notice of same* to Poppleton I, triggering commencement of the 18-month deadline.

5.     Section 1.17 of the LDDA ("Financing Support by the City"), Ex. 1 at page 5, commits the City "**in good faith [to] seek to assist the Project through the following sources**. However, the Department shall make no guarantees as to the success of obtaining funding through the following sources."  The sources include, *inter alia*, Tax Increment Financing and HUD Financing.

6.     Section 2.8 ("Security"), also at page 7 of Ex. 1, recites that ". . . **the City shall use all reasonable efforts to insure that the Project Area receives added attention and security measures from the Baltimore City Police Department, including but not limited to, the manning of the Poppleton substation and utilization of the "police officer next door" program**."  The parties recognized that the City's failure to adhere to this condition could easily undermine the ability to get financing, as a lender would be unwilling to invest in insecure properties that could be compromised, or whose value could decline due to unsafe conditions in the neighborhood.

7.     Section 3.13 of the LDDA ("Completion of Construction"), Ex. 1 at page 11, sets forth a series of deadlines, and then states:

> **Each of the deadlines set forth in Section 3.11 and this Section 3.13 shall be extended by an Event of Force Majeure (as defined in Section 7.9 below)**.  Each of the deadlines in this

Section 3.13 may also be subject to such adjustments as may be warranted by the rate of sales and/or leasing or the findings of an economic feasibility and absorption study conducted by or on behalf of the Developer during the development of the Project in the Developer's reasonable discretion (each a "Market Demand Study").  To the extent the goals and benchmarks identified above are not supported by the rate of sales and/or leasing or the Market Demand Study, the Developer may request an extension of the deadlines from the Department.  In addition, the deadline for Phase I shall be extended automatically for twelve (12) months upon the request of the Developer if site preparation and foundations for Phase I Improvements have been completed, and may be extended for longer periods of time by permission of the Department. Failure to complete the Improvements according to this schedule shall constitute an event of default (unless the delay is due to a default of the City under this Agreement).

8.      Section 7.9 of the LDDA ("Force Majeure"), Ex. 1 at page 23, states that:

**[f]or the purpose of any of the provisions of this Agreement, neither the City (including the Department) nor the Developer, as the case may be . . . shall be considered in breach of or in default in its obligations . . . if the delay in the performance of such obligations is due to causes beyond its control** or without its fault or negligence, including but not restricted to acts of God or of the public enemy, acts of government . . . **acts of the other party . . . material economic downturn** . . . inability to obtain governmental permits or approvals (notwithstanding good faith and diligent efforts) . . . it being the purpose and intent of this Section that in the event of the occurrence of any such delays, the time or times for the performance of the obligations of the parties hereto shall be extended for the period of the delay (including any time reasonable required to recommence performance due to such delay); provided, however, that the party seeking the benefit of the provisions of this Section shall, within thirty (30) days after said party has knowledge of the beginning of any such delay, have first notified the other party thereof in writing of the cause or causes thereof, which entitles such party to an extension of time.  The affected party shall use commercially reasonable efforts to remedy with all reasonable dispatch the cause or causes preventing it from carrying out this Agreement; and provided further, that the settlement of strikes . . . .  Any failure to provide notice within the timeframe provided above shall not deny the benefit of this provision to the party seeking its protection; however the delay in delivery of such notice beyond such timeframe shall be deemed to

11

reduce the period for performance of any provisions delayed by the
Event of Force Majeure.

**D.     The City Failed To Fulfill Its Commitments And Obligations Under The
        LDDA**

1.     The City delayed in acquiring all of the properties, in violation of Sections
       1.2(a) and 1.2(b) of the LDDA.

Although the timetable set forth in the LDDA presumed Poppleton's commencement of

construction of Phase I in 2007 – meaning that the City would have acquired all of Phase I before

then and conveyed it to Poppleton I – the City failed to meet its deadline.  Poppleton I repeatedly

complained to the City about its inordinate delays, but to no avail.  *See, e.g*., Compl., **Exhibit 6**

(e-mail dated July 12, 2007, at 11:15 a.m. from Dan Bythewood to Andrew Frank); **Exhibit 7** (e-

mail dated July 20, 2007, at 12:28 p.m. from Ed Hitchcock to Andrew Frank); **Exhibit 8** (e-mail

dated May 20, 2008, at 5:18 p.m., from Ed Hitchcock to Andrew Frank); **Exhibit 9** (e-mail dated

May 21, 2008, at 12:43 p.m., from Ed Hitchcock to Andrew Frank); and **Exhibit 10** (e-mail

chain dated June 3, 2008, starting at 2:23 p.m. and ending at 10:55 p.m., between Alastair Smith

and Dan Bythewood).

This delay was attributable to the City's failure to acquire free and clear title to all of the

pertinent properties in a timely fashion, a failure acknowledged by the City in numerous

exchanges of e-mails with Poppleton I.  *See, e.g*., Compl., **Exhibit 11** (e-mail dated May 21,

2008, at 12:45 p.m., from Andrew Frank to Ed Hitchcock); **Exhibit 12** (e-mail dated December

10, 2008, at 1:13 p.m. from Alastair Smith to Ed Hitchcock); and **Exhibit 13** (e-mail dated

January 13, 2011, at 12:43 p.m. from Alastair Smith (HABC) to Dan Bythewood).

The City's failure to meet the 2007 deadline for acquisition of the Phase I properties is

also acknowledged in its notice of default, Compl., Ex. 2, in which the City announces that it had

acquired all of Phase I by July 2, 2010 – that is, three years after the deadline presumed in the

LDDA.  In fact, however, even that assertion was inaccurate.  As of July 2, 2010, contrary to its bald assertion in its notice of default, the City had failed to acquire good title to a number of properties within Phase I, including, but not necessarily limited to, 237 N. Schroeder Street, 215 N. Schroeder Street, 900 W. Saratoga Street, 902 W. Saratoga Street, 931 W. Saratoga Street, 940 West Lexington Street, 941 W. Saratoga Street and 952 West Saratoga Street.  Even more egregiously, even now, as of the date of filing of this Verified Complaint, contrary to its bald representations upon which its unlawful notice of default ostensibly rests, Phase I has not been fully acquired by the City.  Properties not acquired include, but are not necessarily limited to 900 W. Saratoga Street and 902 West Saratoga Street.[2]  Compl., ¶¶ 41-43.

> 2. The City failed to clear timely all buildings and other structures, in violation of Section 1.5(b) of the LDDA.

The LDDA required that the City deliver subject properties to Poppleton I "free of all buildings and other structures," and that all existing utilities would either be removed or capped. This obligated the City, *inter alia*, to demolish all structures and clear the remaining construction debris, as well as remove or cap all utilities – before Poppleton I was obligated to close on its acquisition of the properties from the City.  The City, however, delayed in the performance of its demolition and clearing responsibilities, *see*, *e.g.,* Compl., **Exhibit 14** (e-mail dated January 5, 2011, at 4:48 p.m. from Dan Bythewood to Alastair Smith); and **Exhibit 15** (e-mail dated January 13, 2011, at 12:43 p.m. from Alastair Smith to Dan Bythewood).

In violation of the LDDA, and contrary to the representations in its letter of default dated May 2, 2012, the City had not demolished all buildings and other structures on the subject

---

[2] It is noted that several of these properties are in Block 0157, which was initially considered part of Phase IV for all purposes.  However, the LDDA provides: "Notwithstanding the fact that the Properties located in Block 0157 and listed immediately above are in Phase 4, the City will acquire such Properties and conduct clearing activities with respect to such Properties in connection with Phase 1 for purposes of neighborhood safety."

properties, nor had the City removed or capped all utilities, so as to be able to deliver the properties in Phase I and/or Subphase IA to Poppleton I, by July 2, 2010, "free of all buildings and other structures," including removal of utilities and demolition debris.  In fact, even now, as of the date of the filing of this Verified Complaint, the City has not removed from the pertinent properties all utilities and construction debris incident to demolition activities, including, but not necessarily limited to, construction debris and utilities on Blocks 202, 187, 172 and 157 (as to which demolition of existing structures has not even been completed).  *See generally*, Compl., **Exhibits 16–22** (photographs taken by Dan Bythewood on March 31, 2012, showing unremoved utilities and construction debris).  *Id*., ¶¶ 46, 47.

> 3.  The City failed to acquire all properties in Phase I before requiring that Poppleton I close on Phase I, in violation of Section 1.9 of the LDDA.

As discussed above, Section 1.9 of the LDDA does not obligate Poppleton I to close its purchase of the City-owned properties within a given Phase until 18 months after the City's acquisition of all Properties in that Phase.  Thus, as the City had not acquired all properties within Phase I by July 2, 2010 – notwithstanding the erroneous assertion to the contrary in the City's default letter of May 2, 2012 – Poppleton I was not required to acquire Phase I or Subphase IA within 18 months thereafter, *i.e*., by January 2, 2012.  Moreover, even though the January 2012 deadline for closing was extended until May 2, 2012 (Compl., Ex. 2), Poppleton I was not obligated to close then, because: (a) the City's July 2, 2010 statement that it has acquired all subject properties in accordance with the terms of the LDDA was false, and therefore the 18 months for closing by Poppleton was not then triggered; (b) the City never issued a superseding notice that it had acquired all subject properties, and therefore the 18 months for closing by

Poppleton was *never* triggered; and/or (c) to this day, the City has not acquired all subject properties in accordance with the terms of the LDDA.  Compl., ¶¶ 48, 49.

4.   The City failed to assist Poppleton in good faith in obtaining financing, in violation of Section 1.17 of the LDDA.

As discussed above, the City committed itself "in good faith" to assist Poppleton I in obtaining financing, including Tax Increment Financing ("TIF") and HUD Financing.[3]  However the City, in bad faith, breached its obligation to assist Poppleton I in obtaining such financing. Poppleton I, through its investment contacts, introduced the City to a number of potential lenders, including JP Morgan, Fannie Mae lenders and other institutions – and yet the City consistently failed to follow up on these introductions, and failed to support, much less advocate for, Poppleton I's own efforts to obtain such financing.  Compl., ¶¶ 50, 51.

Further, the City first delayed, and then reneged on, its contractual commitment to assist Poppleton I in a timely fashion in obtaining TIF financing.  Poppleton I, starting in early 2011 and throughout the spring, sought assistance from the City in initiating the process to obtain TIF financing (in anticipation of the 18-month deadline for closing in January 2012, imposed upon Poppleton by the City).  *See, e.g.*, Compl., **Exhibit 23** (e-mail dated January 5, 2011, at 4:48 p.m. from Dan Bythewood to Alastair Smith); **Exhibit 24** (e-mail dated February 3, 2011, at 11:23 a.m. from Alastair Smith to Danielle Zoller); **Exhibit 25** (e-mail dated March 30, 2011, at 10:24 a.m. from Justine Linnehan to Alastair Smith); **Exhibit 26** (e-mail dated April 15, 2011, at 5:26 p.m. from Danielle Zoller to Alastair Smith); **Exhibit 27** (e-mail dated April 18, 2011 at 12:11 p.m. from Alastair Smith to Danielle Zoller); **Exhibit 28** (e-mail dated April 27, 2011, at 4:31 p.m. from Justine Linnehan to Alastair Smith, and attachments thereto).  *Id.*, ¶ 52.

---

[3] Tax Increment Financing is used by many local governments for redevelopment and improvement projects.  The cost of the improvements is assessed to future tax revenues by each taxing unit that levies taxes against the property.

Upon information and belief, however, the City decided for political reasons, in violation of the LDDA, to delay providing assistance to Poppleton I for such financing until after the 2011 elections.  *See* Compl., **Exhibit 29** (e-mail dated September 9, 2011, at 4:41 p.m., from Danielle Zoller to Alan C. Cason).  In so doing, the City sought to undermine Poppleton I's ability to obtain adequate financing timely – because firm commitments from private lending sources were dependent on securing financing from public sources (including TIF financing and HUD financing).  As late as March 7, 2012, at a meeting with MuniCap (a public finance consulting firm that specializes, *inter alia*, in TIF financing), HCD, the Developer and others to discuss Poppleton I's application for TIF financing, HCD failed to support the Project and opposed the Developer's suggestions of potential uses of the TIF funds.  *Id*., ¶ 53, 54.

Poppleton I ultimately obtained approval from the City's bond counsel to proceed with the application for the proposed use of TIF funds.  At the City's direction, Poppleton I had hired MuniCap, Inc. and the law firm of McGuire Woods to develop the application materials for the TIF submission.  The TIF application was completed in advance of the deadline for submission to the Board of Finance for its April 2012 Board meeting (the last possible meeting which would allow Poppleton I to obtain approval in order to meet the City's May 1, 2012 deadline for "adequate financing").  The City, however, refused to submit the application.  Compl., ¶ 55.

Poppleton I sought a loan through the "HUD 220" program, as well as a grant through the HUD "Choice Neighborhoods" program.  The City actively opposed both efforts, in violation of the LDDA requirement that the City support them.  In July 2010 Poppleton I met with HCD, Deputy Mayor Andy Frank and Kaliope Parthemos, Deputy Mayor for Economic and Neighborhood Development, to discuss the Developer's request for the Choice Neighborhoods grant.  Despite demonstration of the competitiveness of the Project and the strength of the

applicant team, which included Poppleton I, neighboring developer Hampstead Partners, and the University of Maryland Biopark, as well as strong support from several key political figures including Hon. Elijah Cummings and Council President Bernard "Jack" Young, the City refused to support the team's application, and instead backed another applicant for the grant.  Compl., ¶ 56.

On November 7, 2011, Poppleton I met with the Baltimore HUD office, HCD, Walker & Dunlop, Council President Young and Councilman Welch concerning Poppleton I's application for funding under the HUD 220 program.   HCD failed to support the Developer, openly questioned the feasibility of market-rate housing in the Poppleton neighborhood, and challenged the Developer's experience and ability to perform.   Poppleton I had prepared and submitted, at considerable expense, a market feasibility study establishing the viability of mixed income housing at the Project site.   Yet in meetings and telephone calls with HUD officials, HCD continually insisted that the proposed rents were unachievable despite the findings of the study. HCD's criticisms ultimately led to HUD's rejection of Poppleton I's application.  Compl., ¶ 57.

> 5.  The City failed to use all reasonable efforts to insure adequate security for the area, in violation of Section 2.8 of the LDDA.

As discussed above, the City was obligated under the LDDA to use all reasonable efforts to insure adequate security for the area.  While the rationale for this provision seems self-evident, this clause has particular importance in the context of a developer's efforts to obtain financing. A prospective lender conducting an on-site inspection as part of due diligence will be less likely to lend for development in an unsafe area, because crime and violence chase prospective purchasers and renters away, and reduce overall property values.   Thus, in the service of Poppleton I's efforts to obtain financing, it has been critically important for the City to fulfill its obligation to insure adequate safety in the Poppleton neighborhood.  Compl., ¶ 58.

The City, however, has failed in this contractual obligation, as reflected, for example, in Compl., **Exhibit 30** (e-mail dated February 20, 2008, at 12:44 p.m. from Brie Bythewood to Ed Hitchcock); **Exhibit 31** (e-mail dated February 21, 2008, at 11:43 p.m. from Claude Edward Hitchcock to Paul Graziano); **Exhibit 32** (e-mail dated November 30, 2010 at 11:26 a.m. from Alastair Smith to Dan Bythewood); **Exhibit 33** (e-mails from Anthony Williams to Dan Bythewood dated January 27, 2012 and June 20, 2012 concerning security issues in the Poppleton neighborhood, where he resides at 326 North Schroeder Street).   Further, all parties recognized the importance of acquisition by the City of Block 157 as part of Phase I (although Block 157 was originally designated as part of Phase IV), in order to strengthen security in the affected area.   Residents of that area have complained that Block 157 is rife with drug activity, emphasizing the urgent need for this acquisition by the City.   Yet the City failed to acquire all of Block 157 – and to this day has not done so – in violation of its contractual commitment.   *Id*., ¶ 59.

  **E.**   **The City's Failure To Fulfill Timely Its Commitments And Obligations Under The LDDA, Together With The Economic Recession, Have Triggered Its *Force Majeure* Clause, LDDA Section 7.9, Deferring The Date By Which Poppleton I Must Close on Subphase IA**

As discussed above, Poppleton I cannot be declared in default for failure to fulfill its obligations under the LDDA if such delay is "due to causes beyond its control or without its fault or negligence."   LDDA, Section 7.9.   Those "causes" include "acts of the other party" and "material economic downturn."

The "acts of the other party" – the City – that caused substantial delays in the Project, including delays in acquisition, failure to process the TIF and failure to support Poppleton I's requests for HUD financing, are discussed above.   The "material economic downturn" since 2008 is a matter of which the Court may take judicial notice, and in any case is admitted by the

18

City: *See, e.g.*, Compl., **Exhibit 34** (agenda for the City Board of Estimates meeting dated April 6, 2011, at p. 43, noting as to a project other than Poppleton that "unfavorable market conditions and other causes beyond the control of the developer made it impossible to complete the financing and begin construction as anticipated when the City and Developer entered into the original LDA"); **Exhibit 35** (agenda for the Board of Estimates meeting dated December 21, 2011, at p. 121, "Because of market conditions, Healthy Neighborhoods has requested a 12-month extension to spend the funds targeted to Reservoir Hill . . . approved"); **Exhibit 36** (agenda for the Board of Estimates meeting, dated March 14, 2012, p. 48:: "Due to the current financial conditions, the housing market has been substantially depressed"); **Exhibit 37** (agenda for the Board of Estimates meeting, dated March 14, 2012, p. 49: "Due to the current depressed housing market conditions . . . the proposed purchase prices consistent with the current market do not generate enough funds to repay CHCDC").

The City's most recent statement regarding the economic downturn appears in the press release issued on behalf of Mayor Rawlings-Blake on March 21, 2012. *See* Compl., **Exhibit 38**. Under the caption "Preliminary Budget Background," the press release states:

> For Fiscal 2013, the City confronts a $48 million budget shortfall. For the first time since the economic downturn, property tax revenues will drop. At the same time, the cost of maintaining the current level of City services continues to grow. Compared to Fiscal 2008, General Fund revenue is down by $13 million— despite $50 million in tax and fee increases approved in 2010— while fixed costs (pension, retiree health, debt service, school payments) have grown by more than $120 million.

> "Baltimore, like many local governments, is still feeling the effects of the Great Recession and the real estate downturn," Mayor Rawlings-Blake said. "Through sacrifice and smart budgeting, we will ensure that City Government tightens its belt to get more value for every tax dollar by doing what families are doing everyday: making tough choices about what we can afford and focusing our

> scarce resources on the core priorities that will help get Baltimore growing again."
>
> In the four years since the onset of the Great Recession, the City of Baltimore has closed budget shortfalls totaling more than $400 million while maintaining—and even improving—the performance of core public safety, sanitation, health, and youth development services—all without raising property taxes. It has done so by prioritizing spending, delivering services more efficiently, reforming retiree pension and health programs, and diversifying and enhancing revenue.
>
> Where these actions were not enough to balance the budget, the City has had to make some difficult spending reductions that are not sustainable for the long term, such as freezing pay and hiring, furloughing employees, zeroing out Highway User Revenue capital spending, and using fund balance.

Had the City fulfilled its obligation under the LDDA to acquire the subject properties by 2007 and convey them to Poppleton I then – before the recession hit – adequate financing would have been readily available at that time.   The recession, however, altered the entire funding process and made it considerably more difficult.  Compl., ¶ 63.

### F.      The City's Unlawful Declaration Of Default

Notwithstanding the substantial hurdles that the City placed in Poppleton I's way, frustrating its efforts at every turn, Poppleton I continued its diligent performance under the LDDA, expending over $7.5 million on the Project to date.  Poppleton I also obtained letters from four lenders expressing interest in, and a commitment to, provide financing for the Project. *See* Compl., **Exhibit 39** (letter dated November 21, 2011, from BB&T Capital Markets to Dan Bythewood); **Exhibit 40** (letter dated February 24, 2012, from IFG Capital to Dan Bythewood); **Exhibit 41** (letter dated March 14, 2012, from USBancorp to Dan Bythewood); **Exhibit 42** (letter dated March 19, 2012, from Stern Holdings, LLC to Dan Bythewood).  As recently as June 14, 2012, Poppleton I produced a financing proposal from Wells Fargo for a loan of

$74,827,000, sufficient to underwrite a large portion of Subphases IA and IB of the Project.  *See id.*, **Exhibit 43** (letter dated June 14, 2012, from Wells Fargo to Dan Bythewood).

The City, however, had determined to ignore its contractual commitments to Poppleton I and abrogate the LDDA.  Thus, in a patent effort to avoid the consequences of its own derelictions, the City, on April 18, 2012, embarked on an effort to shift the blame to Poppleton I for the delays in implementation of the Project.  On that date, Peter Engel, Deputy Commissioner of HCD for Project Finance and Development, wrote to Daniel Bythewood, Jr., President of Poppleton I, to

> express [the City's] concern that the Developer has to date not met the requirements of Section 1.7(a) of the LDDA . . . The Department has not received satisfactory evidence that "the Developer has equity capital and/or commitments for the mortgage financing or other capitalization adequate for the construction of the Improvements."  This evidence is a condition precedent to Closing, which is to be held by May 1, 2012.

Compl., **Exhibit 44**, at page 2.  Mr. Engel further asserted that the "four letters of interest" by lenders that had been submitted by Poppleton did not amount, in his judgment, to "commitment" letters, and that in all events Poppleton had failed to submit evidence for the bulk of the financing needed to complete Phase I of the Project.  *Id.*

The City's assertions were clearly pretextual, as the text of the commitment letters submitted to the City by Poppleton I (starting *five months* before the Engel letter was written), were commercially reasonable in the context of the LDDA timetable, and wholly sufficient to meet the requirement of Section 1.7(a) of the LDDA that the Developer, as a condition precedent to closing, must "furnish evidence satisfactory to the Department that the Developer has the equity capital and/or commitments for the mortgage financing or other capitalization adequate for the construction of the Improvements."  Compl., ¶ 68.

Section 3.3 of the LDDA states that the Developer "shall submit the Preliminary Plans for Phase I no later than one hundred twenty (120) days after the Developer has acquired all of the Properties in Phase I," following which the Department shall review the plans and issue a response within 30 days. Section 3.6 of the LDDA states that the Developer "shall submit to the Department for its approval Construction Plans within two hundred ten (210) days after approval of the Preliminary Plans," following which the Department shall review the plans and issue a response within 30 days. Under Section 3.10 of the LDDA, within sixty (60) days after approval by the Department of the Construction Plans for the buildings within Phase I the Developer shall apply for all necessary building permits, and under Section 3.11, within one hundred eighty (180) days after receiving approval of the Construction Plans for Phase I and all necessary building permits, the Developer shall commence construction.

This timeline allows for a total of 630 days between Poppleton I closing on the properties and commencement of construction, and assumes that at the time of closing, Poppleton I is still over a year and a half away from having final Construction Plans, thus allowing for a competitively bid construction contract amount and final development budget. It would be entirely infeasible under standard banking practices, and commercially unreasonable, for the Developer to be expected to obtain a final bank commitment letter when it is over a year and a half away from having a firm construction bid and final development budget. Simply stated, a lender will not issue a firm, unqualified commitment letter in such circumstances.

The City's assertion that Poppleton I produced insufficient evidence of financing is fallacious for another reason. The City erroneously maintains that Poppleton I was obligated to produce adequate financing for the entirety of Phase I, even though only a portion thereof, Subphase IA, was being developed first. Nowhere does the LDDA impose the requirement that

the Developer, prior to closing on a particular Phase or Subphase, have financing in place for complete construction of the buildings covering *a greater geographic area than the Phase or Subphase for which development is to occur.* To the contrary, the LDDA speaks only in terms of adequate financing for the "construction of the Improvements" – meaning construction of the Phase or Subphase that is to be developed as per the approved Construction Plans. *See* LDDA Section 1.7(a).

The City's assertion that Poppleton I had produced insufficient evidence of financing is fallacious for yet a further reason. Section 3.13 of the LDDA recognizes that the Developer's ability to pursue construction of the Project is a function of market demand. Under Sections 3.13 (b)-(d) of the LDDA the Developer is required to move forward with subsequent phases of the Project only after at least eighty percent (80%) of the prior phase has been sold or leased. Further, Section 3.13 allows for extensions or adjustments to the deadlines in the timeline for completion of construction as may be warranted by the rate of sales and/or leasing or the findings of an economic feasibility and absorption study (each a "Market Demand Study"). Thus market demand and adequate absorption are determining factors in the formation of a development program; the market demand and absorption rate limit the amount of units that the Developer can reasonably construct within a given period of time. This limitation is governed primarily by the lender, which places limits on the number of units developed within a given project relative to the absorption rate within the market area.

Poppleton I proposes to construct 239 units under Subphase IA of the Project. Under Section 3.13 of the LDDA, Poppleton I was obliged to commission a "Market Demand Study," and it did so. According to the Market Demand Study subsequently issued by Real Property Research Group, dated October 25, 2011, the anticipated absorption rate for the Project is 15

units per month.  It is therefore anticipated that it will take Poppleton I nearly 16 months to fully

lease out the units in Subphase IA.  If Poppleton I were to construct all 465 units planned for

Subphase IA and Subphase IB of the Project it would take 31 months, or more than 2½ years, to

lease up Phase I of the Project.  Compl., ¶ 75.

At the current rate of absorption it would be unreasonable to expect Poppleton I to

construct all 465 units at the same time.  Rather, as per Section 3.13 of the LDA, read in

conjunction with the Market Demand Study, Poppleton I is allowed to commence the subsequent

phase of the Project when at least 80% of Subphase IA was sold or leased. Given the anticipated

construction timeline of 24 months, in addition to the 12 months that it would take to lease up

80% of the units in Subphase IA at a rate of 15 units per month, it would be at least three years

before Subphase IB would commence construction.  It would therefore be entirely infeasible for

Poppleton I to obtain financing for Subphase IB of the Project when construction on that Phase is

not anticipated to commence for at least three years.

The City's willful misconstruction of the financing commitment necessary for closing

under the LDDA, coupled with the City's failure to assist Poppleton I in obtaining financing, as

required by the LDDA, *see* Compl., ¶¶ 50-57, put Poppleton I in an untenable position.  In

response to the City's letter asserting that Poppleton I had produced insufficient evidence of

financing, Poppleton's counsel, Gordon Feinblatt LLC, on April 23, 2012, wrote:

> . . . [W]e disagree that the Developer has not already met the
> requirements of Section 1.7(a) of the LDDA.  The Development
> Team has submitted a significant amount of information and
> documentation concerning its financing to the Department over the
> years since the LDDA was signed and more recently to the
> Department's consultant MuniCap, Inc. in connection with the
> preparation of the TIF application.  Moreover, the Developer is
> ready, willing and able to proceed with closing on the Phase I
> Properties that the City has acquired and cleared to date.  In fact,

the Developer has the cash available to close on Phase I immediately.

*Id*., **Exhibit 45**.

The letter further observed that:

> you [Mr. Engel] imply by your letter that the Developer must have all of the $135,000,000 for Phase I in hand by April 25, 2012 in order to satisfy Section 1.7(a). This is an unreasonable and arbitrary interpretation of the LDDA. It is particularly unreasonable to expect financing commitments for improvements that will be constructed years from now. The Poppleton market could not absorb so much new housing at one time, as evidenced by the market demand study.
>
> . . . After working on the Project for so many years, your letter is the first time that the Department has ever told the Development Team that the Department may consider the Developer's financing sources or financing letters to be inadequate. The Department should have shared its concern with the Developer long ago.

*Id.*

The City issued a notice of default to Poppleton by letter dated May 2, 2012:

> Section 1.17(a) of the LDDA states as a precedent to closing that 'the Developer furnish evidence satisfactory to the Department that the Developer has the equity capital and/or commitments for the mortgage financing or other capitalization adequate for the construction of the Improvements.' This evidence was not provided prior to the closing deadline. Per the terms of Section 1.9 of the LDDA, failure to satisfy the conditions identified in Section 1.7 and proceed to Closing within the specified timeframe constitutes an event of default on behalf of the Developer for Phase I of the project.

Compl., Ex 2. The letter then advised that

> [p]er the terms of [ ] Section [7.4 of the LLDA], the condition of default must be cured by the Developer within sixty (60) days of this notice (the "Cure Date"). In the event that the default is not cured within this time period, the City will terminate the LDDA in addition to any other remedies allowable to the City under the LDDA . . . It is the intention of the City to terminate the LDDA

25

> with respect to all Phases of the project if the default condition for
> Phase I is not cured by the Cure Date.

*Id.*

The 60 days expires on July 1, 2012.  Allowing three days for mailing of the notice, expiration of the 60 days would occur on July 4, 2012, extended to July 5, 2012 by virtue of the legal holiday on the 4th.

## III.  ARGUMENT

### A.   The Court Has Federal Diversity Jurisdiction In This Case

This Court has federal diversity jurisdiction under 28 U.S.C. § 1332(a).  The Plaintiff, on the one hand, and the Defendants, on the other, are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000 exclusive of interest and costs.

It is settled law that the citizenship of a limited liability company is determined by the citizenship of its members – and not by the citizenship of the state under whose law the limited liability company itself was formed.  *Central W. Virginia Energy Co., Inc. v. Mountain State Carbon, LLC*, 636 F. 3d 101, 103 (4th Cir. 2011); *Schaftel v. Highpointe Business Trust*, 2012 U.S. Dist. LEXIS 8118 at \*5 (D. Md. Jan. 24, 2012); *JBG/JER Shady Grove, LLC v. Eastman Kodak Co.*, 127 F. Supp. 2d 700, 701 (D. Md. 2001).  Thus, the fact that Poppleton I is a Maryland Limited Liability Company, Compl., ¶ 17, is irrelevant for purposes of determining its citizenship.  The issue is the citizenship of its members.

The members of Poppleton I are La Cité, LLC (a Delaware LLC) and Mid Atlantic Real Estate Holdings, LLC (a Delaware LLC).  Thus, in order to determine *their* citizenship, one must look to the citizenship of their members.  The members of La Cité LLC are Daniel Bythewood, Jr. (a New York citizen); Daniel Bythewood, Sr. (a New York citizen); Susan Taylor (a New York citizen); Khephra Burns (a New York citizen); Brie Bythewood (a New York citizen);

Robert Johnson (a Florida citizen); Mira Mullins (a New Jersey citizen); and Brian Mullins (a New Jersey citizen).   Mid Atlantic Real Estate Holdings, LLC – which acquired its interest in Poppleton I from BIH Holdings, LLC (a Delaware LLC) in October 2008 – is wholly owned by La Cité.   Compl., ¶ 15, n.1.  None of the members of the two LLCs that own Poppleton I is a citizen of Maryland.  Thus Poppleton I is not a citizen of Maryland.

The Defendants, however, are all citizens of Maryland.  Baltimore City is a municipal corporation.  *See Clark v. O'Malley*, 186 Md. App. 194, 198 n. 1, 973 A.2d 821, 823 n.3 (2009); *Harper v. Kloster*, 486 F.2d 1134, 1138 (4th Cir. 1973).  A municipal corporation is a citizen of the state under whose law the municipal corporation is organized.  *Moor v. County of Alameda*, 411 U.S. 693, 717-718 (1973); *Rieser v. District of Columbia*, 563 F.2d 462, 470 n.43 (D.C. 1977); *Illinois v. Kerr-McGee Chemical Corp.*, 677 F.2d 571, 578 n.13 (7th Cir. 1982).  Thus, where a city is a municipal corporation, it is deemed to be a citizen of the state that created it. *See, e.g., City of Tucson v. United States W. Communs.*, 284 F.3d 1128, 1132 (9th Cir. 2002).

It follows that Baltimore City, a municipal corporation, is a citizen of Maryland for purposes of diversity jurisdiction.  By the same token, HCD, a department within the City, and Paul T. Graziano, sued in his official capacity as Commissioner of that Department, are citizens of Maryland.   There is complete diversity of citizenship between the Plaintiff and the Defendants, and this Court has subject matter jurisdiction.

### B.   The Standards For Granting A Temporary Restraining Order And A Preliminary Injunction

The standards for granting a preliminary injunction in the Fourth Circuit are recited in *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 345-47 (4th Cir. 2009), *vacated on other grounds*, 130 S. Ct. 2371 (2010), *reissued in relevant part on remand*, 607 F.3d 355 (4th Cir. 2010).  *See also*, *Scott v. Bierman*, 2011 U.S. App. LEXIS 9773, at *8-*9 (4th Cir.

May 12, 2011); and *Williams v. Maryland*, 2011 U.S. Dist LEXIS 85619, at *25 (D. Md. Aug. 3, 2011).  The propriety of issuing a preliminary injunctive relief rests on four factors:  (1) whether plaintiff can make a clear showing that it will likely succeed on the merits at trial; (2) whether plaintiff can make a clear showing that it is likely to be irreparably harmed absent preliminary relief; (3) whether the balance of equities tips in the plaintiff's favor; and (4) consideration of the public consequences of issuing the injunction.  *Real Truth*, *supra,* at 346.  "[T]he Court may consider evidence outside of the pleadings, including affidavits and other exhibits," when ruling on a motion for preliminary injunction.  *Jackson v. Volunteers of Am. Chesapeake, Inc*., 2011 U.S. Dist. LEXIS 68934, at *4 (D. Md. June 27, 2011) (citation omitted).

The standards for obtaining a temporary restraining order in the Fourth Circuit are the same as those for a preliminary injunction.  *See, e.g., Kelly v. Debelius*, 2010 U.S. Dist. LEXIS 92046, at *2 (D. Md. Sept. 3, 2010) (citing *Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7 (2008)).

### C.   Poppleton I Meets The Standards For Issuance Of A Temporary Restraining Order And A Preliminary Injunction

#### 1.   Poppleton I Will Suffer Irreparable Injury Absent Interlocutory Injunctive Relief

Interlocutory injunctive relief is appropriate where the petitioner demonstrates that it will sustain substantial and irreparable injury as a result of the alleged wrongful conduct.  *Bey v. Moorish Sci. Temple of Am.,* 362 Md. 339, 355-56, 765 A. 2d 132, 140 (2001) (citing *Maryland-Nat'l Capital Park and Planning Comm'n v. Washington Nat'l Arena*, 282 Md. 588, 615, 386 A.2d 1216, 1234 (1978) and *Fort v. Groves*, 29 Md. 188, 193-94 (1868)).  Such injury, however, need not "be beyond all possibility of compensation in damages, nor need it be very great." *Maryland-Nat'l*, 282 Md. at 616, 386 A.2d at 1234 (quoting *Hart v. Wagner*, 184 Md. 40, 47-48,

40 A.2d 47, 51 (1944); *Smith v. Shiebeck*, 180 Md. 412, 422, 24 A.2d 795, 801 (1942)).

"Irreparable injury is suffered whenever monetary damages are difficult to ascertain or are

otherwise inadequate." *Bey, supra,* at 355 (quoting *Maryland-Nat'l*, 282 Md. at 615, 386 A.2d at

1234); *see also Dudley & Carpenter v. Hurst*, 67 Md. 44, 52, 8 A. 901, 904 (1887) ("An injury

may be said to be irreparable when it cannot be measured by any known pecuniary standard.").

> As ordinarily understood, an injury is irreparable, within the law of
> injunctions, where it is of such a character that a fair and
> reasonable redress may not be had in a court of law, so that to
> refuse the injunction would be a denial of justice -- in other words,
> where, from the nature of the act, or from the circumstances
> surrounding the person injured, or from the financial condition of
> the person committing it, it cannot be readily, adequately, and
> completely compensated for with money.

*Bey, supra,* at 356 (quoting *Coster v. Dept. of Personnel*, 36 Md. App. 523, 526, 373 A.2d at

1290.

Applying these standards, it is clear that Poppleton I will be immediately and irreparably

injured unless the City is restrained and enjoined from terminating the LDDA on July 2, 2012.

Poppleton I will lose the $7.5 million that it has already invested in the Project; it will lose the

prospect of earning revenues from the Project once completed, which damages are impossible to

calculate; its construction contractors and subcontractors will lose jobs that are sorely needed;

and Poppleton I will suffer irreparable reputational damages.  Compl., ¶ 82.

As critically, if Poppleton I is prevented from performing the LDDA, the immediate loss

to the neighborhood will be incalculable.   New jobs and job training will be sacrificed.

(Subphase IA will produce over 350 temporary and permanent jobs, while the overall multi-

phase project will create approximately 1,200 temporary and permanent jobs.)  MBE and WBE

hiring will be foregone.  Much-needed affordable housing and commercial space, as well as

important community, educational, and recreational programming to benefit the Poppleton area,

including a healthy grocer, a charter school and a United States Tennis Association training facility, will not be built in the near term.  Compl., ¶ 83.

Poppleton I is committed to meeting or exceeding the City's MBE and WBE goals and will use its best efforts to include M/W/DBE firms in all construction, architectural, engineering, and professional services contracts.  To date Poppleton I has contracted a number of M/WBE firms to undertake various aspects of the design and engineering of the Project.  As noted in the Verified Complaint at ¶ 16, Poppleton I itself is a minority-owned enterprise, and intends to partner with a certified MDOT MBE construction contractor to undertake a portion of the construction contract.  As part of the construction contract the general contractor will be required to meet local resident hiring goals for all new hires, and to provide job training programs for all newly hired residents.  To the extent that any of the M/WBE firms do not have adequate capacity or bonding capability to undertake the Project, the development team will work with them to structure a partnership with a general contractor, allowing them to participate in the Project.  All of this will be lost – or deferred for years – if Poppleton I is not permitted to continue its performance of the LDDA.  *Id.*, ¶ 84.

In addition to jobs that will be directly created by the Project, Poppleton I has partnered with the Doe Fund, a successful non-profit corporation with a mission to break the cycles of homelessness, addiction, and criminal recidivism and to train and employ homeless and at-risk of homelessness men. The Doe Fund trains and employs its workers in a variety of job skills, including street cleaning, pest control, building maintenance, security, and business support. Poppleton I will work with the Doe Fund to establish a permanent home in Baltimore and will utilize the company's services within Center West to provide an additional source of job creation.

This initiative will be lost as well – or deferred for years – if Poppleton I is not permitted to continue its performance of the LDDA.  Compl., ¶ 85.

2.   Poppleton I Is Likely To Succeed On The Merits Of Its Claims For Breach of Contract and Declaratory Judgment

a.   Breach of Contract

Poppleton I is likely to succeed on the merits of its claims for breach of contract and declaratory judgment because it has diligently performed under the LDDA while Defendants have failed to perform their material obligations thereunder.

Maryland follows the objective law of contract interpretation.  *Washington Metro Transit Auth. & Potomac Inv. Props., Inc.*, 476 F.3d 231, 235 (4th Cir. 2007).

> A court construing an agreement under this test must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated.  In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed.  . . .  Consequently, the clear and unambiguous language of an agreement will not give away [*sic*] to what the parties thought that the agreement meant or intended it to mean.

*Taylor v. Nationsbank, N.A.*, 365 Md. 166, 178-79, 776 A.2d 645, 653 (2001) (quoting *General Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985)).  To prevail in an action for breach of contract, a plaintiff must show simply "that the defendant had a contractual obligation and that the obligation was breached."[4]  *Id.* at 175, 651; *Mathis v. Hargrove*, 166 Md. App. 286, 318, 888 A.2d 377, 396 (2005).

Here, Poppleton I is likely to succeed on its breach of contract claim because Defendants breached their obligations under the LDDA by: (1) delaying in the acquisition of the properties,

---

[4] "It is not necessary that the plaintiff prove damages resulting from the breach, for it is well settled that where a breach of contract occurs, he may recover nominal damages even though he has failed to prove actual damages." *Taylor*, 365 Md. at 175, 776 A.2d at 651.

in violation of Sections 1.2(a) and 1.2(b) of the LDDA, *see* Section II(D)(1), *supra* pp. 12-13; (2) failing to timely clear all buildings and other structures, in violation of Section 1.5(b) of the LDDA *see* Section II(D)(2), *supra* pp. 13-14; (3) failing to convey all properties in Subphase I before requiring that Poppleton I close on Subphase I, in violation of Section 1.9 of the LDDA, *see* Section II(D)(3), *supra* pp. 14-15; (4) failing to assist Poppleton in good faith in obtaining financing, in violation of Section 1.17 of the LDDA, *see* Section II(D)(4), *supra* pp. 15-17; and (5) failing to use all reasonable efforts to insure adequate security for the area, in violation of Section 2.8 of the LDDA, *see* Section II(D)(5), *supra* pp. 17-18.   For the same reasons, Poppleton I is likely to succeed on it claim seeking a declaration that Baltimore City materially breached its contractual obligations to Poppleton I including those obligations set forth at Sections 1.2(a), 1.2(b), 1.5(b), 1.9, 1.117, 2.8, 3.13 and 7.9 of the LDDA.

Additionally, and for the reasons discussed *inter alia*, *supra* at pp. 18-25, Poppleton is likely to succeed on its claim seeking a declaration that Baltimore City wrongfully declared Poppleton I in default under the LDDA and improperly decided that the LDDA will be terminated as of July 2, 2012.  The letters of interest from lenders that Poppleton I submitted to the City were commercially reasonable in the context of LDDA timetable.

Defendants' position that that Poppleton I was obligated to produce proof of financing for the entirety of Phase I does not withstand scrutiny under the objective law of contract interpretation for at least three reasons.  First, due to timeline in the LDDA, which assumes that Poppleton I would be over a year and half from having final Construction Plans at the time of closing, no lender would make such unqualified commitment – construction plans, among other prerequisites, are the *sine qua non* for a firm financing commitment.  *See supra* at pp. 21-22. Second, Poppleton I did not need to obtain financing for the entirety of Phase I where only a

32

portion of it, Subphase IA, was being developed: The LDDA does not impose the requirement that the Developer, prior to closing on a particular Phase or Subphase, have financing in place for complete construction of the buildings covering a greater geographic area than the Phase or Subphase for which development is to occur.  *Supra* at pp. 22-23.  Third, Poppleton I's market absorption study, required under Section 3.13 of the LDDA, shows that it would be infeasible to construct all 465 planned units in Phase I at one time.  Rather, the Project is intended to proceed in two Subphases in accordance with market demand.  Given the anticipated construction timeline of 24 months, in addition to the 12 months it would take to lease up 80% of Phase IA according to the market absorption study, Subphase IB is not anticipated to commence for at least three years.  Lenders will not issue firm financing commitments for a project of this magnitude that will not start for at least three years, given the multitude of variables that attend such construction and their potential impact on financial feasibility and risk.  *Supra* at pp. 23-24.

Moreover, even if Poppleton I had not satisfied the requirements of Section 1.7(a) of the LDDA, the Developer did not default because Defendants' failure to perform their obligations under the LDDA suspended the duty of Poppleton I to perform under Section 1.7(a) of the LDDA.  *See Wilcom v. Wilcom*, 66 Md. App. 84, 94, 502 A.2d 1076, 1081 (1986) (citing Restatement (Second) of Contracts, § 237 (1981)).  The Restatement, comment a. to § 237, states that a material failure of performance by one party "prevents performance [of the other party's remaining duties] from becoming due, at least temporarily, and it discharges those duties if it has not been cured during the time in which performance can occur."

Defendants cannot prevent the Developer from performing a condition precedent and then claim they have no contractual obligation to the Developer because the Developer failed to meet that condition.  *See, e.g., Baltimore Teachers Union v. Mayor and City Council of*

*Baltimore*, 108 Md. App. 167, 188-89, 671 A.2d 80, 90 (1996) (citing *Kahn v. Schleisner*, 165 Md. 106, 113, 166 A. 435, 438-39 (1933), for the tenet that "where a promise is conditioned upon the happening of an event, the condition is dispensed with if the promisor prevents the event from happening"). *See also NaturaLawn of Am., Inc. v. West Group, LLC*, 484 F. Supp. 2d 392, 400 n.5 (D. Md. 2007) (stating that all contracts in Maryland are subject to an implied covenant of good faith that "prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract" (quoting *Parker v. The Columbia Bank*, 91 Md.App. 346, 366, 604 A.2d 521, 531 *cert. denied*, 327 Md. 524, 610 A.2d 796 (1992)).

Defendants' delay in acquiring the properties, failure to timely clear all buildings and other structures, failure to convey all properties in Subphase I before requiring that Poppleton I close on Subphase I, failure to assist Poppleton in good faith in obtaining financing, and failure to use all reasonable efforts to insure adequate security for the area, all prevented Poppleton I from meetings its obligations under Section 1.7(a) of the LDDA.   That prevention of performance suspended Poppleton I's obligation to satisfy the requirements of that section and, as such, Poppleton I did not default.

Finally, and again, assuming that Poppleton I did not satisfy the "proof of financing" requirement, such requirement is deferred due to the economic downturn that, in turn, triggered the *force majeure* clause, Section 7.9 of the LDDA.  *See supra*, pp. 18-20.  In the face of that provision, the City's declaration of default was nugatory.

b.   Specific Performance

In an appropriate case, a city or county will be ordered to specifically perform an agreement.  *See, e.g., Board of County Comm'rs v. MacPhail*, 214 Md. 192, 199, 133 A.2d 96,

101 (1957); *Cohen v. Baltimore County*, 229 Md. 519, 525, 185 A.2d 185, 188-89 (1962).

Where a "contract sued on [is] legal, fair, reasonable and certain it comes within the rule that it is

as much a matter of course for an equity court to decree its specific performance as it would be

for a law court to award damages for its breach, and that in such a case it is the duty of the court

to enter the decree." *Rockville v. Brookeville Turnpike Constr. Co.*, 246 Md. 117, 134-35, 228

A.2d 263, 273 (1967) (citing *Md. City Realty v. Vogts*, 238 Md. 290, 302 (1965); *Pollin v.*

*Perkins*, 223 Md. 532, 544 (1960); *Perlmutter v. Bacas*, 219 Md. 406, 411-12 (1959)).

> When a contracting party is displeased with the other's
> performance he may follow either of two alternative courses of
> action, if under the facts they are open to him: (1) he can reaffirm
> the existence of the contract and seek specific performance when
> appropriate or claim damages for its breach, or (2) he can repudiate
> the contract altogether and request rescission.

*Maslow v. Vanguri*, 168 Md. App. 298, 329, 896 A.2d 408, 426 (2006) (citing *Lazorcak v.*

*Feuerstein*, 273 Md. 69, 75, 327 A.2d 477, 480 (1974)).  In *Rockville*, the Court observed:

> Rockville could have been required to annex the land it agreed to
> annex had it failed to do so.  Specific performance was required of
> Harford County which had failed to improve a road it had
> obligated itself to improve in *Board of County Comm. v.*
> *MacPhail*, 214 Md. 192, and of Baltimore County in a similar
> obligation in *Cohen v. Baltimore County*, 229 Md. 519.

*Rockville v. Brookeville Turnpike Constr. Co.*, 246 Md. at 134, 228 A.2d at 273.

Because the City breached the LDDA as discussed above, specific performance –

requiring the City to perform its obligations under the LDDA – is an appropriate remedy.

Specific performance is also available where, as here, the Developer has substantially

performed it obligations under the contract (even assuming that the evidence of financing fell

short).  *See Speed v. Bailey*, 153 Md. 655, 139 A. 534 (1927) (where the defendant substantially

performed under the contract, the court found that the plaintiff's legal remedy for partial failure

of performance was not rescission, but is instead a claim for damages only, to the extent that the plaintiff can prove any).

In *Speed*, Appellant Speed agreed to sell Appellee Bailey a plot of land and to build a bungalow on it.  153 Md. at 657, 139 A. at 535.  About two months after making the down payment, Bailey complained that Speed "had not fully complied with their contract to build a house according to the written and oral specifications."  *Id.* at 658, 535-36. Therefore, Bailey argued that he was entitled to rescind the contract and recover his initial payment of $ 2,000.  *Id.* Bailey sued, alleging breach, for which he sought rescission and recovery of his deposit.  *Id.* Speed acknowledged that he "promised to do certain of the things complained of as not having been done," and expressed his "willingness and ability . . . to perform all that he admits he promised to perform."  *Id.*

Although Bailey prevailed in the trial court, the Court of Appeals reversed.  153 Md. at 666, 139 A. at 538.  It stated:

> Before partial failure of performance of one party will give the other the right of rescission, the act failed to be performed must go to the root of the contract, or the failure to perform the contract must be in respect to matters which would render the performance of the rest a thing different in substance from that which was contracted for.

*Id.* at 660, 536.  Notably, the Court recognized that, "when there has been substantial breach of a contract, the other party has a right to rescind the contract or to refuse to perform it and sue for damages."  *Id.* at 661, 537.  The *Speed* Court "reached the conclusion that the rule of substantial compliance is a complete defense to the action . . . ."  *Id.* at 662, 537.

Applying that reasoning, termination of a contract is not justified for a mere failure to perform within a period specified where "time is not of the essence."  *See Ady v. Jenkins*, 133 Md. 36, 40, 104 A. 178, 179 (1918) ("where time is not of the essence of the contract a mere

failure to perform within the period specified will not avoid or justify the rescission of a contract" (citation omitted)).  Here, Poppleton I can show substantial compliance, especially since time is not of essence.  The timelines for the LDDA extend for several years.  *See supra*, at pp. 22-24.  Subphase IB of the Project is not anticipated to commence for *at least three years*. *Supra,* p. 24.  Accordingly, any failure of Poppleton I to perform the requirements of Section 1.7(a) of LDDA "within the period specified will not avoid or justify the rescission of a contract," *Ady*, 133 Md. at 40, 104 A. at 179, because it has substantially complied with the LDDA and "time is not of the essence" for Section 1.7(a) of the LDDA at this stage of the Project.  Poppleton I will likely succeed on the merits of its claim for specific performance.

> 3.    The Balancing Of Equities Favors The Issuance Of Emergency Equitable Relief

In assessing the propriety of immediate injunctive relief, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'"  *Winter*, 555 U.S. at 24 (citing *Amoco Production Co. v. Village of Gambell, Ark.*, 480 U.S. 531, 542 (1987)).  *See also Columbia Gas Transmission, LLC v. Caiman Energy, LLC,* 2011 U.S. Dist. LEXIS 69833, at *10 (N.D. W. Va. June 27, 2011) (citing *Sinclair Refining Co. v. Midland Oil Co.*, 55 F. 2d 42, 45 (4th Cir. 1932)):

> When weighing the parties' respective injuries and balancing the equities to determine whether a preliminary injunction should issue, the court should consider: (1) the relative importance of the rights asserted and the act sought to be enjoined; (2) the preservation of the status quo; and (3) the balancing of damage and convenience generally.

Applying these standards, it is clear that balance of convenience favors the issuance of temporary and preliminary injunctive relief as sought herein.  The injury to Poppleton I, if temporary and preliminary injunctive relief is not granted, will be permanent and incalculable, as

demonstrated above.  On the other hand, the City will incur little if any injury if the injunctive relief sought herein is granted and the City ultimately prevails on the merits.  To the contrary, in that event the City and the Poppleton populace will nonetheless have gained the benefit of the development and construction proceeding in the interim.

> 4.     The Public Interest Strongly Favors The Issuance Of Emergency Equitable Relief

Courts in the Fourth Circuit are unambiguous in recognizing the public interest in enforcing contracts.  "The resolution of the motion as set forth herein gives effect to the terms of the Lease as written.  The enforcement of the parties' agreement serves the public interest." *Rockville Pike Joint Venture L.P. v. Thermopylae, LLC*, 2011 Bankr. LEXIS 3029, at *30 (Bankr. D. Md. Aug. 5, 2011); "There is a public interest in enforcing the terms of a valid contract." *Int'l Fid. Ins. Co. v. Waterfront Group NC, LLC*, 2011 U.S. Dist. LEXIS 116311, at *14 (W.D.N.C. Oct. 6, 2011) (paraphrasing *UBS PaineWebber, Inc. v. Aiken*, 197 F.Supp.2d 436, 448 (W.D.N.C. 2002)).  Finally, "the public interest prong has been equated with preserving the status quo until the merits can be fully considered by the trial court." *Wachovia Ins. Serv., Inc. v. Hinds,* 2007 U.S. Dist. LEXIS 82103, at *27 (D. Md. Aug. 30, 2007) (paraphrasing *Maryland Undercoating Co., Inc. v. Paine*, 603 F.2d 477, 481 (4th Cir. 1979)).

Applying these standards, it is manifest that the public interest favors the issuance of the injunctive relief sought herein.  First, it preserves the status quo.  Second, it enforces the terms of the LDDA.  And third, the Poppleton community will benefit greatly from the issuance of the relief sought, as described *supra* at pp. 28-29, and will suffer if relief is denied.

**IV.**   **CONCLUSION**

WHEREFORE, for the reasons stated above, the Court should issue the interim relief requested. A proposed Order granting such relief is attached for the Court's convenience.

Respectfully submitted,

Charles S. Fax, Fed. Bar No. 02490
Scott A. Livingston, Fed. Bar No. 03246
Liesel Schopler, Fed. Bar No. 17280
Rifkin, Livingston, Levitan & Silver, LLC
7979 Old Georgetown Road
Suite 400
Bethesda, Maryland 20814
Telephone: (301) 951-0150
Facsimile: (301) 951-0172
Email: cfax@rlls.com; scottlivingston@rlls.com;
          lschopler@rlls.com

Attorneys for Plaintiff Poppleton Development I,
LLC

Dated: June 27, 2012

39