```
 1                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF MARYLAND
 2                          NORTHERN DIVISION

 3


 4
       POPPLETON DEVELOPMENT I, LLC
 5
             v.                          CIVIL CASE NO.
 6                                       RDB-12-1904

       MAYOR AND CITY COUNCIL
 7     OF BALTIMORE, ET AL.,

 8          Defendants
       _____/
 9


10
                   (Preliminary Injunction Hearing)
11                    Friday, July 13, 2012
                      Baltimore, Maryland
12

13     Before:  Honorable Richard D. Bennett, Judge

14

15
       Appearances:
16
               On Behalf of the Plaintiff:
17              Charles S. Fax, Esquire
                Scott A. Livingston, Esquire
18
               On Behalf of the Defendants:
19              Steven J. Potter, Esquire
                Matthew Nayden, Esquire
20

21

22
       Reported by:
23     Mary M. Zajac, RPR, FCRR
       Room 5515, U.S. Courthouse
24     101 West Lombard Street
       Baltimore, Maryland 21201
25
```

1          (Proceedings at 9:58 a.m.)

2          THE COURT:  This is a continuation of the hearing on a

3    temporary restraining, Motion For Temporary Restraining Order

4    filed by, in the matter of Poppleton Development, LLC versus the

5    Mayor and City Council of Baltimore, Civil Number RDB-12-194.

6          The City has filed a paper this morning.  Literally it

7    hasn't even been filed in CM/ECF yet.  It has a caption with

8    Judge Quarles.  It's my understanding this case has been assigned

9    to me and everyone has agreed that it's assigned to me.  So it's

10   incorrectly captioned, I believe, if I'm not mistaken.  Please

11   let me know.

12         Is that agreeable to the plaintiff?  There's no

13   objection to it being transferred to me, is that correct?

14         MR. FAX:  No objection.

15         THE COURT:  Mr. Potter, I gather it's just a clerical

16   error by you, is that correct?

17         MR. POTTER:  Yes, Your Honor.

18         THE COURT:  Let me ask you something.  Why was this

19   filed 20 minutes before the hearing?

20         MR. POTTER:  Your Honor, it's not acceptable and

21   there's no excuse for it.  Just, it's --

22         THE COURT:  I mean, if we had a hearing on June the

23   28th --

24         MR. POTTER:  Yes, Your Honor.

25         THE COURT:  -- and on June the 28th, I rescheduled it

1    for this morning, July the 13th.

2              MR. POTTER:  Yes, Your Honor.

3              THE COURT:  Quite frankly, I don't think I've ever had

4    a civil case where the clerk walks back and hands me something

5    that's been submitted.  When you walk into court, I mean, as a

6    matter of courtesy, you could have at least filed it an hour ago,

7    not ten minutes ago.

8              MR. POTTER:  Yes, Your Honor.

9              THE COURT:  All right?  I mean, that's all right.  I'm

10   not angry with you.  We talk about civility and courtesy among

11   lawyers in the court.  It is not really, put it bluntly, Mr.

12   Potter, that's not the standard we expert in federal court.

13             So we're late starting because, as a courtesy to you, I

14   stopped and I read it and I've looked at what your submission is.

15   I gather you just handed it to the other side as you walked in,

16   is that right?

17             MR. POTTER:  I did, Your Honor.

18             THE COURT:  Have you had a chance to read it, Mr. Fax?

19             MR. FAX:  I read it a few minutes ago, as the Court

20   did.  Obviously, I'd like the opportunity to file a formal

21   response.

22             THE COURT:  Well, we're going to have to deal with this

23   here this morning.

24             I just don't quite understand.  This is a very

25   important matter.  I'm trying to give it all the time I can.

4

1    Again, I'm not angry with you, Mr. Potter, I'm just mystified by

2    it.  That's certainly not the standards I would expect of the

3    Office of the City Solicitor, quite frankly.  It is what it is,

4    and I have read it.  I have read it.

5           Quite frankly, Mr. Fax, the issues that are raised, I

6    think, have been raised before, and I don't think they're

7    particularly new to the litigation here.  But you can have been

8    Mr. Livingston and Mr. Bythewood look at it while we're

9    proceeding.

10          With that, essentially, at the time of the hearing on

11   June the 28th, we were dealing -- you all may be seated for a

12   moment -- we were dealing with the real estate contract in

13   question; specifically, the Land Disposition and Development

14   Agreement that was entered into between the parties on September

15   the 7th of 2006, with respect to the 13.8 acre portion of the

16   Poppleton neighborhood located west of Martin Luther King

17   Boulevard here, on the west side of Downtown, of the city.

18          I held a hearing on June the 28th on the Motion For

19   Temporary Restraining Order, at that time acting as chambers

20   judge.  Then after talking with counsel and, actually, speaking

21   with Judge Quarles as well, it seemed everyone agreed I would

22   just keep it because I'm into the case and familiar with it.

23          Essentially, the issue that arose then was, is that

24   Poppleton had argued that the City did not possess title to all

25   properties included in the Sub-Phase 1-A, and that it did not

1    meet certain obligations.  The plaintiff essentially argued that

2    a crucial matter was a matter of whether the City had title or

3    not.

4         At that time, I essentially stayed the proceedings

5    until you could, until facts could be submitted to me as to

6    whether the City did or did not have ownership of the property,

7    that certainly being a condition precedent to moving forward.  So

8    that's where we are here now.

9         With that, again, it's obviously fairly axiomatic, Mr.

10   Fax, that there is a heavy burden on the plaintiff in this case

11   with respect to the legal standard for procuring a temporary

12   restraining order under Rule 65 of the Federal Rules of Civil

13   Procedure, as you well know.

14        The standard has been heightened in recent years, as

15   Mr. Potter has aptly noted in his filing this morning, albeit a

16   late filing, as there's no question that, in light of the Supreme

17   Court's opinion in Winter v. Natural Resources Defense Council,

18   the 2008 Supreme Court opinion, and then the following opinion by

19   the United States Court of Appeals for the Fourth Circuit in Real

20   Truth About Obama, a somewhat curiously named case in light of

21   the national political -- the record will reflect this case has

22   nothing do with President Obama.  Indicate that.  But the name of

23   the case is Real Truth About Obama, at 575 F.3d at 346.

24        Clearly, there's a higher burden upon the plaintiff

25   than there previously was under the old Blackwelder standard.  So

6

1    that's why we are.

2              So I think the way to proceed with this is, in addition

3    to what is before me from the hearing on June the 28th -- Mr.

4    Fax, I'd be glad to hear from you and then I'll hear from Mr.

5    Potter or Mr. Nayden, and we'll proceed.

6              Is this agreeable with you, Mr. Potter?

7              MR. POTTER:  Yes, it is, Your Honor.

8              THE COURT:  Okay.  All right.  Mr. Fax, be glad to hear

9    from you.

10             MR. FAX:  Yes.  Your Honor, as I understand it, the

11   Court wishes to hear evidence in this case.  I have three

12   witnesses.  I can give an opening statement, if the Court wishes.

13             THE COURT:  I don't think you need to.  I guess the

14   crux of the matter is, and again, Mr. Potter, I am not angry with

15   you.  It's just we're trying to move along, and it's difficult

16   when you file something so late.

17             But really, the thrust of what Mr. Potter's submission

18   was this morning is that the City's duty to acquire title to

19   property is separate from its duty to redeem a ground rent.  And

20   I think you're familiar with the position of the City, anyway, in

21   that regard.

22             MR. FAX:  Yes.

23             THE COURT:  And the City is saying that it was able to

24   convey all the properties in Phase I of the project as of July 2

25   of 2010.

1          MR. FAX:  Yes.

2          THE COURT:  And the crucial issue that I addressed on

3     June the 28th was, it seems to me, the City was or was not able

4     to convey title.  Clearly, if the City can show me that it was

5     able to convey title, then that's a separate matter, in light of

6     the high burden you bear.  But if the City's not able to convey

7     title, then there is a real problem here, obviously.

8          So that's one of the key things I need you to address

9     right away.

10         MR. FAX:  Very well.  I have three witnesses.  And if I

11    may, I can call my first witness, Danielle Zoller, Esquire.

12         THE COURT:  Fine.  That's fine.  I gather, under Rule

13    615 of the Federal Rules of Civil Procedure, Mr. Potter, Mr. Fax,

14    you want a sequestration of witnesses who are going to testify?

15         MR. FAX:  You know, I have debating it.  I'm of mixed

16    views on it.  But I think on balance, it's probably a good idea

17    to invoke the witness rule.

18         THE COURT:  Usually, we have to have unanimity on a

19    position on this.  If either side wants sequestration, I usually

20    grant it.  Mr. Potter, do you want sequestration?

21         MR. POTTER:  Your Honor, I'm, I don't think that it's

22    necessary in this case.

23         THE COURT:  That's fine.  We don't need to sequester

24    the witnesses.

25         MR. FAX:  I am going to invoke the rule.

```
1              THE COURT:  All right.  You would like to have

2    sequestration?

3              MR. FAX:  Yes.

4              THE COURT:  If either side wants sequestration of

5    witnesses under Rule 615, then my view is I will so apply it.

6              So whoever is going to be a witness for either the

7    plaintiff or the City, the Mayor and City Council, if you will

8    just please sit out in the hall out there.  Thank you very much.

9    So that there's no one who's going to be a witness in the case

10   should remain here in the courtroom.

11             MR. FAX:  Your Honor, the corporate representative will

12   remain in court.

13             THE COURT:  Sure.  The legal representatives,

14   obviously, can stay in the courtroom.  Sure.  Yes, Mr. Potter.

15             MR. POTTER:  Since there's going to be a corporate

16   representative from the plaintiff, may the City designate one

17   corporate representative?

18             THE COURT:  Sure.  Sure.

19             MR. POTTER:  Okay.  Thank you.

20             THE COURT:  We're ready to go.  Mr. Thompson.

21             DANIELLE ZOLLER, GOVERNMENT'S WITNESS, SWORN

22             THE WITNESS:  I do.

23             THE CLERK:  Please be seated.  Ma'am, I need you to

24   adjust that microphone to yourself.  State your name and then

25   spell your name for the record.
```

Case 1:12-cv-01904-RDB   Document 26   Filed 07/25/12   Page 9 of 263

1              THE WITNESS:  Danielle Stager Zoller.  D-A-N-I-E-L-L-E.

2      S, middle name S-T-A-G-E-R.  Z-O-L-L-E-R.

3              THE CLERK:  Thank you.  Counsel.

4              DIRECT EXAMINATION

5      BY MR. FAX:

6      Q    Thank you.  Good morning, Ms. Zoller.

7      A    Good morning.

8              MR. POTTER:  Pardon me.  I just wanted to make it

9      clear, Your Honor, that Mr. Engel is going to be a witness, even

10     though he is the City designee.

11             THE COURT:  Either side can have one corporate

12     representative, and the corporate representative can also be a

13     witness in terms of the terms of the contract.  Any objection to

14     that, Mr. Fax?

15             MR. FAX:  No objection, Your Honor.

16             MR. POTTER:  Thank you, Your Honor.

17             THE COURT:  Thank you, Mr. Potter.

18     BY MR. FAX:

19     Q    Good morning, again.

20     A    Good morning.

21     Q    Ms. Zoller, you're a partner at Gordon Feinblatt in

22     Baltimore City, is that correct?

23     A    Yes.

24     Q    And what is your field of concentration?

25     A    Commercial real estate.

1    Q    How long have you been practicing real estate law?

2    A    Fifteen years.

3    Q    And how long have you been at Gordon Feinblatt?

4    A    Eleven years.

5    Q    And you are a member of which state bars?

6    A    Maryland and Virginia.

7    Q    All right.  In your real estate practice, what do you do?

8    A    Commercial real estate deals involving selling, leasing,

9    buying, and financing properties.

10   Q    And that includes negotiation, due diligence, documenting

11   and closing real estate deals?

12   A    Correct.

13   Q    What does due diligence entail?

14   A    Once the parties enter into a contract, we go through due

15   diligence, which involves reviewing title, reviewing contracts,

16   reviewing environmental reports.  Just reviewing the property and

17   documents related to the property.

18   Q    Okay.  Is Poppleton I, the plaintiff in this case, is

19   Poppleton I a client of yours?

20   A    Yes.

21   Q    And when did Poppleton I become a client of the firm?

22   A    Poppleton I became the firm's client in 2004 in connection

23   with the RFQ, which was then awarded in 2005.

24   Q    I'm sorry.  RFQ is?

25   A    The City's request for qualifications related to this

1    project.

2    Q    Okay.  That was in 2004?

3    A    That's when we became their counsel.  And I believe that was

4    awarded to Poppleton I in 2005.  I personally became involved in

5    2006 in connection with the preparation of the Land Disposition

6    and Development Agreement.

7    Q    All right.  With respect to your legal representation of

8    Poppleton I for purposes of this deal, what did your legal work

9    generally consist of?

10    A    First and foremost, negotiating the LDDA.  But I also

11    assisted with, and have since 2006, the enactment of various

12    ordinances for the project.  There was a rezoning ordinance,

13    planned unit development, an amendment to the Urban Renewal Plan.

14          I've also assisted the client with respect to

15    negotiations related to financing.

16    Q    I'm sorry.  TIF is?

17    A    Tax increment financing.

18    Q    Okay.

19    A    There were discussions about amendments to the LDDA, which

20    never came to fruition.  And I've assisted the client with

21    reviewing contracts for utilities and service contracts.

22    Q    When you say that you worked on amendments to the Urban

23    Renewal Plan, what happened to that?  How did that play out?

24    What were the steps?

25    A    Oh, all four ordinances were enacted.

Case 1:12-cv-01904-RDB   Document 26   Filed 07/25/12   Page 12 of 263

1    Q    By whom?

2    A    The City.  And signed by the Mayor in 2000, I believe late

3    2006.

4    Q    And you participated in the drafting of those?

5    A    Correct.

6    Q    All right.  And the City also participated?

7    A    Correct, yes.

8    Q    All right.  So on the basis of your work, you are familiar

9    with the terms and conditions of the LDDA, is that correct?

10   A    Yes.

11   Q    Okay.  Now, you have -- may I approach?

12            THE COURT:  Certainly.

13   Q    Your Honor, let the record reflect that I have handed the

14   witness an exhibit book, copies of which I've given to the City's

15   counsel and to the court personnel.  And there is a copy for the

16   Court as well.

17            THE COURT:  Right.

18   Q    It has an index at the front and the exhibits are numbered

19   sequentially.  I should advise the Court, as I advised counsel

20   for the City earlier, I've condensed my direct case somewhat and

21   I am not going to seek to introduce all of the exhibits in the

22   book.  But I will, you know, a good percentage of them I will.

23   But not all of them.

24            The question, I suppose, is going to be, if there is a

25   question, it's the admissibility of each exhibit.  I suggest that

1   a number of the exhibits, in effect, are stipulated to because

2   they're cross exhibits.  For example, I don't believe there's a

3   dispute as to the authenticity of the LDDA.

4            THE COURT:  Under our Local Rule 107.5, an exhibit is

5   deemed to be admitted when it's first mentioned, unless there's

6   some dispute.  Are there any disputes as to these documents, Mr.

7   Potter?  It seems to me the documents speak for themselves in

8   terms of their authenticity, sir.

9            MR. POTTER:  Yes, Your Honor.  I was looking at the

10  different photographs that are listed.

11           MR. FAX:  We will put on direct evidence of the taking

12  of those, Your Honor.  I understand the issue.

13           THE COURT:  All right.  In terms of the time of the

14  taking of the photograph.  So why don't we move forward?

15           MR. POTTER:  Yes.

16           THE COURT:  Other than that, there's really no issue,

17  is there, Mr. Potter?

18           MR. POTTER:  No, Your Honor.

19           THE COURT:  Okay.  Well, fine.  Thank you.  So go

20  ahead, Mr. Fax.

21  BY MR. FAX:

22  Q    Ms. Zoller, would you please turn to Tab One, what's been

23  marked as Exhibit One, the Land Disposition and Development

24  Agreement.  Do you see that?

25  A    Yes.

1    Q     All right.  I want you to turn to Page Two and I want to

2    direct your attention to Paragraph 1.2A on Page Two, titled Land

3    Assemblage and Acquisition.  Do you see that language?

4    A     Yes.

5    Q     And it says, the first sentence, if I may just read it, it

6    says:  The City shall use its best efforts and all legal

7    authority to acquire all the properties identified on Schedule A

8    that the City does not already own as of the effective date.  Do

9    you see that sentence?

10   A     Yes.

11   Q     And then down in the third sentence, it says:  In addition,

12   the City will take all necessary steps to redeem or eliminate

13   ground rents on all properties to be conveyed to the developer.

14   Do you see that?

15   A     Yes.

16   Q     Now, it mentions the term "ground rents."  What is a ground

17   rent?

18   A     A ground rent lease is a renewable lease pursuant to which

19   the fee title owner of the property receives an annual or a

20   semi-annual ground rent or leasehold payment.  And the leasehold

21   tenant owns a right of possession to the property.

22   Q     Including -- you say the property, you mean the raw real

23   estate or the ground itself?  Is that what you mean?

24   A     The tenant can use all of it, the land and the building.

25   But the fee owner owns, actually owns the title to the property.

Case 1:12-cv-01904-RDB   Document 26   Filed 07/25/12   Page 15 of 263

1    Q    All right.  So if I -- the fee owner meaning the person who

2    owns the ground and who is the renter of the ground rent?

3    A    The landlord, correct.

4    Q    The landlord.  Okay.  So if I have a property in Baltimore

5    City where there's a building and then there's real estate under

6    it, land, and the leasehold interest in the property is subject

7    to a ground rent, who owns the land?

8    A    Well, fee title is owned by the fee title owner.  The land

9    is owned by the fee title owner.

10   Q    And the lessee, the ground rent lessee owns the building?

11   A    The lessee has a right to use the building and the land.

12   Q    All right.  Now, how does ownership -- and the lessee is the

13   owner of a leasehold property in a case where the property is

14   subject to a ground rent?

15   A    Correct.

16   Q    All right.  How does ownership of a leasehold property

17   differ from ownership of a property in fee simple?

18   A    Well, if you own the leasehold interest, you're really,

19   you're a tenant and you have to pay an annual rent to the owner

20   of the fee title.  And you may be divested of your right to the

21   property if you fail to make that payment.

22   Q    So if I own a property that's subject to a ground rent and I

23   fail to pay the ground rent, what remedy does the owner of the

24   property have?

25   A    The ground rent owner can eject you from the property and,

Case 1:12-cv-01904-RDB  Document 26  Filed 07/25/12  Page 16 of 263

1   basically, for a relatively small amount of money, retake

2   possession of the property, and you lose your right to use it and

3   any improvements that you might have made to it.

4   Q    All right.  Now, when it says here in Section 1.2A that the

5   City shall use its best efforts and all legal authority to

6   acquire all of the properties, are you able to determine from

7   this entire Paragraph 1.2A whether the term "acquire" means

8   acquire some interest, acquire a leasehold interest, for example,

9   or whether it means acquire the property in fee simple?

10  A    This means acquire the property in fee simple because it

11  does say also in this section that the City will redeem or

12  eliminate all ground rents.

13  Q    Well, how does that tell you that the term "acquire" is

14  intended to mean fee simple?

15  A    Well, again, in the same paragraph, it says that the City's

16  going to eliminate the ground rents.

17  Q    And so do I understand correctly that, that if you eliminate

18  ground rents, by definition that's what fee simple is?

19  A    Correct.

20  Q    And that if you do not eliminate ground rents, you're

21  acquiring something less than that?

22  A    Right.

23  Q    A leasehold interest?

24  A    Right, you're acquiring a leasehold interest.

25  Q    Now, I was handed, a few minutes before the hearing, a

1    document captioned Opposition to the Motion For Temporary

2    Restraining Order.

3              THE COURT:  For the record, that will be filed, Mr.

4    Thompson.  And that is ECF number?

5              THE CLERK:  That actually --

6              THE COURT:  It has to be electronically filed.  We need

7    to give it a number.  The record will reflect, we'll later, we'll

8    indicate this, Mr. Thompson, if you can give it a number.  Just

9    give it the next number on the ECF list here.

10             THE CLERK:  11?

11             THE COURT:  All right.  Paper Number 11.  This will

12   become Paper Number 11.  Mr. Potter, you will see that you get

13   this filed electronically, okay?

14             MR. POTTER:  Yes, Your Honor. Did you want that to be

15   an exhibit?

16             THE COURT:  No.  It just needs to be filed as a matter

17   of record, is the point, normally.  That's why it was not done

18   properly this morning.  It has to be filed as a matter of record.

19   Go ahead, Mr. Fax.

20   BY MR. FAX:

21   Q    Thank you, Your Honor.  If I may just have a moment.  Do you

22   see the -- strike that.  Your Honor, I have only one copy of

23   this.

24             THE COURT:  I have a copy of it.

25   Q    I want to, may I approach?

1         THE COURT:  Yes, certainly.

2    Q    Ms. Zoller, I want to direct your attention to Page Five of

3    the Opposition to the Motion For Temporary Restraining Order.

4    The second paragraph reads as follows, the first sentence:  Under

5    Section 1.2 A of the LDDA, the City's duty to acquire title to

6    property is separate from its duty to redeem ground rent.  Under

7    LDDA Paragraph 1.9, the, quote, "City shall give written notice

8    to developer when it has acquired title to all the properties in

9    each phase", close quote.

10        Again, acquisition of title to the property is treated

11   separately from the redemption of ground rents.  And then it

12   quotes LDDA Section 1.2A, quote:  "In addition, the City will

13   take all necessary steps to redeem or eliminate ground rents on

14   all properties."

15        Do you agree with the statement that the City's duty to

16   acquire title and property is separate from its duty to redeem

17   ground rent under the LDDA?

18   A    I don't.  I think they're one and the same thing.

19   Q    And on what do you base that statement?

20   A    Well, the City will not have acquired fee simple title

21   unless it has redeemed the ground rents.

22   Q    Now, I want you to turn to Exhibit Two in the binder book,

23   in the binder that you have.  This is plaintiff's -- I'm sorry --

24   this is the letter dated July 2nd, 2010 to Mr. Bythewood from

25   Baltimore Housing.  And this was introduced, actually, at the

1    last hearing by the defendants as their Exhibit One.  For

2    purposes of this hearing, Your Honor, I'm calling it Plaintiff's

3    Exhibit Two.

4         Ms. Zoller, did you receive a copy of this letter,

5    signed by Mr. Graziano, contemporaneously with its issuance?

6    A    Yes.

7    Q    Would you please read the first sentence of the letter into

8    the record?

9    A    I am writing to notify you that the Mayor and City Council

10   of Baltimore has acquired title to all properties in Phase I of

11   the Poppleton project area as identified in Schedule A of the

12   Land Disposition and Development Agreement, the LDDA, between the

13   Mayor and City Council of Baltimore City, the City, and Poppleton

14   Development 1, LLC, the developer, executed on September 27,

15   2006.

16   Q    So when you read that sentence, what did that mean to you as

17   Poppleton's real estate lawyer?

18   A    It meant that the City had acquired fee simple title to all

19   of the properties in Phase I.

20   Q    And what, if anything, did that trigger on the part of the

21   developer?

22   A    Under the LDDA, it triggered the time line for closing.

23   Q    Which was?

24   A    Eighteen months.

25   Q    Eighteen months?  Okay.  Now, at the time that you received

1    this letter, did you have any reason to disbelieve or challenge

2    the City's representation that, in fact, it had acquired all of

3    the properties in Phase I?

4    A    No.  In fact, because it had taken so many years to get to

5    this point, I had, I assumed it was correct.

6    Q    Did there come a time when you obtained information that was

7    contrary to the City's representation in its July 2nd, 2010

8    letter?

9    A    Yes.

10   Q    And when was that?

11   A    The spring of this year.

12   Q    2012?

13   A    2012.

14   Q    And what happened at that time?

15   A    Well, we knew that the City had not acquired all of the

16   properties in Block 157, so we thought we ought to check back at

17   all the properties in Phase I as well.

18   Q    So what steps did you take?

19   A    We did a search online of the Baltimore City land records

20   and a search online of SDAT records to determine which, if any,

21   properties had not been acquired.

22   Q    And what did you find?

23   A    We found that the City had not acquired fee simple to a

24   number of properties in Phase I as of July 2nd, 2010.

25   Q    Now, not counting Block 157, which we'll talk about in a

Case 1:12-cv-01904-RDB   Document 26   Filed 07/25/12   Page 21 of 263

1    little bit, do you recall how many properties you identified that

2    had not been acquired in fee simple as of July 2nd, 2010?

3    A    I know of at least five.

4    Q    All right.  Why don't we start with 237 North Schroeder

5    Street.  If you'd turn to Tab Three, Exhibit Three.  Your Honor,

6    let me represent to the Court, I have, I'm relying on certain

7    public records in accordance with Federal Rule of Evidence, I

8    think it's 904 point something, I had original, I had original

9    certifications obtained from the Office of Land Records and the

10   Clerk of Court.  And I have a set that have the original

11   certification of authenticity of the public records.

12          The copies that the Court and counsel have in their

13   binder are photocopies of those, of that set that have the

14   original certifications.

15          If the Clerk of Court requires the original

16   certifications, I can provide them now or later, for purposes of

17   the record.

18          THE COURT:  I don't think there's any need for that.

19   Any need for that, Mr. Potter?

20          MR. POTTER:  No, Your Honor.  We'll stipulate to their

21   authenticity.

22          THE COURT:  It's, essentially, under Rule 901, as well,

23   there is no 904, but it's under Rule 902, self-authentication.

24   They're deemed to be authentic.

25          MR. FAX:  That's it.  I'm sorry.

1           THE COURT:  That's all right.

2           MR. FAX:  Maybe it's 902 paren 4?

3           THE COURT:  I'll check with you in a second.  It's Rule

4    901-4, distinctive characteristics.  And it's essentially

5    self-authenticating under Rule 902.

6           MR. FAX:  902.

7           THE COURT:  Okay.  There's no dispute in terms of the

8    authenticity of the documents.

9           MR. FAX:  Okay.  Thank you.

10          THE COURT:  You may proceed.

11   BY MR. FAX:

12   Q    Thank you.  So Ms. Zoller, please look at Exhibit Three and

13   tell the Court what this is.  What are we looking at?

14   A    This is an instrument by which the City acquired a leasehold

15   interest in 237 North Schroeder Street.

16   Q    All right.  When you say leasehold interest, do you mean

17   that the property was still subject to a ground rent?

18   A    Yes.

19   Q    And how do you know that from the document?

20   A    It says it right on its face.

21   Q    Where?

22   A    That the conveyance, on the second page.

23   Q    Right.

24   A    Is subject to the payment of an annual ground rent of $24

25   payable on April and October 1st of each and every year.

DIRECT EXAMINATION OF ZOLLER                 23

1    Q    All right.  What is the date on this deed?

2    A    April 10, 1990.

3    Q    All right.  Now just out of curiosity, if, if the, if the

4    holder of this leasehold interest failed to pay the ground rent,

5    even though it's a small amount of money, if the holder failed to

6    pay, what remedy would the owner of the ground, of the ground and

7    the holder of the ground lease, what remedy would he or she have?

8    A    They could eject the tenant and retake possession.

9    Q    Okay.  Now, would you turn to the next tab, which is

10   Plaintiff's Exhibit Four?  What is this?

11   A    This is an inquisition dated September 16, 2010, by which

12   the City acquired, it appears, the ground rent, or the fee simple

13   interest in the same property, 237 North Schroeder Street.

14   Q    I'm sorry.  The date of the inquisition or acquisition of

15   the property, of the ground rent by the City is?

16   A    September 16, 2010.

17   Q    All right.  So as of July 2nd, 2010, did the City have fee

18   simple title to 237 North Schroeder Street?

19   A    No.

20   Q    All right.  Now, would you turn to tab, Exhibit Five?  And I

21   ask you, for the record, what is Exhibit Five?

22   A    This is an inquisition pursuant to which the City acquired,

23   in a condemnation proceeding, the leasehold interest in the

24   property known as 931 West Saratoga Street.

25   Q    And what is the date of this inquisition?

Case 1:12-cv-01904-RDB   Document 26   Filed 07/25/12   Page 24 of 263

1    A    June 22, 2010.

2    Q    And was the inquisition subject to a ground rent?

3    A    Yes.  It says that only title to the leasehold interest is

4    being conveyed.

5    Q    Where does it say that?

6    A    On the first page, Paragraph One, it says that there would

7    condemn the leasehold interest.  And then on the second page,

8    near the bottom, it says the title to the leasehold interest to

9    the property is vested in the Mayor and City Council.

10            THE COURT:  Just for the record, that was 931 West

11   Saratoga Street, is that right?

12   Q    That's correct, Your Honor.  That's Exhibit Five.

13            THE COURT:  Yes.

14   Q    All right.  Now, would you turn to Exhibit 6 and tell us

15   what that is?

16   A    This is a Ground Rent Redemption Certificate, pursuant to

17   which the City acquired the fee interest or ground rent in the

18   same property to --

19   Q    What property is that?

20   A    931 West Saratoga Street.

21   Q    Yes.

22   A    And this was recorded on May 20, 2011.  So that's its

23   effective date.

24   Q    All right.  So after July 2nd, 2010, 11 months earlier, 12

25   months earlier, did the City own 931 West Saratoga Street in fee

1    simple?

2    A    No.

3    Q    Okay.  All right.  Now I want to direct your attention to

4    Exhibit Seven.  And please tell us what that is.

5    A    This is a Deed of Assignment by which the City acquired a

6    leasehold interest in 940 West Lexington Street.

7    Q    And when you say "leasehold interest", you mean there was an

8    outstanding ground rent that the City did not acquire at that

9    time?

10   A    Yes.

11   Q    And how do you know that?

12   A    The document says it on its face, that the property's being

13   conveyed subject to the payment of an annual rent of $18.55,

14   payable half yearly.

15   Q    Do you know whether the City acquired that ground rent or

16   ever acquired that ground rent?

17   A    I --

18   Q    Did you do so a search of Land Records?

19   A    Yes.

20   Q    And what, if anything, did you find?

21   A    I believe, for this property, it acquired it at a later

22   date.  Or may have -- yeah.  I have to see the document.

23   Q    Well, okay.  Why don't you turn to Exhibit Eight.  What is

24   Exhibit Eight?

25   A    So this is a deed -- okay.  So this is the deed dated July

1    31, 2010, by which the City did acquire the fee simple interest

2    in that property, 940 West Lexington Street.

3    Q    Okay.  Obviously, that's after July 2nd, 2010?

4    A    Correct.

5    Q    So is it your testimony that as of July 2nd, 2010, the City

6    did not own 940 West Lexington Street in fee simple?

7    A    Yes.

8    Q    All right.  Now, would you turn to Exhibit Nine.  What is

9    Exhibit Nine?

10   A    This is an inquisition dated June 22, 2010, by which the

11   City acquired a leasehold interest in 941 West Saratoga Street.

12   Q    And how do you know that the, that the City was acquiring

13   only a leasehold interest in 941 West Saratoga Street?

14   A    The document says on its face that title to the leasehold

15   interest to the property is hereby vested in the City.

16   Q    Where is that?

17   A    That's on the second page.

18   Q    I just, I want the record to be clear.  Can you tell us

19   approximately?

20   A    It's the second paragraph of Section Two.

21   Q    Second paragraph of Section Two.  Thank you.  So as of --

22   all right.  Okay.  Now look at Exhibit 10.  What is Exhibit 10?

23   A    This is a Ground Rent Redemption Certificate pursuant to

24   which the City acquired the fee interest or ground rent to 941

25   West Saratoga Street.

Case 1:12-cv-01904-RDB   Document 26   Filed 07/25/12   Page 27 of 263

1    Q    And on what date?

2    A    May 20, 2011.

3    Q    All right.  So as of July 2nd, 2010, obviously, the City did

4    not own this property, 941 West Saratoga Street, in fee, is that

5    correct?

6    A    Correct.

7    Q    All right.  Finally, with regard to this set of properties,

8    I want you to turn, I ask you to turn to Exhibit 11.  What is

9    Exhibit 11?

10   A    This is a Ground Rent Redemption Certificate pursuant to

11   which the City acquired the ground rent or fee simple title to

12   215 North Schroeder Street.

13   Q    And that's dated as of when?

14   A    It's dated and recorded July 9, 2010.

15   Q    All right.  Which is obviously after July 2nd, correct?

16   A    Correct.

17   Q    All right.  Now, with respect to all of these properties

18   that we've been discussing, are they within Phase I of Poppleton?

19   A    Yes.

20   Q    So as you understood it when the letter of July 2nd, 2010

21   was issued and you received the copy, the City was representing

22   that it had acquired all of these properties, in addition to all

23   of the other properties in Phase I, is that correct?

24   A    Yes.

25   Q    All right.  Now, I'd like you to go back to Exhibit One.

1          THE COURT:  Just for point of clarification.  Taking

2     some notes here, Mr. Fax.  The status of the property at 215

3     North Schroeder Street was that the City acquired title to that

4     property on what date, again?  With a fee simple, with a ground

5     rent still attendant to it.  What is the date on that?

6          THE WITNESS:  Do you want me to answer?

7          THE COURT:  Yeah, if you would.  I am trying to stay

8     with you.  I was with you the first four properties.  You went

9     through the fifth property too fast.

10          MR. FAX:  Okay.  Go ahead.

11          THE COURT:  I want to address the property at 215 North

12     Schroeder Street.  What is the status of that again?

13          THE WITNESS:  July 9, 2010.

14          THE COURT:  The property was purchased subject to a

15     ground rent?

16          THE WITNESS:  No.

17          THE COURT:  Subject to a ground rent?

18          THE WITNESS:  The ground rent was redeemed on that

19     date.

20          THE COURT:  All right.  Okay.

21     BY MR. FAX:

22     Q    Do you know when the leasehold interest in that property was

23     acquired?

24     A    I don't by these documents.  But the City would have

25     acquired the leasehold interest prior to filing and making an

1    application for this Ground Rent Redemption Certificate.

2    Q     Well, did you search for a recordation for the leasehold

3    interest acquisition?

4    A     I probably did.  I just don't recall specifically what I

5    found out.

6    Q     You didn't find it, is that right?

7    A     It could have been too old because the Land Records online

8    only go back so far.

9    Q     All right.  In any event, we established that the fee

10   interest in the property was acquired on July 10th of 2010, is

11   that correct?

12   A     July 9.

13   Q     July 9th.  I'm sorry.  All right.  Now, let me take you back

14   to Exhibit One, which is the LDDA.  And I'm going to ask you to

15   turn to Page Three, and look at Section 1.3, which is titled,

16   titled Review, Notice of Title Defects.  Do you see that?

17   A     Yes.

18   Q     Would you please read into the record Subsection B of that

19   section?

20   A     If the developer claims any title defect or encumbrance is

21   unacceptable or will cause any property to be unmarketable or

22   uninsurable, said defect or encumbrance shall be brought to the

23   attention of the Department and the City's Law Department in

24   writing at least 120 days prior to the closing date for such

25   property, and the City shall use its best efforts and all legal

1   authority to eliminate such defect or encumbrance at the earliest

2   possible time prior to closing.

3   Q    All right.  Pursuant to this section, was it your

4   understanding that the developer was obligated to notify the City

5   that its letter of July 2nd, 2010 was wrong, and that the

6   properties that we have been discussing had not been acquired in

7   fee simple by that date?

8   A    No.

9   Q    Why not?

10  A    Because the contract, or the LDDA, says in 1.2A that the

11  City is going to acquire all of the property and eliminate all

12  ground rent.  So I don't view 1.3B as being relevant to that,

13  that first and foremost obligation.

14  Q    What was your understanding of the meaning of Section 1.3B?

15  A    It means to, if the developer would claim something else

16  would come up, not ownership, but related to encumbrances or

17  easements on the property, other things that might, the developer

18  might view as a defect towards its development, then we would

19  give notice under Section 1.3B.

20  Q    All right.  Approximately how many properties were embraced

21  within section, within Phase I?

22  A    I know the whole project has 500 plus.  I think Phase I

23  has -- well, I don't know for sure.  300 plus.

24  Q    Approximately?

25  A    300 plus.

1    Q     A couple hundred.  Okay.  So your understanding was that

2    when the City advised you that it had acquired all of those

3    properties, a couple hundred properties by July 2nd of 2010, you

4    were not obligated to go back and do an independent search of

5    each property to ascertain whether the City was telling the

6    truth?

7    A     Correct.

8    Q     Is that your understanding?

9    A     Right.

10   Q     Okay.  But there is -- and why is that?  Why were you not so

11   obligated?

12   A     Because the contract says that the City's going to convey

13   fee title.  So when it gave us a notice saying it owned all the

14   properties --

15   Q     You took them at their word?

16   A     Correct.

17   Q     All right.  So what, what was the obligation, if any, on the

18   part of the developer with respect to notification at least 120

19   days before closing?

20   A     Well, if the developer was going to claim that there was

21   some sort of defect other than what the contract provides for,

22   then they would need to give notice of that.

23   Q     You mean defect other than what the City was representing

24   was not a defect?

25   A     Correct.

1    Q    All right.  Now, we're still with the LDDA, Plaintiff's

2    Exhibit One.  I'd like you to go to Schedule A, which is at Page

3    30, starts at Page 35 of the, of the agreement.  You see that?

4    A    Yes.

5    Q    Okay.  What, what does this schedule represent?  It's 35,

6    36, 37.  It goes through Page 40-something.  47.  Pages 35

7    through 47.  What does this schedule represent?

8    A    It's a list of all of the properties that are within the

9    project and that the City has to acquire and convey to the

10   developer.

11   Q    Okay.  And it's broken out into phases.  What are the

12   phases?  What does that mean?

13   A    There are four main phases.  And these were, when we entered

14   into, and the developer entered into the contract, how the

15   developer expected to build a project.

16   Q    All right.  Would you please turn to Page 47?  It lists a

17   number of properties in Block 157, and they're identified as

18   Phase IV in the, in the text.  Do you see that?

19   A    I do.

20   Q    Would you -- there's a double asterisk footnote.  Would you

21   please read that into the record?

22   A    Notwithstanding the fact that the property is located in

23   Block 157 and listed immediately above, are in Phase IV, the City

24   will acquire such properties and conduct clearing activities with

25   respect to such properties in connection with Phase I for

Case 1:12-cv-01904-RDB   Document 26   Filed 07/25/12   Page 33 of 263

1    purposes of neighborhood safety.

2    Q    All right.  Let's orient everybody, if we can.  You have on

3    your screen a scheme drawing of a large portion of the Poppleton

4    project.  This is Exhibit Four to the plaintiff's certified

5    complaint, the color version is, this one.  And I also notice

6    it's listed as an exhibit to the defendant's exhibits.  And I

7    have two blow-ups.  I have one that is, that can be seen by

8    defense counsel and one that can be seen by the Court.  It's also

9    on the screen.

10          Let me, if you can, can you explain to us the

11   orientation of Block 157 and the blocks in Phase I?  Just so we

12   can understand geographically what we're looking at.

13   A    Well, Block 157 is in the upper right-hand corner.  In fact,

14   it says 157.  It's that entire block.

15          THE CLERK:  Ms. Zoller, if you touch the screen, you

16   can make a mark.

17   Q    Go ahead.

18   A    That's pretty neat.  That's Block 157.

19   Q    Okay.  And how does it relate to Phase I?

20   A    Well, all of this right below it is Phase I, going down

21   these two blocks.

22   Q    Okay.  All right.  Now, you read this footnote into the

23   record.  There's language at the end, quote, "For purposes of

24   neighborhood safety", close quote.  What was the concern

25   regarding neighborhood safety as it relates to Block 157?

1    A    Well, at the time the LDDA was entered into, there was, as I

2    understand, a lot of drug trafficking happening on that block,

3    157.

4    Q    So?

5    A    Well, I believe we were pretty concerned about that.  And

6    the developer was concerned that its lenders would be concerned

7    about a drug corner being so near Phase I, and its workers having

8    problems with that happening while they were constructing the

9    project.

10   Q    So the footnote was a product of negotiations between the

11   parties?

12   A    Yes.

13   Q    What was the concern, what was the concern about detrimental

14   impact on the development, more specifically?  Can you be more

15   specific?

16   A    Well, the developer wanted to have those properties removed,

17   the improvements on those property demolished in connection with

18   Phase I.

19   Q    Why?

20   A    So that the people who were selling their drugs on the

21   street corner couldn't, couldn't do that from the improvements.

22   Q    Okay.  Was there any concern about marketability of the

23   project with Block 157 remaining?

24   A    Absolutely.

25   Q    What was the concern?

1    A    Well, the concern was once improvements were built in Phase

2    I, that nobody would want to buy, say, a home or rent a home

3    there if there was going to be a drug corner right up the street.

4    Q    Okay.  So what was the purpose, then, of footnote, of the

5    footnote on Page 47?

6    A    The purpose was that that entire block needed to be acquired

7    by the City and, and the improvements removed so that the

8    opportunity for drug traffic wouldn't exist any more.

9    Q    Acquired by when?

10   A    Acquired by closing for Phase I.

11   Q    Okay.  Now, let me ask you to turn to Plaintiff's Exhibit

12   12, which is the Notice of Default dated May 2nd, 2012.  Do you

13   see that?

14   A    Yes.

15   Q    Now, rather than have, asking you to go through this, I

16   don't think this is disputed.

17        According to this notice, Poppleton was required to

18   produce adequate proof of financing so as to be able to close in

19   no later than 60 days, is that right?

20   A    Correct.

21   Q    All right.  So 60 days from May 2nd, 2012 is July 1st, which

22   is a Sunday.  So let's move it to Monday, July 2nd.  Okay?  We're

23   now on Monday, July 2nd, 2012.  Okay.  That would have been the

24   final closing date.  Okay?

25   A    Okay.

Case 1:12-cv-01904-RDB   Document 26   Filed 07/25/12   Page 36 of 263

1    Q    According to this letter.  As of Monday, July 2nd, 2012, had

2    the City acquired all of the properties on Block 157?

3    A    No.

4    Q    I show you what has been marked as -- I'm sorry -- I show

5    you Plaintiff's Exhibit 13.  Why don't you turn to Tab 13?  What

6    is Tab 13?

7    A    This is an assignment by which the First Mt. Olive Freewill

8    Baptist Church acquired a leasehold interest in 900 West Saratoga

9    Street.

10   Q    What is the date of the assignment?

11   A    It's April 1996.

12   Q    And is 900 West Saratoga Street in block 157 in Poppleton?

13   A    Yes.

14   Q    All right.  When you say the church acquired a leasehold

15   interest in 900 West Saratoga Street in 1996, does that mean that

16   the church's ownership was itself subject to a ground rent?

17   A    Yes.

18   Q    What, if anything, did you do to determine whether, since

19   April 1996, the church and the ground underneath it were conveyed

20   to the City?

21   A    I did a search online of the Baltimore City Land Records

22   and, both by grantor and by the address, or the block and

23   address, and did not find anything or any documents by which the

24   church conveyed title to another party.

25   Q    And so, and how far do the web site records go?  How far do

1   those online records go?

2   A    I did the search, again, a day or two ago.  And the web site

3   said it was good through July 3rd of this year, 2012.

4   Q    So according to the posted information in the archives, as

5   of 10 days ago, the City still had not acquired either the

6   leasehold interest or the ground rent on 900 West Saratoga Street

7   in Block 157.  Is that your testimony?

8   A    As --

9   Q    According to the records?

10  A    According to the records, as to the leasehold, I could not

11  determine from the records who owns the ground rent.

12  Q    So we know at least the leasehold interest had not been

13  acquired as of July 3rd, 2012?

14  A    Correct.

15  Q    All right.  Would you now turn to Exhibit 14?  Tell us what

16  that is.

17  A    This is an instrument dated October 9, 1981, by which Metro

18  Metals Incorporated acquired a leasehold interest in more than

19  one property, but including 902, 904 -- 903 through 915.  I'm

20  sorry, those are -- scratch that.  902 and 904 West Saratoga

21  Street.

22  Q    All right.  Are 902 and 904 West Saratoga Street within

23  Block 157 in Poppleton?

24  A    Yes.

25  Q    All right.  Now, when you say Metro Metals acquired the

Case 1:12-cv-01904-RDB   Document 26   Filed 07/25/12   Page 38 of 263

1    leasehold interest in that property, you're saying that they own

2    the building but not the ground under it, is that right?

3    A    They have a leasehold interest in the property.

4    Q    All right.  So what, if anything, have you done to determine

5    whether, since October 1981, the Metro Metals Building and the

6    ground underneath it were conveyed to Baltimore City?

7    A    I did the same search that I did for 900 West Saratoga,

8    which was a search amongst the Baltimore City Land Records on

9    line, both by grantor and by block and address, and did not find

10   any instruments by which Metro Metals conveyed its leasehold

11   interest.

12   Q    So there's no record that you could, that you could

13   ascertain in the Land Records, as reflected online through July

14   3, 2012, showing a conveyance of 902 West Saratoga Street to

15   Baltimore City.  Is that what you're saying?

16   A    Correct.

17   Q    All right.  Finally, I want to direct your attention to

18   Section 1.5B of the LDDA.  So please go back to Exhibit One and

19   go to Page Three.  Section 1.5B on Page Three.  Do you see that?

20   A    Yes.

21   Q    All right.  Do you see where it says, in that section, the

22   properties identified as new construction in Schedule A, which

23   we're just looking at, in Schedule A of this agreement, are to be

24   delivered to the developer free of all buildings and other

25   structures.  Do you see that?

1    A    Yes.

2    Q    All right.  Now, I'm sorry to do this to you.  But I want

3    you to go back to where you were before, on Page 47, of the same

4    agreement, same exhibit.

5    A    Okay.

6    Q    And I want you to look at, see where it says 90 -- on page,

7    sorry, Page 46, under Phase IV, 906 West Saratoga Street.  Do you

8    see that?

9    A    Yes.

10   Q    And then it says new construction?

11   A    Yes.

12   Q    So as I understand the language in Section 1.5B, that 906

13   West Saratoga Street was to have been cleared, to have been

14   leveled because it's new construction and it was, according to

15   the footnote that you read on Page 47, it was to be cleared

16   before closing, is that right?

17   A    Yes.

18   Q    All right.  Meaning it had to be torn down before the

19   closing?

20   A    Yes.

21   Q    All right.  So yesterday, did you have occasion to drive by

22   906 West Saratoga Street?

23   A    Yes.

24   Q    What did you see?

25   A    There's still a building there.

1    Q     Is there only one building or more than one building?

2    A     There's a couple buildings, 906 -- they're all the same tax

3    lot, I believe.

4    Q     I'm sorry.  The same tax what?

5    A     Tax lot.

6    Q     Okay.  Same tax lot.

7    A     But when you look at it, you see more than one address.

8    906, 908, probably 910 and 912.

9    Q     So it's four buildings?  906, 908?

10   A     Like row homes.

11   Q     Okay.  Contiguous.  906, 908, 910, and 912 next to each

12   other?

13   A     Correct.

14   Q     And they are all Tax Lot 906?

15   A     906.

16   Q     So for purposes of attachment, of Schedule A, when it lists

17   906 West Saratoga Street, we're to understanding that that's a

18   tax lot, but that includes, actually, four building?

19   A     Four row homes.

20   Q     Four row houses.  I see.  Because they're attached, you

21   don't necessarily call them separate buildings?

22   A     Right.

23   Q     But they're four separate addresses?

24   A     Correct.

25   Q     Okay.  And those buildings were still there?

41

1    A     Yes.

2    Q     And that was on July 12th, 2000?

3    A     Yesterday.

4    Q     2012, is that correct?

5    A     Yes, that's correct.

6    Q     No further questions at this time, Your Honor.

7          THE COURT:  Thank you, Mr. Fax.  Mr. Potter.

8          CROSS EXAMINATION

9    BY MR. POTTER:

10   Q     Thank you, Your Honor.  Ms. Zoller, I would like to direct

11   your attention back to Plaintiff's Exhibit 11.

12   A     Okay.

13   Q     And I wanted to clarify something.  This document is a

14   Ground Rent Redemption Certificate for 215 North Schroeder

15   Street, is that correct?

16   A     Correct.

17   Q     And what was the date that the ground rent was redeemed?

18   A     The date it was recorded, which is July 9, 2010.

19   Q     Actually, I didn't ask you the date it was recorded.  I

20   asked you the date it was redeemed.  Isn't it true that the State

21   of Maryland issued the redemption certificate on June 23rd, 2010?

22   A     That was the date it was issued.  But under the Real

23   Property article, it's not effective to vest fee simple title

24   until it's recorded, and that's probably 8-110, but I'm not 100%

25   sure.

1    Q    I believe it's defendant's, call it defendant's exhibits,

2    defendant's exhibit, it's listed as 31, but it's Exhibit 45 to

3    the verified complaint.  May I approach the witness?

4              THE COURT:  Certainly.

5    Q    Ma'am, is that a letter that you wrote, Exhibit 31?

6    A    Yes, it is.

7              MR. FAX:  For the record, Your Honor, it's, counsel

8    indicates it's his Exhibit 31 for purposes of this hearing.

9    Defense Exhibit 31.

10             THE COURT:  Yes.  And he said it's Exhibit 45 in your

11   verified complaint.

12             MR. FAX:  Yes.

13             THE COURT:  It's a letter of April 23rd, 2012 from Ms.

14   Zoller to the, to Mr. Peter Engel, Deputy Commissioner of the

15   Department of Housing and Community Development.  You may

16   continue, Mr. Potter.

17   BY MR. POTTER:

18   Q    Thank you, Your Honor.  Ms. Zoller, and that letter, is it

19   true that you raised your concerns about the condition of Block

20   157, the fact that the 900 West Saratoga Street parcel was still

21   owned, not acquired by the City?

22   A    Yes, I do mention that here.

23   Q    Now, did you raise in that letter anything about the ground

24   rents that you've been discussing here this morning on the five

25   properties, 215 North Schroeder, 930 West Saratoga, 237 North

CROSS EXAMINATION OF ZOLLER

43

1   Schroeder, 941 West Saratoga, and 931 West Saratoga?

2   A    No.

3   Q    So, ma'am, is it, it's true, though, that with regard to

4   Phase I, presently all of the ground rents for Phase I have been

5   redeemed?

6   A    With the exception of Block 157, the answer would be yes.

7   Q    Well, Block 157 isn't part of Phase I, is it?

8   A    Well, it is under the LDDA for purposes of closing.

9   Q    Where does it say "for purposes of closing?"

10  A    The footnote that I read earlier.

11  Q    Does that have the word "closing" in it?

12  A    It does not.  It does not.

13  Q    And ma'am, I was looking for, looking at, I guess, Exhibit

14  One, Plaintiff's Exhibit One, the LDDA.  You were testifying

15  about Paragraph 1.2.  And I was trying to find the phrase "fee

16  simple."  Is the phrase "fee simple" in there?

17  A    It's not, but it's implied by the language here.

18  Q    So under, direct your attention to 1.9, Page 4.  Do you see

19  that?

20  A    Yes.

21  Q    Okay.  One, two, three, four, five lines down.  In Paragraph

22  Nine, it states that the City's failure to acquire one or more

23  properties within a particular phase or sub-phase by the closing

24  date for that phase or sub-phase shall not prevent the developer

25  from proceeding to closing for such phase or sub-phase.

44

1    A    Correct.

2    Q    But the developer shall not be required to go to closing on

3    any phase or sub-phase unless the City is able to convey all of

4    the properties in such phase or sub-phase.  Is that right?

5    A    Correct.

6    Q    So would you agree that the developer is required to go to

7    closing if the City is able to convey all of the properties in

8    such phase or sub-phase?

9    A    If the time period has run, yes.

10   Q    Thank you.

11          THE COURT:  Any further questions, Mr. Potter?

12          MR. POTTER:  No.  I'm sorry.

13          THE COURT:  The Court has a question.  Just one or two

14   questions.  Ms. Zoller, as to five properties that -- just to

15   clarify.  The property at 931 West Saratoga Street, one of the

16   five properties as to which there's that issue of ground rent,

17   that's definitely in Phase I, correct?

18          THE WITNESS:  Correct.  Yes.

19          THE COURT:  And the title was not acquired in total

20   fee, absent ground rent, until May 20th of 2011, is that correct?

21          THE WITNESS:  Correct.

22          THE COURT:  And that is also true of the property at,

23   that was 931 West Saratoga.  That is also true of the property at

24   941 West Saratoga.  Again, May 20 of 2011 as to 941 West Saratoga

25   Street, correct?

1              THE WITNESS:  May 20, 2011 for 941 West Saratoga.

2              THE COURT:  So those two properties were not acquired

3    in fee, absent a ground rent, by the City until May 20, 2011?

4              THE WITNESS:  Correct.

5              THE COURT:  Apart from any issues as to Block 157,

6    correct?

7              THE WITNESS:  Correct.

8              THE COURT:  All right.  No further questions from the

9    Court.

10             REDIRECT EXAMINATION

11   BY MR. FAX:

12   Q    Thank you, Your Honor.  Very briefly, Ms. Zoller.  Counsel

13   asked you whether there was an obligation to, looking at Section

14   1.9 on Page Four of the agreement, whether there was an

15   obligation to close within 18 months if the City was able, 18

16   months earlier, to convey all of the properties to Poppleton.  Do

17   you remember that question?

18   A    Yes.

19   Q    And your answer was, you qualified it in some respect.  What

20   was your answer?

21   A    I qualified that if the time period had run, the developer

22   had an obligation.  Although I would add to that that there are

23   other, probably, conditions that had to be satisfied.  Assuming

24   all of the conditions to closing were satisfied, then the

25   developer would have an obligation to close.

1  Q    So if the City failed in fulfilling other conditions

2  precedent to closing, then the agreement might provide that the

3  obligation to close either did not exist or was deferred?

4  A    Correct.

5  Q    Well, in fact, in that regard, same paragraph.  Would you

6  look down where it says -- see the sentence that says, Failure of

7  the Developer to Satisfy the Conditions?  It's in the middle of

8  the paragraph.  The last word on the line --

9  A    Yes.

10  Q    -- is failure?  Would you read that into the record, that

11  sentence?

12  A    Starting with, Failure of the developer to satisfy --

13  Q    Yes.

14  A    -- the conditions precedent to closing identified in Section

15  1.7, and proceed to closing within such time frame, shall be

16  considered an event of default, provided, however, such 18 month

17  time frame shall be extended if the developer's inability to

18  satisfy the condition precedent set forth in Section 1.A, if

19  applicable, is due to the City's failure to approve the

20  developer's construction plans for the subject phase in a timely

21  manner, in which case such time frame shall be extended at the

22  developer's request until such time as the City has approved such

23  construction plans.

24  Q    All right.  So while that's not an issue in this case, the

25  approval of construction plans, that's one condition that would

1    excuse or defer the obligation to close on the part of the

2    developer, is that correct?

3    A    Correct.

4    Q    And there are others in this agreement, is that correct?

5    A    Correct.  Such as clearing the property.

6    Q    I'm sorry?

7    A    Such as clearing the property.

8    Q    Clearing the properties.  Do you recall anything else?

9    Well, clearing meaning demolition?

10   A    Demolition of the construction properties.

11   Q    And clearing of debris, yes.  Now, counsel directed your

12   attention to the footnote on Page 47 and asked you whether the

13   word "closing" was in the footnote.  And the answer, of course,

14   is, no, it's not.  I recall your answer, but I want to make it

15   clear on the record.

16        What is the basis for your position or your view or

17   understanding that this footnote requires acquisition of the

18   Block 157 buildings before closing?

19   A    Well, because it says the City will acquire such properties

20   and conduct clearing activities with respect to such properties

21   in connection with Phase I.  And as part of our negotiations, in

22   fact, these properties in Block 157 were originally shown -- on

23   this --

24   Q    On the exhibit, Exhibit Four?  Yeah.

25   A    Well, the exhibit doesn't have the phases on it.  But it's

1    on other exhibits.  The exhibit to the LDDA, it's shown as part

2    of Phase I.  I guess that's the very last page.

3    Q    That is this exhibit.

4    A    Page 59.

5    Q    Yeah.  It's hard to see.

6    A    On the LDDA, it says Phase I.  On this exhibit, it doesn't

7    show the phase numbers.

8    Q    Well, actually, there is a box that says Phase I properties.

9    Do you see that?

10   A    No.

11   Q    Right in the middle.  Do you see where Greater Model Park?

12   Right there?

13   A    I see that.

14   Q    And the arrow pointing to the block to the right?

15   A    Right.  But my point being, on the LDDA, all of Phase I is

16   blocked off and Block 157 is part of the diagram.

17   Q    And also, if you turn back to Section 1.2A, where it talks

18   about acquiring all of the properties identified on Schedule A as

19   of the effective date, the effective date is what date?

20   A    The date that this was signed.

21   Q    Okay.  So the City has to acquire all the properties in

22   Phase I.  And the same language is used in the footnote, meaning

23   the term "acquire" is used.  Acquire in relation to Phase I, is

24   that correct?

25   A    Correct.

1    Q    Okay.  Finally, counsel asked you, in the letter of April

2    23rd, 2012, whether you talked about the ground rents.  And the

3    answer was that's not in the letter.  Is there, was there some

4    reason for that?

5    A    We weren't focused on the ground rents.

6    Q    At that point?

7    A    Right.  We had, again, no reason to believe that the City

8    hadn't acquired the ground rents when they gave its notice.

9    Q    No further questions, Your Honor.

10            THE COURT:  Is there any recross just on these points,

11   Mr. Potter?

12            RECROSS EXAMINATION

13   BY MR. POTTER:

14   Q    Yes, Your Honor.  Ms. Zoller, you just testified that there

15   are other conditions that need to be satisfied in advance of

16   closing?

17   A    Correct.

18   Q    And some of those things, I think, were mentioned had to do

19   with, I guess, clearing the property?

20   A    Correct.

21   Q    Do you think that failing to clear the property would be a

22   breach of the City's obligations under the agreement?

23   A    Yes.

24   Q    And as a breach of the City's obligations under the

25   agreement, isn't the developer required to give notice of

1    default, to issue a notice of default to the City?

2    A    Not required, but it could elect to do so.

3    Q    Right.  So they would give a notice of default and then the

4    City would have 60 days to cure?

5    A    Correct.

6    Q    But these are, has the developer ever issued a notice of

7    default to the City on any of these issues?

8    A    On the clearing?  Not to my knowledge.

9    Q    Well, with regard to the ground rents?

10   A    Not to my knowledge.  But I don't deem that an event of

11   default.  That goes to the title that the City owned when they

12   gave a notice.

13   Q    Well, if the City couldn't convey title, that would be, they

14   would be in default, would they not?

15   A    Correct.

16   Q    Nothing further.

17            THE COURT:  Thank you, Ms. Zoller.  You may step down.

18   You shouldn't discuss your testimony with anyone in the event

19   you're called back to the witness stand, before this hearing is

20   over with.  Maybe, in the abundance of caution, you should stay

21   in the hallway in case you're needed to be called back for any

22   reason.

23            MR. FAX:  Your Honor, may the witness be excused?  I

24   told her if I needed her for rebuttal, I would call her on her

25   cell phone.  She has billable work to do for other clients and so

51

1      forth.

2              THE COURT:  Well, but she would still have billable

3      work here.  She would stay here, Mr. Fax.

4              MR. FAX:  She could double bill.

5              THE COURT:  No.  I'm sure Ms. Zoller never double bill.

6      I suspect that's she's on billable time here right now.  I just

7      think, in the abundance of caution, that it would probably be

8      good for her if she could stay here, in the event we need to call

9      her back to the witness stand if we have any questions.

10             MR. FAX:  Understood.

11             THE COURT:  And the record will reflect, from my point

12     of view, she's obviously on billable time as to your client right

13     now.

14             MR. FAX:  Do you have an hourly rate, Your Honor.

15             THE COURT:  No. I don't.

16             THE WITNESS:  Shall I leave these here?

17             THE COURT:  Yes.  You can.  Thank you, Ms. Zoller.  And

18     there is a lawyer's lounge down on the third floor.  You're

19     welcome to use that.  In fact, your law firm may be one of those

20     firms that helped contribute to that.  So you can certainly

21     benefit from that and certainly stay down there if you'd like.

22             Next witness, Mr. Fax.

23             MR. FAX:  Thank you, Your Honor.  We call Daniel

24     Bythewood to the stand.

25             THE CLERK:  Raise your right hand.

Case 1:12-cv-01904-RDB   Document 26   Filed 07/25/12   Page 52 of 263

1        DANIEL BYTHEWOOD, PLAINTIFF'S WITNESS, SWORN

2             THE WITNESS:  I do.

3             THE CLERK:  Please be seated.  Sir, the first thing I

4    need you to do is adjust that microphone to yourself.  State your

5    name and then spell your name for the record.

6             THE WITNESS:  Daniel Wallace Bythewood, D-A-N-I-E-L.

7    Wallace, W-A-L-L-A-C-E.  Last name Bythewood, B-Y-T-H-E-W-O-O-D.

8             THE CLERK:  Thank you.  Counsel.

9             DIRECT EXAMINATION

10   BY MR. FAX:

11   Q    Thank you.  Good morning, Mr. Bythewood.

12   A    Good morning.

13   Q    Would you state your professional position, for the record?

14   A    I am the President of La Cite Development and managing

15   member of Poppleton Development I.

16   Q    And you are based in New York, is that correct?

17   A    Yes, that is.

18   Q    And La Cite is the principal owner of Poppleton Development?

19   A    Yes.

20   Q    And Poppleton Development is the developer under the LDDA,

21   is that right?

22   A    Yes.

23   Q    Now, Poppleton I was organized to perform the LDDA, is that

24   correct?

25   A    Yes.

DIRECT EXAMINATION OF BYTHEWOOD                    53

1    Q    But I take it that La Cite has other development projects

2    throughout the eastern seaboard?

3    A    Yes.

4    Q    And do you manage those as well?

5    A    Yes, I do.

6    Q    All right.  With respect to Poppleton I, what are your

7    management responsibilities?

8    A    I have day-to-day oversight management of architectural

9    renderings, selection of contractors.  I would look at bids and

10   determine their actual viability into the effective construction

11   of the project, whether it's, I guess you could say, entitlement

12   issues or things of that nature, doing the PUD with Ms. Zoller.

13   Q    PUD is what?

14   A    Project unit development.

15   Q    Okay.

16   A    And everything that happens in conjunction with that.  And

17   all third party reports, market studies, etc.

18   Q    Do you have any management responsibilities concerning the

19   relationship with or interaction with Baltimore City?

20   A    Yes, I do.

21   Q    What is the nature of that responsibility?

22   A    The responsibility is to manage the relationship, have

23   ongoing conversation with the City, manage it from the standpoint

24   of building a project, dealing with the community needs, that

25   we're actually going to hopefully change, i.e., the supermarket

1    and things of that nature.

2    Q    Have you met with the Poppleton community over the last

3    several years?

4    A    Numerous times.

5    Q    For what purpose?

6    A    To get their input, to make sure that the community was

7    still very supportive.  As of recently, we brought members of the

8    community into our architect's office and had them give us their

9    thoughts on the physical plans of what we're building, what we

10   plan to use our commercial space for.  Did they like the design,

11   as we are a large, big box development versus the smaller town

12   homes?  So we wanted to make sure that the community was

13   supportive of the project, as well as the type of individuals

14   that we're marketing to.

15          So as it related to our work force and split between

16   work force/market rate housing and affordable housing mix, to

17   make sure that it complied with our original understanding with

18   us and the community.

19   Q    Okay.  Now, there's no dispute that the LDDA, Exhibit One,

20   was executed in 2006.  At that time, you were managing the

21   project, is that correct?

22   A    Yes.  I was co-managing with Westpac.

23   Q    And then Poppleton I bought out Westpac, is that right?

24   A    Yes, that is correct.

25   Q    All right.  Was there any objection raised by the City at

Case 1:12-cv-01904-RDB   Document 26   Filed 07/25/12   Page 55 of 263

1    any time to the buyout by Poppleton I of Westpac?

2    A    No.

3    Q    All right.  So throughout the period starting with the

4    execution of the, of the LDDA, through today, you have been

5    basically in charge of the project, from the standpoint of

6    Poppleton, is that right?

7    A    Yes.

8    Q    Okay.  And, in fact, you executed the LDDA, among other

9    people who signed it?  You executed it on behalf of Poppleton, is

10   that right?

11   A    Yes.  Yes, that is correct.

12   Q    You negotiated on behalf of Poppleton during the development

13   of the LDDA?

14   A    Yes, that is correct.

15   Q    And you're familiar with its terms?

16   A    Yes, I am.

17   Q    Okay.  And you're familiar with both the implementation and

18   the course of performance of the LDDA by Poppleton?

19   A    Yes, that is correct.

20   Q    All right.  Now, the LDDA, in addition to imposing

21   performance obligations on the part of Poppleton I, also imposed

22   performance obligations on the part of Baltimore City, is that

23   correct?

24   A    Yes.

25   Q    And as the day-to-day managing member of Poppleton I, were

1     you, have you been in the position to observe Baltimore City's

2     performance of its obligations under the LDDA?

3     A    That is correct.

4     Q    All right. Now, I want you to look -- you have that, the

5     black binder in front of you. Would you, you can take the first

6     document, just put that on the side.

7           But if you would open the binder and turn to Tab One,

8     that's Exhibit One, which is the LDDA. Do you see that?

9     A    Yes, I do.

10     Q    All right. I want to direct your attention to Page Three,

11     Section 1.5B as in boy, under the caption, Condition of the

12     Property. Do you see that?

13     A    Yes, I do.

14     Q    Would you please read into the record Subsection B, starting

15     with "the properties?"

16     A    The properties identified as new construction in Schedule A

17     of this agreement are to be delivered to the developer free of

18     all buildings and other structures. All existing utilities will

19     either be removed or capped by the City during the demolition and

20     clearing work and prior to closing. The City will conduct such

21     clearing activity in accordance with the phasing plan. The City

22     will not be required to remove or cap utilities located on those

23     properties upon which no demolition or clearing activities must

24     be performed by the City pursuant to this Section 1.5B.

25     Q    All right. What do the terms "clearing work" and "clearing

1    activities" mean to you in the context of this overall language?

2    A    That would be the demolition of the existing structures, as

3    well as clearing and carting away the debris after they've been

4    demolished.

5    Q    When is the last time that you visited the Poppleton

6    neighborhood?

7    A    6:15 last evening.

8    Q    Yesterday?

9    A    Yesterday, correct.

10   Q    Okay.  Did you, at that time that you went there, did you

11   check to see whether Baltimore City had either removed or capped

12   all utilities and removed all debris from demolished properties

13   at the Poppleton project?

14   A    I did check for that.

15   Q    And what did you find?

16   A    That all properties have not had the utilities removed or

17   capped.

18   Q    And what about debris?

19   A    The debris still exists.  There are approximately six or

20   seven rubble piles, as well as other debris that has been left

21   from the demolition.

22   Q    All right.  Now, I want you to turn -- we're going to look

23   at Exhibits 15 through 21 in the black binder.  Now, these were

24   in the, as attachments to the verified complaint, they were

25   Exhibits 16 through 22.  For purposes of this hearing, we've

1    marked them Exhibits 15 through 21.

2              These photographs, did you take --

3              THE COURT:  Hold on one second, Mr. Fax.  As to these,

4    Mr. Potter, you noted some exception under our Local Rule 107.5

5    in terms of any objection to these.  So my ruling had been all

6    exhibits are deemed admitted as referenced.  We withheld on the

7    matter of the photographs.  Do you want to be heard on that?

8              MR. POTTER:  Your Honor, they are -- I'll agree that

9    they show what they purport to show.  I am not sure what the date

10   is for them.

11             THE COURT:  We'll get into that.  So that will be asked

12   of the witness in terms of exactly when it was taken.

13             So with that reference to Plaintiff's Exhibits 15

14   through 21, they will be admitted subject to establishing when

15   the photographs were taken.

16   BY MR. FAX:

17   Q     Did you take these photographs?

18   A     Yes, I did.

19   Q     And do you recall the date on which you took them?

20   A     Yes.  May 30th, this year.

21   Q     May 31?

22   A     Yes.

23   Q     May 31?

24   A     Sorry.  May 31 of this year.

25   Q     Okay.  Now, I will tell you that in Paragraph 47 of the

1    verified complaint, it says March 31, 2012.  Is that a

2    typographical error?

3    A    Yes, it is.

4    Q    All right.  So you took these photographs on May 31, 2012.

5    And then yesterday when you went back to the site, what did you

6    do with respect to these photographs that had been taken at the

7    end of May.

8    A    I wanted to verify that nothing has either changed for the

9    good or bad of what we're talking about.  So the existing

10   conditions still are in the same, the same condition as the

11   photo.

12   Q    All right.  So do I understand you're saying that the

13   conditions depicted as of May 31, 2012 in the photographs taken

14   on that date still existed yesterday, based upon your eyeball

15   review of the properties in relation to the photographs?

16   A    That is correct.

17   Q    Okay.  Your Honor, with that, I would, I would offer them

18   into --

19         THE COURT:  So admitted.  15 through 21 are admitted.

20   BY MR. FAX:

21   Q    All right.  So go to Exhibit 15.  Tell us what that

22   photograph depicts.

23   A    So what this photograph is depicting is at the corner of

24   West Fayette Street and North Schroeder, looking north.  You can

25   see that there are telephone poles squarely in, I guess, the

1   middle of the picture, which still exist, which are supposed to

2   be either removed or capped.  And then towards the far side of

3   the photo, you can start to see debris piles which existed at

4   that time.

5   Q    I'm having trouble with the debris piles.  I see.  I am

6   having trouble with that.  We'll get to that.  Let's focus on the

7   poles.

8          Are these telephone poles within the area of,

9   quote-unquote, "new construction" in Phase I that were required

10  to be either removed or capped?

11  A    Yes, that is correct.

12  Q    All right.  And you're saying they were still there

13  yesterday?

14  A    Yes, they were still there yesterday.

15  Q    All right.  So with regard -- I'm sorry.  With regard to the

16  debris, you're saying in the back -- where is the debris depicted

17  in this photograph, Exhibit 15?

18  A    It's almost in the middle of the photo.  If I look between

19  the two poles -- it's kind of hard.  It's in another exhibit.

20  However, if you look between the two poles, you could start to

21  see the debris field which exists right above the blue truck as

22  well.

23  Q    Okay.  And now turn to Exhibit 16.  What does this depict?

24  A    So 16 was me walking across the street and taking a better

25  photo of the telephone poles, as well as the debris field, which

Case 1:12-cv-01904-RDB Document 26 Filed 07/25/12 Page 61 of 263

1    you could see a little clearer in the photo currently.

2    Q    And is this within the area of new construction within

3    Poppleton, within Phase I that was to be, where construction was

4    to be removed and debris was to be cleared before closing?

5    A    Yes, that is correct.

6    Q    All right.  Would you turn to Exhibit 17 and tell us what

7    we're looking at there?

8    A    17 is I walked a little further north.  However, this photo

9    is taken looking westerly.  And it's showing the debris and the

10   types of debris that exist.  So it shows the wood joists which

11   were demolished, as well as brick, along with rubble that exists

12   from the demolition itself.

13   Q    And can you give us a sense, can you estimate or tell us the

14   height of this debris pile, the big one in the background?

15   A    It's five feet or so tall.

16   Q    And how, and what's the breadth of it, do you know?  How

17   many feet is it across?  Can you estimate?  I'm not myself good

18   at estimating.

19   A    Let's call it six feet wide.

20   Q    Okay.  Okay.  And is this part of the same debris pile that

21   was depicted in prior exhibits or is it a separate debris pile?

22   A    No.  This was the same debris pile depicted previously.

23   Q    Okay.  So looking at Exhibit 19, is that the same -- I'm

24   sorry -- Exhibit 18, that's the same debris pile from a different

25   angle?

1    A    Yes.  That is me backing up a little, still shooting the

2    same westerly direction.  However, I backed up some 15 feet to

3    show a larger depiction of not only the debris pile, but also

4    the, whether it's telephone and/or electric conduit on the

5    telephone pole itself.

6    Q    And that telephone pole or electric conduit is within new

7    construction of Phase I that was to have been removed or capped?

8    A    Yes, that is correct.

9    Q    Okay.  And that, this was the condition also yesterday when

10   you saw it?

11   A    Yes, it was the same condition as yesterday.

12   Q    All right.  Now, going to Exhibit 19.  What are we looking

13   at there?

14   A    So I'm standing now on the northern-most corner of Schroeder

15   and Lexington Street, looking further north.  So on the map, if

16   you're looking, it would be from the bottom of 172, looking all

17   the way up to Saratoga, up towards 157.

18        However, what's depicted in here, in this photo, is

19   still continuing telephone pole and/or conduit throughout the

20   rest of Block 172 located within Phase I.

21   Q    Okay.  And is that the same or a different telephone pole

22   than those depicted in Exhibit 20?  If you would turn to 20.

23   A    So this is actually looking north.  And Exhibit 20, that is

24   looking south.  So those are different telephone poles.  The ones

25   in exhibit, the prior exhibit, are in addition to the telephone

1    poles that you've seen previously.

2    Q    Okay.  So, and then finally, Exhibit 21.  What does that

3    depict?

4    A    So this is, as you could see, the debris field is located on

5    the left-hand side of the photo.  So I have now crossed the

6    street and shooting the photo back towards more of a

7    southern/western direction.  So you can see the University of

8    Maryland Biotech Park so that it was giving a real sense of

9    context.  And showing the telephone poles going down the middle

10   of the block, 187.

11   Q    All right.  So can you estimate, based upon your site visit

12   yesterday, the number of utilities that have not been removed or

13   capped in Phase I as of yesterday?

14   A    Seven to ten.

15   Q    Okay.  And again, going back to 1.5B, where it says the

16   properties identified as new construction are to be delivered to

17   the developer free of all buildings and other structures, all

18   existing utilities will either be removed or capped by the City

19   during the demolition and clearing work and prior to closing, had

20   the City and had, had Baltimore City and Poppleton I sat down for

21   closing on July 2nd of 2012, is it your testimony that, based

22   upon your eye, your site visit yesterday, these utilities and

23   associated debris would still be there?  It would not have been

24   removed?

25   A    Yes, that is correct.

1    Q    Notwithstanding 1.5, the requirement of 1.5B, is that right?

2    A    Yes.

3    Q    Okay.  Now, in terms of debris, you had several different

4    shots of a pile of debris.  Was there more than one significant

5    pile of debris within the new construction area in Phase I

6    yesterday when you were there?

7    A    There were multiple piles.  But it was located within one

8    larger, I call it a debris field just because it was in the same

9    general area.

10   Q    Well, how many -- okay.  How many discrete piles of debris

11   were you able to see yesterday?

12   A    Five, six.

13   Q    And what did the debris consist of, the debris that you

14   looked at yesterday?  What is it?

15   A    It's wood joists, brick, nails from the demolition of the

16   buildings, rubble, sand, concrete.  It's legitimate construction

17   debris from the site when it was demolished.

18   Q    Is it, is it safe there, I mean, to play, if my kids were

19   playing there?  Is it well contained with rails around it and

20   marked off, or not?

21   A    No.  It would not be a safe place for a child to play.

22   Q    Why not?

23   A    Children, I would imagine, would like to climb.  And with

24   nails and other kinds of debris and jagged wood edges and sharp

25   objects and metal all rolled into construction debris piles, it's

Case 1:12-cv-01904-RDB   Document 26   Filed 07/25/12   Page 65 of 263

1    actually a very unsafe place for children.

2    Q    Okay.  Your Honor, at this point I would like to shift my

3    direct examination to discuss some of Mr. Bythewood's experiences

4    with the City concerning efforts to obtain, concerning efforts to

5    have the City assist in obtaining financing for the project.

6         I am mindful, Your Honor, as I understood the Court's

7    directive at the last hearing, I interpreted your remarks as

8    suggesting that you wanted to confine this hearing to the issues

9    of acquisition and the related issues, demolition and so forth,

10   as of July 2nd, 2010 and as of the closing date.

11        I represent to the Court, in all candor, the testimony

12   that remains of Mr. Bythewood departs from that.

13        THE COURT:  Well, Mr. Fax, you can address that

14   briefly.  And we can, you can have some discussion.  Obviously, a

15   developer cannot obtain financing if there's cloud on title.

16   It's very simple.  So I don't think we need to belabor the point.

17   But to the extent that he wants to get into it very briefly.  We

18   are not going to go into an extensive discussion on it because

19   that's not really before me.

20        It's not complicated.  If there's cloud on title, if

21   title cannot be conveyed, a developer cannot get financing.  I

22   don't care who the developer is or who the bank is.  Not in this

23   economic climate.  So it's perfectly obvious to me.  But you can

24   address it briefly.

25        MR. FAX:  Thank you, Your Honor.  To be clear, this is

1    actually a slightly different issue.  This is, we take the

2    position that the, that the agreement, the LDDA, obligated the

3    City to assist the developer in obtaining --

4              THE COURT:  That's fine.  You can address that.

5              MR. FAX:  All right.

6              THE COURT:  I've read the LDDA.  I don't purport to

7    have as detailed knowledge as all of you.  But I've looked at it

8    since June the 28th and I'm familiar with it.  Yes, it did.  So

9    you can address it.  But again, I want it to be a brief topic of

10   discussion, Mr. Fax.

11             MR. FAX:  I'll try to keep it -- brevity is not my

12   strong suit.

13             THE COURT:  That's all right.

14             MR. FAX:  I'll do the best I can.  The Court is going

15   to cut me off when it wants to.

16             THE COURT:  Well, I don't want to cut anybody off.  But

17   I think the focus is in terms of these issues, in terms of the

18   subject properties and the date when the City actually had title

19   to the subject properties, as well as the issue of Block 157

20   being somewhat adjacent to the obligations as to Phase I.

21             But I will be glad to hear from Mr. Bythewood with

22   respect to efforts to obtain financing.

23   BY MR. FAX:

24   Q    Thank you, Your Honor.  Mr. Bythewood, would you turn to

25   Page 5, Paragraph 1.17, where it says Financing Support by the

1    City?  And I'm going to read to keep the pace going, I'm going to

2    read the, starting the third sentence.

3           In addition, and in furtherance of the foregoing, the

4    Department will, in good faith, seek to assist the project

5    through the following sources.  Then it says:  However, the

6    department shall make no guarantees as to the success of

7    obtaining funding through the following sources.

8           Then it lists A, Tax Increment Financing, and then B,

9    C, D, E on Page 6.  Do you see all of that?

10   A    Yes.

11   Q    Would you tell us briefly, what is tax increment financing?

12   We've abbreviated it TIF, T-I-F.  It stands for tax increment

13   financing.  What does it mean to a layman?  What does it mean?

14   A    A TIF, and/or tax increment financing, would be the use of

15   the taxes created by the development to repay the bonds by which

16   would be issued to the project.  So instead of paying the

17   general, what's called the General Fund of the City as a tax

18   revenue, it goes to repaying bond holders.

19   Q    How does one get the right to utilize tax increment

20   financing?

21   A    Well, the City itself is the taxing authority.  And within

22   the taxing authority ability, they have the rights to offer TIFs

23   to projects.  So the first step in the TIF would be to have a

24   letter of intent signed between the City and us as the developer.

25   From that letter of intent, you then provide and pay for the

1     City's consultants, which is one Muni-Cap, who's their financial

2     consultant, as well as McGuire Woods, who's their legal

3     consultant.

4           And the legal consultant basically tells you if your

5     uses for the tax dollars are appropriate.  And their financial

6     consultant basically reports back to the City whether or not this

7     is a credible project that can afford paying for the bonds

8     through the use of the TIF.

9     Q    Okay.  So now look at 1.17A.  It says, under Tax Increment

10    Financing:  The City will support the designation of the project

11    area as a development district or other appropriate designation,

12    as needed to finance the project, that may qualify the project to

13    benefit from tax increment financing.  When it says the City will

14    support the designation, what did that mean to you?

15    A    The City's support was to actually not only draw a district,

16    but also to support the actual, physical process of the City

17    going from Stage I, which is the LOI, through a series of steps

18    by which you submit that documentation to the Board of Finance.

19    Board of Finance would then approve and send that through the

20    Board of Estimates and City Council for the actual laws that are

21    necessary.

22          It is then sent back to the Board of Finance for final

23    approval.  And then you can physically float the bond to, out

24    into the public market, which then allowed you to --

25    Q    I'm sorry.  I don't want to cut you off.

DIRECT EXAMINATION OF BYTHEWOOD                                    69

1   A    Which allowed you to then finance the project.

2   Q    The term "support", what did that mean to you?  It said the

3   City will support.  What does that mean?

4   A    The meaning was that they were going to understand that this

5   is their process and take our TIF through the entire process and

6   to the funding, to the end, so that we can get it funded.

7   Q    Did it mean that they would advocate on your behalf?

8   A    Absolutely.

9   Q    All right.  Now, why was this provision in the agreement?

10  A    The provision is in the agreement because it's part of our

11  total finance package.  So without the TIF, we have a massive gap

12  in our financing.

13  Q    Okay.  Did Poppleton attempt to obtain TIF financing?

14  A    Yes.

15  Q    When did Poppleton begin the process of trying to obtain TIF

16  financing?

17  A    January, February.

18  Q    Of what year?

19  A    Of last year.

20  Q    Meaning 2011?

21  A    Yes.

22  Q    January, February of 2011?

23  A    Yes.  That's right.

24  Q    You're saying that Poppleton began, tried to begin the

25  process then?

1    A     That is correct.

2    Q     What did you do in initiating the process?  What was your

3    first step?

4    A     Outside of conversations, there were e-mails between us and

5    the City to initiate the physical TIF process.  So we, there are

6    a list of, whether there were e-mails from Danielle Zoller or

7    ourselves, to initiate the TIF process.

8    Q     You mentioned earlier an LOI.  What's an LOI?

9    A     It was the letter of intent which is set out by Finance,

10   with allows us to move forward.  The City has an LOI process,

11   which is the start.  So that is --

12   Q     So that's the first step?

13   A     That is the first step.

14   Q     All right.  And did Poppleton I try to enter into a letter

15   of intent in January with the City, in January, February of 2011?

16   A     That is correct.

17   Q     And assuming that a letter of intent had been entered into

18   at that time, in January, February of 2011, what would the next

19   step have been right after that?  What would the next step have

20   been?

21   A     The next step is for us to engage the City's legal counsel

22   and their bond counsel.  Then after that, you submit a ton of

23   information.

24   Q     Okay.

25   A     Because --

1    Q    All right.

2    A    Sorry.

3    Q    No.  That's all right.  So we're now in January, February of

4    2011.  You have sought to engage with the City and have a letter

5    of intent prepared and executed.  Was the letter of intent that

6    you requested from the City in January/February of 2011, was that

7    letter entered into at that time?

8    A    No.

9    Q    Was a letter of intent ever entered into between the City

10   and Poppleton regarding the TIF?

11   A    Yes, it was.

12   Q    How long -- when was that?  How long did it take between

13   January/February of 2011 and whenever it was that the letter was

14   finally done?

15   A    Basically 11 months.

16   Q    I'm sorry.  How long?

17   A    11 months.

18   Q    And you had asked for this in January/February of 2011?

19   A    Yes, that is correct.

20   Q    All right.  Would you turn to, in the black binder, to

21   Exhibit 22?  Do you have that?

22   A    Yes, I do.

23   Q    All right.  What is Exhibit 22?

24   A    This is the proposed tax increment/special tax and

25   assessment financing for improvements in connection with the

Case 1:12-cv-01904-RDB   Document 26   Filed 07/25/12   Page 72 of 263

1    Poppleton project.

2    Q    Is this the letter of intent?

3    A    Yes, this is.

4    Q    And this is executed by all parties?  Look at the last page.

5    A    Yes, it is.

6    Q    And what's the date on this?

7    A    December 22nd, 2011.

8    Q    All right.  Once this letter is entered into, once a letter

9    of intent is engaged between the two parties, how long would you

10   expect the TIF process to take?

11                MR. POTTER:  Objection.

12                THE COURT:  Sustained.  You need to lay the foundation

13   for that, Mr. Fax.

14   BY MR. FAX:

15   Q    Did you have an expectation, from the date that you entered

16   into the TIF agreement, as to how long the process would take?

17                MR. POTTER:  Objection.

18                THE COURT:  Sustained.  I think the problem with this,

19   Mr. Fax, is you need to qualify Mr. Bythewood, or perhaps Ms.

20   Zoller is more able to address this question, in terms of what

21   the standards would be anticipated in these kinds of

22   transactions.  How long would it take to get tax increment

23   financing?

24                MR. FAX:  I'm sorry?

25                THE COURT:  In terms of his speculation, it may or may

1    not be of any moment.  I'm glad to hear his experience on this

2    topic, or Ms. Zoller can address it.

3              MR. FAX:  My question, my second question, I suggest,

4    was not objectionable because I was asking --

5              THE COURT:  Well, it was because I've sustained it.  So

6    go ahead.

7              MR. FAX:  This is what Article III is all about.  I

8    knew that.

9              THE COURT:  Indecisiveness is not one of my problems.

10   BY MR. FAX:

11   Q    What are the steps that you were required to go through,

12   once the letter of intent was executed, in order to obtain TIF

13   financing?

14   A    The steps, once this letter was executed, was basically for

15   us to engage the City's bond counsel and Muni-Cap.  And then

16   there's --

17   Q    What's Muni-Cap?

18   A    Muni-Cap is their financial analyst arm for, as a consultant

19   to the City.

20   Q    Okay.

21   A    And they analyze whether or not the project has merit from a

22   financial perspective, and either it does or does not, in terms

23   of its ability to repay the bonds that are being issued and/or

24   the credibility based around the actual project itself.  Is it a

25   good project for the City?  Does it kind of have the merits that

1   it needs to meet a minimum threshold for the Department of

2   Finance?

3   Q    And then what?

4   A    Then it is, it's, all of this detailed analysis, which is

5   hundreds of pages that they actually produce for financial

6   projections, is circulated within the parties over the course of

7   time.  And then it's submitted to the Department of Finance.

8   Q    And then what?

9   A    Then the Department of Finance has their own internal

10  meeting.  This meeting is, you're either approved or not.  So,

11  you know, theoretically it's approved because it's made it

12  through a series of hurdles.

13  Q    Then what?

14  A    Then the Board of Estimates and the City Council then

15  actually vote as well, and pull together the laws which are

16  necessary.  And then it goes back to the Board of Finance for

17  final approval.  And then, then that is taken by a third party

18  investment banking house and they fund or float the bonds from

19  that standpoint.

20  Q    All right.  Once the letter of intent was entered into in

21  December of 2011, did Poppleton I initiate this process that

22  you've described on the record?

23  A    Yes.

24  Q    And how did you initiate it?

25  A    We have paid the representative amount of money that was

1    required to Muni-Cap, as well as the attorneys.  We went through

2    an exhaustive process of use of funds to figure out what the

3    physical dollars were legally allowed to be used for.  We also

4    went through a significant amount of data exchange with Muni-Cap.

5    And that allowed Muni-Cap to run all of their detailed financial

6    analysis on the physical project itself.

7    Q    How far did the process get?

8    A    The process got to the doorstep of the Board of Finance.

9    Q    And what happened?

10   A    The Housing Department stopped the project from moving

11   forward.

12   Q    How so?

13   A    They refused to submit it to the Board of Finance.

14   Q    And when was that?

15   A    It was in April, mid/late April.

16   Q    All right.  In fact, did the Housing Department raise a

17   series of questions and concerns about the adequacy of the TIF

18   application, of the TIF application?

19   A    Yes, they did.

20   Q    And that was in April of 2012?

21   A    Yes, that is correct.

22   Q    All right.  Let me ask you this.  Had you begun this process

23   a year earlier, when you tried to initiate it in January, in

24   January/February of 2011, and the same process had unfolded at

25   the same rate of speed and the same objections made by the

1    Department of Housing in April or May of 2011, instead of a year

2    later, would Poppleton have had the time to respond and address

3    any objections before the July 2, 2012 closing date?

4    A    Yes.

5    Q    But as it was, because the letter had been delayed almost a

6    year and the objections were made only in April of 2012, at that

7    point did Poppleton I have the opportunity, the ability to

8    respond quickly enough and resolve issues before the July 2nd,

9    2012 closing date?

10   A    If I could clarify something for you.  It was, there was an

11   extension that was granted on the books, which, in April, we

12   needed to submit to the Board of Finance.  So the Board of

13   Finance meeting was a determinative date by which there was no

14   way for us to actually respond to the letter from the Department

15   in adequate time to, to meet the date by which we had to submit

16   to the Board of Finance.

17   Q    Which was April of 2012?

18   A    Yes.

19   Q    All right.  But had the objections, had the letter of intent

20   been entered into a year earlier and the objections raised in

21   April or May of 2011, would Poppleton I have had time to meet,

22   say, an April 2012 deadline before the Board, before the Finance

23   Department?

24   A    Yes.

25   Q    All right.  Now, I want to ask you about one other aspect of

DIRECT EXAMINATION OF BYTHEWOOD                    77

1    financing.  Go back to Section 1.17 on Page 5 of the agreement.

2    I'm sorry.  The same section.  1.17.  But Page 6.

3            If you look at Subsection E of Section 1.17, where it

4    says Other Financing.  Do you see that?

5    A    Yes, I do.

6    Q    And it says:  The City will consider such other approvals as

7    are needed to implement financial elements that will be of

8    benefit to the project, consistent with this agreement,

9    including, but not limited to, redevelopment bonds, special tax

10   districts, and enterprise zones.  Do you see that?

11   A    Yes, I do.

12   Q    Did Poppleton I try to obtain any other governmental

13   financing pursuant to this provision?

14   A    Yes.

15   Q    What was that?

16   A    It was financing through the HUD program.

17   Q    What program?  Which one?

18   A    220.

19   Q    What is the HUD 220 financing?

20   A    HUD 220 financing is a federal program by which HUD insures

21   the mortgage.

22   Q    And does that, does obtaining that financing assist in the

23   ability to then get conventional financing?

24   A    Yes.

25   Q    How?

1    A    It provides the guarantee of repayment if anything were to

2    go, go wrong with the project.

3    Q    When did Poppleton I attempt to obtain HUD 220 financing?

4    A    Early 2011.

5    Q    And what efforts did you undertake?

6    A    We engaged a mortgage banker for the project early on.  You

7    can't go directly, I can't walk into HUD directly.  So we have to

8    engage a mortgage banker.

9    Q    A mortgage banker or broker?

10   A    They're the --

11   Q    They're the same thing?

12   A    Yes.

13   Q    Okay.  Go ahead.

14   A    So they take our package.  They re-underwrite it.  They

15   submit a significant amount of information to HUD directly.  And

16   as they've done projects with HUD, there's a set format by which

17   they follow.

18   Q    Okay.  Did you involve Baltimore City or try to involve

19   Baltimore City in this process?

20   A    Yes.  Baltimore City.

21   Q    And how so?

22   A    They were invited to a meeting with HUD, where we were

23   looking for support, so that the federal government could

24   understand that the City government was backing the project.

25   Q    And why did you involve Baltimore City?

1    A    We needed, we wanted their support as it was a part of not

2    only the document, but we wanted their support so that we can

3    insure that HUD was going to support our project for the mortgage

4    insurance.

5    Q    Did there come a time when you had a meeting with HUD

6    representatives at which Baltimore City representatives were

7    present?

8    A    Yes.

9    Q    And when was that?

10   A    It was the end of last year, roughly November.

11   Q    November of 2011?

12   A    2011.  Sorry.

13   Q    Okay.  And who was present at that meeting representing the

14   City?

15   A    City Council President Jack Young, his deputy, Carolyn

16   Blakeney, Councilman Welch, and his, his deputy as well.  And

17   then the Department was there, so Commissioner Graziano.

18   Q    This is the HCD, the defendant in this action?

19   A    The HCD.

20   Q    Go ahead.

21   A    So Commissioner Graziano, Deputy Commissioner Engel,

22   Alastair Smith.

23   Q    Mr. Engel, who's seated here today?  He was there?

24   A    Yes.

25   Q    And you mentioned Mr. Smith.  He was here earlier.  He's

Case 1:12-cv-01904-RDB   Document 26   Filed 07/25/12   Page 80 of 263

1    identified as a witness.  He was there at that meeting?

2    A    Correct.

3    Q    Okay.  And there were HUD officials present?

4    A    Yes, there were three HUD officials as well.

5    Q    And, of course, Poppleton people were there?

6    A    Yes.

7    Q    And you were there?

8    A    Yes.

9    Q    Obviously.  Okay.  What, if anything, did Peter Engel, from

10   HCD, say at that meeting?

11   A    Mr. Engel said he did not support the direction of the

12   project in terms of the type of project that we were building,

13   that he didn't support the rents and/or market rate/work force

14   housing that we were building for.  He felt that the actual

15   project should be more of a lower income project versus the

16   target that we were trying to actually build into the community,

17   that we agreed with the community on to build.

18          He also questioned the viability or the ability to

19   attract a grocer and why we were drawing architectural plans for

20   a grocer that we did not have at that particular point in time.

21   Q    Did he say anything about your pro forma?

22   A    Yes.

23          THE COURT:  Mr. Fax, time constraints here.

24          MR. FAX:  I'm sorry, Your Honor.

25          THE COURT:  At the pace we're going, we're going to be

1    here until 9:00 tonight.  This is not the time to try to lay your

2    entire case out here, Mr. Fax.  I don't mean to cut you off, but

3    it's perfectly obvious to me that until I do, you're going to

4    keep going.

5            MR. FAX:  Two more questions.

6            THE COURT:  All right.  Really, I'm not trying to cut

7    you off, but I really get the sense that you're going to go as

8    long as I let you go until I finally tell you to stop.  I don't

9    want you to do that.  I'm asking you not to do that.

10           MR. FAX:  I will not do that, Your Honor.

11           THE COURT:  All right.  But I get the sense that's

12   where we are, is that you're prepared to go for hours until I

13   tell you to stop.

14           MR. FAX:  Two more questions.

15           THE COURT:  I'm going to hold you to it.  I understand.

16   I don't need any more detail on this.  I'm not trying to be quick

17   with you, but we have a lot of territory to cover here.  And in

18   fairness to the Court, you have to have time considerations here.

19   Okay?

20           MR. FAX:  I understand.

21           THE COURT:  And if I get the sense that you're

22   intending just to go with a witness as long as I'll let you, then

23   I'm going to start really cutting you off.  I'm starting to get

24   that sense, quite frankly.  So go ahead.

25           MR. FAX:  Forgive me, Your Honor.  I will limit it to

1    two more questions.

2            THE COURT:  And that's a caution on both sides now.  We

3    have a lot of things to cover here now.

4    BY MR. FAX:

5    Q    At this meeting or thereafter, in your presence, did either

6    Mr. Graziano or Mr. Smith or Mr. Engel ever say anything positive

7    to HUD about the Poppleton project?

8    A    No.

9    Q    Okay.  And my final question is, did -- actually, my final

10   question, was Poppleton ever able to obtain a HUD commitment for

11   the 220 financing?

12   A    No.

13           MR. FAX:  No further questions, Your Honor.

14           THE COURT:  Thank you.  We'll take a brief recess and

15   we'll be going around 1:00 to lunch.  We'll take about a

16   10-minute recess.

17           I'm serious.  At ten minutes I'm back on the bench.  No

18   more than 10-minute recess.

19           (Recess.)

20           THE COURT:  Mr. Bythewood, if you'll take the witness

21   stand, sir.  And you're still under oath.  Cross examination, Mr.

22   Potter.

23           CROSS EXAMINATION

24   BY MR. POTTER:

25   Q    Thank you, Your Honor.  Good morning, Ms. -- good morning,

1    Mr. Bythewood.

2    A    Good morning.

3    Q    You, in your capacity with La Cite, you also, you

4    participated in submitting other applications for financing from

5    the City aside from, aside from the TIF?

6    A    Can you explain exactly -- I don't know exactly what you're

7    asking about.  Sorry.

8    Q    Let me show you what's been marked as Defendant's Exhibit

9    18.  Is that a document you've seen before?

10   A    Yes.

11   Q    What is it?

12   A    It's an application for NEDs, which are non-elderly and

13   disabled individuals.

14   Q    That's --

15   A    Sorry.

16   Q    Are you done?

17   A    Yes.

18   Q    And that's, that's a funding source that came from the City?

19   A    Yes, it is a City-based funding source.

20   Q    Yes.  Okay.  I'd like to direct your attention to Page 21,

21   please, under the paragraph that says Opportunity.

22   A    Yes.

23   Q    Can you read the last sentence in that paragraph, please?

24   A    It says:  Currently, the City has completed acquisition of

25   100% of the properties in the first phase of the project,

Case 1:12-cv-01904-RDB  Document 26  Filed 07/25/12  Page 84 of 263

1    enabling the commitment of construction on Phase I immediately.

2    Q    So at the time you wrote that, did you believe that to be

3    true?

4    A    We absolutely believed that was the true statement.

5    Q    And as part of the TIF application, you submitted, you

6    submitted, TIF process, you submitted a presentation, is that

7    correct, to the City?

8    A    There were a host of meetings.

9    Q    Exhibit 19.  I'd like to show you what's been marked as

10   Defendant's Exhibit 19.

11        THE COURT:  Which exhibit number is that?  I'm sorry.

12   Q    19, Your Honor.  Is that a document you've seen before, Mr.

13   Bythewood?

14   A    Yes.

15   Q    Okay.  Is that a document you participated in preparing?

16   A    My office prepared this, yes.

17   Q    Okay.  I would like to direct your attention to the

18   paragraph on Page 8.  It says Acquisition.

19   A    Yes.

20   Q    Can you read that into the record, please?

21   A    Acquisition.  All properties in Phase I of the project have

22   been acquired by the City of Baltimore as of 2010.

23   Q    So when you submitted that to the City, did you believe it

24   to be true?

25   A    We believed it to be true.

1    Q    Okay.  Now, approximately, approximately how much is, is

2    necessary, in terms of financing, for closing on Phase I, all

3    Phase I?

4    A    Somewhere around 130 million dollars or so.

5    Q    And how much would be the amount of the TIF, had you

6    received it, was the amount you were applying for?

7    A    The total TIF was 60 million dollars.

8    Q    Pardon?

9    A    60.

10   Q    60 million dollars for the TIF?

11   A    Yes.

12   Q    Okay.  Now, did you attempt to, you testified that you

13   attempted to obtain financing from HUD, is that right?

14   A    Yes.  That is correct.

15   Q    And that you engaged a mortgage broker, is that right?

16   A    Yes.

17   Q    Okay.  I would like to show you what's marked as Defendant's

18   Exhibit 20.  Is that a document you've seen before?

19   A    Yes.

20   Q    Is that, is that the submission from your mortgage broker to

21   HUD?

22   A    Yes, it is.

23   Q    Okay.  And Exhibit 21, counsel.  And, in addition, I would

24   like to show you this Application For Multifamily Housing

25   Project.  Now, have you seen that document before?

1    A    I have not seen this specific document.  But --

2              MR. FAX:  Objection, Your Honor.  If the witness

3    cannot -- I am not objecting to the admissibility.  I am

4    objecting to any questions on a document he has not seen.

5              THE COURT:  You can, one, first of all, ask if he's

6    familiar with it and if he's seen it.  We'll see how far that Mr.

7    Potter intends to go.  You may continue, Mr. Potter.

8    BY MR. POTTER:

9    Q    Thank you, Your Honor.  So you have not seen that particular

10   application?

11   A    I have not seen this particular, this physical document.

12   Q    Have you seen one like it?

13   A    I have seen this document, which was Exhibit Number 20.

14   Q    Okay.  So your mortgage broker, on your behalf, made

15   submissions to HUD, is that correct?

16   A    That is correct.

17   Q    Okay.  So I would like to show you what's Exhibit 22.  Have

18   you seen that document before?

19   A    Yes, I have.

20   Q    Okay.  So going back to Exhibit 20.  What is the date on

21   that?

22   A    You're saying Exhibit 20?

23   Q    Yes.

24   A    July 5th, 2011.

25   Q    And the date on Exhibit 22?

1    A    November 30th, 2011.

2    Q    So what is Exhibit 22?

3    A    22 is the decline for, for mortgage insurance from HUD, from

4    Bob Iber.

5    Q    So HUD, HUD declined to approve your financing, is that

6    correct?

7    A    They declined to issue the mortgage insurance.

8    Q    All right.  And they had three concerns, did they not?  And

9    one of those concerns was, was about, was over marketability of

10   the project?

11   A    There were three concerns, yes.  And one was marketability.

12   Q    What was the second one?

13   A    The second was grocer.

14   Q    Right.  The fact that there had been, a last grocery store

15   in the area had closed does not bode well for the same activity

16   at this location.  That was HUD's conclusion, is that right?

17   A    Which?  Is that on the document?

18   Q    Yes?  I'm sorry.  That's on Exhibit 22.

19   A    Yes.  Which we explained to HUD, in the larger meeting that

20   we had with everyone, inclusive of the Department and the City

21   Council president.  The reason for the close of the grocer was a

22   landlord/tenant dispute, as well as an internal grocery versus

23   our external facing grocery.

24   Q    And lastly, can you read the final sentence of the letter?

25   A    Says:  Finally, we are not convinced that the developer has

Case 1:12-cv-01904-RDB  Document 26  Filed 07/25/12  Page 88 of 263

1    the requisite experience to oversee a complex internal city

2    mixed-use development project.

3    Q     So these issues that HUD has raised aren't based on anything

4    that the City did, were they?

5    A     The City had the ability to have closed door conversations I

6    was not apprised of.  So I don't know if I can necessarily make

7    that statement.  However --

8    Q     Go ahead.

9    A     However, this is what they wrote back to us.

10   Q     Now, you testified with regard to the current conditions of

11   the premises of Phase I, is that right?

12   A     Yes.

13   Q     Okay.  And the LDDA, Exhibit One, Paragraph 1.5B, in the

14   second sentence, requires that the utilities be removed or capped

15   by the City during the demolition and clearing work and prior to

16   closing, is that correct?

17   A     Yes, that is correct.

18   Q     Okay.  So these are obligations with regard to the City that

19   would be performed prior to closing, is that correct?  Is that

20   right?

21   A     Yes, it is.

22   Q     Okay.  We haven't had a closing in this transaction?

23   A     That is correct.

24   Q     And no closing was ever scheduled?

25   A     No.  We requested a closing, but it was never officially

1    established.

2    Q    Now, I would like to show you what's marked as Exhibit 24,

3    Defendant's Exhibit 24.  Have you seen this document before?

4    A    Yes.

5    Q    What is it?

6    A    It's an extension of the settlement date of, made on

7    December 30th, 2011.

8    Q    So in that document, the City agreed to extend the time for

9    closing to the developer by four months?

10   A    Yes.

11   Q    Okay.  So that would have been helpful to the developer?

12   A    It was helpful on both sides as a partnership.  We were

13   supposed to, as you heard in my testimony, the actual TIF was not

14   signed until, the LOI for the TIF was not signed until December,

15   either.  So it was, I think, in efforts to actually support both

16   sides.

17   Q    I would like to show you what's been marked as Exhibit 16,

18   Defendant's Exhibit 16.

19             THE COURT:  What exhibit number is that?

20             MR. POTTER:  16, Your Honor.

21             THE COURT:  I'm sorry?

22             MR. POTTER:  16, Your Honor.

23             THE COURT:  16?

24   BY MR. POTTER:

25   Q    Yes, 16.  Have you seen that document before, Mr. Bythewood?

CROSS EXAMINATION OF BYTHEWOOD                    90

1    A     This is a title policy.  Whether I've seen this exact title

2    policy, I've seen lot of title policies.  So I can't say that I

3    have.  But --

4    Q     Take a look at it for a minute.  Direct your attention to

5    the fourth page, I believe.

6    A     Okay.

7    Q     And the proposed insured is Park Square LLC, is that right?

8    A     Um-hum.

9    Q     And who is Park Square LLC?

10   A     Park Square LLC is an entity that we control or own.

11   Q     When you say "we", you mean Poppleton?

12   A     Poppleton, a sub-corporation to Poppleton.

13   Q     So it's you, it's the plaintiff?

14   A     Yes.

15   Q     Okay.  So the plaintiff obtained a title insurance policy

16   commitment, is that correct?

17             MR. FAX:  Objection, Your Honor.  He said he hasn't --

18   I have yes, that's sustained.  This witness is not qualified to

19   deal with this, Mr. Potter.  That's sustained.

20   BY MR. POTTER:

21   Q     Okay.  Mr. Bythewood, did your offices obtain this policy or

22   this commitment letter, this commitment?

23             MR. FAX:  Same objection, Your Honor.

24             THE COURT:  Sustained.

25             MR. POTTER:  Court's indulgence.

1          (Pause.)

2    BY MR. POTTER:

3    Q    Mr. Bythewood, you said that the TIF would be for 60

4    million, is that correct?

5    A    Yes.

6    Q    And that would -- and was that for, how many phases of the

7    project was that for?

8    A    For all four phases.

9    Q    And for Phase I, how much was the TIF?

10   A    The Phase I TIF is roughly, let's call it 18 million or so.

11   I don't know the exact number off the top of my head.

12   Q    You think it's approximately 18 million?

13   A    18, 20.  Somewhere in that general.

14   Q    And you need 135 million for the project?

15   A    135 was in the iteration that we actually read, yes.

16   Q    Okay.  Nothing further, Your Honor.

17          THE COURT:  Thank you, Mr. Potter.  Redirect, just on

18   these points, Mr. Fax.

19          REDIRECT EXAMINATION

20   BY MR. FAX:

21   Q    Yes, Your Honor.  Mr. Bythewood, would you look at, do you

22   have the defendants' exhibits in front of you?

23   A    Yes.

24   Q    Okay.  So would you look at Exhibit 18, the NEDs

25   application?

1   A     Okay.

2   Q     Do you have that in front of you?

3   A     Yes, I do.

4   Q     Do you recall the questions and answers concerning your

5   representation at that time that you filed this application,

6   that, that the City had obtained title to the subject properties?

7   A     Yes.

8   Q     And do you see the date of this application?  If you look on

9   page 2 of 18, there's a stamp in the top right-hand corner.  What

10  is the date of this application?

11  A     It's something 30, 2010.

12  Q     Is that July 30?

13  A     I honestly, I can't make that out.  But it could be.

14  Q     But it's sometime in 2010.  It looks to me like July 30.

15  But you can't tell?

16  A     I can't.  This is not my document.  But it looks like July

17  30.

18  Q     Okay.  And as of July 30, 2010, on what basis did you

19  believe that the City had acquired title to the properties?

20  A     We were sent a letter from the City that they had acquired

21  all the properties.

22  Q     And you were relying on that letter?

23  A     Absolutely.

24  Q     And that letter was dated July 2nd, 2010?

25  A     Yes.

1    Q    Okay.  And now, if you go to Exhibit 19.  Do you recall the

2    questions and answers concerning your representation in this

3    document?

4    A    Yes.

5    Q    That the City had acquired title?

6    A    Yes.

7    Q    Okay.  Do you know, can you tell the date of this document?

8    If you go to, the date on here.  I saw it earlier.

9         THE COURT:  I think the first page says April 2011, Mr.

10   Fax.

11   Q    Thank you, Your Honor.  Yes.  April 2011.  Do you see that?

12   A    Yes.

13   Q    And as of that date, on what basis did you believe that the

14   City had acquired title?

15   A    I would imagine that that came from correspondence with the

16   City.

17   Q    Well, the same letter that the --

18   A    Yes.

19   Q    You had no reason to believe otherwise as of April 2011?

20   A    No.

21   Q    Okay.  Now, would you turn to Exhibit 22?  That is to say

22   Defense Exhibit 22.  The letter dated November 30, 2011.  Do you

23   recall the questions and answers regarding HUD declining to

24   provide support and the three reasons why.  Do you recall those

25   questions and answers?

1    A    Yes.

2    Q    All right.  Now, this letter of November 30, 2011, was that

3    before or after the meeting about which you testified on direct

4    examination, where Mr. Engel spoke up and you were in attendance

5    and HUD was in attendance?  Was this letter before or after?

6    A    It was after.

7    Q    And the issues raised by Mr. Iber in his letter, were these

8    issues as to which Mr. Engel had spoken against Poppleton in that

9    meeting?

10   A    Yes.  Two of the three, I would say.

11   Q    Okay.

12   A    Which, then, the third one goes to experience.  So if we

13   couldn't deliver a grocery store and/or if we were completely off

14   base with our population and whether or not that would be doable,

15   then it would obviously speak to our experience as a developer.

16   Q    Well, on the issue of experience -- correct me if I'm

17   wrong -- but the procurement process pursuant to which the City

18   selected Poppleton in the 2004 to 2006 timeframe, that was a

19   competition in which a number of developers competed, am I right?

20   A    Yes.

21   Q    And Poppleton I was selected by the City?

22   A    Correct.

23   Q    So at that time, the City had the opportunity to determine

24   whether Poppleton I had the experience to complete this project?

25   A    Yes.

Case 1:12-cv-01904-RDB   Document 26   Filed 07/25/12   Page 95 of 263

1  Q     And at that time, the City awarded the project to Poppleton

2  I?

3  A     Yes.

4  Q     Did Mr. Engel ever, in your presence, ever say to HUD, we

5  think they have sufficient experience, after all, we selected

6  them as the developer?

7  A     No.

8  Q     Okay.  And finally, exhibit, I guess it's Defense Exhibit

9  12.  I'm sorry.  Defense exhibit -- can't read my handwriting.

10 There were questions and answers concerning the ability,

11 concerning the obligation of the City to clear prior to closing.

12 Do you recall those questions and answers?

13 A     Yes.

14 Q     And you were asked whether any closing has ever occurred.

15 Do you recall that?

16 A     Yes.

17 Q     All right.  Turn to Plaintiff's Exhibit 12.  It's

18 Plaintiff's Exhibit 12, which is the default letter dated May

19 2nd, 2012.  Do you see that?  In the black binder.

20 A     Under what number?

21 Q     Exhibit 12.

22 A     Exhibit 12.  Thank you.

23 Q     And do you see where it says, at the end of the second,

24 second paragraph, The extension set the deadline for settlement

25 of all properties in Phase I as of May 2012?  Do you see that?

1    A    Yes.

2    Q    So the settlement, that's closing, is that right?

3    A    Yes, that is correct.

4    Q    All right.  So as of May 1, 2012, had the City cleared the

5    properties that you identified earlier, the properties subject to

6    Paragraph 1.5B?

7    A    No.

8    Q    No further questions, Your Honor.

9         THE COURT:  Thank you.  Any recross, just on these

10   points?

11        RECROSS EXAMINATION

12   BY MR. POTTER:

13   Q    Yes, Your Honor.  Mr. Bythewood, at the time the City

14   awarded the developer the opportunity to proceed in the LDDA,

15   there were, there were other partners, other partners?

16   A    Yes.

17   Q    And who was that?

18   A    Westpac.

19   Q    And?

20   A    Or Pat Smith.

21   Q    And when did those partners depart the project, leave the

22   project?

23   A    Three, four years ago.

24   Q    So between the time the job was awarded or the project was

25   awarded to Poppleton, and the time you went to HUD, partners

1    left?

2    A     Some partners left, yes.

3    Q     Okay.  And with regard to, you noted with regard to

4    exhibits, I believe it was 19, you noted the date being April,

5    April 2011.  I want to direct your attention to Defendant's

6    Exhibit 16, again Page 4.

7            What is the date of this document?

8            MR. FAX:  Your Honor, same objection as I made earlier.

9    He's not competent to testify.  This is the document he said he

10   didn't recognize.

11           THE COURT:  We're talking about Exhibit 16, Defendant's

12   Exhibit 16?

13           MR. FAX:  Yes.

14           MR. POTTER:  Yes, Your Honor.

15           THE COURT:  Hold on one second.  Yeah.  Sustained.

16   That's a Chicago title policy.  Sustained.

17   BY MR. POTTER:

18   Q     Justine Linnehan, does she work for you?

19   A     Yes, she does.

20   Q     What is her capacity?

21   A     She is the Director of Development.

22   Q     So she's your employee?

23   A     Yes, that is correct.

24   Q     Thank you.

25           THE COURT:  All right.  Thank you, Mr. Bythewood.  You

1    may return to the table there.  You're the corporate

2    representative for the Poppleton Development, LLC, the corporate

3    plaintiff.  You may stay in the courtroom.

4              All right.  Next witness, Mr. Fax.

5              MR. FAX:  Thank you, Your Honor.  We call Jonathan

6    Stern.  I think he's in the anteroom.  Mr. Livingston will

7    retrieve him.  This is my last witness, Your Honor.

8              THE COURT:  We'll go up until, until 1:00, and we'll

9    break for lunch at one and start promptly again at two.

10             Counsel, let me just ask you something while we're

11   waiting for Mr. Stern.  It certainly seems to me that, in the

12   context of the hearing today that's going to take the better part

13   of the day, certainly into early afternoon, we've got to finish

14   by a certain time, can't go to the end of the day, this is really

15   in the context of, essentially, an effort for preliminary

16   injunction, is it not?

17             Do you agree with that, Mr. Potter?  I mean, there's no

18   reason to be dealing with this just in the context of a temporary

19   restraining order.  Do you agree with that or not?

20             MR. POTTER:  Yes, I do.

21             THE COURT:  Okay.  So this is really a hearing on a

22   preliminary injunction, seeking injunctive relief.  Because we

23   met 15 days ago and I delayed the process.  But we're here for --

24   if you'll step out just for one second, please.  Do you agree

25   with that, Mr. Fax?

1          MR. FAX:  Well, the only issue in that regard, Your

2   Honor, is that I'm not presenting testimony on irreparable

3   injury.  I'm not presenting testimony on public interest and

4   balancing of the equities.  I am presenting some, but not all, of

5   my evidence on likelihood on success of the merits.

6          I tried to focus this hearing, bearing in mind the

7   Court's injunction at the last hearing, I tried to focus on this

8   issue, that is to say, the acquisition of title.  Candidly, if we

9   prevail on this issue, I don't need to put on other evidence.

10         But if there's any issue in that regard as to whether

11  or not I can prevail --

12         THE COURT:  We'll just wait and see how we proceed.

13  The City, I think, at least agrees that we're really in the

14  context of a preliminary injunction here, is where we are, to

15  deal with the whole issue.  I'm not sure how much we gain by

16  having another hearing.

17         MR. FAX:  As far as --

18         THE COURT:  Delay on this for now.  Let's just bring

19  the next witness in.

20         MR. FAX:  I mean, as far as it goes, I agree with the

21  Court.  I'm not sure it goes all the way, the hearing goes all

22  the way.

23         THE COURT:  Mr. Livingston, you may bring in the next

24  witness.

25         MR. FAX:  But as I said, I mean, if there's no need to

1  put on further evidence, I'd just as soon not.

2          THE COURT:  Come forward, sir, and be sworn.

3          THE CLERK:  Raise your right hand.

4           JONATHAN STERN, PLAINTIFF'S WITNESS, SWORN

5          THE WITNESS:  I do.

6          THE CLERK:  Have a seat, please.  Sir, if I could offer

7  you a cup.

8          THE COURT:  We don't bring bottled water in here, sir.

9  Just pour it in the cup.  Thank you very much.

10         THE CLERK:  First thing I need you to do is adjust that

11  microphone to yourself.

12         THE WITNESS:  How's that?

13         THE CLERK:  That's great.  And then if you would state

14  your name and then spell your name for the record.

15         THE WITNESS:  Jonathan D. Stern.  J-O-N-A-T-H-A-N.

16  Stern is S-T-E-R-N.

17         THE CLERK:  Thank you.  Counsel.

18         DIRECT EXAMINATION

19  BY MR. FAX:

20  Q    Thank you.  Mr. Stern, good afternoon.  Thank you for your

21  patience outside.  Would you, for the record, will you tell us

22  what your business is?

23  A    My business is real estate development and investment.

24  Q    And briefly, could you describe the scope of your

25  development and investment experience during the past 10 years?

Case 1:12-cv-01904-RDB   Document 26   Filed 07/25/12   Page 101 of 263

1    A    I've developed, I would say, in excess of a billion dollars

2    of real estate, including hotel projects, residential apartments

3    and condominiums, resort residential with golf courses, and some

4    retail.

5    Q    And in what geographic areas have you participated in these

6    developments?

7    A    I've developed domestically in such locations as Miami, New

8    York, Las Vegas.  I've also developed internationally in China

9    and South Africa.

10   Q    And where, where is your office based?  Where are you

11   located?

12   A    New York City.

13   Q    Okay.  So what is your involvement with Poppleton?

14   A    I was approached by the developer, Dan Bythewood, maybe 18

15   to 20 months ago to see if I had an interest in participating,

16   investing, becoming a co-developer.  And at that time I gave my

17   opinion as to the viability of securing financing, and didn't

18   think I could contribute much to the project at that point.

19        I then, approximately six months ago, approached Mr.

20   Bythewood, having seen the credit markets loosen up a bit,

21   financing opportunities avail themselves, to see if there was

22   still an opportunity for me to get involved as an equity investor

23   and co-developer.

24   Q    Equity at what level of participation?

25   A    I committed, subject to further and final diligence, between

1  six and seven million, which is what I understood the need to be.

2  Q    Six or seven million dollars?

3  A    Of equity, yes.

4  Q    Yeah.  Equity meaning you put in the money and you become,

5  in effect, a partner to that extent?

6  A    A partner, as well as a co-developer with the developer.

7  Q    What, as a co-developer, what would your responsibilities

8  be?

9  A    All facets of the development.  As a developer for 20-odd

10  years, that would mean assisting in the planning, the site

11  planning, the architectural plans, the securing of financing,

12  which clearly is, you know, a critical piece of any project.

13  Q    What about --

14  A    Seeing the project all the way through to completion.

15  Q    What about locating retail tenants?  Would that be part of

16  your job as a co-developer?

17  A    Absolutely.  Understanding that there is a retail component

18  to this project, I have a strong retail background both from a

19  development standpoint, as well as connections to retailers.  And

20  securing an anchor tenant or a couple of anchor tenants is

21  critical to the project.

22  Q    Okay.  In that regard, focus, zeroing in on that, what, if

23  anything, have you done regarding development of retail at

24  Poppleton?

25  A    Well, I, understanding that the retail piece is part of

1    Phase I-A and 1-B, I approached first, I approached several

2    potential anchor, anchor tenants.  You must have an anchor, so to

3    speak, before you can get the smaller tenants.  One of those

4    prospective companies is a large retail company that my family

5    founded.

6    Q    Which one was that, is that?

7    A    It's the TJX Companies, which consists of T.J. Maxx,

8    Marshalls and Home Goods, as well as a separate company called

9    BJ's Wholesale Club, which is akin to Costco, Sam's Club, that

10   type of business.

11   Q    And was there any expression of interest in that regard?

12   A    Absolutely.  T.J. Maxx and Marshall, which, combined, makes

13   up the largest off-price retailer in the world today, expressed

14   absolute interest in exploring, coming in as an anchor tenant.

15   It would be one or the other, not both.

16   Q    Okay.  Now -- all right.  Now, I want to shift to the period

17   2008 to 2011.  Were you involved in the real estate business in

18   that period, 2008 to 2011?

19   A    Yes.

20   Q    As a developer?

21   A    Not --

22   Q    During that period?

23   A    Not as a developer.

24   Q    Why not?

25   A    The market dramatically, as I think we all know, shifted,

1    essentially collapsed, beginning in late '07 into '08.  A lot of

2    my financing came from Lehman Brothers.  When Lehman collapsed,

3    that was kind of the end of, it triggered a wave of bank

4    collapses.  And, of course, as we all know, the housing market,

5    just about everywhere, including internationally, collapsed, and

6    credit dried up.

7            So the opportunities to do ground-up development really

8    pretty much disappeared almost everywhere.

9    Q    Okay.

10   A    So I shifted and I actually became the Managing Director For

11   Investments for one of the largest real estate brokerage firms,

12   with the idea coming at the business from the direction of buying

13   distressed assets.

14   Q    Okay.  Well, between then and now, between 2008 and the

15   present, did there come a time when you got back into the

16   development side of the real estate business?

17   A    Yes.

18   Q    When was that?

19   A    About six to eight months ago, beginning of this year, I

20   started getting presented development opportunities, especially

21   markets that, you know, strong urban markets.  And in talking to

22   my banking relationships, my large private equity fund

23   relationships, you could see that credit was loosening.  The

24   banks, insurance companies, were beginning to finance again.  The

25   big equity funds were beginning to invest again in ground-up

1    development.  Not to the extent of pre '08, but certainly where

2    it had basically shut down for three years, it started to open

3    up.

4    Q    And that's when you approached, you reapproached Mr.

5    Bythewood?

6    A    I actually --

7    Q    Mr. Bythewood?

8    A    Yeah.  At one point I called Mr. Bythewood, asked what was

9    happening with Poppleton, and sort of got an update.  And felt

10   that, based on the nature of the project, housing, rental, the

11   retail component, and in a great urban market like this, in this

12   location, that there would be an opportunity to procure financing

13   that was on commercially reasonable terms.

14   Q    And as you sit here today, subject to due diligence and all

15   of that, do you remain committed to Poppleton and the project?

16   A    Absolutely.  I think it's a great project.

17           MR. FAX:  No further questions, Your Honor.

18           THE COURT:  Thank you, Mr. Fax.  Mr. Potter.

19           CROSS EXAMINATION

20   BY MR. POTTER:

21   Q    Thank you.  Good afternoon, Mr. Stern.

22   A    Hi.

23   Q    You describe yourself as a co-developer in this project, is

24   that correct?

25   A    Well, I would become a co-developer.  We haven't signed

Case 1:12-cv-01904-RDB   Document 26   Filed 07/25/12   Page 106 of 263

1    anything.  I've given a letter, which perhaps you have,

2    committing equity funds to the developer, subject to final due

3    diligence.  And obviously, with what's happened the last couple

4    of months with the City, you know, I've sort of stepped a little

5    aside.  I've advised the developer as best I can on how I think

6    they should proceed, and the type of financing and so on, so

7    forth.  But there's not much we can do at this point due to the

8    nature of the dispute here.  But I would call myself, if we went

9    forward, a co-developer.

10   Q    Had you asked the City for a, I guess, authority or

11   permission to become a co-developer, to join the partnership?

12   A    My first step was to give Mr. Bythewood a letter committing

13   the funds subject to final due diligence, as I would do in any

14   project.

15          And then I actually, I am not sure of the date, you

16   probably have it over there, I sent a letter to the Mayor

17   advising that I was committed to the project, committing the

18   equity.  I was disappointed that we, I had requested or asked Mr.

19   Bythewood to request a face-to-face meeting several weeks ago,

20   hoping that maybe I could come down and, with him, and my

21   commitment, break the logjam, so to speak, and get beyond this

22   point.

23   Q    Now, you testified earlier about the financial distress in

24   the economy some years ago and the fact that there was, credit

25   was not, I'm not sure what your word was, flowing.  Credit was

CROSS EXAMINATION OF STERN                                    107

1    not available for --

2    A    Essentially, when Lehman collapsed in September of '08, from

3    then on out, credit dried up.

4    Q    And if you were going to put a date on that, what would be a

5    fair date to say anybody should have known by this date that we

6    had, you know, that the credit availability for a project of this

7    nature was likely very difficult to get?

8    A    Well, I wouldn't say there was one specific, you know, point

9    in time.  I think it, by the end of '09, I think it was fairly

10   clear that, or maybe mid '09, that a project like this, albeit a

11   great project, would require all the various components of

12   financing to make it fly.  In other words, the City support it,

13   the TIF financing, etc.

14          Where pre '09 I was obtaining financing to the extent

15   of as much as 90%, commercial financing, 90% of the cost of a

16   project, you would be lucky during that period to get maybe 50%

17   for ground-up development.

18   Q    But I thought you said earlier that the economic crisis, I

19   think as you described it, occurred in 2007 and Lehman collapsed

20   in 2008, is that right?

21   A    For those of us selling residential property, by the end of

22   '07, the banks providing the mortgages to potential home buyers

23   were starting to shut down.  In other words, the perception of

24   fraudulent transactions or people obtaining financing to buy

25   homes based on inaccurate financial information, that was

CROSS EXAMINATION OF STERN                                    108

1    starting to occur.

2          It wasn't until the end of '08 when Lehman collapsed,

3    and that triggered a wave of bank failures into '09 that, from a

4    developer's perspective, you would say, you know, ground-up

5    development is going to be very hard except for very unique

6    projects or projects supported with government funding of some

7    sort.

8    Q    So would it be fair to say by January 1st of '09, someone

9    would have known for, I don't know, at least a month, maybe

10   longer, that the credit markets had changed and that this kind of

11   development or obtaining financing for this type of development

12   had become much more difficult?

13   A    Sure.  I would say by the first half of '09, you would know

14   it would be more difficult.  My experience with development, I

15   had always borrowed pretty straight up commercial financing.  It

16   wasn't a combination of capital stack, so to speak, with new

17   market, TIF, all the things associated with this project.

18         So I basically said, from my own standpoint, and a lot

19   of developer friends and partners also developed like I did, you

20   know, hotel properties, etc., we basically pulled out.

21         I didn't think, when Mr. Bythewood approached me 20-odd

22   months ago that the gap, that the gap between the commercial

23   financing and the, I'll call it government-supported financing,

24   could be made up with enough equity financing, enough cash from

25   people like me to justify the investment.  There might have been

1    some people out there, but I didn't think, you know, you could

2    obtain commercial financing, but not by any stretch on the same

3    basis that developers like me were obtaining it pre '09.

4    Q    Right.  So by January 1st of '09, somebody would have known,

5    somebody in that position would have known?

6              MR. FAX:  Objection, Your Honor.  I think he's answered

7    the question.

8              THE COURT:  I think he has.

9              MR. POTTER:  That's fine.  Nothing further.  Thanks.

10             THE COURT:  Any redirect?

11             MR. FAX:  No, Your Honor.

12             THE COURT:  Thank you very much, Mr. Stern.  You may

13   step down.  I don't think there's any need for Mr. Stern to stay.

14   I really want Ms. Zoller to remain available for this afternoon's

15   session.

16             Any reason for Mr. Stern to stay, from the point of

17   view of the City, Mr. Potter?

18             MR. POTTER:  No, Your Honor.

19             THE COURT:  Thank you, Mr. Stern.  You're excused.  You

20   shouldn't discuss your testimony until this hearing is over.  But

21   thank you very much.

22             MR. FAX:  May he, if he wishes to, may he sit behind

23   the well of the court and observe?

24             THE COURT:  Well, if he's not going to be called.  But

25   he can't be called back as a witness.  That's fine.

1          MR. FAX:  I understand.

2          THE COURT:  Any objection to that, Mr. Potter?

3          MR. POTTER:  No, Your Honor.

4          THE COURT:  Okay.  You're welcome to stay.  With that,

5    it's time to break for lunch.  And we'll take a one-hour recess

6    for lunch.

7          (Luncheon recess at 12:57 p.m.)

8          THE COURT:  We are continuing.  Are any other witnesses

9    to be presented by the plaintiff, Mr. Fax?

10          MR. FAX:  No further witnesses, Your Honor.

11          THE COURT:  All right.  Mr. Potter, any witnesses to be

12    presented by the City?

13          MR. POTTER:  Yes.  Preliminarily, Your Honor, I would

14    like to make a motion for dismissal of the motion for injunctive

15    relief based on the movant's failure to meet the burden of proof.

16          THE COURT:  All right.  The motion's denied.  There are

17    clearly issues that would satisfy all four criteria of injunctive

18    relief here, I mean, in terms of the evidence that's been

19    presented by the plaintiff thus far.  So I would be glad to hear

20    from your witnesses, Mr. Potter.

21          MR. POTTER:  Thank you.  Mr. Maneval.  Your Honor, the

22    City calls Mr. Maneval, John Maneval.

23          JOHN MANEVAL, PLAINTIFF'S WITNESS, SWORN

24          THE WITNESS:  I do.

25          THE CLERK:  Please be seated.  And, sir, first I need

1    you to adjust that microphone to yourself.

2              THE WITNESS:  Can you hear me?

3              THE CLERK:  Yes.  State your name and then spell your

4    name for the record.

5              THE WITNESS:  John Maneval.  First name, J-O-H-N.  Last

6    name M-A-N-E-V as in Victor, A-L.

7              THE CLERK:  Thank you.  Counsel.

8              DIRECT EXAMINATION

9    BY MR. POTTER:

10   Q    Thank you.  Mr. Maneval, are you employed?

11   A    Yes, I am.

12   Q    By whom are you employed?

13   A    I work for the Maryland Department of Housing and Community

14   Development.

15   Q    And do you work in a particular division?

16   A    I'm in the Multifamily Housing Division.

17   Q    What does the Multifamily Housing Division do?

18   A    We provide financing for the renovation and construction of

19   apartments around the State of Maryland.

20   Q    And what is your title there?

21   A    I'm the Deputy Director, which serves in the role of

22   managing a group of about 20 employees that coordinate the

23   financing for eligible projects, monitor the disbursement of that

24   financing, and the construction of projects.

25   Q    Do you evaluate whether projects will be financed by the

1    State?

2    A     Yes.  We have a number of different financing programs, some

3    of which are competitive in nature, some of which are

4    non-competitive.  In all cases, we evaluate projects for

5    potential financing.  We have a series of rules and regulations

6    we follow.  Those rules are encompassed in our Multifamily

7    Financing Guide, in our Qualified Allocation Plan.

8         We accept applications for financing for competitive

9    funds and non-competitive funds at different times of the year.

10   And those applications are completed using our Application

11   Submission Package.

12   Q     Has the developer in this case, Poppleton, contacted you or

13   your office?

14   A     Yes.  We've had several meetings with the developer.  I

15   looked at my notes.  The first meeting I had was back in 2009.

16   We often meet with developers, to help them understand what our

17   processes and procedures are.  And those meetings will occur

18   prior to the submission of applications for financing.

19   Q     So what were the nature of your discussions with Poppleton?

20   A     Pretty standard stuff.  We meet with lots of developers who

21   have prospective projects.  We've met to talk about our

22   requirements for submitting an application.  In those meetings,

23   the developer also had an opportunity to describe the proposed

24   project that they were working on.

25        We provided as much guidance as we could about our

Case 1:12-cv-01904-RDB   Document 26   Filed 07/25/12   Page 113 of 263

1    financing programs, about potential, you know, issues we might

2    have in evaluating applications.  These were all what I would

3    call pre-application meetings.

4            We would have, after the submission of a complete

5    application and review, we would have a kick-off meeting.  But we

6    never got to that stage.

7    Q    Did the Poppleton submit an application to you for

8    financing?

9    A    No.

10   Q    Now, how long does it typically take from the borrower's

11   application to the CEA's decision to issue a commitment letter?

12   What is that timeframe?

13   A    Well, it depends on the track of financing a developer

14   chooses.  There's a competitive track and a non-competitive

15   track.

16           Most of the discussions we had about this project

17   revolved around some of our non-competitive funding.  And in

18   those cases, a project, from the time of application to

19   commitment, could be anywhere from seven to nine months.  If the

20   applicant had chosen to go a competitive route, which was also

21   open to them, the timing between application and commitment would

22   probably be more in the realm of 10 to 12 months.

23   Q    Did the developer, Poppleton, did they ever express any

24   reason why they did not apply to you?

25           MR. FAX:  Your Honor, objection.  I think if, I

1   recognize that admissions can be drawn.  But I think we need a

2   name of a person, not an entity making statements.

3            THE COURT:  Sustained.  Sustained.

4   BY MR. POTTER:

5   Q    That's fine.  With whom did you speak from the developer?

6   A    I spoke to Mr. Bythewood.  I spoke with Justine Linnehan, I

7   think is her name.  And also at one point, one of my notes, we

8   got some correspondence from a Mr. Hitchcock.  I'm not sure who

9   that was.  I don't really recollect.  This was a couple years

10  ago.

11  Q    Now, did Mr. Bythewood express to you where, any reason why

12  they had, why he had not submitted an application?

13  A    No.  We talked about the project a number of times and the

14  complexity of the proposed financing and real estate development.

15  We tried to provide as much feedback as we could about putting

16  together an application.  But it never rose to the level with me

17  that an application was not being submitted for any particular

18  reason.

19           This is not all that unusual for me.  I'm looking at,

20  you know, scores of projects at any one time that haven't applied

21  to us and try and provided advice on them.

22  Q    Did the City or Mr. Engel ever attempt to dissuade you from

23  financing Poppleton?

24  A    No.

25  Q    Now, if the City put together a number of parcels, 100, 173

1    parcels for development, would 5 unredeemed ground rents on the

2    development parcel prevent the developer from applying for a

3    loan, applying to the CDA for a loan?

4    A    We rely in these sorts of circumstances on the City to enter

5    into a Land Disposition Agreement.  We've done numerous projects

6    of this type around the City.  And those Land Disposition

7    Agreements indicate to us that the City has assembled the parcels

8    necessary for a project and has entered into an agreement with

9    the prospective developer.  And that rises to the level of site

10   control to meet our requirements.

11          That level of review by us and our staff, we don't get

12   involved in analyzing ground rents.  We're relying on that

13   agreement to tell us that the City and the developer have agreed

14   on the sites that are going to be in the project.

15   Q    So the presence or absence of unredeemed ground rents has,

16   would that have an effect on your analysis?

17   A    Not at the application stage.  It certainly would have to be

18   resolved before we close on the financing.

19   Q    Well, would it affect your ability to offer a commitment

20   letter, for example?

21   A    No.  I would put that in the category of general title

22   issues that need to be resolved before we close.

23   Q    Now, does the CDA look for other lenders to make commitments

24   before issuing its own commitment letter?

25   A    No.  Very often we're the first ones to commit financing for

1    a project.  We find it helps induce other lending partners to get

2    in the pool with us.

3    Q    Does, would the CDA need to see the City issue a TIF

4    financing, for example, before the CDA would issue a commitment

5    letter?

6    A    We would seek some sort of assurance from the City that the

7    project is in line or, and reserved a slot for financing.  But we

8    don't require that financing to be committed or funded in any way

9    before we'll issue or commitment.

10   Q    Now, if -- so, do you think, so the developer can get

11   financing from you, or at least a commitment letter for

12   financing, even though there are unredeemed ground rents?

13   A    Yes, I would say that's true.  A commitment.

14   Q    A commitment?

15   A    A commitment.

16   Q    Now, if title insurance would be issued at closing over a

17   few unredeemed ground rents, would the CDA still close on the

18   loan?

19   A    I would consult with my attorneys to make sure they had

20   reviewed the title and to make sure we had adequate coverage.

21   Could you repeat the question?  You say at commitment or at

22   closing?

23   Q    At closing.

24   A    Okay.  I would consult with our attorneys and I would make

25   sure that they were comfortable that we were protected as a

1    lender in the event that something happened to those ground

2    rents, whoever holds the ground rents.

3           I don't recollect whether or not we've, we've done that

4    before.  But I would really lean on our attorneys, who understand

5    that sort of, you know, detail much better than I do.

6    Q    But in terms of financing the project and issuing a

7    commitment letter for financing, the presence of ground rents

8    would have no effect on your decisionmaking?

9           MR. FAX:  Objection.  I think he's answered.

10          THE COURT:  Sustained.  First of all, the question's

11   been answered.  Second of all, you have qualified him as being

12   able to opine as to that, Mr. Potter.  Thank you.

13          MR. POTTER:  Yes, Your Honor.  May I approach the

14   witness?

15          THE COURT:  Certainly.  Certainly.

16   BY MR. POTTER:

17   Q    I would like to show you Exhibit 25.  I would like to show

18   you what's been marked as Defendant's Exhibit 25.  What, what

19   type of services are being offered in -- what is Exhibit 25?

20   A    Are you asking me?

21   Q    Yes.

22   A    Give me a minute to read it.

23   Q    Okay.

24          MR. FAX:  Your Honor, could we do a voir dire on this?

25   This is not a letter that indicates that the witness either sent

1    it or received it.

2              THE COURT:  Why don't you approach the bench here for

3    one second, please?

4              (Bench conference on the record.)

5              THE COURT:  Mr. Potter, what are you proffering here on

6    this?

7              MR. POTTER:  Yes, Your Honor.  I am proffering that

8    this is a letter, this was, this was a letter submitted by the

9    plaintiff to the defendant as evidence of financing.  The letter

10   purports to offer services for the placement of bonds, state

11   bonds, and that's private placement.  And this is something that

12   the State does not do.

13             THE COURT:  Well, the point is is that BB&T Capital

14   Markets is sending a letter to Mr. Bythewood.  And in the letter

15   you're saying there's representation for the potentiality of

16   state bonding?  And you're proffering this witness would say that

17   it does not do state bonding?

18             MR. POTTER:  No, that they do not, that they do not

19   allow private placement of state bonds.

20             THE COURT:  So that the letter from BB&T to Mr.

21   Bythewood would be erroneous?

22             MR. POTTER:  Right.  It would not, it would not be

23   evidence of financing of any type that would be allowed by the

24   State.

25             MR. FAX:  If the State were participating.

1          MR. POTTER:  Right.  Well, it's for state bonds.

2     That's the service.  State bonds.

3          THE COURT:  Under no conditions would the state

4     participate.

5          MR. POTTER:  Right.

6          THE COURT:  And is there any indication that this

7     witness has any dealing with this in one way or the other?  Is

8     there any indication that anybody has spoken to the State about

9     this?

10          MR. POTTER:  Well, yes.  The State -- right.  I asked

11     him whether the State --

12          THE COURT:  No.  BB&T spoke with the state?

13          MR. POTTER:  No.  No.  No.  It's a state policy.  State

14     policy.

15          MR. FAX:  I think that he's basically trying to impeach

16     a letter that, that, you know, he's not participating in, that,

17     that I don't think he's competent to testify about.

18          THE COURT:  Well, it's the topic of whether or not

19     there is a bonding agent for a state bond.

20          MR. FAX:  He can ask the witness any questions --

21          THE COURT:  You can say, seeing this reference, does

22     the State act as a bonding agent in this fashion?

23          MR. POTTER:  Does the State allow, would the State

24     allow BB&T to be its bonding agent?

25          THE COURT:  So that it's, there might be some error in

Case 1:12-cv-01904-RDB   Document 26   Filed 07/25/12   Page 120 of 263

1    BB&T's letter to the plaintiff.

2              MR. POTTER:  Yes.

3              THE COURT:  You may ask that question.

4              (End of bench conference.)

5    BY MR. POTTER:

6    Q    Mr. Maneval, would the State allow BB&T to place its bonds?

7    A    No.

8    Q    So would the State allow the services being proffered in

9    Exhibit 25?

10   A    No.

11   Q    Thank you.  Nothing further.

12             THE COURT:  Mr. Fax.

13             MR. FAX:  Can I just have a moment, Your Honor?

14             (Pause.)

15             THE COURT:  Mr. Fax.  Cross examination.

16             CROSS EXAMINATION

17   BY MR. FAX:

18   Q    Thank you.  Very briefly, Your Honor.  Mr. Maneval, there

19   was part of your testimony I didn't quite get clear.  You said --

20   correct me if I'm wrong and if I misunderstood you, please

21   correct me -- I understood you to say that, in order for you to

22   go forward and make a commitment, that you would want to see a

23   commitment from the City that the developer was in line for TIF

24   financing?  Did I understand you correctly?

25   A    Could you repeat the question again?

1    Q    Yeah.  Could we have the reporter read -- is it easier for

2    me to repeat it or --

3              THE COURT:  I think it would be easier for you to

4    repeat it.

5    Q    Okay.  I thought I understood you -- excuse me.  Guys.  I

6    thought I understood you to say that in order for the State to go

7    forward with the commitment, it would want to see, it would want

8    a representation from the City that the developer was in line for

9    TIF financing.  Did I understand that correctly?

10   A    Yeah.  Yes.  That's accurate.

11             I haven't done a transaction with the City issuing TIF

12   financing in my time at the state.  And I've been with the state

13   for 11 years.  However, in all cases where we're going to issue a

14   commitment for financing, we want to know that the other

15   financing for the project has been identified and that the

16   applicant is in some phase of processing for that financing.

17   Q    All right.

18   A    In the case of TIF financing, we would look for some sort of

19   indication from the City where they are in that process.

20   Q    So if the City gave you a contraindication and said, we do

21   not think we're going to support TIF financing, then that would

22   cause the State to back away from its own commitment?

23   A    Yeah.  If the City were to reach out to us and say, we are

24   not providing the financing, we would not commit our financing

25   until a developer had identified some alternate source.

1    Q     You would not go forward, correct?

2    A     That's right.  I would not commit our financing.

3              MR. FAX:  No further questions.  Thank you.

4              THE COURT:  Thank you, Mr. Fax.  You may step down, Mr.

5    Maneval.  Is there any reason for this witness to remain here?

6    Is there any likelihood he'll be called back to the witness

7    stand?

8              MR. FAX:  Not from us.

9              THE COURT:  From the City.

10             MR. POTTER:  No, Your Honor.

11             THE COURT:  You're excused, Mr. Maneval.  Thank you

12   very much.  All right.  Mr. Potter, next witness.

13             MR. POTTER:  Yes.  Thank you.  The City calls William

14   Burgee.

15             THE CLERK:  Raise your right hand.

16              WILLIAM BURGEE, DEFENDANT'S WITNESS, SWORN

17             THE WITNESS:  I do.

18             THE CLERK:  Please be seated.  Sir, if you would,

19   adjust that microphone to yourself.  State your name and then

20   spell your name for the record.

21             THE WITNESS:  William N. Burgee.  And that's spelled

22   capital W-I-L-L-I-A-M.  Capital N period.  Capital B-U-R-G-E-E.

23             THE CLERK:  Thank you.  Counsel.

24             DIRECT EXAMINATION

25   BY MR. POTTER:

1    Q    Thank you.  Sir, are you employed?

2    A    Excuse me?

3    Q    Are you employed?

4    A    Yes, I am.

5    Q    By whom?

6    A    The Mayor and City Council of Baltimore.

7    Q    And in what particular division are you in with the Mayor

8    and City Council of Baltimore?

9    A    The Land Resources Division.

10   Q    And what is your -- do you have a title?

11   A    I'm Director of the Office of Property Acquisition and

12   Relocation.

13   Q    And in that position, what are your responsibilities?

14   A    I'm sorry?

15   Q    What are your responsibilities?

16   A    I acquire real estate and assure that people that are

17   displaced are relocated properly.  And I help implement and

18   design strategies for site assemblage.

19   Q    Now, did you have any responsibilities with regard to the

20   acquisition of the properties in Poppleton?

21   A    That's true, yes.

22   Q    What were your duties?

23   A    Directing the acquisition, having staff prepare letters

24   over, for my signature to send to owners and interested parties

25   that the property was to be acquired.

1    Q    Are you familiar with the properties that comprise the

2    Poppleton project?

3    A    I am.

4    Q    Now, what part of the project is Block 157?

5    A    Block 157 sits on the upper northeast corner.  It's like a

6    capstone on top of Phase I, and it's part of Phase IV.

7    Q    Now, I'd like to direct your attention, if you could look at

8    the book in front of you.  And in Exhibit One, it's the

9    Plaintiff's Exhibit One.  In the binder.  I'm sorry.  And Exhibit

10   One.

11   A    Is that the complaint?  Or is it next to that?  I see it.

12   The Land Disposition and Development Agreement?

13   Q    I'd like to direct your attention to Page 47.  Now, under,

14   on Page 47, there is a, next to a double asterisk, there's a

15   statement?

16   A    Yes.

17   Q    Can you read that?

18   A    Notwithstanding the fact that the properties located in

19   Block 0157 are listed immediately above are in Phase IV, the City

20   will acquire such properties, conduct clearing activities with

21   respect to such properties in connection with Phase I for

22   purposes of neighborhood safety.

23   Q    Now, when would, what does that, what does that phrase

24   require of the City to do?

25   A    Well --

1          MR. FAX:  Objection, Your Honor.  I think it speaks for

2    itself.

3          THE COURT:  Certainly seems to.  But I'll let the

4    witness answer the question.

5    A    Well, at such time that there are properties that are

6    developed, in which these properties would have been a

7    deleterious influence, it would have been incumbent upon the City

8    to perform the task that's stated higher in support of that

9    development.

10   Q    So when would, when are the acquisition and clearing

11   activities for the Phase IV properties, when it says in

12   connection with Phase I, what does that mean to you?

13   A    To me, it would mean that, as it relates to properties that

14   are developed in Phase I, that these properties would have to be,

15   the activities that are stated here would have to be performed at

16   such time that the properties in Phase I receive Certificates of

17   Occupancy.

18   Q    So when the Phase I properties are occupied or have a

19   Certificate of Occupancy?

20   A    When they have Certificates of Occupancy.

21   Q    So when, after they're built?

22   A    After they're finished, sure.

23   Q    Now, did the City acquire title to all the properties in

24   Phase I prior to July 2nd, 2010?

25   A    That's correct.

Case 1:12-cv-01904-RDB   Document 26   Filed 07/25/12   Page 126 of 263

1  Q    Okay.  Now, there is, did the City need to redeem the ground

2  rents for all, all of the properties in Phase I before it could

3  say that it had acquired title?

4  A    They do not.

5  Q    Why not?

6  A    Because ground rents are, in Baltimore, are an interest in

7  property.  They can be insured over by a title insurance company.

8  And it's typically done in major assemblage projects.  The

9  acquisition of the leasehold and the fee simple is sufficient

10 enough to perform assemblage task.

11 Q    Well, would the, would the City be able to convey to

12 Poppleton, for example, all the properties in Phase I if there

13 were five unredeemed ground rents?

14 A    Certainly.

15 Q    How could they do that?

16 A    By deed.

17 Q    And what would they need to do?  What would the City need to

18 do?

19 A    Well, if I'm inferring this accurately, the deed would be

20 conveyance in fee simple.  And the outstanding ground rents would

21 be still under acquisition through the various strategies that

22 can be used for that, and including redemption with SDAT or a

23 purchase and sale, if somebody has emerged that can actually sign

24 the deed, or backstop by condemnation, if necessary.

25          And at such time that those activities are completed,

1    because the properties were previously conveyed under the fee

2    simple deed, title would ascend or ripen unto the grantee under

3    the doctrine of after-acquired title.

4    Q    Well, what happens to the, to the property's title when the

5    City redeems the ground rent?  What happens to the leasehold

6    interest?

7    A    Well, the leasehold interest is, is merged.

8    Q    So does the City have to convey an additional interest to

9    the developer?

10   A    No.  It ripens under the doctrine of after-acquired title.

11   Q    I would like to direct your attention to, in Exhibit One,

12   Paragraph 1.10.

13   A    I don't see the annotation here.

14   Q    It's Point 4, on Page 4.

15   A    Okay.

16   Q    And at the bottom of the page?

17   A    Yes.  1.10.

18   Q    Yes.

19   A    Heading, Conditions of Title.

20   Q    Yes.  Now, can you read that?  Can you read that sentence

21   into the record, please?

22   A    Certainly.  1.10, Conditions of Title.  At the time of

23   closing, the City shall convey to the developer or its designee,

24   by special warranty deed, good and marketable and insurable title

25   to the properties free and clear of all liens, encumbrances, and

1    title defects, but subject to and with the benefit of all terms,

2    conditions, covenants, rights, and restrictions set forth in this

3    agreement, any and all municipal utilities and easements, both

4    recorded and unrecorded, approved by the developer and necessary

5    for the full development of the properties according to Renewal

6    Plan and this agreement.

7    Q    Are unredeemed ground rents title defects?

8    A    They are not.

9    Q    Now, could the City have met this Paragraph 1.10 and

10   conveyed the properties to the Poppleton developer as of July

11   2nd, 2010?

12   A    Certainly.

13   Q    Nothing further.

14        THE COURT:  Mr. Fax.

15        CROSS EXAMINATION

16   BY MR. FAX:

17   Q    Thank you, Your Honor.  Mr. Burgee, are you saying that the

18   City could have gone to closing with Poppleton I even not having

19   redeemed the ground rents?

20   A    That's absolutely true.  We do it routinely in assemblage

21   development.

22   Q    And you were saying that under the terms of this agreement,

23   the City could have done that?

24   A    Certainly.

25   Q    And you don't think that the existence of a ground rent is

1    an encumbrance to clear title?

2    A    I don't think it's a title defect.

3    Q    But do you think it's an encumbrance to clear title?

4    A    I don't know how to parse the word "encumbrance."  But, no,

5    I don't believe so.

6    Q    You don't think it's a --

7    A    I think it's an interest in the property.

8    Q    You don't think that the existence of a ground rent is an

9    encumbrance to clear title, is that correct?

10   A    I don't believe that it's an encumbrance.  I believe it's an

11   interest.

12   Q    I understand you --

13   A    I think of encumbrance as something that you do to encumber

14   the title, such as a mortgage or something.

15   Q    Right.  So you're saying it's not an encumbrance to clear

16   title, correct?

17   A    I believe that to be the case.

18   Q    Okay.  Your Honor, may I approach?

19        THE COURT:  Yes.

20   Q    Mr. Burgee, I show you what, what is captioned Application

21   For Residential Ground Rent Redemption.  Your Honor, I would like

22   this marked for identification as plaintiff's exhibit, whatever

23   the next number is.

24        THE CLERK:  28.

25   Q    28.

CROSS EXAMINATION OF BURGEE

130

1     THE COURT:  Which one is number -- are both of them 28?

2     Q    Yeah.  They're the same, they're copies of the same thing.

3     I have another document, but this one is the same.

4     THE COURT:  I've got two copies of the same exhibit,

5     then.  I don't need --

6     Q    Right.  Exhibit 28?

7     THE CLERK:  Yes.

8     Q    Mr. Burgee, this is captioned Application For Residential

9     Ground Rent Redemption.  And this is a form that the City uses,

10    is that correct?

11    A    No, it's not.  It's a state form.

12    Q    It's a -- fine.  It's a state form.  It's a form with which

13    you're familiar, is that right?

14    A    Yes.

15    Q    And this is, in this case, this is a form completed by the

16    Mayor and City Council of Baltimore, or on behalf of the Mayor

17    and City Council of Baltimore, is that right?

18    A    That's correct.

19    Q    And this is for 931 West Saratoga Street, is that correct?

20    A    Yes.

21    Q    And 931 West Saratoga Street is within Phase I of the

22    Poppleton project, is that correct?

23    A    That's correct.

24    Q    All right.  Would you turn to the third page that begins, I

25    hereby certify.  Do you see that?

1    A    I do.

2    Q    And is that your signature?

3    A    It is.

4    Q    All right.  Would you do me a favor and read the, the "I

5    hereby certify" language, and then .5?

6    A    You want me to read just --

7    Q    The introductory sentence and then Number 5.

8    A    I hereby certify that it is necessary for the Mayor and City

9    Council of Baltimore to have title to the grand rent interest in

10   the property known as 931 West Saratoga Street.

11           Five is, The existence of the ground rent is an

12   impediment to the redevelopment of the site.

13   Q    And this certification that you gave, this is a

14   certification that you give routinely, is that correct?

15   A    In compliance with the application, that's correct.

16   Q    Yes.  And in each of those cases, you certify that the

17   existence of the ground rent is an impediment to the

18   redevelopment of the site, is that correct?

19   A    That's correct.

20   Q    And am I correct, then, that the City views this, views the

21   removal of the ground rent as necessary in order to transfer

22   clear title?

23   A    Absolutely not.

24   Q    The term "special warranty deed", which appears in Section

25   1.10, Conditions of Title, at the time of closing the City shall

1    convey to the developer or its designee by special warranty deed.

2    Do you agree with me that the term "special warranty deed" means

3    in fee simple?

4    A    Not necessarily.

5    Q    You dispute that it means in fee simple, as a term of legal

6    art?  Is that your position?

7    A    I've seen leasehold assignments that are special warranties,

8    special warrantied leasehold assignments, but they're

9    euphemistically referred to as deeds.

10   Q    I'm sorry.  As?

11   A    As deeds.

12   Q    So you disagree that the words "special warranty deed" have

13   a meaning, a technical term of art meaning, and that they mean

14   fee simple in this, in this case, is that right?

15   A    To me, what it means is that we would be conveying the

16   interest in the property that we have or that we're acquiring.

17   Q    So you disagree with my statement?

18   A    Yes.

19   Q    You're disagreeing that --

20   A    Yes.

21   Q    -- the term "special warranty deed" means in fee simple?

22   A    Yes.

23   Q    Okay.  Fine.  Is a ground rent a, in the nature of a lien,

24   in your opinion?

25   A    It's a --

CROSS EXAMINATION OF BURGEE

133

1    Q    Is it a lien?  Yes or no, please.  You can explain.

2    A    I haven't contemplated its status as lien or non-lien.

3    Q    Contemplate it now, if you would, sir.

4    A    Okay.

5    Q    Is it a lien, yes or no?

6    A    I think it's a charge on the property.

7    Q    You're disputing my representation to you that it is a lien?

8    You're saying, I disagree with you, it's not a lien?  A ground

9    rent that's still on the property is not a lien?  Is that what

10   you're saying?

11   A    It's enforceable, so I guess it's a lien.

12   Q    It is a lien.  Okay.  Now, Section 1.10 says that, at the

13   time of closing, the City shall convey to the developer or its

14   designee, by special warranty deed, good and marketable and

15   insurable title to the property, free and clear of all liens.

16   Doesn't that mean that the City has to convey, in fee simple,

17   without the existence of the ground rent?  Isn't that what that

18   means?

19   A    Well, when, the way it occurs to me as to liens would be

20   free and clear of liens, such as mortgages, creditors, judgment

21   creditors, secured and unsecured liens.  And I don't think, in

22   the construction of this sentence, that a ground rent was

23   contemplated.

24          When I read this sentence in its totality, I see good

25   and marketable and insurable title.  And when I think of the

1    impediment that's referred to in 5 on the certification for the

2    ground rent redemption, the impediment that's being removed is

3    the three years of back rent that have to be escrowed at

4    settlement and the, any charge the title company charges for

5    collection.  They're the impediments that this is talking about.

6    Getting rid of the three years of back rent that the statute

7    would require and getting rid of any fee that the title company

8    would charge.

9    Q    So you mean we should read this to say that a special

10   warranty deed has to be conveyed free and clear of some liens?

11   Is that what you're saying?

12   A    No, I'm not saying that.

13   Q    This says "all liens", by the way.

14   A    Okay.

15   Q    So wouldn't you agree with me --

16          MR. POTTER:  Objection.

17   Q    -- that this means that the property has to be conveyed

18   without the existence of the ground rent, eliminating that lien?

19   A    That's not how I would construct it.

20   Q    Now, you said, you said in your direct testimony that the

21   City acquired title prior to July 2nd, 2010 on the five

22   properties.  Do you recall saying that?

23   A    On the -- I don't recall saying that at all.  I said that

24   the City acquired title to the properties that were on the list.

25   Q    By July 2nd is what my notes say.

1   A     Yes.

2   Q     Yes.  In fact, the City acquired a leasehold interest,

3   correct?

4   A     Well, they did.  And when you look at the LDDA and the

5   property description in the LDDA, it's identified by assessment,

6   block and lot, and by address, unless the property is unimproved

7   and has no address.  Then it's merely described by assessment,

8   block and lot.  And ground rents are not assessed in the State of

9   Maryland.  Only leaseholds and fees are.

10  Q     In fact, the City only had a leasehold interest in those

11  five properties as of July 2nd, correct or not?  Yes or no?

12  A     That's correct.

13  Q     That's true, isn't it?

14  A     Yes.

15  Q     So your testimony that they had acquired title prior to July

16  2nd, 2010 is incorrect?  They had a leasehold interest?

17  A     That's not true.  What the testimony is, the City has

18  acquired the properties prior to.

19  Q     Actually, you said -- well, the record will speak for

20  itself.  But you're saying, then, that they did not acquire

21  title.  You're agreeing with me today that they did not acquire

22  title?

23  A     I'm saying that the construction of my statement, if it were

24  not, should have been that the City acquired the properties and

25  the properties are those that are listed in the LDDA.  And that

1    the properties are listed in the LDDA are talking about, by legal

2    description in the LDDA, if you want to call it a legal

3    description, they're identified by block and lot, which is an

4    assessed interest, and that a ground rent is not.

5    Q    So they acquired a leasehold interest subject to the ground

6    rents?

7    A    And the pending --

8    Q    Yes?

9    A    The pending SDAT redemption.

10   Q    Right.  But the answer to my question is yes?

11   A    Yes.

12   Q    As of July 2nd, 2010.  Now, let me direct your attention to

13   Page 47 of the LDDA.  Did I understand you to say that this did

14   not obligate the City to acquire and clear the properties in

15   Block 157 by the time of closing?  Is that your testimony?

16   A    That is.

17   Q    And the issue of neighborhood safety, you are saying that

18   the City was only responsible for dealing with the issue of

19   neighborhood safety at the time when there were, when there were

20   Certificates of Occupancy pending?

21   A    You could -- yes.  Which would indicate that you could have

22   a neighborhood because the buildings that create a neighborhood

23   were in place.

24   Q    And you understand that Block 157 presented unique safety

25   issues that all parties recognized in the drafting of this

1    agreement, is that correct?

2    A    No, I don't.

3    Q    You're not?  Have you ever been over there?

4    A    Yeah.

5    Q    Do you know what's on Block 157?  Have you seen it?

6    A    I don't know what's there now.  I haven't been there in

7    years.

8    Q    Are you aware that at any time there was a serious drug

9    corner there and drug problem in that area?

10   A    I've nothing to do with the police department.

11   Q    You don't know?  You don't know that?

12   A    Right.

13   Q    Do you understand that the parties had recognized that, in

14   order to obtain finance interest on the part of lenders, and in

15   order to obtain interest on the part of builders --

16             MR. POTTER:  Objection.  That's not in the record.

17             MR. FAX:  I disagree.  I think Ms. --

18             THE COURT:  I think there's testimony with respect to

19   what Block 157 is.

20             MR. FAX:  Yeah.  Ms. Zoller testified to that.

21   BY MR. FAX:

22   Q    Do you understand that there was recognition by both parties

23   that in order to obtain the interest of lenders and builders and

24   tenants, that Block 157 would have to be removed because it was a

25   threat, a threat to safety?  Do you have that understanding?

1    A    No one conferred with me when they were, you know,

2    contemplating the LDDA.

3    Q    Okay.  So you were not a party to the negotiations on the

4    LDDA?

5    A    I was not.

6    Q    So the reading that you give of the double asterisk page on

7    47 is based upon your understanding today as you read these

8    words, is that right?

9    A    I read these words.  I comprehend them.

10   Q    It's how you were reading them?

11   A    Yeah.  And when you say "safety", for the purposes of a

12   neighborhood, there is no neighborhood there now.  There will be

13   a neighborhood there when the Phase I is built.  And my logical

14   deduction is that when you have evidence of a Certificate of

15   Occupancy, then you could actually have people living in the

16   buildings that were built, and that gives you a neighborhood.

17   Q    So you're giving us your opinion as to how you read these

18   words?

19   A    Yeah.

20   Q    But you were not present at the time when this language was

21   negotiated, correct?

22   A    That's true.

23   Q    Okay.  And you are aware, or are you aware, that as of

24   yesterday, there were still four units, four attached buildings

25   that were on Lot 157?  Are you aware of that?

1    A    I am.

2    Q    And are you aware that they've not been, that they've not

3    been, that there are two properties on Lot 157 that have not yet

4    been acquired by the City?  Are you aware of that?

5    A    And the special circumstances surrounding them.

6    Q    So you are aware of it?

7    A    Yes.

8    Q    All right.  Now, what about clearing activities?  Clearing

9    of debris and telephone poles and utility and all of that?  Let

10   me direct your attention to 1.5B on Page 3 of the agreement.  Do

11   you see that?

12             MR. POTTER:  I'll object as beyond the scope of direct.

13             THE COURT:  Under Rule 607, that's permissible.  611,

14   rather.  So it's overruled.

15   Q    Would you please turn, Mr. Burgee, to Page 3?

16   A    I'm on Page 3.

17   Q    All right.  You see where it says 1.5, 1.5B, the properties

18   identified as new construction in Schedule A of this agreement

19   are to be delivered to the developer free of all buildings or

20   other structures.  Do you see that?

21   A    I do.

22   Q    All right.  Now, when you go back to Page 47 -- I'm sorry --

23   Page 46, you would agree with me, would you not, that where it

24   says 906 West Saratoga Street, it says new construction, is that

25   right?

1    A    It does.

2    Q    Okay.  And Schedule A is what we're looking at.  That's

3    Schedule A.  We're at Page 46 of Schedule A, right?

4    A    I don't know.  But I assume it is.

5    Q    Go ahead.  Take a look.  It's back a number of pages.  It's

6    Page 35, Schedule A.

7    A    That page is part of Schedule A, which begins as Page 35.

8    Q    So as I read 1.5B, it says that the new construction,

9    Schedule A, has to be delivered to the developer free of all

10   buildings and other structures.  And then it says that 906 West

11   Saratoga Street is new construction.  And that's in Schedule A,

12   correct?

13   A    Where is 906?

14   Q    Go back, it's on Page 47, 46.

15   A    46?

16   Q    Yeah.  906 West Saratoga Street, new construction?

17   A    And that's in Phase IV.

18   Q    Yeah, but it's part of Schedule A.  I'm not talking about

19   the phase.  I'm talking about Schedule A.  It's all part of

20   Schedule A.

21   A    Okay.

22   Q    It's still in Schedule A, correct?

23   A    Yes.

24   Q    So that means that the City had to be prepared to deliver to

25   the developer 906 West Saratoga Street cleared, free of all

1    buildings and other structures, right?

2    A    At what time would that be?

3    Q    Well, it says, are to be delivered to the developer.  When

4    delivery occurs.  I guess that's closing, right?

5    A    Delivery of Phase IV?  It's contemplated much later.

6    Q    1.5B is talking about Schedule A.

7    A    1.5B, Schedule A.  Okay.  Condition of the property.  B, new

8    construction.

9    Q    Right.  So if, if 906 West Saratoga Street --

10   A    Well, actually, now you pointed out something again in 1.5B.

11   It seems that it says, the City will conduct such clearing

12   activities in accordance with the phasing plan.  And if I'm not

13   mistaken, most of what we're talking today about is Phase I, not

14   Phase IV, and these properties are in Phase IV.

15   Q    Listen to my question.  I understand your point.  My

16   question is this.  If 906 West Saratoga Street was to be conveyed

17   to Poppleton at the closing on Phase I, you would agree with me

18   that, as of July 2nd, 2012, the City could not comply with 1.5B,

19   is that correct?

20   A    Well, I think your premise is wrong.

21   Q    I understand you think it.  But listen to my assumption.

22   A    Let me preface --

23   Q    Accept my premise as a hypothetical.

24            THE COURT:  Let him answer, Mr. Fax.  Go ahead, Mr.

25   Burgee.

1          THE WITNESS:  My interpretation and construction of the

2     paragraph and of the purpose of why I believe we're here today

3     has to do with Phase I and the deliverable of Phase I properties

4     to the developer at some point in time, after with which they've

5     asked, actually, to have the properties conveyed, which, to my

6     understanding, they have never asked.

7          And now in Phase I, that was, was the part of the

8     phasing plan which I believe is referred to in 1.5B.  And the

9     phasing plan is numbered in sequence.  And Phase I is the first

10    to go, and Phase IV is one to come later.

11         The statement in this Page 47 about notwithstanding the

12    properties being in a different phase, that we will acquire

13    properties and conduct clearing activities with respect to such

14    properties in connection with Phase I, which would be after they

15    ask, actually, to have the properties, which, to my

16    understanding, they never have up to this date, and that, for the

17    purposes of neighborhood safety.

18         Neighborhood safety, it's incumbent, I think, to have a

19    neighborhood and you'd have to have constructed properties for

20    people to live in to be part of a neighborhood.  A vacant lot is

21    not a neighborhood.

22         Built environment creates a neighborhood, and then we

23    have a right to occupy it.  And then you have people living in a

24    neighborhood and becomes the social fabric that actually needs to

25    have safety.

1          And it's at that time that the properties should be

2     raised, cleared and this condition should be met.

3     Q     And that's how you interpret the language?

4     A     Absolutely.

5     Q     Okay.  Now, would you agree with me that, in order for the

6     City to close, it has to have cleared the properties in Phase I?

7     Cleared, cleaned them up, removed debris?  Would you agree with

8     that or not?

9     A     I've never read that.

10    Q     You are not aware one way or the other?

11    A     No.

12    Q     I have no further questions, Your Honor.

13          THE COURT:  Any redirect, Mr. Potter?

14          REDIRECT EXAMINATION

15    BY MR. POTTER:

16    Q     Mr. Burgee, following up on the last point.  Could the City

17    clear the property if we knew of a closing date?

18    A     Yes.

19    Q     And isn't it also true that the City has redeemed all the

20    ground rents for Phase I?

21    A     Yes.

22    Q     Nothing further.

23          THE COURT:  Thank you.  You may step down, Mr. Burgee.

24    Thank you very much, sir.

25          THE WITNESS:  Thank you.

1          THE COURT:  You shouldn't discuss your testimony with

2     anyone until we finish this afternoon, in the event you're called

3     back to the witness stand.  Is he free to go?  Is there any

4     reason to call him back from the point of view of the plaintiff?

5          MR. FAX:  May I have a moment?

6          THE COURT:  Sure.

7          MR. FAX:  He's released, Your Honor.

8          THE COURT:  Mr. Potter, is there any reason he needs to

9     be called back?

10         MR. POTTER:  No, Your Honor.

11         THE COURT:  Mr. Burgee, you're excused.  Thank you very

12    much.

13         Mr. Livingston, I think there's some paper that fell on

14    the floor.  Come forward and be sworn, sir.

15         MR. POTTER:  The City calls Alastair Smith.

16         THE CLERK:  Raise your right hand.

17          ALASTAIR SMITH, DEFENDANT'S WITNESS, SWORN

18         THE WITNESS:  I do.

19         THE CLERK:  Please have a seat.  Sir, if you would

20    first adjust to that microphone.  State your name and then spell

21    your name for the record.

22         THE WITNESS:  Alastair Smith.  A-L-A-S-T-A-I-R.  Last

23    name Smith, S-M-I-T-H.

24         THE CLERK:  Thank you.  Counsel.

25         DIRECT EXAMINATION

1    BY MR. POTTER:

2    Q     Thank you.  Mr. Smith, are you employed?

3    A     Yeah.

4    Q     By whom are you employed?

5    A     City of Baltimore, Department of Housing and Community

6    Development.

7    Q     What is your position with the Department of Housing and

8    Community Development?

9    A     Senior Development Manager.

10   Q     And what do you do as a Senior Development Manager?

11   A     I manage redevelopment projects on behalf of the City and

12   the Housing Authority of Baltimore City.

13   Q     Did you have any role with regard to the Poppleton project?

14   A     I did.  I was the project manager.

15   Q     Now, has the, has the Poppleton project, how is that

16   supposed to close?  What is the order in which it's supposed to

17   close?

18   A     There are two conditions precedent to closing.  One is that

19   the developer commits to comply with the minority business

20   enterprise requirements for the City.  The other is to

21   demonstrate that they have financial commitments to construct the

22   improvements.

23           Prior to that, the City was to give the developer

24   notice that it acquired the properties in the designated Phase I

25   site in the agreement.  Once we had the properties, we are to

1    send them a notice.  The developer then had 18 months to show the

2    financing commitments, to construct the improvements, and at

3    which point the City would convey the properties in Phase I to

4    the developer.

5    Q    Has the developer satisfied those conditions precedent?

6    A    It has not satisfied the evidence of financing commitments.

7    Q    And what is the current status of that?

8    A    The current status is that we have received letters of

9    interest for financing.  We determined that these were not

10   evidence of financing commitments and we issued a notice of

11   default to the developer, as the time period had passed by which

12   to achieve closing for Phase I.

13   Q    Now, was the City, would the City be able to, had the City

14   acquired the properties when issued notice in July, 2nd of 2010?

15   A    Yes.

16   Q    And would the presence or, presence of unredeemed ground

17   rents prevent the City from doing that?

18   A    No.

19   Q    Why not?

20   A    The City was able to convey good fee-simple marketable title

21   at the time.  So it was able to close at that time.  It was also,

22   per the agreement, notice that the develop, that the City had

23   completed its acquisition and the developer could plan proceed to

24   closing.

25   Q    Now, in terms of, in terms of the condition of the Phase I

1    area, are you familiar with that?

2    A    I am.

3    Q    And is that, is that, is that condition ready for closing?

4    A    Yes.

5    Q    Is there -- is the site fully cleared of all debris and all

6    utilities capped?

7    A    I believe there is some debris, which there's been some

8    dumping that's happened on the site.  I had the debris cleared

9    when it's pointed out.  I understand the debris has reappeared.

10            I have instructed Havco, which is an arm of the City

11   and Housing Authority, to have a construction crew to go out and

12   to clear the site and to work with the City's Department of

13   Public Works possibly to install cameras, continue to monitor the

14   site.

15            We had a conversation with the police officer on site

16   to try and observe if there's further dumping.

17            We're happy to continue to clear debris, but we would

18   be eager to not have that responsibility any more.

19   Q    Is this a continuing problem you face when the developer

20   hasn't gone to closing?

21   A    I think it's a problem with any city-owned property.  You

22   know, the City's responsible for upkeep and it's very difficult

23   to police vacant lots and vacant buildings.

24   Q    Now, I want to direct your attention to Exhibit One, in

25   front of you.  It's the LDDA.  Specifically as to Paragraph 1.7.

1    A    Yes.

2    Q    Do you see that?

3    A    I do.

4    Q    Now, what did the, did you take any actions to assist the

5    developer in obtaining financing to satisfy the condition

6    precedent in 1.7A of LDDA?

7    A    Yes.

8    Q    And what actions did you take?

9    A    Throughout the course of the project, I sent notices to the

10   developer, e-mails, phone conversations, informing them of

11   different financing sources that I have come across that might be

12   helpful.  Procured a $75,000 grant from the Maryland Department

13   of Natural Resources to assist with green design for the project.

14        Also worked with the developer to review Tax Increment

15   Financing, both when the City was pursuing it for its own

16   acquisition to further the project, and then further on when the

17   developer proposed using Tax Increment Financing to finance

18   construction for the project.

19   Q    Now, the agreement provides that -- I'm looking at 1.17 --

20   historic tax credits.  Is that related to, what?  Phase I?

21   A    No.  There's no rehabilitation plan for Phase I of the

22   project.

23   Q    1.17C of the LDDA.  What program does it refer to?

24   A    The Maryland Priority Places.  This was a program put into

25   place during the administration of Governor Ehrlich.  It really

1    kind of designated areas of priority place, of which Poppleton

2    received its designation, and enabled the, with that designation

3    you kind of got extra attention from the state.  So I think we

4    were able, through that designation, to obtain the Department of

5    Natural Resources grant for $75,000.  And the City obtained some

6    Community Legacy Funding for acquisition, I think through that

7    designation.  But that designation, my understanding is it

8    doesn't exist any more under the current governor's

9    administration.

10   Q    1.17E, what, what financing source does that address?

11   A    Other financing.

12   Q    1.17E?

13   A    Yes, E.  Other financing.

14   Q    Is there something -- enterprise zone?  I might have picked

15   the wrong one.

16   A    Enterprise zones are listed as one type of other financing.

17   Q    And does that, is that applicable to this project?

18   A    There have been proposals to change the enterprise zone, but

19   I believe, I believe Poppleton would still fall under the

20   enterprise zone after the changes go into effect.

21   Q    Now, under 1.17A -- yes -- 1.17A, it says that the City will

22   support a designation of the project area as a development

23   district as needed to finance the project for a TIF, is that

24   correct?

25   A    That's correct.

1    Q    Okay.  So what did you do with regard to assisting the

2    developer in obtaining a TIF?

3    A    Well, as I noted, first, the City had looked at a TIF for,

4    you know, several years, to use it to finance acquisition and

5    demolition for the project.  So we had determined that the TIF

6    was extremely expensive and wasn't a feasible tool for the City's

7    purposes.

8         When the developer in, I believe it was January of

9    2011, requested TIF financing for construction improvements, I

10   worked with them.  I did request additional information.  I set

11   up a meeting with Steve Kraus at the Department of Finance, who

12   handles TIF applications to the City's Board of Finance.

13        After letters of, letters of intent were executed with

14   bond counsel for the City and with the City's financial

15   consultant, Muni-Cap, I worked with those entities to help review

16   the financial analysis and to prepare a TIF application.

17   Q    Were there problems with the TIF application?

18   A    There were problems with the TIF application, yes.

19   Q    So what were the, without the specifics, what were the

20   nature, what was the nature of the problems with the TIF

21   application?

22   A    There were some technical issues with the TIF application.

23   Some of the, there's an affordable housing component in the

24   project, and some of the rents didn't match up with that.  We had

25   concerns that the, you know, the purpose of the TIF, the way it

1    works is, if you have a piece of land which is generating

2    currently no property tax revenue to the City, which Phase I was

3    not because it was all owned by the City, that the City can

4    effectively borrow money based on future property tax revenues.

5    The amount of those property tax revenues is based upon the value

6    of the project.

7              So the value is based upon, as we looked at the

8    application, probably the two, two of the most high end, most

9    valuable residential properties in the City.

10             So we had concerns that those were not good comparables

11   for the amount of tax revenue that the project would be able to

12   generate.

13             Let's see.  We also had some concern whether the -- and

14   this was a point of debate for the whole five months or so we're

15   preparing the application -- whether or not the proposed uses

16   were going to, in the end, be eligible uses.  The developer

17   proposed using the TIF proceeds to finance a parking garage, and

18   also, so they would end up with a publicly financed parking

19   garage, which they said they also needed to keep the revenues

20   generated by the parking garage.

21             This was not allowable under the City's TIF process, to

22   both build a garage and let them keep the revenues from it.

23             So the proposed uses were for infrastructure.  You

24   know, received proposed infrastructure costs about a week or so

25   before the TIF application was due.  And the amount of

1    infrastructure costs that were deemed eligible went from two or

2    three million to be about ten million dollars.

3         So we had concern that some of the uses proposed for

4    infrastructure were not going to be allowable uses.

5    Q    When would -- well, if you recommended it, when would this

6    become an issue, this problem with the proposed use?  Who would

7    decide what's acceptable use and not an acceptable use?

8    A    This would be determined by bond counsel employed, or under

9    contract to the City.

10   Q    Now, notwithstanding all these problems, did you assist the

11   developer in trying to pursue this financing source?

12   A    Yes.  I pursued and assisted them to every extent possible,

13   leading up to when the application was submitted, the final

14   application was submitted to review by the Housing Department.

15   Q    And what was the amount of the financing that was proposed

16   for the TIF?

17   A    For the TIF for Phase IA, it was to be, I believe, 8.9

18   million dollars.

19   Q    Now, are there, between 2010 and 2012, have there been any

20   projects near, physically near the Poppleton area that have

21   actually been financed and gone to closing?

22   A    Yes.  There's a project directly across the street, on the

23   east side of Amity Street.  That would be the Poppleton Co-op

24   Redevelopment.

25   Q    How many units is that?

1    A    That's 111 units.

2    Q    And did they go to construction?

3    A    Yes.  They began construction, I believe it was in October

4    of 2010.

5    Q    And has it been completed?

6    A    Yes.  I believe Certificates of Occupancy were all issued by

7    February of 2012.

8    Q    Now, with regard to the, in terms of your responsibilities,

9    do you work with the Request For Proposals?

10   A    Yes.

11   Q    And so if -- how long does it take for a development of this

12   nature, how long does it take to prepare a Request For Proposal?

13   A    It takes usually two to three months to draft it, circulate

14   it for comment, get it ready, get the exhibits ready, and

15   possibly place an ad in, usually do, place an ad in the paper and

16   publicize it.

17        MR. FAX:  Your Honor, objection.  I don't see the

18   relevance of this testimony.

19        THE COURT:  Yeah.  How much longer are we going to go

20   with this, Mr. Potter.  We have a lot more, we have a lot of

21   ground to cover, and I'm still waiting for Mr. Engel.  I assume

22   Mr. Engel's testifying, correct?

23        MR. POTTER:  Yes.

24        THE COURT:  All right.  Well, I think he's going to be

25   lengthy, so we need to move on here.

1    BY MR. POTTER:

2    Q    Well, Mr. Smith, from the beginning of preparing the RFP

3    till when the, till the City awards a new developer the

4    opportunity to redevelop the Poppleton area, how long a time

5    period would that be?

6              MR. FAX:  Objection, Your Honor.  I mean, there's no --

7              THE COURT:  I don't know how this witness -- he's no

8    more qualified than you are as to opine as to that, Mr. Potter.

9              MR. POTTER:  Well, he is the person that prepares them.

10             THE COURT:  I understand.  But this is really getting

11   speculative.  This is not helpful to me at all in terms of the

12   address, the issues I'm trying to address here today.

13             MR. POTTER:  Nothing further, Your Honor.

14             THE COURT:  Thank you.  We got to move on here.

15             MR. FAX:  No questions.

16             THE COURT:  Thank you very much, Mr. Smith.  You may

17   step down.  Don't discuss your testimony with anyone in the

18   event, unlikely event you are called back to the witness stand

19   before the hearing is over.  Thank you very much.

20             All right.  Next witness, Mr. Potter?

21             MR. POTTER:  The next witness is Peter Engel.

22             THE COURT:  Is this the last witness for the City?

23             MR. POTTER:  Yes, it is.

24             MR. FAX:  Your Honor, I think we will put on a little

25   bit of a rebuttal case.

1          THE COURT:  All right.

2          MR. FAX:  After, if we could take a break after.

3          THE COURT:  When you say "little", how many witnesses

4    are you anticipating?

5          MR. FAX:  No more than two.  I know I need Ms. Zoller,

6    who's here.  I'm going to have to speak with my client to see

7    whether there are any issues that he --

8          THE COURT:  All right.  I think we'll just probably

9    hear from Mr. Engel and then we'll hear from Ms. Zoller.

10         MR. FAX:  Okay.

11         THE COURT:  Thank you.  Swear the witness, please.

12            PETER ENGEL, DEFENDANT'S WITNESS, SWORN

13         THE WITNESS:  I do.

14         THE CLERK:  Please be seated.  If you would, sir, state

15   your name and then spell your name for the record.

16         THE WITNESS:  My name is Peter Engel.  P-E-T-E-R.

17   E-N-G-E-L.

18         THE CLERK:  Thank you.  Counsel.

19         DIRECT EXAMINATION

20   BY MR. POTTER:

21   Q    Thank you.  Sir, are you employed?

22   A    Yes, I am.

23   Q    By whom are you employed?

24   A    The Baltimore Department of Housing and Community

25   Development, and the Housing Authority of Baltimore City.

1    Q    And what is your title?

2    A    I'm a Deputy Commissioner For Project Finance and

3    Development.

4    Q    Now, as a Deputy Commissioner, were you involved in the

5    Poppleton redevelopment?

6    A    I have been.

7    Q    What is the nature of your involvement?

8    A    Mr. Smith reports to me, so I've been involved as he has

9    been processing the project.  I've been involved with some of the

10   financing elements, and many of the other pieces of the

11   development.

12   Q    Now, could the City convey good marketable insurable title

13   to the developer of all Phase I properties as of July 2nd, 2010?

14   A    I believe it could.

15   Q    Why?

16   A    The City acquired all the title, with the exception of some

17   ground leases, which were being redeemed.  And i believe that

18   could have been insured.

19   Q    What do you mean insured?

20   A    You could have received title insurance covering the title,

21   literally to have conveyed those properties for all purposes

22   necessary for development.

23   Q    Well, as a practical matter, we've not gone to closing.  But

24   do, have all the ground rents been redeemed?

25   A    Yes, they have.

1    Q    Okay.  Now, as part of your duties, did you assist the

2    developer in its attempts to obtain financing for this project?

3    A    Yes.

4    Q    How did you attempt to assist the developer?

5    A    We met with the developer in 2009, when there was still a

6    large gap on the project, and referred them to various ways of

7    trying to fill that gap, sources that could be used.

8         I spoke with HUD directly, with the Baltimore HUD

9    Office, and asked them, informed them we didn't think that our

10   Poe Homes public housing development near the site should be a

11   problem.  That was a stable project, a good project, and

12   shouldn't playing a factor with any issues in the market.

13        We assisted them by taking applications which really

14   were not in any financeable shape and giving them advice on how

15   to make them financeable.

16        Often when you're working with developers, a lot of

17   this is about getting the money through various specialized

18   sources.  Some developers are better than others at putting those

19   pieces together.

20        One of the jobs we do all the time is taking those

21   applications and providing advice on those so that they can be

22   improved and actually made to be acceptable.

23   Q    Now, what kind of financing did the developer intend to get

24   initially, if you know?

25   A    Well, I believe the initial financing was intended to be all

1    private debt and equity.

2    Q     And did that change?

3    A     In the TIF application, the vast majority of the financing

4    was all public sources.  Through the Maryland Department of

5    Housing, the bulk of the financing was a tax exempt bond loan.

6    They're also looking for low income housing tax credits, a

7    complex federal program, which goes with the bond financing.

8    They were applying for new markets tax credits, a second federal

9    tax credit, which has issues of working together with a low

10   income credit.  You need to separate the project into phases or

11   parts to use that.

12              There was the TIF financing, other government source.

13              There was a small portion of equity, private equity,

14   which was unspecified how that could be repaid because on most

15   affordable projects, projects that use bonds and tax credits,

16   there's no funding to repay the equity.  It was possible that

17   that was intended to come from the commercial sources, but it was

18   never specified.

19   Q     Now, what was the total amount of the Phase I transaction,

20   Phase I financing?

21   A     It varied.  But it was around 75 million dollars.

22   Q     Is that Phase 1-A?

23   A     Phase 1-A.  Yes.  I'm sorry.  Phase I was about 135 million

24   dollars.

25   Q     So what, what was the sum total of all these, well, all

1    these different types of public financing that you're mentioning?

2    A    Well, the pieces we saw that had any backing to them were

3    for Phase IA. And if you put them all together, I believe they

4    were 75 million dollars, although it was inconsistent and hard to

5    tell the credit enhancement letter, which is what you need to go

6    for the bond funding, was for a lesser amount than the loan

7    amount that was in the TIF application. So the deal hadn't been

8    cooked. These numbers hadn't been settled in a way that really

9    could let you see that all the pieces were in place for

10   financing.

11   Q    And what is the problem with using new market tax credits,

12   low income tax credits, and NEDs all in the same project?

13   A    Well, particularly the new markets credits, they

14   specifically say they cannot be used with low income housing tax

15   credits, they can't be used with rental housing. So I'm assuming

16   they were going to be used for the commercial portion.

17        But we had asked for the developer for how they were

18   separating the project and the different ownership entities, how

19   this would all work. And we've never received any answers to

20   that.

21        The NEDs funding is a relatively small part of it.

22   That's more city funding that would have gone into the project

23   for a particular unit serving non-elderly disabled residents.

24   Once, when they applied for the tax credit piece of it, the NEDs

25   units were required under our tax credit support, and so they

1    couldn't have gotten funding for that.  And that would have had

2    to come back out.

3    Q    So is it fair to say you never had a final package?

4    A    Yes.

5    Q    Now, with regard to the attempted HUD financing, did you, in

6    fact, attend a meeting?

7    A    Yes.

8    Q    And what do you recall about the meeting?

9    A    There was a lot of discussion about the project.  I do not,

10   I was never informed that the meeting was, the intent of the

11   meeting was to show City support to HUD for the development.  I

12   believed we were there to discuss the project.  And when you're

13   discussing a project, you need to raise the issues that any

14   lender would look at for a project, flesh those out, explain how

15   and why they might be ameliorated and how risk would be reduced,

16   and solve those problems.

17           I don't know of a lender who would just say, Well, the

18   City supports it so we'll fund it regardless of issues.

19   Q    Now, did you ever express any support for the project to

20   HUD?

21   A    Yes.  As I mentioned, I called Mary Ann Henderson, who was

22   the, one of the multifamily supervisors at the HUD Baltimore

23   Field Office, and told her directly that we didn't think the

24   market should be impacted by our other developments in the area,

25   and that, you know, that should not be a concern for the project.

1   Q    Now, there's been testimony with regard to the condition of

2   the TIF application.  What problems did you find with the TIF

3   application?

4   A    There were a large number of issues, starting with the

5   developer's experience.  The developer showed no experience with

6   the types of financing that the project had become, all these

7   government sources.  The state loan hadn't been applied for and

8   the credit enhancement wasn't in place of any sort, so you

9   couldn't actually get the state loan with what we've seen.

10        As I mentioned, the NEDs funding, a piece of the

11   funding was no longer eligible.

12        The rents were too high, were above allowable levels

13   for the affordable units in the range of 300 to 350, as much as

14   400 dollars a month, high for a substantial number of units.

15   That would reduce the rent, which reduces the project income,

16   which means they can't borrow what they intended to borrow.  The

17   loan-to-value ratio is at 95% roughly, which is not an achievable

18   number in the market.  You can't get someone to lend that amount.

19   Again, that was even considered a relatively high valuation.  The

20   comparables were questionable.

21        So that would again impact the amount that could

22   actually be borrowed for the project.

23        So the uses, as Alastair Smith mentioned, the uses of

24   TIF funds were in question.  While it was possible you could

25   qualify that much, we needed a lot more data to indicate that

1    really is a feasible use.

2              The developer's fee was listed as six and a half

3    million or more.  The State only allows a two and a half million

4    dollar developer fee.  There were, I think, probably additional

5    issues as well.  I outlined all of this in a memo to the

6    developer.

7    Q    Well, do you see this as an effort to not support the

8    developer's application?

9    A    No.  This is, I think, a fairly standard process, although

10   most applications are in better shape.  But you need to, any time

11   somebody submits an application, almost always there's some

12   issues that get raised and have to be discussed and clarified.

13   And part of the process is going back and forth, saying, all

14   right, here are problems, what we're trying to do, how do we fix

15   those?  And we have not received any response to the problems

16   with the TIF application.  The developers never actually applied

17   for a loan with the state.

18   Q    So getting back to that last point.  You said that, where do

19   the new market tax credits, where do they come from?

20   A    New markets credits are allocated to something called

21   community development finance institutions.  And then they agree

22   to put those into projects.  They compete for a program to get

23   those and then they actually supply those to projects.

24   Q    Does the developer have any?

25   A    I believe the developer's letter on the new markets credits

1    was contingent upon them finding the new markets credits.

2    Q    And where does the low income housing tax credits come from?

3    A    The low income housing tax credits in this case are

4    allocated as part of the bond financing.  So if they had

5    successfully received a letter from the State for bond financing,

6    they probably would have received a letter as well that would

7    allocate or reserve the low income housing tax credits.

8    Q    So if the developer had gone to the CDA for bond financing,

9    they would have gotten the low income housing tax credits as

10   well?

11   A    If they -- that's part of the same application, typically.

12   So they would have applied and processed both of those together.

13           MR. FAX:  Your Honor, I think this is going pretty far

14   afield.

15           THE COURT:  Well, I think we're about to move on.

16   BY MR. POTTER:

17   Q    Okay.  Yes, Your Honor.  Now, do you, do you believe that

18   the City was required to clear 906 West Saratoga Street, as

19   described by the plaintiff's counsel, at the time?

20           MR. FAX:  Objection, Your Honor.

21           THE COURT:  This is legal argument at this point.

22           MR. POTTER:  That's fine.

23           THE COURT:  You can argue this, Mr. Potter.  But don't

24   ask the witness what his opinion on it is.

25           MR. POTTER:  Court's indulgence.

1          (Pause.)

2     BY MR. POTTER:

3     Q    Mr. Engel, in all your discussions with the developer, did

4     they, did Mr. Bythewood or anyone else, did they ever tell you

5     that the presence of unredeemed ground rents had hindered their

6     ability to obtain financing?

7     A    No.

8     Q    And when was the first time that you ever became aware that

9     there were unredeemed ground rents and that had become an issue?

10    A    The first time I knew they raised it as an issue was in

11    their complaint.

12    Q    And were the ground rents redeemed by that time?

13    A    Yes.

14    Q    Nothing further.

15         THE COURT:  Thank you.  Mr. Fax.

16         CROSS EXAMINATION

17    BY MR. FAX:

18    Q    Just very few questions, Your Honor.  Am I correct, Mr.

19    Engel, that you were not involved in the negotiation of the LDDA?

20    A    Yes.

21    Q    I'm correct?

22    A    Yes.

23    Q    Okay.  So no further questions, Your Honor.

24         THE COURT:  Thank you very much, Mr. Engel.  You may

25    step down.  You may be continuing to act as a representative of

1    the City for purposes of the hearing.  You may sit back at trial

2    table.  Thank you.

3              All right.  Any other witnesses, Mr. Potter?

4              MR. POTTER:  No, Your Honor.

5              THE COURT:  All right.  Any rebuttal witnesses you want

6    to call?

7              MR. FAX:  May I have a moment?

8              THE COURT:  Sure.

9              (Pause.)

10             MR. FAX:  Your Honor, I call Danielle Zoller.

11             THE COURT:  Okay.

12             MR. FAX:  In rebuttal.  I'll be very brief with her.

13   One or two questions.

14             THE COURT:  All right.  Mr. Livingston, you're about to

15   get exercise, because if you go right out to the stairway door,

16   you go straight down, and the third floor conference room is

17   right below this courtroom.  You don't need to walk up the steps.

18   You catch the elevator up.  But you quickly go down, literally

19   right below this courtroom.

20             MR. FAX:  Is the Court disposed to entertain oral

21   argument?

22             THE COURT:  Yes.

23             MR. FAX:  You want to hear oral argument?

24             THE COURT:  Yeah.  I want to hear oral argument.  And

25   I'm going to make a ruling today.

 1              MR. FAX:  Okay.

 2              (Pause.

 3              MR. LIVINGSTON:  Couldn't find her.

 4              THE COURT:  I'm sorry?

 5              MR. LIVINGSTON:  I tried to.

 6              (Pause.)

 7              THE COURT:  We'll take a brief recess right now, then,

 8   and be ready to briefly -- the longer we wait, the briefer the

 9   testimony will be.

10              MR. FAX:  Here she is.  I just have very few questions.

11              THE CLERK:  Do you want her resworn?

12              THE COURT:  Yes.

13              DANIELLE ZOLLER, PLAINTIFF'S WITNESS, SWORN.

14              THE WITNESS:  I do.

15              THE CLERK:  Please be seated.  And if you would, state

16   your name and then spell your name once more for the record.

17              THE WITNESS:  Danielle Stager Zoller, D-A-N-I-E-L-L-E.

18   S-T-A-G-E-R.  Z-O-L-L-E-R.

19              THE CLERK:  Thank you.

20              DIRECT EXAMINATION

21   BY MR. FAX:

22   Q    Counsel.  Thank you.  Ms. Zoller, I want to direct your

23   attention to Section 1.10 of the LDDA, on Page 4, it's Conditions

24   of Title.

25   A    Yes.

1    Q    You see it says, At the time of closing, the City shall

2    convey to the developer or its designee, by special warranty

3    deed, good and marketable, insurable title, etc.?

4    A    Yes.

5    Q    In your real estate discipline, does the term "special

6    warranty deed" have a particular meaning?

7    A    Yes, it does.

8    Q    What does it mean?

9    A    It's a deed for a fee simple title in which the granter

10   makes a special warranty against claims by the granter or anybody

11   under the granter.

12   Q    So if there is a ground lease that remains when title is

13   conveyed, can that title be conveyed by special warranty deed?

14   A    No, not in my opinion.

15   Q    Okay.  No further questions, Your Honor.

16           THE COURT:  Mr. Potter.

17           MR. POTTER:  No, Your Honor.  No questions.

18           THE COURT:  Thank you, Ms. Zoller.  Thank you very

19   much.  You are excused now.

20           THE WITNESS:  Thank you very much.

21           THE COURT:  May Ms. Zoller remain in the courtroom?

22           MR. FAX:  Yes.

23           THE COURT:  Ms. Zoller, you may remain in the

24   courtroom.

25           MR. FAX:  You don't have to.  Unless the Court orders

1    you.

2            THE COURT:  No.  No.  All right.  Mr. Fax, be glad to

3    hear from you, and then I'll hear from the City.

4            It seems to me that this entire matter can be held in

5    the context of whether or not I grant a preliminary injunction,

6    in that it would certainly seem to me that, based upon the

7    presentations here on June the 28th and then most of the day

8    today, that be the issue revolves around a clear demonstration of

9    likely success on the merits of trial, the first of four

10   criteria.

11           I don't think there's any question about irreparable

12   harm to the plaintiff if, if injunctive relief is not granted.

13   And I don't think there's any question about the balance of

14   equities.

15           If you want to be heard on that, Mr. Potter.  I think,

16   really, the whole focus is the matter of the likelihood of

17   success on the merits.  Is that correct, from the point of view

18   of the City?

19           MR. POTTER:  I have a slightly different gloss on it,

20   Your Honor.

21           THE COURT:  All right.  Well, I'll be glad to hear from

22   you if you want.  I guess what I'm trying to do is focus and

23   crystallize.

24           As far as I'm concerned, I'm prepared to rule on this

25   in the context of a preliminary injunction motion.  We'll deal

1    with the first four items.

2            In terms of balancing the public interests and

3    balancing of the equities and irreparable harm, I'll be glad to

4    hear from you, Mr. Potter, if your view is is that balancing the

5    equities favors the City over the private developer and if the

6    public interest favors the City.

7            In light of the fact Mr. Fax doesn't yield on this

8    point, we're going to have to take time on it.  Okay?

9            The City has agreed I should deal with this in the

10   context of a preliminary injunction, but Mr. Fax has not agreed

11   to that.  Let's go ahead with these other three items, Mr. Fax.

12   Make argument, and then the City will respond.  And we'll deal

13   with that and we'll get to the main argument here.

14           So go ahead with these other three items.  Go ahead.

15           MR. FAX:  Your Honor, if I may.  On the other three

16   items, I'm simply saying that, if necessary, I would put on

17   testimony to support the, the verified complaint --

18           THE COURT:  I understand.

19           MR. FAX:  -- that we put in on the issue of irreparable

20   injury and balancing of the equities and public interest.  I

21   think that those issues are a slam dunk.

22           THE COURT:  All right.  Let me hear from Mr. Potter on

23   these other two.  Then we'll get to the matter of the likelihood

24   of success on the merits or not.

25           First of all, essentially, under Rule 65, in terms of

1    the legal standard for preliminary injunction, we are, as you all

2    are well aware, we're under the world now of the new standards

3    set by the Supreme Court in Winter v. Natural Resources Defense

4    Council, 555 U.S. 7, 2008, and then the Fourth Circuit opinion in

5    Real Truth About Obama v. The FTC, 575 F.3d 342, Fourth Circuit,

6    2009.  That was vacated by the Supreme Court in 2010 and

7    reinstated in part for other reasons.

8         But in terms of the standards for injunctive relief,

9    they're well defined.  And the standards are higher for plaintiff

10   than they were in the era of the earlier standards under the

11   Blackwelder, Blackwelder Furniture Company, which was litmus test

12   law here in this circuit, 550 F.2d. 189, Fourth Circuit opinion,

13   1977.  Essentially, up until 2009, that was pretty much the

14   litmus test.  But definitely, the burden is higher now upon a

15   plaintiff.

16        But, first, the plaintiff must make a clear

17   demonstration of likely success on the merits at trial.  And this

18   places a higher burden on the plaintiff than the Blackwelder

19   requirement, that the plaintiff show only a grave or serious

20   question for litigation.

21        Secondly, the plaintiff must make a clear showing that

22   it is likely to be irreparably harmed absent preliminary relief.

23   Again, more is required of plaintiff.  Blackwelder previously

24   only required the Court to balance the irreparable harm to the

25   respective parties, just required the harm to outweigh the, the

1    plaintiff to outweigh the harm to the defendant.

2           There's a higher standard now, a clear showing that it

3    would be irreparably harmed.

4           Third, the Court must consider the balance of equities.

5    In each case, the courts must balance the competing claims of

6    injury and must consider the effect on each party of the granting

7    or withholding of the requested relief.  That's language from the

8    Supreme Court in the <u>Winter</u> case.

9           Fourth and finally, the Court must evaluate whether

10   granting an injunction is in the overall public interest.  Unlike

11   the preliminary injunction analysis under <u>Blackwelder</u> that did

12   not consider the public interest requirement in depth, the <u>Winter</u>

13   case does emphasize, the Supreme Court has emphasized, the public

14   interest requirement.

15          And unlike <u>Blackwelder</u>, that allowed requirements to be

16   conditionally redefined, each of the four <u>Winter</u> elements must be

17   satisfied here for me to grant injunctive relief as to the, as

18   requested by the plaintiff.

19          So let me, before we get to the matter of likelihood of

20   success on the merits of the case, let me just hear, if I can,

21   the matter of those second, third and fourth criteria, Mr.

22   Potter.

23          MR. POTTER:  Thank you, Your Honor.  The plaintiff has

24   advanced a few types of harm that he says is irreparable harm.

25   One is money.  And money does not generally qualify as

1    irreparable harm.

2              Secondly, the plaintiff also identified --

3              THE COURT:  How else is one to be harmed?

4              MR. POTTER:  Pardon?

5              THE COURT:  How else is one to be harmed in the context

6    of a business dispute?

7              MR. POTTER:  Your Honor, I guess the, in terms of a

8    business dispute, the other harm in this case is the loss of the

9    deal opportunity.  But, and the plaintiff has identified, you

10   know, future revenues when completed, contractors and

11   subcontractors losing jobs, reputational damages.  All those

12   things are remote and speculative.

13             THE COURT:  We're really talking about money here, are

14   we not?  I mean, in terms of irreparable harm, it's a matter of

15   the potential financial loss to the plaintiff, correct?

16             MR. POTTER:  Well, yes.

17             THE COURT:  And also, also, costs have already been

18   expended.

19             MR. POTTER:  Yes, costs expended.  Costs expended.

20   But, typically, money is something that can be recovered at law.

21   So that's why it isn't something that you would get an injunction

22   for over money.

23             THE COURT:  What about the balancing the equities?  The

24   third criteria?

25             MR. POTTER:  Yes, Your Honor.  Well, without the

1    termination of --well,  without, if the judgment is not granted

2    and the City terminates the contract, unless the City terminates

3    the contract, it cannot engage in any conversations with

4    interested parties, other stakeholders.  It's our position it is

5    not legal for us to talk to anyone else because the plaintiff

6    still has an exclusive right.  We can't begin the process of

7    preparing an RFP, submitting the RFP to other, to other potential

8    developers.

9               And as Mr. Smith was trying to explain --

10              THE COURT:  You're representing to the Court, as an

11   officer of the court, that the City fully intends to do that?

12              MR. POTTER:  Terminate the contract?

13              THE COURT:  No.  It fully intends to proceed?  I've

14   heard testimony and proffers from your side of the aisle with

15   respect to the questions as to the viability and questions about

16   the nature of the development.  But you're representing that the

17   City fully intends to continue with the development at Poppleton,

18   correct?

19              MR. POTTER:  Well, Your Honor, the answer is yes.  You

20   know, the precise nature of the type of development it will be, I

21   can't say.

22              THE COURT:  I'm asking you as an officer of the court,

23   we're balancing equities.

24              MR. POTTER:  Yes.

25              THE COURT:  And you're implying, you're representing

1    that the City fully intends to proceed and submit Requests For

2    Proposals and intends to go forward.

3              MR. POTTER:  Definitely, yes.  Definitely.

4              THE COURT:  Has there been any evidence to that effect

5    presented to me?

6              MR. POTTER:  I was trying to get, from Mr. Smith, that

7    that's what we were doing.  But as an officer of the court, I can

8    tell you that's what we intend to do.  We have over 10 million

9    dollars invested in acquiring all the parcels and acquiring, and

10   putting it together.

11             THE COURT:  All right.

12             MR. POTTER:  But, essentially, and I think that Mr.

13   Engel may have testified to that.

14             But more to the point, if there's an injunction, the

15   City cannot go forward.  And the City will be delayed as long as

16   the injunction is in place, from, you know, beginning this

17   process of finding a developer that can obtain financing.

18             Contrary, if the injunction is denied and the plaintiff

19   is, and plaintiff were successful in this case down the road,

20   then the plaintiff could be reinstated in the contract, if the

21   City were wrong in terms of its termination.

22             So, on the one hand, the City is damaged immediately

23   with delay.  And on the other hand, the plaintiff is not damaged

24   by delay as long as there's not a new developer.  But until such

25   time as a new developer is awarded the job, the plaintiff can be

1    reinstated.  And that's why there's a question of, you know, the

2    equities, in terms of who's going to be damaged more or less by

3    the grant or non-grant of the injunction.

4         With regard to the public consequences, as I said, the

5    City's invested 10 million dollars.  Acquisition, demolition of

6    the, at least the Phase I set of buildings, and a great part of

7    Phase IV.  As well there's been environmental remediation.  We've

8    cleared sites.  Yes, there's debris that will need to be removed

9    prior to any closing, and, as Mr. Smith said, incurs costs for

10   the upkeep of the land, for repeatingly clearing dumping that

11   occurs.

12        Lastly, importantly, the presence of the vacant lots

13   caused urban blight.  We have undeveloped land, uncertain future

14   for adjacent communities.  There are adjacent communities,

15   including Poe Homes --

16        THE COURT:  How quick will the future be -- on the

17   matter of balancing public interests, Mr. Potter, how quick will

18   the turn-around of that community be if we start back at square

19   one again with another developer?

20        MR. POTTER:  Well, we are nowhere this developer.

21        THE COURT:  I beg your pardon?

22        MR. POTTER:  A number of years.

23        THE COURT:  I beg your pardon?  You are nowhere with

24   this developer?

25        MR. POTTER:  We're nowhere with this developer.  They

1  have no financing.

2          THE COURT:  They don't have any financing yet.

3          MR. POTTER:  Well, right.  And it's been a number of

4  years.  They don't have any financing so we don't have any

5  closing.  Even if they were to have the state bonds, it would

6  still take another six to nine months for them to process.  But

7  there hasn't even been an application.

8          THE COURT:  Are you seriously representing that if we

9  go back to square one, you're representing to this Court, if we

10  go back to square one, it's in the interest of the public to go

11  back to square one, where you were in 2006?

12          MR. POTTER:  We would not be where we were in 2006.

13          THE COURT:  But 2006 was the date of this contract, was

14  it not?

15          MR. POTTER:  Yes.  But we've cleared all the properties

16  and resolved all the litigation for these parcels since that

17  period.

18          THE COURT:  So I gather, as an officer of the court

19  here in this public forum, you're not only guaranteeing,

20  guaranteeing as an officer of the court, representing to this

21  Court that the City fully intends to go forward with the

22  development, you're also representing as an officer of this court

23  that the City intends to do so with all due speed, is that

24  correct?

25          I'm laying a lot on you right now, I know, Mr. Potter,

1    because you're the one that's representing the City.

2              MR. POTTER:  Yes, actually, yes, Your Honor.  We intend

3    to move forward with all due speed.  Yes.

4              THE COURT:  Hasn't been any testimony as to that before

5    me, either.

6              MR. POTTER:  That's correct.

7              THE COURT:  That's what you're representing to me --

8              MR. POTTER:  Yes.

9              THE COURT:  -- as an officer of the court, in good

10   faith, I can't bind the city government as to whether or not it

11   does so, but at least you, as a lawyer, are placed in a position

12   of guaranteeing that.

13             So you're representing that the interest of the public

14   is better served by stopping everything now and going back to a

15   new developer.  That's the legal position you're taking?

16             MR. POTTER:  Yes.

17             THE COURT:  Why don't we move on, let's move on to the

18   really meat of the matter with respect to the matter of the

19   likelihood of success on the merits.  With that, Mr. Fax, I'll be

20   glad to hear from you.  Let's zero in on the crucial one of the

21   four factors.

22             MR. FAX:  Your Honor, I think the first thing to note

23   is that the facts upon which we rely are not seriously disputed

24   by the defendants in this action.  Namely, the failure of the

25   City to acquire five properties in fee simple prior to their

1    declaration on July 2nd, 2010, that they had acquired those

2    properties, and all the other properties in Phase I, and,

3    therefore, the developer had 18 months from that date in which to

4    close on the properties.

5            Now, the legal significance of the terms, the meaning

6    and so forth, I will get into in a minute.  But in terms of the

7    facts that those five properties had not been acquired in fee

8    simple as of that date, there was no testimony disputing that.

9    And, indeed, there could not be any because the records, the

10   City's own Land Records reflect the failure of the City to

11   acquire those properties in fee simple prior to July 2nd, 2010.

12           The second key fact is that there is no dispute on the

13   record regarding the failure of the City to acquire two

14   properties in Block 157, not only prior to July 2nd, 2010, but,

15   in fact, up to today.  And there was no evidence to contradict

16   Ms. Zoller's testimony or the documents that we introduced

17   through her to establish that.

18           And further, there was nothing to contradict her

19   testimony and the documentary record that there are four

20   properties on Block 157 that, as of today, which is well after,

21   certainly well after July 2nd, 2010, but it's as importantly, if

22   not more importantly, after July 2nd, 2012, which is the drop

23   dead date, the default date if we did not close, there was no

24   dispute that there were four properties in Block 157 that have

25   not been removed and have not been cleared.

1        Likewise, there's no dispute that the utilities and

2   debris that are scattered throughout Phase I and Phase IA, they

3   have not been resolved and cleared, not only as of July 2nd,

4   2012, but as of last night.  And unless magically it happened

5   today, I think it's safe to say that that is the status quo

6   today.

7        So those are the basic facts upon which we rely with

8   respect to our argument that the City, in making the

9   representation in its letter of July 2nd, 2010, that the

10  properties had been acquired, that, in fact, that was a

11  misrepresentation.  And, therefore, that letter was not effective

12  to trigger the 18 months within which we must close on the

13  properties.  And to this day, the City has not issued the

14  requisite letter, the 18 months letter, if you will, that says,

15  okay, now we've got it right, now we have closed on, now we have

16  acquired all of these properties in accordance with the

17  requirement of the, the agreement, and you have 18 months from

18  this day.

19       So our view is, we never get to the issue of the

20  adequacy or inadequacy of financing on the part of the developer

21  as a condition precedent to closing because the obligation was

22  never vested upon us within that 18 month period, because the

23  letter that triggered the obligation was a miss, was inaccurate,

24  was wrong, was nugatory, had no effect.  And, therefore, when the

25  City declared a default, it was in violation of the agreement, in

1    breach of the agreement, and the default itself, the declaration

2    of default is of no effect.

3         That is, those are the facts upon which we rely for

4    that position.  And we derive our understanding of the

5    requirements imposed upon the City from the language of the

6    agreement itself.

7         THE COURT:  Does not, should not the Court, in terms of

8    determining likelihood of success on the merits, the first and

9    most important of the criteria I need to address here, Mr. Fax,

10   do I not need to consider the potentiality, whether you can or

11   cannot obtain financing?  I presume, I presume that that is the,

12   the reason.

13        MR. FAX:  I actually, I actually, Your Honor, don't

14   think that we need to, that we reach that.

15        THE COURT:  I'm sure that's why you called Mr. Stern to

16   the witness stand.

17        MR. FAX:  I called him for a number of different

18   reasons.  I wanted to show the Court that, in fact, we do have

19   financing and we're moving forward robustly on that front.

20        THE COURT:  And that was the purpose of Mr. Stern's

21   testimony.

22        MR. FAX:  Correct.  Correct.

23        THE COURT:  All right.

24        MR. FAX:  But I am saying, as a legal matter, I do not

25   believe, in the first instance, that we were obligated as of July

1    2nd, 2012, to have adequate financing.  I think, and moreover,

2    whether we did or did not have adequate financing as of that

3    date, and I submit we were not required to because the trigger

4    letter of 18 months was invalid, on the basis of Mr. Stern's

5    testimony, I suggest to the Court that we have been moving

6    forward; that Mr. Stern is obviously a serious, major player, has

7    contacts not only in the real estate community and in the retail

8    community through his own family and others, including major

9    anchor tenants, but also in the equity community.  And he is a

10   co-developer of this project.

11          So harkening back to the Court's colloquy with opposing

12   counsel regarding where this project would be or where it is,

13   say, tomorrow, my response to the Court is, we are well ahead of

14   the curve in that regard.

15          THE COURT:  Just as the Court leaped on Mr. Potter,

16   make sure he understands the significance of his representations

17   to this court in the light of public interest to the City of

18   Baltimore --

19          MR. FAX:  Yes.

20          THE COURT:  -- I probably should lean on you as well,

21   Mr. Fax.  I'm accepting the fact that Mr. Stern has come down

22   here to Baltimore, has testified under oath here before me, and,

23   certainly, I assume that proffer was with respect to the serious

24   financial commitment that's to be made.

25          MR. FAX:  Absolutely.

1          THE COURT:  All right.  And that's a matter of

2    considering the public interest involved here.  And so to the

3    extent that you argue that we shouldn't go back to square one,

4    part of the basis of that is some realistic, honorable

5    presentation that you're pretty far along to getting financing if

6    you're permitted to stay with this contract.

7          MR. FAX:  Correct, Your Honor.  And that was the

8    purpose of his testimony.

9          THE COURT:  I accept it for that reason.  But let's not

10   just fudge over the importance of Mr. Stern's testimony here, the

11   implications of it.

12         MR. FAX:  I could not agree with the Court more.

13         With regard to the legal issues, that is to say, the

14   interpretation of this agreement and the significance of the

15   words "special warranty deed" and "fee simple", the Court will

16   recall that Mr. Burgee, he was not a participant in the

17   negotiations for the agreement.  He's simply reading it after the

18   fact and giving his spin on it, which is all well and good.  But

19   I think it's irrelevant to an understanding of the meeting of the

20   minds at the time that this agreement was negotiated.

21         Ms. Zoller was a party to the negotiations.  She did

22   testify as to the intent of the parties regarding the asterisk on

23   Page 47, to the effect that, whether you call Block 157 part of

24   Phase I or you call it part of Phase IV, it was to be cleared in

25   conjunction, it was to be acquired and cleared in conjunction

1    with the acquisition and clearing of Phase I.  Why?  Because the

2    parties need, agreed that that block needed to be cleared before

3    closing in order to attract investors, lenders, retail, tenants.

4                This is a dangerous part of the City, as the Court

5    observed in our last hearing.

6                THE COURT:  No question.  This court, this court, like

7    all the courtrooms in this building, we're very familiar with

8    West Baltimore, unfortunately far too familiar.  So we've had a

9    lot of testimony here with respect to West Baltimore, I can

10   assure you.  Never in the business context before.  Usually, it's

11   in our criminal context setting.  We have a lot of testimony

12   about West Baltimore.

13               MR. FAX:  I'm sure.  And that is the reason why the

14   parties took that caveat on Page 47 so seriously, because they

15   all recognized, as Ms. Zoller testified, they all recognized that

16   it was essential to the deal that the area be safe.  So that if

17   we are the potential investors, the potential tenants, and we're

18   doing our due diligence and we're down from New York and we're

19   walking around, we don't feel scared for our lives.  That's the

20   point.

21               Since Phase I was the first phase to be developed, and

22   as the Court sees, Block 157 is right there.  It abuts Phase I at

23   the top in the northeast corner.  That was a key part of the

24   agreement.

25               When the City represented, in July of 2010, that it had

1    acquired the properties, and when the City says now that it, you

2    know, acknowledges that it has not acquired those properties in

3    Block 157, I submit --

4              THE COURT:  As of July of 2010 they say they've

5    acquired them.

6              MR. FAX:  No.  They say, they --

7              THE COURT:  I'm sorry.  They acknowledge they have not

8    yet purchased 157.  Yes, that's correct.

9              MR. FAX:  Right.  Two properties on 157 they have not

10   acquired.

11             THE COURT:  Right.

12             MR. FAX:  Four properties they have not cleared.

13             THE COURT:  Right.

14             MR. FAX:  With respect to the remainder of Phase I,

15   five properties were not in fee simple as of July 10.  They are

16   today.  We acknowledge that.

17             But we submit that the, because the condition precedent

18   was not satisfied in that letter, we are not, we were erroneously

19   declared in default.  And the same thing is true for the failure

20   to clear the utility poles.

21             Those utility poles -- it's not that simple.  You don't

22   just go out and take down utility poles.  You've got to deal with

23   the utilities.  You've got to get permits.  It's a complicated

24   matter.  And it requires the City's intervention and time to do

25   it.  And that was their job and they did not do it.

1      So they now seek to shift the burden to us when, in

2 fact, it was their dereliction at the outset.

3      Now, you know, we heard testimony from both Mr. Burgee

4 and Mr. Engel that, you know, title could be conveyed subject to.

5 You know, you could get insurance on it.  And, you know, Mr.

6 Burgee opined that, in his view, "special warranty deed" does not

7 mean without ground rent.  But Ms. Zoller testified on rebuttal

8 that "special warranty deed" is a term of art.  It has meaning to

9 real estate professionals and real estate lawyers, those who

10 negotiated and signed this agreement.  A special warranty deed,

11 she said, is a fee simple deed.

12      Now, all the of the, or actually three of the four

13 witnesses who testified for the defense, by my count, took the

14 position, actually took the position that not only was the City

15 not obligated to clear the ground rents by July 2nd, 2010, but

16 even more so, the City was not obligated to clear the ground

17 rents by closing.  That's their position.

18      And that position finds no sanction, no support in the

19 agreement, in accordance with Ms. Zoller's testimony as someone

20 who negotiated the agreement, and based on her understanding of

21 the interrelationship among the various provisions in the

22 agreement.

23      So we submit that when the Court, when we all step back

24 and look at this problem in three dimensions, what do we have?

25 We have a developer who proceeded in good faith, who relied on

1    the City's representation in July of 2010 to, that the City had

2    obtained title, and sought to obtain financing in the worst

3    economic market since the Great Depression.  And since I was not

4    around in the Great Depression, I am not in position to speak

5    firsthand.  But so I'm told.

6         THE COURT:  I think Mr. Thompson is the only one here

7    who was around for the Great Depression.

8         MR. FAX:  Touche, Your Honor.

9         THE COURT:  Just teasing Mr. Thompson, the Deputy Clerk

10   of Court.

11        MR. FAX:  So we have a developer who attempted to do

12   not only the best that it could, but the best that the market

13   would allow in terms of proceeding.  The developer who was

14   invested in excess of 7.5 million dollars, who had trouble

15   between 2008 and 2011 with regard to financing, as everybody else

16   in the world did, at least in the United States, certainly on

17   East Coast, in accordance with Mr. Stern's testimony, and sought,

18   the developer sought additional government financing in order to

19   compensate for the inability to obtain conventional financing in

20   the amount that the project would otherwise warrant.

21        And we had testimony regarding the developer's efforts

22   and the City's response.  The City was critical of the plan of

23   the program proposed by the developer.

24        Now, the TIF financing is a matter that, where the

25   application, it was to be drafted jointly between the City and

1    the developer.  The City was obligated under the terms of the

2    agreement to support the application for TIF financing.  And you

3    heard testimony from Mr. Bythewood that, to the contrary.  The

4    City did not support the efforts.  The City was critical at every

5    turn, you know, in the 2012 time period.

6           For example, Mr. Bythewood testified that he sought to

7    accomplish the first step in the TIF financing process in

8    January/February of 2011.  And I believe Mr. Smith agreed with

9    that.  He testified in direct examination that, yes, they came to

10   us in January/February of 2011 to seek TIF financing.  But the

11   evidence is clear, because the exhibit is in the record, the TIF

12   letter, the letter of, the LOI, letter of intent, was not

13   executed until almost a year later, notwithstanding the fact that

14   the developer tried to get this thing going a year earlier.

15          So when the City raises questions in April of 2012

16   about the adequacy of the application and shoehorns the developer

17   into an improbable position because they had to get to the Board

18   of Finance by April of 2012 in order to meet the July 2012

19   deadline, the developer was between a rock and a hard place,

20   whereas, had the City responded as it was required to do under

21   the agreement a year earlier, had the City signed the agreement

22   in the first quarter, let's say, of 2011, then there would have

23   been sufficient time to work out any kinks, any problems, any

24   legitimate criticisms of the application.

25          You heard testimony regarding Mr. Engel's behavior at

1    the meeting with HUD.  And I did not hear Mr. Engel, who was in

2    the courtroom for that testimony, I did not hear him dispute

3    that.  I heard him explain it.  He said, Well, I thought this was

4    a meeting where we were supposed to really be honest, you know,

5    and work together and so forth and put our views on the table.

6    Okay.  But the fact is, according to the testimony of Mr.

7    Bythewood, Mr. Engel, representing the City, was undermining the

8    application at every turn.

9          So what do you expect from HUD in response to that?

10   Sure enough, no surprise.  After that meeting, HUD issues a

11   letter saying, Thanks but no thanks.

12          Again, when we put this in the context of the most

13   difficult economic environment since the Great Depression.  And

14   now we look at it in terms of today.  Mr. Stern testified that

15   the market has turned.  After all, Mr. Stern had turned down this

16   deal a year and a half ago, according to his testimony.  But six

17   months ago he said he goes back to Mr. Bythewood and says, Look,

18   I'm interested now because I think we can do this.  I see the

19   market turning.  I am willing to put in, I think he said seven or

20   eight million dollars, six or seven million dollars.  Something

21   like that.  I'm willing to talk to others.

22          He has access capital markets.  He has access to

23   retailers.  His own family brings to the table the big box store

24   component.

25          So the market is turning and we are now in a position

1    where we can actually move forward to perform in accordance with

2    the agreement.

3          If the Court were to grant a preliminary injunction, it

4    would be devastating to Poppleton.  It would be the end of the

5    road.  Not only --

6          THE COURT:  You say if the Court were not to grant?

7          MR. FAX:  Sorry.  Were not to grant the preliminary

8    injunction.  Not only would Poppleton be out of pocket 7.5

9    million dollars, but, as importantly, all of the plaintiff's

10   plans that Poppleton has invested, its reputational interest, the

11   interests of the vendors it would use, the construction

12   companies, all of these people, maybe hundreds of people who are

13   dependent on this going forward for construction and so forth,

14   they would all be out.  And the City would be back, as the Court

15   said, would be back to square one, with issuance over a period of

16   months with another RFP and starting from scratch.

17         If the lawsuit is still pending, what is the likelihood

18   that other lenders, that other developers who are not at the

19   table already, what is the likelihood, given the cloud

20   established by this ongoing litigation, what is the likelihood

21   that they would be so willing to step up to the plate and

22   actually do the, engage them in the sweat and the work necessary

23   to put together a proposal at this time?

24         I think that the, in terms of the future of this

25   project, clearly, in my view, the best, the best, the last best

1    hope at this point is to, is to grant the injunction, which would

2    permit Poppleton to go forward.

3            Contrary to what counsel says, granting the injunction

4    would not freeze frame this problem.  It would free Poppleton to

5    move forward with its friends, with the people it's lined up,

6    with the retail it's lining up, and the equity players.  It would

7    enable Poppleton to move forward.

8            And that is what we seek to do from the Court.  And

9    that is the reason why we come to the Court today and submit that

10   we have satisfied the four criteria for issuance of a preliminary

11   injunction.  And we ask the Court to so order.  Thank you.

12           THE COURT:  Thank you, Mr. Fax.  Mr. Potter.

13           MR. POTTER:  Thank you, Your Honor.  Your Honor --

14           THE COURT:  Hold on just one second.  Mr. Thompson.

15           (Pause.)

16           THE COURT:  Yes.  Mr. Potter, be glad to hear from you.

17           MR. POTTER:  Thank you, Your Honor.  There are a number

18   of points that I'd like to make.  But first, this case is

19   essentially a red herring.  This is a situation in which the

20   plaintiff has challenged the City's letter with regard to notice

21   of acquisition on the basis that there are four or five

22   unredeemed ground rents and that there, somehow that Block 157,

23   not Phase IV, not part of Phase I, not going to be conveyed, is

24   somehow wrapped up in this, and that additional significant

25   property acquisition and clearing activities needed to occur in

1      order to go to closing on Phase I.

2             Now, but the fact of the matter is that by the time

3      anyone ever mentioned anything about ground rents, unredeemed

4      ground rents, they were already redeemed.

5             THE COURT:  Two of them weren't redeemed until May 20th

6      of 2011.

7             MR. POTTER:  Yes.  2011.  That's correct.  Yes.  That's

8      right.

9             THE COURT:  So two of them weren't redeemed at the

10     time -- I think three of them were redeemed somewhat

11     contemporaneous with the July 2010 notice.  But two of them

12     weren't even redeemed until a year later.

13            MR. POTTER:  Yes, Your Honor.  That's right.

14            THE COURT:  Mr. Potter, are any of the people who

15     testified here for you, were are they real estate lawyers?  Were

16     any of your witnesses, you didn't qualify them and I didn't want

17     to, you know, it's not my business to essentially ask, but were

18     any of them real estate lawyers?

19            MR. POTTER:  Mr. Engel is a lawyer and he does real

20     estate.

21            THE COURT:  All right.  Well, then, he's a real estate

22     lawyer.  Because that's important in terms of, it's interesting

23     to hear what everyone's theory is with respect to the legal

24     effect or not of a ground rent.  But it's also important for the

25     Court to apply the law in terms of what the legal significance

1    is.

2         Two the five properties, the ground rent wasn't

3    redeemed in any way, shape or form until May 20th, 2011, 10

4    months after the City sent the notice letter.  That's an

5    undisputed fact, is it not?

6         MR. POTTER:  It is.

7         THE COURT:  And your position is, it's of no legal

8    significance?

9         MR. POTTER:  That's correct.  That's correct.

10        THE COURT:  All right.

11        MR. POTTER:  And the fact of the matter is is that the

12   City would be able to secure insurable title and give insurable

13   title to the plaintiff.  But this is, again, theoretical because

14   by the time any closing were to happen, which hasn't, they're

15   already redeemed.

16        And first, firstly, it wasn't ever raised.  It wasn't,

17   you know, wasn't until the complaint was filed that anyone said

18   anything about any ground rents being unredeemed.  Certainly, if

19   it's an event of default, we would have the opportunity to cure,

20   60 days.

21        THE COURT:  Just so I'm clear on your legal position.

22   Paragraph 1.9 of the Land Disposition and Development

23   Agreement --

24        MR. POTTER:  Yes.

25        THE COURT:  -- referred to as the LDDA, the language

1    there that says closing for the entirety of each phase must occur

2    within 18 months of the City's acquisition of all properties

3    within a given phase, your legal position is is that, that all

4    that property had, in fact, been purchased and conveyed by July

5    of 2010?  Is that right?

6              MR. POTTER:  Our position, as July of 2010 when the

7    notice was issued --

8              THE COURT:  Yeah.

9              MR. POTTER:  -- that we had acquired, either we had

10   acquired all of the properties, but for the five identified

11   unredeemed ground rents, that were redeemed during that time

12   period.  By the time the 18 months had elapsed, and we gave, and

13   we issued, we gave the plaintiff an extension, a

14   four-month extension --

15             THE COURT:  Well, I'm just making sure I understand

16   what your legal position is as to the meaning of the language:

17   Closing for the entirety of each phase must occur within 18

18   months of the City's acquisition of all properties within a given

19   phase.

20             MR. POTTER:  Yes.

21             THE COURT:  So the last date I have, again, if the

22   Court attaches legal significance to the matter of the redemption

23   of the ground rents, is that two of those properties,

24   specifically 931 West Saratoga Street and 941 West Saratoga

25   Street, the ground rents were finally purchased on May 20 of

1    2011, according to the Land Records.

2              MR. POTTER:  Yes.

3              THE COURT:  All right.  So if that has -- you say it

4    has no legal significance.  If it does have legal significance,

5    that would trigger a time period up until November of this year,

6    would it not?  18 months from that date?

7              MR. POTTER:  Yes.

8              THE COURT:  All right.  Go ahead.

9              MR. POTTER:  Yes.  Yes.  But, additionally, to the

10   point, that the, that the, that with regard to the Phase I, 57

11   properties, the idea that closing can be read into the, into the

12   page, into the statement on Page 47 is, it's simply not

13   reasonable because it doesn't say closing.  And just like it

14   doesn't say, with regard to the notice, the City shall give

15   written notice to the developer when the City has acquired title

16   to all properties in each phase.  In Paragraph 1.9, it doesn't

17   say fee simple title.

18             THE COURT:  Let me just get to, before we get to the

19   matter of the significance of the wording as to the matter of

20   special warranty as opposed to fee simple, before we get to that

21   issue, the language here on Page 47 of the LDDA specifically

22   says:  Notwithstanding the fact that the properties located in

23   the Block 0157 and listed immediately above are in Phase IV, the

24   City will acquire such properties and conduct clearing activities

25   with respect to such properties in connection with Phase I for

1      the purposes of neighborhood safety.

2                MR. POTTER:  Yes.

3                THE COURT:  Now, as I understand the position of the

4      City, as I believe, through Mr. Smith's testimony was, that

5      really isn't triggered until there are occupancy permits issued.

6      Is that right?

7                MR. POTTER:  Yes.

8                THE COURT:  So the buildings are built, the development

9      is done, and then there are occupancy permits that are issued.

10               MR. POTTER:  Yes.

11               THE COURT:  And then the units are for sale.

12               MR. POTTER:  Yes.

13               THE COURT:  And then at that time, at that time, the

14     City would then be obligated, for purposes of neighborhood

15     safety, to acquire the properties in Block 0157 and clear them?

16               MR. POTTER:  Our position is that by the time the

17     Certificates of Occupancy are issued for the properties, that our

18     clearing and our acquisition and clearing activities should be

19     completed.

20               THE COURT:  All right.  So, exactly, I'm just trying to

21     make sure I understand your position on this.

22               MR. POTTER:  Yes.

23               THE COURT:  Because there's been a great deal of

24     discussion about this.  Apart from the clear issue of the ground

25     rents or the five properties which are in Phase I, clearly,

1    there's no dispute about that.  And there would be no dispute

2    about the fact that the ground rents, as to two of them, weren't

3    even purchased and cleared until May of 2011.

4         With respect to the properties in Block 0157, for the

5    purposes of neighborhood safety, given the clear testimony that's

6    before me in terms of drug activity in that area, there's no

7    dispute about that, is there, Mr. Potter?

8         MR. POTTER:  No, sir.

9         THE COURT:  All right.  And I'm glad you said that

10   because there certainly wouldn't be any dispute in terms of the

11   testimony I hear in this criminal court constantly.  The position

12   of the City is is that that blight in the neighborhood would not

13   need to be remedied until after the entire development was done

14   and the occupancy permits are issued?

15        MR. POTTER:  We're only talking about Phase I of the

16   project.

17        THE COURT:  But again, Phase I, in terms of right there

18   next to Block 0157, right?

19        MR. POTTER:  Yes.  Being completed.

20        THE COURT:  It's right across the street.  I'm looking

21   at the diagram here.  Is that right?

22        MR. POTTER:  Yes.  Completed.  That those activities

23   would be completed when, at least when, no later than when

24   certain occupancy certificates are issued, no later than that,

25   for neighborhood safety.

1          Now, I think what's important to recognize is, is in

2     this particular agreement, in Paragraph 9.6, there is a provision

3     that says, in the event of any question regarding the meaning of

4     any of the restrictive covenants, agreements or provisions

5     contained in this agreement, or the renewal plan, the

6     interpretation placed thereon by the Department --

7               THE COURT:  What paragraph is this?

8               MR. POTTER:  9.6.  Page 27.

9               THE COURT:  All right.  Go ahead.

10              MR. POTTER:  Yes.  The interpretation placed thereon by

11    the Department shall be final and binding on the parties hereto,

12    provided that any such interpretation shall not be unreasonable

13    or arbitrary.

14         So the question is whether the City's reading is

15    unreasonable and arbitrary, not whether what the intent of the

16    parties was or some gloss that might be more favorable to the

17    plaintiff.

18              THE COURT:  And that's your, that's the City's

19    position, citing 9.6, to the issue of Block 0157?

20              MR. POTTER:  Correct.

21              THE COURT:  All right.

22              MR. POTTER:  Now, with regard, getting back to the

23    issue with regard to, with regard to the unredeemed ground rents.

24    No wonder, there's no evidence that any lender ever asked about

25    ground rents, that the presence or absence of unredeemed ground

1    rents had no role in the plaintiff's ability or inability to

2    obtain financing in this case.  And while we fully respect Mr.

3    Stern and his substantial contribution that he intends to make,

4    as represented in his letters, it is not close to the 135 million

5    that needs to be shown in order to go to closing.

6            As we know, the plaintiff was rejected by HUD for

7    financing.  And while the plaintiff can blame the City for that,

8    I think that HUD's position, based on its November 30th, 2011

9    letter, is based on objective factors.  I think that HUD is more

10   than sophisticated enough to make its own decisions with regard

11   to whether the area is, whether the proposed plan is marketable,

12   meaning whether the rents are too high for the area; secondly,

13   HUD's position with regard to a supermarket; and thirdly, HUD's

14   position with regard to the experience of the developer.

15           These are, these are things that, you know, HUD can

16   evaluate and aren't based on what the City's position is with

17   regard to that.

18           More significantly, the evidence of financing that's

19   offered by the plaintiff in this case, aside from the one BBT

20   letter that, for placement, for private bond placement that's a

21   CDA that says they don't accept, there are no, except for -- and

22   Mr. Stern's commitment letter -- there are no, there's no other

23   source of funding that's presented of any, that's in any way

24   solid, any way close to a commitment letter.

25           The fact is that those other sources are based on state

1    bonds in terms of low income housing tax credits, new market tax

2    credits.  They're associated with other types of public financing

3    and state bonds.  And in this case, the developer never applied

4    to the State for bonds.

5         And I think that the example is -- and I think that

6    that's instructive in that, and supports the City's position that

7    the developer isn't close to obtaining the financing needed to

8    the 135 million dollar level, regardless of the TIF or even, or

9    even HUD, for that matter.

10         But the point is, that's why our position is that going

11   forward with the developer, that was the ultimate reason why,

12   even after an extension, that we felt that we needed to issue a

13   notice of default and not go forward with the developer.  Of

14   course, developer had an additional 60 days to try to remedy the

15   default and hadn't.

16         The bottom line is when the City issued the notice of

17   acquisition to the plaintiff, the City had insurable title, title

18   that could be, could be conveyed.  The only place in the LDDA

19   that refers, I believe, to ground rents, is in 1.2A.

20         THE COURT:  So I'm clear on this point.  The evidence

21   before me is, on behalf of the plaintiff, Ms. Zoller, an active,

22   participating real estate lawyer, has testified to the contrary.

23   Correct, Mr. Potter?  She's testified that it's not a fully

24   marketable title if there's a ground rent on a piece of property.

25   That's her testimony, correct?

1          MR. POTTER:  She didn't say that it was uninsurable.

2          THE COURT:  Quite frankly, Mr. Potter, it's of no

3     moment to me whether it's insurable or not.  It's a question of

4     whether or not it can be conveyed.  And she testified that it's

5     not conveyable, did she not?

6          MR. POTTER:  I believe, yes.

7          THE COURT:  She testified, I will have to look at my

8     notes, I won't waste a lot of time on this, she said it's not

9     clear title, correct?

10         MR. POTTER:  She said it's not fee simple title.

11         THE COURT:  Okay.  Well, it's not clear title.  That

12    was essentially her testimony, correct?

13         MR. POTTER:  That was her testimony.

14         THE COURT:  All right.  And then the very City

15    employees, including Mr. Engel, who is a lawyer and works in real

16    estate, in the Housing and Community Development, he essentially

17    testified that it is, that it is conveyable, correct?

18         MR. POTTER:  Yes, that it could be conveyed over

19    insurance, with insurance.

20         THE COURT:  I'm sorry.  What?

21         MR. POTTER:  Conveyed with insurance.

22         THE COURT:  Conveyed with insurance.

23         MR. POTTER:  Title insurance.

24         THE COURT:  All right.

25         MR. POTTER:  But the fact of the matter is that it's a

1      theoretical objection.  It's not something that ever arose.

2              And I think that Ms. Zoller also testified, in response

3      to a question that I asked, that the developer is required to go

4      to closing on any phase or sub-phase if the City is able to

5      convey all the properties in the phase.  And the City, and our

6      position is that the City was able to convey all the properties

7      in the phase.  And that's, that's sort of the point.

8              It's not so much whether, you know, all potential,

9      whether the unredeemed ground rent had merged into a particular

10     deed at the time, is that, is that the City is able to convey all

11     the properties when it comes time for closing.

12             Essentially, what's happening is that the standard is

13     becoming higher for this acquisition notice than it is for actual

14     closing, which doesn't make a lot of sense, especially when the

15     property, when the, when the City is simply obligated to give

16     notice when they have acquired title to all the properties.

17             And under 9.6, it is not unreasonable or arbitrary for

18     the City to think that we can give notice to the developer that

19     we've acquired all of the leasehold title.  Remember, we're

20     talking about 5 ground rents out of 173 parcels.

21             And the point is that what the developer needs and the

22     lender needs is site control, meaning that they have control over

23     the site, over the premises.  And that's clear between the LDDA

24     and the fact that there's no unresolved or uncompleted

25     condemnation or any other proceeding with regard to the buildings

1    and structures on the property.  The ground rent is simply, it's

2    simply just this sort of ownership of the land only.

3          People buy and sell houses all the time over ground

4    rents.  That's extremely common in Baltimore City.

5          THE COURT:  Your position is, despite the fact that the

6    City ultimately did take steps to purchase these 5 ground rents,

7    of one, as to 237 North Schroeder, accomplished it by September

8    16th of 2010, as to 940 West Lexington, it accomplished it by

9    July 31, 2010, as to 215 North Schroeder, it was accomplished by

10   July 9, 2010, and then ultimately, as I've said, as to the

11   properties at 931 West Saratoga and 941 West Saratoga, not being

12   accomplished until May of 2011, it was really of no legal moment;

13   that the City didn't even need to take those steps?  Is that your

14   position, Mr. Potter?

15         MR. POTTER:  Yes, Your Honor.  Yes.  And, I mean, as

16   part of the, in terms of the conveyance.  But, otherwise, in

17   terms of the overall obligations under the agreement where it

18   says additionally we will, we will eventually take steps

19   necessary to redeem the ground rents on the properties to be

20   conveyed, you know, we have that obligation to get it done.  But

21   it doesn't mean necessarily that it has to be done at the time of

22   closing.  Simply that we're able to make the sale.

23         Substantively, the issue of ground rents only becomes

24   relevant when they're consolidating the parcels for tax purposes

25   and they're changing, they're changing the parcels themselves.

1    So that's why it's not an issue in terms of the conveyance.

2         When the City -- actually, you'll notice that the

3    particular ground rents that the Court has noted in 941 West

4    Saratoga, 931 West Saratoga, those are from the SDAT.  It's

5    simply, it's simply since the City owns leasehold, it simply

6    forms are filed and the State department got to it when they got

7    to it.  And that's when they issued the ground rent redemption

8    certificate.

9         And as a result, the title merges into the, merges,

10   would merge into the City's title or the developer's title, and

11   it's extinguished.  There's nothing additional to be conveyed.

12   It's simply extinguished.  And the plaintiff holds all the title

13   that they would have received at closing.

14        THE COURT:  All right.  Thank you very much, Mr.

15   Potter.  Mr. Fax, briefly in rebuttal.

16        MR. FAX:  Very briefly.  Only one point, Your Honor.

17   Mr. Livingston reminded me that I failed to connect the dots with

18   regard to the economic meltdown and the force majeure clause,

19   Section 7.9, which defers our obligation to close based on events

20   outside of our control, including an economic meltdown, which is

21   specifically mentioned in the force majeure clause.  But I'm

22   content to rest on my papers on that issue.

23        With that, I'll close, Your Honor.

24        THE COURT:  Thank you, Mr. Fax.

25        I thank everyone for their efforts today, and

1      particularly the court staff.  We spent the entire day on this

2      matter because it is a very important matter to this community.

3      It's a very important matter to the plaintiff, with the lawsuit

4      here.  It's a very important matter to the City.  It's a very

5      important matter to the community, without question a very

6      serious matter to this community.

7              The plaintiff, Poppleton Development, LLC, filed this

8      breach of contract action on June the 27th against the

9      defendants, the Mayor and City Council of Baltimore, the

10     Baltimore City Department of Housing and Community Development,

11     and Paul D. Graziano in his official capacity as the Commissioner

12     of the Housing Department.

13             According to the plaintiff, the suit arises out of the

14     City's breach of and failure to fulfill its obligations under the

15     Real Estate Development Contract, and the allegation of the

16     City's unlawful effort to terminate Poppleton I's performance,

17     and the immediate and irreparable injury that Poppleton says it

18     will suffer if the City is not enjoined from doing so.

19             Essentially, there are three counts against the

20     defendants.  Count One alleges breach of contract.  Count Two

21     seeks a declaratory judgment.  And Count Three requests

22     preliminary and permanent injunctive relief.

23             The plaintiff, along with the complaint, filed a Motion

24     for Temporary Restraining Order and a Motion for Preliminary

25     Injunction arguing that, absent injunctive relief, plaintiff will

1    be immediately and irreparably harmed.  The parties have agreed,

2    essentially, as a result of the hearing before me on June the

3    28th, and then the entire day today being spent on it, this Court

4    can treat this as a Motion for Preliminary Injunction itself.

5         The real estate contract in question is the Land

6    Disposition and Development Agreement, referred to as LDDA,

7    entered into between the parties on September 7, 2006.  The

8    contract provides for the redevelopment of a 13.8 acre portion of

9    the Poppleton neighborhood, located just west of Martin Luther

10   King Boulevard here in the city, on the west side, adjacent to

11   the University of Maryland Biopark, and essentially just south

12   of, I believe, Route 40.

13        I held a hearing on the record concerning the pending

14   motions and then we continued the hearing today.  Specifically,

15   the issue before me on June the 28th was whether or not the City

16   possessed title to all properties, including as to Subphase I-A

17   for purposes of Phase I of the contract, and whether or not it

18   met its cleaning and security obligations.

19        The plaintiff further argued and has argued that the

20   City's request for a demonstration of financing in the amount of

21   135 million represented financing for two subphases and is

22   contrary to the LDDA.  But that is not really being addressed by

23   me today in any great detail.

24        The City has essentially argued that, given the fact

25   that five properties of the properties in Phase I, specifically

1    215 North Schroeder, 237 North Schroeder, 931 West Saratoga, 941

2    West Saratoga, and 940 West Lexington, the fact that there were

3    ground rents as to all of those properties is of absolutely no

4    legal significance.

5          And the City has further argued that, with respect to

6    Page 47 of the LDDA, the reference to those properties being

7    acquired as well, even though they're listed in Phase IV, in

8    connection with Phase I for purposes of neighborhood safety, is a

9    matter that could await the development of Phase I.  There is no

10   dispute before me of the blight of Block 0157.  The Court, for

11   all intents and purposes, can take judicial notice of the blight,

12   urban blight and activities around that parcel.  There's no

13   dispute of the crime issues that have been raised as to that

14   particular area.  And the City takes the position that there was

15   no requirement to clear those lands as well in connection with

16   the contract.

17          I would note that, alternatively, the plaintiff has

18   argued that the economic downturn, under what's known as the

19   Force Majeure Clause, which is Section 7.9 of the LDDA, has not

20   been heavily discussed here today.  It was discussed previously

21   on June the 28th with respect to releasing the contractor with

22   respect to certain timeframes, under what's known as the Force

23   Majeure, M-A-J-E-U-R-E, clause.  It's really not been heavily

24   discussed here today.  But it is another factor that the City has

25   raised with respect to its entitlement to injunctive relief.

1          As a preliminary matter, it is well established that

2    the standard for evaluating a temporary restraining order or a

3    preliminary injunction, request for preliminary injunction,

4    they're both the same standard.  There's no legal distinction.

5    The parties don't dispute that and that was well set by the

6    Fourth Circuit in Commonwealth of Virginia v. Kelly, at 29 F.3d

7    145, a Fourth Circuit opinion in 1994.

8          Indeed, this Court has previously noted where the

9    opposing party receives notice of a motion or application for

10   temporary restraining order, that a trial court may treat it as a

11   matter for preliminary injunction.  That was CVI/Beta Ventures v.

12   Custom Optical, 859 F. Supp. 945, an opinion of this Court in

13   1994.

14         So there's no question about notice here.  And the City

15   has very vigorously opposed the plaintiff's request for

16   injunctive relief.

17         Furthermore, given the elapsed 15 days between the

18   first hearing on this matter and the scope of argument and

19   testimony heard all day today, this Court will consider this

20   matter as one requesting a preliminary injunction.

21         Under Rule 65 of the Federal Rules of Civil Procedure,

22   the decision whether to issue a preliminary injunction is

23   committed to the sound discretion of the trial court, as the

24   Fourth Circuit has noted in Hughes Network v. Interdigital

25   Communications, 17 F.3d 691, a Fourth Circuit opinion, 1994.

1          There's no question that a preliminary injunction is an

2   extraordinary remedy, as has been recently noted by the Fourth

3   Circuit in the now seminal case on injunctive relief in the

4   Fourth Circuit, Real Truth About Obama v. FTC, the Fourth Circuit

5   opinion in 2009 to which I've made earlier reference.

6          To obtain a preliminary injunction, a plaintiff must

7   establish four elements:  One, that he is likely to succeed on

8   the merits; two, that he is likely to suffer irreparable harm in

9   the absence of preliminary relief; three, that the balance of

10  equities tips in his favor; and four, that an injunction is in

11  the public interest.  And the Fourth Circuit so noted in its

12  discussion in Real Truth About Obama, and it was quoted, the

13  Supreme Court, in the 2008 opinion, Winter v. Natural Resources

14  Defense Council, 555 U.S. 7, the 2008 opinion, which set the new

15  standard, a higher standard, as I've noted, with respect to

16  injunctive relief.  Before, the higher standard previously

17  required was what was known as the Blackwelder standard.

18          With respect to likelihood of success on the merits,

19  the crucial argument that we focused on most of the day today,

20  the Fourth Circuit has held that a party seeking a preliminary

21  injunction must demonstrate by a clear showing that it is likely

22  to succeed at trial on the merits.  That's the language in the

23  Real Truth About Obama case.

24          Circuit courts are split on this question.  The Federal

25  Circuit for the Court of Appeals has held that the new Winter

1    standard, <u>Winter v. Natural Resources Defense Council</u>, is the

2    equivalent of finding that success on the merits is more likely

3    than not.  And that is in <u>Titan Tire Company v. Case New Holland</u>,

4    566 F.3d. 1372, an opinion of Federal Circuit in 2009.

5          The United States Court of Appeals for the DC Circuit

6    also interprets this stricter approach of the Fourth Circuit,

7    this circuit, with regards to success on the merits, as requiring

8    a finding that success is more likely than not, and that is

9    <u>Sherley</u>, S-H-E-R-L-E-Y, <u>versus Sebelius</u>, 644 F.3d 388, a DC

10   Circuit opinion in 2011, discussing, but not necessarily

11   agreeing, with a concurring opinion in <u>Davis v. Pension Benefit</u>

12   <u>Guaranty</u>, 571 F.3d 1288, an opinion of the DC Circuit in 2009.

13         I would note, however, on the other hand, the Second

14   and Ninth Circuits have rejected any interpretations of

15   likelihood of success that would require a finding of more likely

16   than not.  The Ninth Circuit opinion is at 640 F.3d 962,

17   <u>Leiva-Perez v. Holder</u>.  And the Second Circuit case is <u>Citigroup</u>

18   <u>Global Markets</u>, 598 F.3d 37, a Second Circuit opinion, 2010.

19         However, there is no question that the requirement is

20   far stricter than the <u>Blackwelder</u> requirement, that the plaintiff

21   previously only had to demonstrate a grave or serious question

22   for litigation, as the <u>Real Truth About Obama</u> case noted, and has

23   been noted by my colleague, Judge Blake of this court, this year,

24   in <u>Allstate Insurance v. Warns</u>, 2012 Westlaw 681792.

25         As noted, the plaintiff's complaint alleges breach of

1    contract and seeks a declaratory judgment that the defendants, I

2    will name just generally as the City of Baltimore, materially

3    breached its contractual obligations.  To establish a cause of

4    action for breach of contract in Maryland, the complainant must

5    allege that a contractual obligation exists and that the

6    defendant has breached that obligation.

7         It is undisputed that the Land Disposition and

8    Development Agreement, LDDA, entered into between the parties on

9    September the 7th, is the contract that governs the relationship

10   between the parties.  And according to that contract, the City

11   was to acquire title to the properties in Subphase I prior to

12   closing.  Upon receiving the notice that the City had acquired

13   title to those properties, and the notice was provided in July of

14   2010, then the plaintiff had a period of some 18 months in which

15   to continue with the contract.

16        The plaintiff argues that the City did not have title

17   to all the properties in Phase I on July 2, 2010, contrary to the

18   notice letter that was sent to the plaintiff on that date.

19        And we've had the testimony here today with respect to

20   evidence that the City acquired what I refer to as clear title to

21   five properties in Subphase I after the July 2, 2010 date.  And

22   I've specifically noted those properties as 237 North Schroeder,

23   215 North Schroeder, 940 West Lexington, 931 West Saratoga, and

24   941 West Saratoga.

25        I've heard the testimony of Danielle Zoller, the very

1    experienced real estate lawyer in this city, with a law firm, one

2    of the top law firms in the City of Baltimore, known for

3    experience in real estate transactions.  In response, I've heard

4    testimony from Baltimore City officials, only one of whom is

5    licensed to practice law and is a real estate lawyer, generally

6    opining that the ground rent has absolutely no legal significance

7    on clearing title.  I find that position to be totally without

8    merit.  And not only is it without merit, the absence of any

9    strong testimony in that regard is patent to me.  Indeed, Mr.

10   Engel did not so opine generally.  He parted the party line of

11   "It's of no legal significance."

12          The Court would note it's of sufficient legal

13   significance that the City spent time over the next year making

14   sure that it did clear the ground rents.  And I reject as a

15   matter of law the notion that a ground rent has no legal

16   significance with respect to the matter of clearing title.

17          It's undisputed that the City did not finally redeem

18   all of the ground rents until May of 2011, when it finally

19   redeemed the last two.

20          Furthermore, with respect to the matter of the LDDA,

21   it's clear, Page 47, it's abundantly clear with respect to what

22   was anticipated in the contract.

23          Mr. Potter, as a good advocate for his client, takes

24   the fallback position that Section 9.6 of the LDDA provides that

25   in the event of any question regarding the meaning of any

1    restrictive covenants, agreements, or provisions contained in

2    this agreement or the renewal plan, the interpretation placed

3    thereon by the Department shall be final and binding on the

4    parties hereto, provided that any such interpretation shall not

5    be unreasonable or arbitrary.

6          And, essentially, the position of the Department, under

7    9.6, presented here to this court today, is that the language as

8    follows, "Notwithstanding the fact that the properties located in

9    Block 0157 and listed immediately above are in Phase IV, the City

10   will acquire such properties and conduct clearing activities with

11   respect to such properties in connection with Phase I for

12   purposes of neighborhood safety," the City of Baltimore has

13   offered testimony that that means that once the development is

14   undertaken, once the buildings are built, once there are

15   certificates of occupancy, that then and only then is the

16   obligation of the City to deal with what is undisputed to be

17   urban blight and criminal activity across the street in Block

18   0157, only then is the City obligated to then proceed.

19         This Court finds, under the phraseology of 9.6, that to

20   be totally unreasonable.  Apart from being arbitrary, it is

21   absolutely unreasonable.  It defies belief to believe that a

22   developer, that, first of all, anyone's going to invest money in

23   a project and that a developer's going to put money into a

24   project, and that the City will not have to deal with a clear,

25   undisputed area of urban blight that's been referenced in the

1    contract until after it's built, until after occupancy permits

2    are issued.  It's absolutely totally unreasonable.

3         The language here is abundantly clear.  And there is no

4    dispute as to that phrase.

5         As of today, as of today the City has still not met

6    that obligation as to Block 0157.  This is not a sophisticated

7    legal discussion as to the effect of a ground rent on clear

8    title.  This is absolutely an unreasonable position being taken

9    by the City of Baltimore.  The City of Baltimore clearly has not

10   complied with the requirements of the contract as set forth on

11   Page 47 of the LDDA.  And Section 9.6 provides little refuge for

12   the City in that regard.

13        As a corollary, I would note that the LDDA also

14   provides that the property shall be delivered free from all

15   buildings and other structures, as well as all utilities,

16   resulting from the City's demolition and clearing work prior to

17   closing.  There's clearly been evidence presented that at least 7

18   to 10 utilities are still present on the property.  Clearly, the

19   City has not complied with this section of the LDDA.

20        Furthermore, the plaintiff has claimed that it is

21   likely to succeed on its claims seeking a declaration that

22   Baltimore City wrongfully declared Poppleton in default under the

23   contract, and improperly decided that the contract would be

24   terminated as of July 2 of 2012 in light of the fact that it

25   submits that its letters of interest from lenders would be

1     commercially reasonable in the context of the contract's

2     timetable.

3          Under the totality of circumstances and having heard

4     testimony for a lengthy, having heard argument for a lengthy

5     period of time on June 28th, and having conducted this hearing

6     all day today, it is clear to me that the plaintiff has

7     demonstrated it will likely be successful on the merits at trial.

8     This ruling does not mean that Poppleton will be successful, but

9     this Court finds that its success is likely, which is the

10    standard.  It's a higher standard than Blackwelder, but I find

11    that they've met the first of the criteria.

12         Having noted that, it is abundantly clear under the

13    law, as has been noted in the Winter case, that all four of the

14    Winter requirements must be satisfied.  So this doesn't end the

15    inquiry.  That's the first of the four criteria that must be

16    addressed.

17         In terms of irreparable harm.  Generally, irreparable

18    injury is suffered when monetary damages are difficult to

19    ascertain or are inadequate, Multi-Channel TV Cable v.

20    Charlottesville, a Fourth Circuit opinion, 1994, at 22 F.3d 546,

21    a Fourth Circuit opinion, 1994.  Indeed, injury to reputation or

22    good will is not easily measurable in monetary terms and is often

23    viewed as irreparable.

24         Here, Poppleton argues that it will suffer irreparable

25    harm in numerous ways.  First of all, it argues that it will lose

1    the 7.5 million that it has already invested in this project,

2    that it will lose the prospect of earning revenues from the

3    project once completed, and that its construction contractors and

4    subcontractors will lose jobs that are sorely needed in the

5    metropolitan area, and that Poppleton will suffer irreparable

6    damage to its reputation.  That is the argument presented by the

7    plaintiff.

8         While perhaps I should address this in more detail in

9    the fourth of the four prongs that I must address here today in

10   terms of the public interest, Poppleton also argues that it is

11   prevented from performing the contract here, the LDDA, that the

12   damage to the neighborhood will be incalculable in terms of the,

13   not only the loss of economic development, but the need for

14   affordable housing, the need for grocery stores, the need for

15   facilities in a major part of this city.

16        There is little harm, if any -- the requirement under

17   the new standard in terms of irreparable harm, Blackwelder only

18   required that the Court balance the irreparable harm to the

19   respective parties, requiring the harm to the plaintiff to

20   outweigh the harm to the defendant.  A higher standard is

21   required here now.  The plaintiff must make a clear showing it is

22   likely to be irreparably harmed.

23        There is no question in this Court's mind that the

24   plaintiff is likely to be irreparably harmed unless injunctive

25   relief is granted.  So the plaintiff has satisfied the second of

1    the four criteria.

2            Third, in terms of balancing of the equities.  Yes,

3    balancing of the equities.  This factor bears upon the Court's

4    exercise of its discretion as to whether or not granting

5    preliminary injunctive relief, essentially, I think involves an

6    evaluation of the severity of the impact on the party, on the

7    defendant should the injunction be granted, and the hardship that

8    would occur to the plaintiff if the injunction is denied.  And

9    that's the standard that the Supreme Court in <u>Winter</u> applied at

10   55 U.S. at 23.

11           Here, Poppleton has argued that if the injunctive

12   relief is not granted, injury to Poppleton will be permanent and

13   incalculable, whereas the City will incur little, if any, injury

14   because even if it ultimately prevails on the merits, the City of

15   Baltimore and those residents, particularly in the Poppleton

16   area, will have gained benefits of development of some sort.

17           The City has essentially taken the position, and Mr.

18   Potter has essentially represented, under some pressure from

19   me -- I'll acknowledge that I pressured both lawyers on the

20   implications to the community in this case -- that the City

21   definitely intends to go forward with the same type of project

22   and that it will be delayed in sending out Requests For

23   Proposals, and the development of the project will be

24   substantially delayed.  However, implicit in this argument of the

25   City, there is an acknowledgment that there is substantial

1          interest in the prompt and successful redevelopment in the area.

2                    On this factor, I conclude that the balance of the

3          equities clearly is in favor of the plaintiff in terms of trying

4          to move forward with a project it first started in 2006, and has

5          been just lying fallow for several years now.

6                    So finally we get to the matter of public interest.

7          The City submitted a memorandum literally at 9:30 this morning,

8          as we were about to start this hearing, and caused me to have to

9          delay for 15 minutes, essentially saying that the grant of

10         injunctive relief to the developer would cause economic harm to

11         the City by delaying the eventual redevelopment of the Poppleton

12         area, and essentially noting that it's in the public interest

13         because city streets have been closed and alleys have been closed

14         necessary for construction and performance of environmental

15         remediation, that there would be, it's in the public interest

16         that it be permitted to terminate this contract.

17                   This Court finds otherwise.  Indeed, this Court finds

18         that it's exactly the opposite.  And it's strange to believe that

19         it is in the public interest to go back to square one when you

20         have a developer who's already expended efforts and studies and

21         has a major investor who's testified under oath here before me

22         today.  And just as I pressured Mr. Potter, I pressured Mr. Fax

23         with respect to the seriousness of these financial commitments.

24                   I have no doubt, having observed Mr. Stern under oath

25         testifying before me, of his sincere and legitimate interest in

1    the development of these properties.  And I have no doubt he

2    understands the seriousness and importance of his testimony here

3    in federal court in Maryland.

4         Focusing on this particular question, it has frequently

5    been emphasized that whether the public interest either might be

6    furthered or might be injured by an injunction should be given

7    considerable weight.  And that's in Volume 11A of Wright & Miller

8    on Federal Jurisdiction, Section 2948.4.

9         I recognize the public interest is served by enforcing

10   contracts, as this court, as Judge Davis, now on the Fourth

11   Circuit of this court, indicated in his opinion in NaturaLawn of

12   America v. West Group, LLC, 484 F.Supp.2d 392, a discussion by

13   Judge Davis, now on the Fourth Circuit, when he was a judge of

14   this court in 2007.  Indeed, as Judge Davis noted in that case,

15   essentially, to avoid contractual obligations, it is important to

16   repudiate that kind of activity when it involves, essentially,

17   harm and delay to the public.

18        Listening to this testimony all day today, being aware

19   as I am, and I have on more than one occasion made reference to

20   the increased criminal docket of this court and the criminal

21   issues attendant to this metropolitan area, this Court's great

22   familiarity with some of these sections of West Baltimore, which,

23   in other settings in other days, we're not talking about, we're

24   talking about other contracts, we're talking about drug contracts

25   being enforced in another matter in West Baltimore, the public

1    interest is clearly served by a swift resolution of this dispute,

2    allowing the Poppleton development to go forward.

3         The residents of this community are entitled to have

4    all efforts be made to have this contract go forward as quickly

5    as possible.  And it is absolutely in the public interest that

6    this injunction be granted so that the contract can be performed.

7         I am not deciding the case on the merits today.  I am

8    only deciding likelihood of success on the merits.  I have also

9    addressed the other criteria as well, and I address this fourth

10   criteria in terms of public interest.  Given that the primary

11   purpose of the preliminary injunction is to preserve the status

12   quo until the merits of the case can be decided, this Court

13   concludes that a preliminary injunction is warranted in this

14   case.

15        As a distinguished author such as Professor Charles

16   Alan Wright and others have noted, although the fundamental

17   fairness of preventing irreparable harm to a party is an

18   important factor on a preliminary injunction application, the

19   most compelling reason in favor of entering a Rule 65 order is a

20   need to prevent the judicial process from being rendered futile

21   by actions or refusing to act.

22        The Supreme Court has noted years ago that it is the

23   duty of a court of equity granting injunctive relief to do so

24   upon considerations that will protect all, including the public,

25   whose interest the injunction may affect.

1          Under the totality of the circumstances, this Court

2     finds that the plaintiff, Poppleton Development, LLC, has met its

3     burden entitling it to a preliminary injunction.  The Court finds

4     that Poppleton is likely to succeed on the merits, that it will

5     suffer irreparable harm absent a preliminary injunction.

6          The Court further finds that the balance of equities is

7     in favor of Poppleton.  The Court further finds that,

8     overwhelmingly, the public interest is clearly in favor of

9     resolving this dispute quickly and in accordance with the plans

10    already underway.  Put simply, this area of Baltimore cannot wait

11    another six years for some competing plan to surface.

12         So for those reasons, the Motion for Preliminary

13    Injunction is granted and I will enter a preliminary injunction

14    order.  And I just need you to give me a few moments to have a

15    draft of that be prepared.

16         Is there anything further procedurally from the point

17    of view of the plaintiff, Mr. Fax?

18         MR. FAX:  We would ask Your Honor that the order

19    provide that no bond --

20         THE COURT:  I'm going to address that in a second.  Mr.

21    Potter, do you want to address the issue of bond here?

22         MR. POTTER:  One moment.

23         THE COURT:  Take a moment with that, if you want, with

24    Mr. Engel, if you want to talk to Mr. Engel about that.

25         MR. POTTER:  Please.

1          (Pause.)

2          MR. NAYDEN:  Your Honor --

3          THE COURT:  Yes, Mr. Nayden, be glad to hear from you,

4     sir.  Am I pronouncing your name correctly, Nayden?

5          MR. NAYDEN:  It's Matthew Nayden.

6          THE COURT:  Yes, sir.  Yes, sir.

7          MR. NAYDEN:  I'm sorry for coming up at the last

8     minute.

9          THE COURT:  That's all right.

10          MR. NAYDEN:  We are having a little difficulty making,

11     articulating to ourselves a clear position as to the requirement

12     for a bond.  I would like to make the effort to tell --

13          THE COURT:  Go right ahead.

14          MR. NAYDEN:  -- Your Honor what we would like.

15          THE COURT:  Under Rule 65(a), under Rule 65 generally,

16     with respect to the matter of a bond, it clearly is required with

17     respect to a temporary restraining order and it's required

18     generally, and can be required generally as to a preliminary

19     injunction.  So I'll be glad to hear from you, sir.

20          MR. NAYDEN:  Your Honor, we recognize that we have,

21     given your decision, failed to persuade you of our view of what

22     our concerns are.  But if I could just acknowledge that we

23     believe there's a substantial risk that the project will not go

24     forward under the existing deal.  And that would be the really

25     substantial cause of damages to us.

1          And so I don't think, we don't right now have the

2     ability to state what the amount would be, but that would be the

3     real basis.  I mean, there are other damages that we would have.

4          THE COURT:  Well, perhaps, Mr. Nayden, what we can do

5     is, on this -- I'll hear from Mr. Fax in a moment -- is I can

6     issue the, I will issue the preliminary injunction today and I

7     could take sub curia the issue of the amount of the bond.

8          I'll be away next week at a judicial meeting, but both

9     parties can have an opportunity to present their positions with

10    respect, the City can present its position on what the amount of

11    the bond should be and the reason that the City believes there

12    should be a bond posted, and the plaintiff can present its

13    position with respect to why it believes, one, a bond should not

14    be posted, and, if so, the amount.  Is that agreeable to the

15    City?

16          MR. NAYDEN:  Yes.

17          THE COURT:  Okay.  I'm willing to extend that courtesy

18    to the City, so we'll decide.  I am not ruling out the fact that

19    a bond may not required.  Is that agreeable to you, Mr. Fax?

20          MR. FAX:  Absolutely.

21          THE COURT:  All right.  It's late in the day.  It's a

22    Friday.  So staff goes out of the way to not be with me on a

23    Friday sometimes, except for Mr. Thompson.  He has no social

24    life.  So he comes with me in here.  Just kidding.

25          But what we'll do is I will take a brief recess.  Just

1    give me a few moments.  I am going to get the preliminary

2    injunction.

3         Do we have a draft?  I think it went back in chambers.

4    Do we have it back there?  Let me just read generally.  We'll go

5    over the language right now.  We'll go over the discussion of

6    language.  I have edited out some of the language, but I

7    basically followed the model that was presented by the plaintiff

8    when it filed the Motion For Temporary Restraining Order.  But

9    we'll go over the language now.

10        The Preliminary Injunction Order.  The Plaintiff,

11   Poppleton I Development, LLC, hereinafter Plaintiff Poppleton I,

12   or the developer, end of paren, has filed a Motion For

13   Preliminary Injunction, supported by a verified complaint for

14   breach of contract and declaratory and injunctive relief and

15   exhibits thereto, together with a Memorandum of Law in support of

16   said motion.  The Court has conducted a hearing on June 28, 2011

17   and July 13, 2011.

18        Poppleton seeks an emergency Preliminary Injunction

19   Order, A, restraining defendants, the Mayor and City Council of

20   Baltimore, the Baltimore City Department of Housing and Community

21   Development, and Paul T. Graziano in his official capacity as

22   Commissioner of the Baltimore City Department of Housing and

23   Community Development, collectively defendants, Baltimore City or

24   the City, from terminating the land disposition and development

25   agreement, (LDDA), and by ordering the City to allow Poppleton to

1    continue its performance of the LDDA injunction filed -- hold on

2    a second.

3           Then continuing on with the draft.  The City has

4    opposed the Motion For Preliminary Injunction.

5           The Court has reviewed the papers filed herewith and

6    has considered the arguments of all parties, and finds that

7    Poppleton I will be immediately and irreparably injured if a

8    preliminary injunction is not issued as Poppleton I will lose

9    substantial funds that it has already invested in the project;

10   Poppleton I will lose the prospect of earning revenues from the

11   project once completed, which damages are impossible to

12   calculate; Poppleton I's construction contractors and

13   subcontractors will lose jobs, and Poppleton I will suffer

14   irreparable reputational damages.

15          I am going to delete out the matter of that finding.  I

16   am not making that finding and there's no evidence before me to

17   that sufficient at this point.  It goes without saying the

18   construction contractors and subcontractors will lose jobs.

19          The Court further finds that Poppleton has made a clear

20   showing that it is likely to succeed on the merits of its claims

21   at trial, namely, A, that the City breached the LDDA by, One,

22   delaying the acquisition of the properties, in violation of

23   Sections 1.2A and 1.2B of the LDDA; Two, failing to timely clear

24   all buildings and other structures, in violation of Sections 1.5B

25   of the LDDA; Three, failing to acquire all properties in

1    Sub-Phase I before requiring that Poppleton close on Sub-Phase I,

2    in violation of Section 1.9 of the LDDA; Four, failing to use all

3    reasonable efforts to insure adequate safety for the area, in

4    violation of Section 2.8 of the LDDA; and that the City

5    wrongfully declared Poppleton I in default under the LDDA and

6    improperly decided that the LDDA would be -- not will -- would be

7    terminated as of July 5, 2012.

8         The Court further finds that the balance of convenience

9    and the equities favor the issuance of a preliminary injunction

10   as Poppleton I will immediately and irreparably, will be

11   immediately and irreparably injured absent the issuance of the

12   relief requested, but the City will incur little, if any, injury

13   if the injunctive relief sought herein is granted and the City

14   ultimately prevails on the merits.

15        In fact, the contrary.  In that event, the City and

16   Poppleton, populace, will nonetheless have gained the benefit of

17   the development and construction proceeding in the interim.

18        I am going to edit that language out, Mr. Fax.  The

19   last phrase I am going to edit out.

20        This Court further finds that the public interest

21   favors the issuance of a preliminary injunction as the public

22   interest strongly favors the maintenance of the status quo, the

23   enforcement of valid contracts, and the redevelopment of the

24   Poppleton community.

25        Now therefore, it is by this Court, this 13th day of

1    July, 2012, ordered that a preliminary injunction shall be and

2    the same is granted, and is further ordered that the defendants,

3    officers, departments, divisions, agencies and persons acting

4    through them or on their behalf are hereby enjoined from

5    terminating the LDDA and shall permit Poppleton to continue its

6    performance of the LDDA.

7           And I will note that it is further ordered that the

8    Court shall withhold a ruling on the posting of a bond, upon

9    further briefing of the parties.  And I'll prepare that

10   Preliminary Injunction Order in that fashion.

11          If both of you can just get your positions in, say, by

12   next Friday.  And I'll be back, I'll be away next week, I'll be

13   back in the office, Monday, July the 23rd.

14          Is that language, it's late in the day, but, Mr. Fax,

15   is that language generally agreeable to you?

16          MR. FAX:  It is, Your Honor.  There's one, I think the

17   Court said that the hearing was on two days in 2011 at the

18   beginning of the order.

19          THE COURT:  I'm sorry.  You've right.  Should be 2012.

20          MR. FAX:  Should be 2012.  I also noted that I had made

21   a mistake.  I said Sub-Phase I.  It should be Phase I in the --

22          THE COURT:  All right.  I'll change it.

23          MR. FAX:  You will find it.  Yes.

24          THE COURT:  I will find it.

25          Okay.  Mr. Nayden, any other thoughts, from your point

1      of view?

2                  MR. NAYDEN:  At the beginning of the list of breaches,

3      I thought I heard the Court read, and I don't have --

4                  THE COURT:  That's okay.

5                  MR. NAYDEN:  -- the language in front of me, that, that

6      it was a, that you're finding that the City breached the contract

7      by delaying the acquisition of the properties.  I understand that

8      the Court is finding that --

9                  THE COURT:  I said that it has made a clear showing

10     that it is likely to succeed on the merits, namely, that the City

11     breached the LDDA by delaying in the acquisition of the

12     properties, in violation of Sections 1.2A and 1.2B.

13                 MR. NAYDEN:  I just wanted to make, make you aware that

14     I thought that the breach would be that we issued the notice of

15     default, but that the mere fact that we didn't acquire the

16     properties, as you're finding, was not a breach of the contract.

17     It was just a condition that we needed to fulfill in order to do

18     that.

19                 THE COURT:  All right.  You want to be heard on that,

20     Mr. Fax?

21                 MR. FAX:  Well, Your Honor, we included that, the City

22     wrongfully declared Poppleton I in default.  There's a whole

23     litany of alleged wrongdoing leading up to the wrongful

24     declaration of default.  That's in my draft.  So I agree to the

25     extent that I think it's the, it's the --

1          THE COURT:  The language, Mr. Nayden, the Court further

2     finds that Poppleton has made a clear showing that it is likely

3     to succeed on the merits of its claims at trial, namely, that the

4     City breached the LDDA by, One, delaying in the acquisition of

5     the properties.  And you prefer it to read that I'm making a

6     clear finding that it's likely to succeed on the merits because

7     the City issued a notice, a premature notice that it had, in

8     fact, acquired the properties?

9          MR. NAYDEN:  Yes.

10          THE COURT:  Does that suffice to you, Mr. Fax?

11          MR. FAX:  Yes.

12          THE COURT:  All right.  Then it will ready by, One,

13     issuing a premature notice that it had acquired the properties,

14     in violation of Section 1.2A.

15          Does that suffice, Mr. Nayden?

16          MR. NAYDEN:  Thank you.

17          THE COURT:  Okay.  All right.  I'll make that change.

18     Certainly, I will make that change.  Anything else, from the

19     City's point of view?

20          MR. NAYDEN:  Not that I was able to pick up.

21          THE COURT:  All right.  I'll go on a brief recess, for

22     about, maybe five minutes at most.  Just stand by.  I am going to

23     have this typed out in formal fashion because it's very important

24     we get it exactly right.  And I will sign it.

25          And then we will, again, the record will reflect that I

1    will wait for further briefing by next Friday as to the matter of

2    the bond.  And I will be contacting counsel the week of July

3    23rd.  We'll either have a hearing on the issue of the bond.  We

4    might have a telephonic conference of some sort.

5            I would urge the parties, in light of the implications

6    of this order, to get together for the good of the community to

7    move forward.  I expect the first indication of that might be an

8    agreement on the bond of some sort.

9            With that, we'll take a very brief recess.

10           (Recess at 5:18 p.m.)

11    THE COURT:  Counsel, I have signed the original of the

12    record and given it to Mr. Thompson for filing.  I have a copy

13    here for my file.  Counsel each have a copy.  And I think it's

14    consistent with what I just read.  If you want to take a moment

15    just to read through it.

16           Anybody see any major changes?  Because it's late in

17    the day.  I think this captures what I have read.  Correct, Mr.

18    Fax?

19           MR. FAX:  Yes, Your Honor.

20           THE COURT:  Correct, Mr. Potter?

21           MR. POTTER:  Yes, Your Honor.

22           THE COURT:  And I think I made the change you wanted,

23    Mr. Nayden, there, in terms of the phrase, "issuing a premature

24    notice that it had acquired the subject properties", is the

25    language you've requested, and I've put that there.

1          Okay.  Thank you all very much.  Thank you for the

2     thoroughness of your briefing.  And I want to thank court staff

3     for a busy day here.  We got it done before the close of the day.

4          With that, all of you have a nice weekend.  I think

5     you'll see, at the end of the order, I've indicated that -- if

6     you'll get this -- both of you file briefs by next Friday.  I

7     don't think they need to be biblical.  So, I mean, a five-page

8     limit, I think, is reasonable on that.  And both of you can

9     address it with the five pages, I would think.

10          MR. FAX:  Single space or double space?

11          THE COURT:  Just the normal spacing, Mr. Fax.  Thank

12     you all very much.  You have a nice weekend.

13          (Conclusion of Proceedings at 5:38 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                            INDEX

2
                                                     PAGE
3     WITNESS: DANIELLE ZOLLER
      DIRECT EXAMINATION BY MR. FAX                    9
4     CROSS EXAMINATION BY MR. POTTER                 41
      REDIRECT EXAMINATION BY MR. FAX                 45
5     RECROSS EXAMINATION BY MR. POTTER               49

6     WITNESS: DANIEL BYTHEWOOD
      DIRECT EXAMINATION BY MR. FAX                   52
7     CROSS EXAMINATION BY MR. POTTER                 82
      REDIRECT EXAMINATION BY MR. FAX                 91
8     RECROSS EXAMINATION BY MR. POTTER               96

9     WITNESS: JONATHAN STERN
      DIRECT EXAMINATION BY MR. FAX                  100
10    CROSS EXAMINATION BY MR. POTTER                105

11    WITNESS: JOHN MANEVAL
      DIRECT EXAMINATION BY MR. POTTER               111
12    CROSS EXAMINATION BY MR. FAX                   120

13    WITNESS: WILLIAM BURGEE
      DIRECT EXAMINATION BY MR. POTTER               122
14    CROSS EXAMINATION BY MR. FAX                   128
      REDIRECT EXAMINATION BY MR. POTTER             143
15
      WITNESS: ALASTAIR SMITH
16    DIRECT EXAMINATION BY MR. POTTER               144

17    WITNESS: PETER ENGEL
      DIRECT EXAMINATION BY MR. POTTER               155
18    CROSS EXAMINATION BY MR. FAX                   164

19    WITNESS: DANIELLE ZOLLER
      DIRECT EXAMINATION BY MR. FAX                  166
20

21

22

23

24

25

1                        REPORTER'S CERTIFICATE

2

3          I, Mary M. Zajac, do hereby certify that I recorded

4    stenographically the proceedings in the matter of Poppleton v.

5    Mayor and City Council of Baltimore, et al., Case Number(s)

6    RDB-12-1904, on July 13, 2012.

7          I further certify that the foregoing pages constitute

8    the official transcript of proceedings as transcribed by me to

9    the within matter in a complete and accurate manner.

10         In Witness Whereof, I have hereunto affixed my

11   signature this _____ day of _____, 2012.

12

13

14

15         _____

           Mary M. Zajac,
16         Official Court Reporter

17

18

19

20

21

22

23

24

25

## $

**$18.55** [1] - 25:13
**$24** [1] - 22:24
**$75,000** [2] - 148:12, 149:5

## '

**'07** [2] - 104:1, 107:22
**'08** [4] - 104:1, 105:1, 107:2, 108:2
**'09** [8] - 107:9, 107:10, 107:14, 108:3, 108:8, 108:13, 109:3, 109:4

## 0

**0157** [10] - 124:19, 194:23, 195:15, 196:4, 196:18, 197:19, 206:10, 212:9, 212:18, 213:6

## 1

**1** [2] - 19:14, 96:4
**1-A** [3] - 4:25, 158:22, 158:23
**1-B** [1] - 103:1
**1.10** [7] - 127:12, 127:17, 127:22, 128:9, 131:25, 133:12, 166:23
**1.17** [5] - 66:25, 77:1, 77:2, 77:3, 148:19
**1.17A** [3] - 68:9, 149:21
**1.17C** [1] - 148:23
**1.17E** [2] - 149:10, 149:12
**1.2** [2] - 18:5, 43:15
**1.2A** [10] - 14:2, 16:4, 16:7, 18:12, 30:10, 48:17, 199:19, 224:23, 227:12, 228:14
**1.2B** [2] - 224:23, 227:12
**1.3** [1] - 29:15
**1.3B** [3] - 30:12, 30:14, 30:19
**1.5** [2] - 64:1, 139:17
**1.5B** [18] - 38:18, 38:19, 39:12, 56:11, 56:24, 63:15, 64:1, 88:13, 96:6, 139:10, 139:17, 140:8, 141:6, 141:7, 141:10, 141:18, 142:8, 224:24
**1.7** [2] - 46:15, 147:25
**1.7A** [1] - 148:6

**1.9** [6] - 18:7, 43:18, 45:14, 192:22, 194:16, 225:2
**1.A** [1] - 46:18
**10** [11] - 23:2, 26:22, 37:5, 100:25, 113:22, 174:8, 175:5, 184:15, 192:3, 213:18
**10-minute** [2] - 82:16, 82:18
**100** [2] - 114:25, 231:9
**100%** [2] - 41:24, 83:25
**101** [1] - 1:24
**105** [1] - 231:10
**107.5** [2] - 13:4, 58:4
**10th** [1] - 29:10
**11** [10] - 17:10, 17:11, 17:12, 24:24, 27:8, 27:9, 41:11, 71:15, 71:17, 121:13
**111** [2] - 153:1, 231:11
**11A** [1] - 218:7
**12** [8] - 24:24, 35:12, 95:9, 95:17, 95:18, 95:21, 95:22, 113:22
**120** [3] - 29:24, 31:18, 231:12
**122** [1] - 231:13
**128** [1] - 231:14
**1288** [1] - 209:12
**12:57** [1] - 110:7
**12th** [1] - 41:2
**13** [6] - 1:11, 36:5, 36:6, 223:17, 232:6
**13.8** [2] - 4:15, 205:8
**130** [1] - 85:4
**135** [6] - 91:14, 91:15, 158:23, 198:4, 199:8, 205:21
**1372** [1] - 209:4
**13th** [2] - 3:1, 225:25
**14** [1] - 37:15
**143** [1] - 231:14
**144** [1] - 231:16
**145** [1] - 207:7
**15** [10] - 57:23, 58:1, 58:13, 59:19, 59:21, 60:17, 62:2, 98:23, 207:17, 217:9
**155** [1] - 231:17
**157** [42] - 20:16, 20:25, 32:17, 32:23, 33:11, 33:13, 33:14, 33:18, 33:25, 34:3, 34:23, 36:2, 36:12, 37:7, 37:23, 42:20, 43:6, 43:7, 45:5, 47:18, 47:22, 48:16, 62:17, 66:19, 124:4, 124:5, 136:15, 136:24, 137:5, 137:19, 137:24,

138:25, 139:3, 178:14, 178:20, 178:24, 182:23, 183:22, 184:3, 184:8, 184:9, 190:22
**16** [14] - 23:11, 23:16, 57:25, 60:23, 60:24, 89:17, 89:18, 89:20, 89:22, 89:23, 89:25, 97:6, 97:11, 97:12
**164** [1] - 231:18
**166** [1] - 231:19
**16th** [1] - 202:8
**17** [3] - 61:6, 61:8, 207:25
**172** [2] - 62:16, 62:20
**173** [2] - 114:25, 201:20
**18** [23] - 45:15, 46:16, 61:24, 83:9, 91:10, 91:12, 91:13, 91:24, 92:9, 101:14, 146:1, 178:3, 179:12, 179:14, 179:17, 179:22, 181:4, 193:2, 193:12, 193:17, 194:6, 210:14
**187** [1] - 63:10
**189** [1] - 170:12
**19** [7] - 61:23, 62:12, 84:9, 84:10, 84:12, 93:1, 97:4
**1977** [1] - 170:13
**1981** [2] - 37:17, 38:5
**1990** [1] - 23:2
**1994** [5] - 207:7, 207:13, 207:25, 214:20, 214:21
**1996** [3] - 36:11, 36:15, 36:19
**1:00** [2] - 82:15, 98:8
**1st** [4] - 22:25, 35:21, 108:8, 109:4

## 2

**2** [6] - 6:24, 76:3, 92:9, 210:17, 210:21, 213:24
**2.8** [1] - 225:4
**20** [17] - 2:19, 24:22, 27:2, 44:24, 45:1, 45:3, 62:22, 62:23, 85:18, 86:13, 86:20, 86:22, 91:13, 101:15, 111:22, 193:25
**20-odd** [2] - 102:9, 108:21
**2000** [2] - 12:2, 41:2
**2004** [3] - 10:22, 11:2, 94:18
**2005** [2] - 10:23, 11:4
**2006** [12] - 4:15, 11:5,

11:11, 12:3, 19:15, 54:20, 94:18, 176:11, 176:12, 176:13, 205:7, 217:4
**2007** [2] - 107:19, 218:14
**2008** [9] - 5:18, 103:17, 103:18, 104:14, 107:20, 170:4, 186:15, 208:13, 208:14
**2009** [7] - 112:15, 157:5, 170:6, 170:13, 208:5, 209:4, 209:12
**2010** [58] - 6:25, 18:24, 20:7, 20:24, 21:2, 23:11, 23:16, 23:17, 24:1, 24:24, 26:1, 26:3, 26:5, 26:10, 27:3, 27:14, 27:20, 28:13, 29:10, 30:5, 31:3, 41:18, 41:21, 65:10, 84:22, 92:11, 92:14, 92:18, 92:24, 125:24, 128:11, 134:21, 135:16, 136:12, 146:14, 152:19, 153:4, 156:13, 170:6, 178:1, 178:11, 178:14, 178:21, 179:9, 183:25, 184:4, 185:15, 186:1, 191:11, 193:5, 193:6, 202:8, 202:9, 202:10, 209:18, 210:14, 210:17, 210:21
**2011** [50] - 24:22, 27:2, 44:20, 44:24, 45:1, 45:3, 69:20, 69:22, 70:15, 70:18, 71:4, 71:6, 71:13, 71:18, 72:7, 74:21, 75:24, 76:1, 76:21, 78:4, 79:11, 79:12, 86:24, 87:1, 89:7, 93:9, 93:11, 93:19, 93:22, 94:2, 97:5, 103:17, 103:18, 150:9, 186:15, 187:8, 187:10, 187:22, 191:6, 191:7, 192:3, 194:1, 196:3, 198:8, 202:12, 209:10, 211:18, 223:16, 223:17, 226:17
**2012** [44] - 1:11, 20:12, 20:13, 35:12, 35:21, 35:23, 36:1, 37:3, 37:13, 38:14, 41:4, 42:13, 49:2, 59:1, 59:4, 59:13, 63:21, 75:20, 76:3, 76:6, 76:9, 76:17, 76:22, 95:19, 95:25, 96:4, 141:18, 152:19, 153:7, 178:22, 179:4, 181:1, 187:5, 187:15, 187:18, 209:24, 213:24, 225:7, 226:1,

226:19, 226:20, 232:6, 232:11
**20th** [3] - 44:20, 191:5, 192:3
**21** [7] - 57:23, 58:1, 58:14, 59:19, 63:2, 83:20, 85:23
**21201** [1] - 1:24
**215** [8] - 27:12, 28:2, 28:11, 41:14, 42:25, 202:9, 206:1, 210:23
**22** [13] - 24:1, 26:10, 57:25, 71:21, 71:23, 86:17, 86:25, 87:2, 87:3, 87:18, 93:21, 93:22, 214:20
**220** [5] - 77:18, 77:19, 77:20, 78:3, 82:11
**22nd** [1] - 72:7
**23** [1] - 216:10
**237** [8] - 21:4, 22:15, 23:13, 23:18, 42:25, 202:7, 206:1, 210:22
**23rd** [5] - 41:21, 42:13, 49:2, 226:13, 229:3
**24** [2] - 89:2, 89:3
**25** [4] - 117:17, 117:18, 117:19, 120:9
**27** [2] - 19:14, 197:8
**27th** [1] - 204:8
**28** [5] - 129:24, 129:25, 130:1, 130:6, 223:16
**28th** [12] - 2:23, 2:25, 4:11, 4:18, 6:3, 7:3, 66:8, 168:7, 205:3, 205:15, 206:21, 214:5
**29** [1] - 207:6
**2948.4** [1] - 218:8
**2nd** [42] - 18:24, 20:7, 20:24, 21:2, 23:17, 24:24, 26:3, 26:5, 27:3, 27:15, 27:20, 30:5, 31:3, 35:12, 35:21, 35:22, 35:23, 36:1, 63:21, 65:10, 76:8, 92:24, 95:19, 125:24, 128:11, 134:21, 134:25, 135:11, 135:16, 136:12, 146:14, 146:14, 156:13, 178:1, 178:11, 178:14, 178:21, 178:22, 179:3, 179:9, 181:1, 185:15

## 3

**3** [4] - 38:14, 139:10, 139:15, 139:16
**30** [8] - 32:3, 92:11, 92:12, 92:14, 92:17,

92:18, 93:22, 94:2

**300** [3] - 30:23, 30:25, 161:13

**30th** [4] - 58:20, 87:1, 89:7, 198:8

**31** [12] - 26:1, 42:2, 42:5, 42:8, 42:9, 58:21, 58:23, 58:24, 59:1, 59:4, 59:13, 202:9

**342** [1] - 170:5

**346** [1] - 5:23

**35** [5] - 32:3, 32:5, 32:6, 140:6, 140:7

**350** [1] - 161:13

**36** [1] - 32:6

**37** [2] - 32:6, 209:18

**388** [1] - 209:9

**392** [1] - 218:12

**3rd** [2] - 37:3, 37:13

## 4

**4** [6] - 22:2, 43:18, 97:6, 127:14, 166:23

**40** [1] - 205:12

**40-something** [1] - 32:6

**400** [1] - 161:14

**41** [1] - 231:4

**45** [3] - 42:2, 42:10, 231:4

**46** [5] - 39:7, 139:23, 140:3, 140:14, 140:15

**47** [22] - 32:6, 32:7, 32:16, 35:5, 39:3, 39:15, 47:12, 58:25, 124:13, 124:14, 136:13, 138:7, 139:22, 140:14, 142:11, 182:23, 183:14, 194:12, 194:21, 206:6, 211:21, 213:11

**484** [1] - 218:12

**49** [1] - 231:5

## 5

**5** [9] - 66:25, 77:1, 115:1, 131:5, 131:7, 134:1, 201:20, 202:6, 225:7

**50%** [1] - 107:16

**500** [1] - 30:22

**52** [1] - 231:6

**546** [1] - 214:20

**55** [1] - 216:10

**550** [1] - 170:12

**5515** [1] - 1:23

**555** [2] - 170:4, 208:14

**566** [1] - 209:4

**57** [1] - 194:10

**571** [1] - 209:12

**575** [2] - 5:23, 170:5

**59** [1] - 48:4

**598** [1] - 209:18

**5:18** [1] - 229:10

**5:38** [1] - 230:13

**5th** [1] - 86:24

## 6

**6** [3] - 24:14, 67:9, 77:2

**60** [9] - 35:19, 35:21, 50:4, 85:7, 85:9, 85:10, 91:3, 192:20, 199:14

**607** [1] - 139:13

**611** [1] - 139:13

**615** [2] - 7:13, 8:5

**640** [1] - 209:16

**644** [1] - 209:9

**65** [5] - 5:12, 169:25, 207:21, 219:19, 221:15

**65(a** [1] - 221:15

**681792** [1] - 209:24

**691** [1] - 207:25

**6:15** [1] - 57:7

## 7

**7** [4] - 170:4, 205:7, 208:14, 213:17

**7.5** [3] - 186:14, 189:8, 215:1

**7.9** [2] - 203:19, 206:19

**75** [2] - 158:21, 159:4

**7th** [2] - 4:15, 210:9

## 8

**8** [1] - 84:18

**8-110** [1] - 41:24

**8.9** [1] - 152:17

**82** [1] - 231:7

**859** [1] - 207:12

## 9

**9** [7] - 27:14, 28:13, 29:12, 37:17, 41:18, 202:10, 231:3

**9.6** [8] - 197:2, 197:8, 197:19, 201:17, 211:24, 212:7, 212:19, 213:11

**90** [1] - 39:6

**90%** [2] - 107:15

**900** [6] - 36:8, 36:12, 36:15, 37:6, 38:7, 42:20

**901** [1] - 21:22

**901-4** [1] - 22:4

**902** [8] - 21:23, 22:2, 22:5, 22:6, 37:19, 37:20, 37:22, 38:14

**903** [1] - 37:19

**904** [5] - 21:8, 21:23, 37:19, 37:20, 37:22

**906** [18] - 39:7, 39:12, 39:22, 40:2, 40:8, 40:9, 40:11, 40:14, 40:15, 40:17, 139:24, 140:10, 140:13, 140:16, 140:25, 141:9, 141:16, 163:18

**908** [3] - 40:8, 40:9, 40:11

**91** [1] - 231:7

**910** [2] - 40:8, 40:11

**912** [2] - 40:8, 40:11

**915** [1] - 37:19

**930** [1] - 42:25

**931** [15] - 23:24, 24:10, 24:20, 24:25, 43:1, 44:15, 44:23, 130:19, 130:21, 131:10, 193:24, 202:11, 203:4, 206:1, 210:23

**940** [6] - 25:6, 26:2, 26:6, 202:8, 206:2, 210:23

**941** [13] - 26:11, 26:13, 26:24, 27:4, 43:1, 44:24, 45:1, 193:24, 202:11, 203:3, 206:1, 210:24

**945** [1] - 207:12

**95%** [1] - 161:17

**96** [1] - 231:8

**962** [1] - 209:16

**9:00** [1] - 81:1

**9:30** [1] - 217:7

**9:58** [1] - 2:1

**9th** [1] - 29:13

## A

**A-L** [1] - 111:6

**A-L-A-S-T-A-I-R** [1] - 144:22

**a.m** [1] - 2:1

**abbreviated** [1] - 67:12

**ability** [11] - 67:22, 73:23, 76:7, 77:23, 80:18, 88:5, 95:10, 115:19, 164:6, 198:1, 222:2

**able** [25] - 6:23, 7:3, 7:5, 7:6, 16:6, 35:18, 44:3, 44:7, 45:15, 64:11, 72:20, 82:10, 117:12,

126:11, 146:13, 146:20, 146:21, 149:4, 151:11, 192:12, 201:4, 201:6, 201:10, 202:22, 228:20

**absence** [4] - 115:15, 197:25, 208:9, 211:8

**absent** [6] - 44:20, 45:3, 170:22, 204:25, 220:5, 225:11

**absolute** [1] - 103:14

**absolutely** [18] - 34:24, 69:8, 84:4, 92:23, 102:17, 103:12, 105:16, 128:20, 131:23, 143:4, 181:25, 206:3, 211:6, 212:21, 213:2, 213:8, 219:5, 222:20

**abundance** [2] - 50:20, 51:7

**abundantly** [3] - 211:21, 213:3, 214:12

**abuts** [1] - 183:22

**accept** [4] - 112:8, 141:23, 182:9, 198:21

**acceptable** [4] - 2:20, 152:7, 157:22

**accepting** [1] - 181:21

**access** [2] - 188:22

**accomplish** [1] - 187:7

**accomplished** [4] - 202:7, 202:8, 202:9, 202:12

**accordance** [8] - 21:7, 56:21, 141:12, 179:16, 185:19, 186:17, 189:1, 220:9

**according** [12] - 35:17, 36:1, 37:4, 37:9, 37:10, 39:14, 128:5, 188:6, 188:16, 194:1, 204:13, 210:10

**accurate** [2] - 121:10, 232:9

**accurately** [1] - 126:19

**achievable** [1] - 161:17

**achieve** [1] - 146:12

**acknowledge** [4] - 184:7, 184:16, 216:19, 221:22

**acknowledges** [1] - 184:2

**acknowledgment** [1] - 216:25

**acquire** [37] - 6:18, 14:7, 16:6, 16:7, 16:8, 16:9, 16:10, 16:13, 18:5, 18:16, 25:8, 26:1, 30:11, 32:9, 32:24, 43:22, 47:19, 48:21, 48:23, 123:16, 124:20, 125:23,

135:20, 135:21, 136:14, 142:12, 177:25, 178:11, 178:13, 194:24, 195:15, 210:11, 212:10, 224:25, 227:15

**acquired** [81] - 18:8, 18:20, 19:10, 19:18, 20:2, 20:15, 20:21, 20:23, 21:2, 22:14, 23:12, 23:22, 24:17, 25:5, 25:15, 25:16, 25:21, 26:11, 26:24, 27:11, 27:22, 28:3, 28:23, 28:25, 29:10, 30:6, 31:2, 35:6, 35:9, 35:10, 36:2, 36:8, 36:14, 37:5, 37:13, 37:18, 37:25, 42:21, 44:19, 45:2, 49:8, 84:22, 92:19, 92:20, 93:5, 93:14, 123:25, 126:3, 127:3, 127:10, 134:21, 134:24, 135:2, 135:15, 135:18, 135:24, 136:5, 139:4, 145:24, 146:14, 156:16, 178:1, 178:7, 179:10, 179:16, 182:25, 184:1, 184:2, 184:5, 184:10, 193:9, 193:10, 194:15, 201:16, 201:19, 206:7, 210:12, 210:20, 228:8, 228:13, 229:24

**acquiring** [7] - 16:21, 16:24, 26:12, 48:18, 132:16, 194:9

**Acquisition** [3] - 14:3, 84:18, 123:11

**acquisition** [30] - 18:10, 23:14, 29:3, 47:17, 65:9, 83:24, 84:21, 99:8, 123:20, 123:23, 125:10, 126:9, 126:21, 146:23, 148:16, 149:6, 150:4, 175:5, 183:1, 190:21, 190:25, 193:2, 193:18, 195:18, 199:17, 201:13, 224:22, 227:7, 227:11, 228:4

**acre** [2] - 4:15, 205:8

**act** [3] - 119:22, 164:25, 219:21

**acting** [2] - 4:19, 226:3

**action** [4] - 79:18, 177:24, 204:8, 210:4

**actions** [3] - 148:4, 148:8, 219:21

**active** [1] - 199:21

**activities** [17] - 32:24, 47:20, 56:23, 57:1, 124:20, 125:11, 125:15,

126:25, 139:8, 141:12, 142:13, 190:25, 194:24, 195:18, 196:22, 206:12, 212:10

**activity** [5] - 56:21, 87:15, 196:6, 212:17, 218:16

**actual** [7] - 53:10, 68:16, 68:20, 73:24, 80:14, 89:13, 201:13

**ad** [2] - 153:15

**add** [1] - 45:22

**addition** [8] - 6:2, 14:11, 18:12, 27:22, 55:20, 62:25, 67:3, 85:23

**additional** [7] - 127:8, 150:10, 162:4, 186:18, 190:24, 199:14, 203:11

**additionally** [2] - 194:9, 202:18

**address** [25] - 7:8, 28:11, 36:22, 36:23, 38:9, 40:7, 65:13, 65:24, 66:4, 66:9, 72:20, 73:2, 76:2, 135:6, 135:7, 149:10, 154:12, 180:9, 215:8, 215:9, 219:9, 220:20, 220:21, 230:9

**addressed** [4] - 7:2, 205:22, 214:16, 219:9

**addresses** [1] - 40:23

**adequacy** [3] - 75:17, 179:20, 187:16

**adequate** [6] - 35:18, 76:15, 116:20, 181:1, 181:2, 225:3

**adjacent** [4] - 66:20, 175:14, 205:10

**adjust** [6] - 8:24, 52:4, 100:10, 111:1, 122:19, 144:20

**administration** [2] - 148:25, 149:9

**admissibility** [2] - 12:25, 86:3

**admissions** [1] - 114:1

**admitted** [5] - 13:5, 58:6, 58:14, 59:19

**advance** [1] - 49:15

**advanced** [1] - 171:24

**advice** [3] - 114:21, 157:14, 157:21

**advise** [1] - 12:19

**advised** [3] - 12:19, 31:2, 106:5

**advising** [1] - 106:17

**advocate** [2] - 69:7, 211:23

**affect** [2] - 115:19, 219:25

**affixed** [1] - 232:10

**afford** [1] - 68:7

**affordable** [5] - 54:16, 150:23, 158:15, 161:13, 215:14

**afield** [1] - 163:14

**Africa** [1] - 101:9

**after-acquired** [2] - 127:3, 127:10

**afternoon** [4] - 98:13, 100:20, 105:21, 144:2

**afternoon's** [1] - 109:14

**agencies** [1] - 226:3

**agent** [3] - 119:19, 119:22, 119:24

**ago** [17] - 3:6, 3:7, 3:19, 37:2, 37:5, 96:23, 98:23, 101:15, 101:19, 104:19, 106:19, 106:24, 108:22, 114:10, 188:16, 188:17, 219:22

**agree** [16] - 18:15, 44:6, 58:8, 98:17, 98:19, 98:24, 99:20, 132:2, 134:15, 139:23, 141:17, 143:5, 143:7, 162:21, 182:12, 227:24

**agreeable** [5] - 2:12, 6:6, 222:14, 222:19, 226:15

**agreed** [10] - 2:9, 4:21, 80:17, 89:8, 115:13, 169:9, 169:10, 183:2, 187:8, 205:1

**agreeing** [2] - 135:21, 209:11

**agreement** [48] - 32:3, 38:23, 39:4, 45:14, 46:2, 47:4, 49:22, 49:25, 56:17, 66:2, 69:9, 69:10, 72:16, 77:1, 77:8, 115:8, 115:13, 128:3, 128:6, 128:22, 137:1, 139:10, 139:18, 145:25, 146:22, 148:19, 179:17, 179:25, 180:1, 180:6, 182:14, 182:17, 182:20, 183:24, 185:10, 185:19, 185:20, 185:22, 187:2, 187:21, 189:2, 197:2, 197:5, 202:17, 212:2, 223:25, 229:8

**Agreement** [9] - 4:14, 11:6, 13:24, 19:12, 115:5, 124:12, 192:23, 205:6, 210:8

**Agreements** [1] - 115:7

**agreements** [2] - 197:4, 212:1

**agrees** [1] - 99:13

**ahead** [18] - 13:20, 17:19, 28:10, 33:17, 73:6, 78:13, 79:20, 81:24, 88:8, 140:5, 141:24, 169:11, 169:14, 181:13, 194:8, 197:9, 221:13

**aisle** [1] - 173:14

**akin** [1] - 103:9

**AL** [1] - 1:7

**al** [1] - 232:5

**Alan** [1] - 219:16

**Alastair** [4] - 79:22, 144:15, 144:22, 161:23

**ALASTAIR** [2] - 144:17, 231:15

**albeit** [2] - 5:15, 107:10

**allegation** [1] - 204:15

**allege** [1] - 210:5

**alleged** [1] - 227:23

**alleges** [2] - 204:20, 209:25

**alleys** [1] - 217:13

**allocate** [1] - 163:7

**allocated** [2] - 162:20, 163:4

**Allocation** [1] - 112:7

**allow** [7] - 118:19, 119:23, 119:24, 120:6, 120:8, 186:13, 223:25

**allowable** [5] - 151:21, 152:4, 161:12

**allowed** [6] - 68:24, 69:1, 75:3, 75:5, 118:23, 171:15

**allowing** [1] - 219:2

**allows** [2] - 70:10, 162:3

**Allstate** [1] - 209:24

**almost** [5] - 60:18, 76:5, 104:8, 162:11, 187:13

**alternate** [1] - 121:25

**alternatively** [1] - 206:17

**ameliorated** [1] - 160:15

**amendment** [1] - 11:13

**amendments** [2] - 11:19, 11:22

**America** [1] - 218:12

**Amity** [1] - 152:23

**amount** [22] - 16:1, 23:5, 74:25, 75:4, 78:15, 85:5, 85:6, 151:5, 151:11, 151:25, 152:15, 158:19, 159:6, 159:7, 161:18, 161:21, 186:20, 205:20, 222:2, 222:7, 222:10, 222:14

**analysis** [5] - 74:4,

75:6, 115:16, 150:16, 171:11

**analyst** [1] - 73:18

**analyze** [1] - 73:21

**analyzing** [1] - 115:12

**anchor** [2] - 102:20, 103:2, 103:14, 181:9

**AND** [1] - 1:6

**angle** [1] - 61:25

**angry** [3] - 3:10, 4:1, 6:14

**Ann** [1] - 160:21

**annotation** [1] - 127:13

**annual** [4] - 14:19, 14:20, 15:19, 22:24, 25:13

**answer** [11] - 28:6, 43:6, 45:19, 45:20, 47:13, 47:14, 49:3, 125:4, 136:10, 141:24, 173:19

**answered** [3] - 109:6, 117:9, 117:11

**answers** [7] - 92:4, 93:2, 93:23, 93:25, 95:10, 95:12, 159:19

**anteroom** [1] - 98:6

**anticipated** [2] - 72:21, 211:22

**anticipating** [1] - 155:4

**anyway** [1] - 6:20

**apart** [3] - 45:5, 195:24, 212:20

**apartments** [2] - 101:2, 111:19

**Appeals** [3] - 5:19, 208:25, 209:5

**Appearances** [1] - 1:15

**applicable** [2] - 46:19, 149:17

**applicant** [2] - 113:20, 121:16

**Application** [4] - 85:24, 112:10, 129:20, 130:8

**application** [48] - 29:1, 75:18, 83:12, 84:5, 86:10, 91:25, 92:5, 92:8, 92:10, 112:22, 113:3, 113:5, 113:7, 113:11, 113:18, 113:21, 114:12, 114:16, 114:17, 115:17, 131:15, 150:16, 150:17, 150:18, 150:21, 150:22, 151:8, 151:15, 151:25, 152:13, 152:14, 158:3, 159:7, 161:2, 161:3, 162:8, 162:11, 162:16, 163:11, 176:7, 186:25, 187:2, 187:16, 187:24, 188:8, 207:9, 219:18

**applications** [9] - 83:4, 112:8, 112:10, 112:18, 113:2, 150:12, 157:13, 157:21, 162:10

**applied** [7] - 114:20, 159:24, 161:7, 162:16, 163:12, 199:3, 216:9

**apply** [3] - 8:5, 113:24, 191:25

**applying** [4] - 85:6, 115:2, 115:3, 158:8

**apprised** [1] - 88:6

**approach** [7] - 12:11, 17:25, 42:3, 117:13, 118:2, 129:18, 209:6

**approached** [6] - 101:14, 101:19, 103:1, 105:4, 108:21

**appropriate** [2] - 68:5, 68:11

**approval** [3] - 46:25, 68:23, 74:17

**approvals** [1] - 77:6

**approve** [3] - 46:19, 68:19, 87:5

**approved** [4] - 46:22, 74:10, 74:11, 128:4

**April** [22] - 22:25, 23:2, 36:11, 36:19, 42:13, 49:1, 75:15, 75:20, 76:1, 76:6, 76:11, 76:17, 76:21, 76:22, 93:9, 93:11, 93:19, 97:4, 97:5, 187:15, 187:18

**aptly** [1] - 5:15

**arbitrary** [5] - 197:13, 197:15, 201:17, 212:5, 212:20

**architect's** [1] - 54:8

**architectural** [3] - 53:8, 80:19, 102:11

**archives** [1] - 37:4

**area** [26] - 19:11, 60:8, 61:2, 64:5, 64:9, 68:11, 87:15, 137:9, 147:1, 149:22, 152:20, 154:4, 160:24, 183:16, 196:6, 198:11, 198:12, 206:14, 212:25, 215:5, 216:16, 217:1, 217:12, 218:21, 220:10, 225:3

**areas** [2] - 101:5, 149:1

**argue** [2] - 163:23, 182:3

**argued** [8] - 4:24, 5:1, 205:19, 205:24, 206:5, 206:18, 216:11

**argues** [2] - 210:16, 214:24, 214:25, 215:10

**arguing** [1] - 204:25

**argument** [12] - 163:21, 165:21, 165:23, 165:24, 169:12, 169:13, 179:8, 207:18, 208:19, 214:4, 215:6, 216:24
**arguments** [1] - 224:6
**arises** [1] - 204:13
**arm** [2] - 73:18, 147:10
**arose** [2] - 4:23, 201:1
**arrow** [1] - 48:14
**art** [3] - 132:6, 132:13, 185:8
**article** [1] - 41:23
**Article** [1] - 73:7
**articulating** [1] - 221:11
**ascend** [1] - 127:2
**ascertain** [3] - 31:5, 38:13, 214:19
**aside** [4] - 83:5, 106:5, 198:19
**aspect** [1] - 76:25
**assemblage** [4] - 123:18, 126:8, 126:10, 128:20
**Assemblage** [1] - 14:3
**assembled** [1] - 115:7
**assessed** [2] - 135:8, 136:4
**assessment** [3] - 71:25, 135:5, 135:7
**assets** [1] - 104:13
**assigned** [2] - 2:8, 2:9
**Assignment** [1] - 25:5
**assignment** [2] - 36:7, 36:10
**assignments** [2] - 132:7, 132:8
**assist** [5] - 65:5, 66:3, 67:4, 77:22, 148:4, 148:13, 152:10, 157:1, 157:4
**assisted** [5] - 11:11, 11:14, 11:20, 152:12, 157:13
**assisting** [2] - 102:10, 150:1
**associated** [3] - 63:23, 108:17, 199:2
**assume** [3] - 140:4, 153:21, 181:23
**assumed** [1] - 20:5
**assuming** [3] - 45:23, 70:17, 159:15
**assumption** [1] - 141:21
**assurance** [1] - 116:6
**assure** [2] - 123:16, 183:10
**asterisk** [4] - 32:20, 124:14, 138:6, 182:22

**attached** [2] - 40:20, 138:24
**attaches** [1] - 193:22
**attachment** [1] - 40:16
**attachments** [1] - 57:24
**attempt** [5] - 69:13, 78:3, 85:12, 114:22, 157:4
**attempted** [3] - 85:13, 160:5, 186:11
**attempts** [1] - 157:2
**attend** [1] - 160:6
**attendance** [2] - 94:4, 94:5
**attendant** [2] - 28:5, 218:21
**attention** [21] - 14:2, 18:2, 25:3, 29:23, 38:17, 41:11, 43:18, 47:12, 56:10, 83:20, 84:17, 90:4, 97:5, 124:7, 124:13, 127:11, 136:12, 139:10, 147:24, 149:3, 166:23
**attorneys** [4] - 75:1, 116:19, 116:24, 117:4
**attract** [2] - 80:19, 183:3
**authentic** [1] - 21:24
**authenticating** [1] - 22:5
**authentication** [1] - 21:23
**authenticity** [5] - 13:3, 13:8, 21:11, 21:21, 22:8
**author** [1] - 219:15
**Authority** [3] - 145:12, 147:11, 155:25
**authority** [6] - 14:7, 16:5, 30:1, 67:21, 67:22, 106:10
**avail** [1] - 101:21
**availability** [1] - 107:6
**available** [2] - 107:1, 109:14
**avoid** [1] - 218:15
**await** [1] - 206:9
**awarded** [7] - 10:23, 11:4, 95:1, 96:14, 96:24, 96:25, 174:25
**awards** [1] - 154:3
**aware** [12] - 137:8, 138:23, 138:25, 139:2, 139:4, 139:6, 143:10, 164:8, 170:2, 218:18, 227:13
**axiomatic** [1] - 5:9

**B**

**B-U-R-G-E-E** [1] - 122:22
**B-Y-T-H-E-W-O-O-D** [1] - 52:7
**backed** [1] - 62:2
**background** [2] - 61:14, 102:18
**backing** [3] - 62:1, 78:24, 159:2
**backstop** [1] - 126:24
**bad** [1] - 59:9
**balance** [10] - 7:16, 168:13, 170:24, 171:4, 171:5, 208:9, 215:18, 217:2, 220:6, 225:8
**balancing** [10] - 99:4, 169:2, 169:3, 169:4, 169:20, 172:23, 173:23, 175:17, 216:2, 216:3
**BALTIMORE** [1] - 1:7
**Baltimore** [60] - 1:11, 1:24, 2:5, 9:22, 15:4, 18:25, 19:10, 19:13, 20:19, 36:21, 38:6, 38:8, 38:15, 53:19, 55:22, 56:1, 57:11, 63:20, 78:18, 78:19, 78:20, 78:25, 79:6, 84:22, 123:6, 123:8, 126:6, 130:16, 130:17, 131:9, 145:5, 145:12, 155:24, 155:25, 157:8, 160:22, 181:18, 181:22, 183:8, 183:9, 183:12, 202:4, 204:9, 204:10, 210:2, 211:2, 211:4, 212:12, 213:9, 213:22, 216:15, 218:22, 218:25, 220:10, 223:20, 223:22, 223:23, 232:5
**bank** [3] - 65:22, 104:3, 108:3
**banker** [3] - 78:6, 78:8, 78:9
**banking** [2] - 74:18, 104:22
**banks** [2] - 104:24, 107:22
**Baptist** [1] - 36:8
**bars** [1] - 10:5
**base** [2] - 18:19, 94:14
**based** [22] - 52:16, 59:14, 63:11, 63:21, 73:24, 83:19, 88:3, 101:10, 105:10, 107:25, 110:15, 138:7, 151:4, 151:5, 151:7, 168:6,

185:20, 198:8, 198:9, 198:16, 198:25, 203:19
**basic** [1] - 179:7
**basis** [9] - 12:8, 47:16, 92:18, 93:13, 109:3, 181:4, 182:4, 190:21, 222:3
**BB&T** [5] - 118:13, 118:20, 119:12, 119:24, 120:6
**BB&T's** [1] - 120:1
**BBT** [1] - 198:19
**bear** [1] - 7:6
**bearing** [1] - 99:6
**bears** [1] - 216:3
**became** [5] - 10:22, 11:3, 11:4, 104:10, 164:8
**become** [9] - 10:21, 17:12, 102:4, 105:25, 106:11, 108:12, 152:6, 161:6, 164:9
**becomes** [2] - 142:24, 202:23
**becoming** [2] - 101:16, 201:13
**beg** [2] - 175:21, 175:23
**began** [2] - 69:24, 153:3
**begin** [3] - 69:15, 69:24, 173:6
**beginning** [8] - 104:1, 104:19, 104:24, 104:25, 154:2, 174:16, 226:18, 227:2
**begins** [2] - 130:24, 140:7
**begun** [1] - 75:22
**Behalf** [2] - 1:16, 1:18
**behalf** [6] - 55:9, 55:12, 69:7, 86:14, 130:16, 145:11, 199:21, 226:4
**behavior** [1] - 187:25
**behind** [1] - 109:22
**belabor** [1] - 65:16
**belief** [1] - 212:21
**believes** [2] - 222:11, 222:13
**below** [3] - 33:20, 165:17, 165:19
**bench** [4] - 82:17, 118:2, 118:4, 120:4
**Benefit** [1] - 209:11
**benefit** [5] - 51:21, 68:13, 77:8, 128:1, 225:16
**benefits** [1] - 216:16
**Bennett** [1] - 1:13
**best** [10] - 14:6, 16:5, 29:25, 66:14, 106:5, 186:12, 189:25
**better** [6] - 60:24,

98:12, 117:5, 157:18, 162:10, 177:14
**between** [26] - 4:14, 19:12, 34:10, 54:15, 60:18, 60:20, 67:24, 70:4, 71:9, 71:12, 72:9, 96:24, 101:25, 104:14, 108:22, 113:21, 152:19, 186:15, 186:25, 187:19, 201:23, 205:7, 207:17, 210:8, 210:10
**beyond** [2] - 106:21, 139:12
**biblical** [1] - 230:7
**bids** [1] - 53:9
**big** [4] - 54:11, 61:14, 104:25, 188:23
**bill** [2] - 51:4, 51:5
**billable** [4] - 50:25, 51:2, 51:6, 51:12
**billion** [1] - 101:1
**bind** [1] - 177:10
**binder** [9] - 18:22, 18:23, 21:13, 56:5, 56:7, 57:23, 71:20, 95:19, 124:9
**binding** [2] - 197:11, 212:3
**Biopark** [1] - 205:11
**Biotech** [1] - 63:8
**bit** [3] - 21:1, 101:20, 154:25
**BJ's** [1] - 103:9
**black** [4] - 56:5, 57:23, 71:20, 95:19
**Blackwelder** [11] - 5:25, 170:11, 170:18, 170:23, 171:11, 171:15, 208:17, 209:20, 214:10, 215:17
**Blake** [1] - 209:23
**Blakeney** [1] - 79:16
**blame** [1] - 198:7
**blight** [7] - 175:13, 196:12, 206:10, 206:11, 206:12, 212:17, 212:25
**block** [13] - 33:14, 34:2, 35:6, 36:12, 36:22, 38:9, 48:14, 63:10, 124:5, 135:6, 135:8, 136:3, 183:2
**Block** [44] - 20:16, 20:25, 32:17, 32:23, 33:11, 33:13, 33:18, 33:25, 34:23, 36:2, 37:7, 37:23, 42:19, 43:6, 43:7, 45:5, 47:18, 47:22, 48:16, 62:20, 66:19, 124:4, 124:19, 136:15, 136:24, 137:5, 137:19, 137:24, 178:14, 178:20,

178:24, 182:23, 183:22, 184:3, 190:22, 194:23, 195:15, 196:4, 196:18, 197:19, 206:10, 212:9, 212:17, 213:6

**blocked** [1] - 48:16
**blocks** [2] - 33:11, 33:21
**blow** [1] - 33:7
**blow-ups** [1] - 33:7
**blue** [1] - 60:21
**bluntly** [1] - 3:11
**Board** [13] - 68:18, 68:20, 68:22, 74:14, 74:16, 75:8, 75:13, 76:12, 76:16, 76:22, 150:12, 187:17
**board** [1] - 68:19
**Bob** [1] - 87:4
**bode** [1] - 87:15
**bond** [27] - 67:18, 68:23, 70:22, 73:15, 119:19, 150:14, 152:8, 158:5, 158:7, 159:6, 163:4, 163:5, 163:8, 198:20, 220:19, 220:21, 221:12, 221:16, 222:7, 222:11, 222:12, 222:13, 222:19, 226:8, 229:2, 229:3, 229:8
**bonding** [5] - 118:16, 118:17, 119:19, 119:22, 119:24
**bonds** [16] - 67:15, 68:7, 73:23, 74:18, 77:9, 118:10, 118:11, 118:19, 119:1, 119:2, 120:6, 158:15, 176:5, 199:1, 199:3, 199:4
**book** [4] - 12:14, 12:22, 18:22, 124:8
**books** [1] - 76:11
**borrow** [3] - 151:4, 161:16
**borrowed** [2] - 108:15, 161:22
**borrower's** [1] - 113:10
**bottled** [1] - 100:8
**bottom** [4] - 24:8, 62:16, 127:16, 199:16
**bought** [1] - 54:23
**Boulevard** [2] - 4:17, 205:10
**box** [3] - 48:8, 54:11, 188:23
**boy** [1] - 56:11
**breach** [11] - 49:22, 49:24, 180:1, 204:8, 204:14, 204:20, 209:25, 210:4, 223:14, 227:14,

227:16
**breached** [6] - 210:3, 210:6, 224:21, 227:6, 227:11, 228:4
**breaches** [1] - 227:2
**breadth** [1] - 61:16
**break** [4] - 98:9, 106:21, 110:5, 155:2
**brevity** [1] - 66:11
**brick** [2] - 61:11, 64:15
**brief** [7] - 66:9, 82:14, 165:12, 166:7, 222:25, 228:21, 229:9
**briefer** [1] - 166:8
**briefing** [3] - 226:9, 229:1, 230:2
**briefly** [10] - 45:12, 65:14, 65:17, 65:24, 67:11, 100:24, 120:18, 166:8, 203:15, 203:16
**briefs** [1] - 222:10
**bring** [3] - 99:18, 99:23, 100:8
**brings** [1] - 188:23
**broken** [1] - 32:11
**broker** [4] - 78:9, 85:15, 85:20, 86:14
**brokerage** [1] - 104:11
**Brothers** [1] - 104:2
**brought** [2] - 29:22, 54:7
**build** [4] - 32:15, 80:16, 80:17, 151:22
**builders** [2] - 137:15, 137:23
**building** [14] - 14:24, 15:5, 15:10, 15:11, 38:2, 39:25, 40:1, 40:18, 53:24, 54:9, 80:12, 80:14, 183:7
**Building** [1] - 38:5
**buildings** [22] - 38:24, 40:2, 40:9, 40:21, 40:25, 47:18, 56:18, 63:17, 64:16, 136:22, 138:16, 138:24, 139:19, 140:10, 141:1, 147:23, 175:6, 195:8, 201:25, 212:14, 213:15, 224:24
**built** [8] - 35:1, 125:21, 138:13, 138:16, 142:22, 195:8, 212:14, 213:1
**bulk** [1] - 158:5
**burden** [6] - 5:10, 5:24, 7:6, 110:15, 170:14, 170:18, 185:1, 220:3
**Burgee** [13] - 122:14, 122:21, 128:17, 129:20, 130:8, 139:15, 141:25, 143:16, 143:23, 144:11,

182:16, 185:3, 185:6
**BURGEE** [2] - 122:16, 231:13
**business** [11] - 100:22, 100:23, 103:10, 103:17, 104:12, 104:16, 145:19, 172:6, 172:8, 183:10, 191:17
**busy** [1] - 230:3
**buy** [3] - 35:2, 107:24, 202:3
**buyers** [1] - 107:22
**buying** [2] - 10:9, 104:12
**buyout** [1] - 55:1
**BY** [62] - 9:5, 9:18, 13:21, 17:20, 22:11, 28:21, 41:9, 42:17, 45:11, 49:13, 52:10, 58:16, 59:20, 66:23, 72:14, 73:10, 82:4, 82:24, 86:8, 89:24, 90:20, 91:2, 91:20, 96:12, 97:17, 100:19, 105:20, 111:9, 114:4, 117:16, 120:5, 120:17, 122:25, 128:16, 137:21, 143:15, 145:1, 154:1, 155:20, 163:16, 164:2, 164:17, 166:21, 231:3, 231:4, 231:4, 231:5, 231:6, 231:7, 231:7, 231:8, 231:9, 231:10, 231:11, 231:12, 231:13, 231:14, 231:14, 231:16, 231:17, 231:18, 231:19
**BYTHEWOOD** [2] - 52:1, 231:6
**Bythewood** [36] - 4:8, 18:24, 51:24, 52:6, 52:7, 52:11, 65:12, 66:21, 66:24, 72:19, 82:20, 83:1, 84:13, 89:25, 90:21, 91:3, 91:21, 96:13, 97:25, 101:14, 101:20, 105:5, 105:7, 105:8, 106:12, 106:19, 108:21, 114:6, 114:11, 118:14, 118:21, 164:4, 187:3, 187:6, 188:7, 188:17
**Bythewood's** [1] - 65:3

## C

**Cable** [1] - 214:19
**calculate** [1] - 224:12
**cameras** [1] - 147:13
**candidly** [1] - 99:8
**candor** [1] - 65:11

**cannot** [9] - 65:15, 65:21, 86:3, 159:14, 173:3, 174:15, 180:11, 220:10
**Cap** [8] - 68:1, 73:15, 73:17, 73:18, 75:1, 75:4, 75:5, 150:15
**cap** [1] - 56:22
**capacity** [4] - 83:3, 97:20, 204:11, 223:21
**capital** [5] - 108:16, 122:22, 188:22
**Capital** [1] - 118:13
**capped** [10] - 56:19, 57:11, 57:17, 60:2, 60:10, 62:7, 63:13, 63:18, 88:14, 147:6
**capstone** [1] - 124:6
**caption** [2] - 2:7, 56:11
**captioned** [4] - 2:10, 17:1, 129:20, 130:8
**captures** [1] - 229:17
**care** [1] - 65:22
**Carolyn** [1] - 79:15
**carting** [1] - 57:3
**Case** [1] - 232:5
**case** [45] - 2:8, 3:4, 4:22, 5:10, 5:20, 5:21, 5:23, 6:11, 7:22, 8:9, 10:18, 12:20, 15:13, 46:21, 46:24, 50:21, 81:2, 112:12, 121:18, 129:17, 130:15, 132:14, 154:25, 163:3, 171:5, 171:8, 171:13, 171:20, 172:8, 174:19, 190:18, 198:2, 198:19, 199:3, 208:3, 208:23, 209:3, 209:17, 209:22, 214:13, 216:20, 218:14, 219:7, 219:12, 219:14
**CASE** [1] - 1:5
**cases** [4] - 112:4, 113:18, 121:13, 131:16
**cash** [1] - 108:24
**catch** [1] - 165:18
**category** [1] - 115:21
**caused** [2] - 175:13, 217:8
**caution** [3] - 50:20, 51:7, 82:2
**caveat** [1] - 183:14
**CDA** [7] - 115:3, 115:23, 116:3, 116:4, 116:17, 163:8, 198:21
**CEA's** [1] - 113:11
**cell** [1] - 50:25
**certain** [5] - 5:1, 21:6, 98:14, 196:24, 206:22
**certainly** [25] - 4:2, 5:7,

12:12, 18:1, 42:4, 51:20, 51:21, 98:11, 98:13, 105:1, 115:17, 117:15, 125:3, 126:14, 127:22, 128:12, 128:24, 168:6, 178:21, 181:23, 186:16, 192:18, 196:10, 228:18
**Certificate** [7] - 24:16, 26:23, 27:10, 29:1, 41:14, 125:19, 138:14
**CERTIFICATE** [1] - 232:1
**certificate** [2] - 41:21, 203:8
**Certificates** [5] - 125:16, 125:20, 136:20, 153:6, 195:17
**certification** [2] - 196:24, 212:15
**certification** [4] - 21:11, 131:13, 131:14, 134:1
**certifications** [3] - 21:9, 21:14, 21:16
**certified** [1] - 33:4
**certify** [6] - 130:25, 131:5, 131:8, 131:16, 232:3, 232:7
**challenge** [1] - 20:1
**challenged** [1] - 190:20
**chambers** [3] - 4:19, 223:3
**chance** [1] - 3:18
**change** [7] - 53:25, 149:18, 158:2, 226:22, 228:17, 228:18, 229:22
**changed** [2] - 59:8, 80:10
**changes** [2] - 149:20, 229:16
**changing** [2] - 202:25
**Channel** [1] - 214:19
**characteristics** [1] - 22:4
**charge** [4] - 55:5, 133:6, 134:4, 134:8
**charges** [1] - 134:4
**Charles** [2] - 1:17, 219:15
**Charlottesville** [1] - 214:20
**check** [4] - 20:16, 22:3, 57:11, 57:14
**Chicago** [1] - 97:16
**child** [1] - 64:21
**children** [2] - 64:23, 65:1
**China** [1] - 101:8
**chooses** [1] - 113:14
**chosen** [1] - 113:20
**Church** [1] - 36:8

church [3] - 36:14, 36:19, 36:24
church's [1] - 36:16
Circuit [26] - 5:19, 170:4, 170:5, 170:12, 207:6, 207:7, 207:24, 207:25, 208:3, 208:4, 208:11, 208:20, 208:25, 209:4, 209:5, 209:6, 209:10, 209:12, 209:16, 209:17, 209:18, 214:20, 214:21, 218:11, 218:13
circuit [3] - 170:12, 208:24, 209:7
Circuits [1] - 209:14
circulate [1] - 153:13
circulated [1] - 74:6
circumstances [4] - 115:4, 139:5, 214:3, 220:1
Cite [4] - 52:14, 52:18, 53:1, 83:3
Citigroup [1] - 209:17
citing [1] - 197:19
City [378] - 2:5, 2:6, 4:3, 4:24, 5:2, 5:6, 6:20, 6:23, 7:3, 7:4, 8:7, 8:16, 9:10, 9:22, 12:2, 12:6, 12:20, 14:6, 14:8, 14:12, 15:5, 16:5, 16:11, 18:7, 18:12, 18:20, 19:9, 19:13, 19:18, 20:15, 20:19, 20:23, 22:14, 23:12, 23:15, 23:17, 23:22, 24:9, 24:17, 24:25, 25:5, 25:8, 25:15, 26:1, 26:5, 26:11, 26:12, 26:15, 26:24, 27:3, 27:11, 27:21, 28:3, 28:24, 29:25, 30:4, 30:11, 31:2, 31:5, 31:23, 32:9, 32:23, 35:7, 36:2, 36:20, 36:21, 37:5, 38:6, 38:8, 38:15, 42:21, 44:3, 44:7, 45:3, 45:15, 46:1, 46:22, 47:19, 48:21, 49:7, 50:1, 50:4, 50:7, 50:11, 50:13, 53:19, 53:23, 54:25, 55:22, 56:19, 56:20, 56:21, 56:24, 57:11, 63:18, 63:20, 65:4, 65:5, 66:3, 66:18, 67:1, 67:17, 67:21, 67:24, 68:6, 68:10, 68:13, 68:16, 68:20, 69:3, 70:5, 70:10, 70:15, 71:4, 71:6, 71:9, 73:19, 73:25, 74:14, 77:6, 78:18, 78:19, 78:20, 78:24, 78:25,

79:6, 79:14, 79:15, 83:5, 83:18, 83:19, 83:24, 84:7, 84:22, 84:23, 87:20, 88:4, 88:5, 88:15, 88:18, 89:8, 92:6, 92:19, 92:20, 93:5, 93:14, 93:16, 94:17, 94:21, 94:23, 95:1, 95:11, 96:4, 96:13, 99:13, 101:12, 106:4, 106:10, 107:12, 109:17, 110:12, 110:22, 114:22, 114:25, 115:4, 115:6, 115:7, 115:13, 116:3, 116:6, 120:23, 121:8, 121:11, 121:19, 121:20, 121:23, 122:9, 122:13, 123:6, 123:8, 124:19, 124:24, 125:7, 125:23, 126:1, 126:11, 126:17, 127:5, 127:8, 127:23, 128:9, 128:18, 128:23, 130:9, 130:16, 130:17, 131:8, 131:20, 131:25, 133:13, 133:16, 134:21, 134:24, 135:2, 135:10, 135:17, 135:24, 136:14, 136:18, 139:4, 140:24, 141:11, 141:18, 143:6, 143:16, 143:19, 144:15, 145:5, 145:11, 145:12, 145:20, 145:23, 146:3, 146:13, 146:17, 146:20, 146:22, 147:10, 148:15, 149:5, 149:21, 150:3, 150:14, 151:2, 151:3, 151:9, 152:9, 154:3, 154:22, 155:25, 156:12, 156:16, 160:11, 160:18, 163:18, 165:1, 167:1, 168:3, 168:18, 169:5, 169:6, 169:9, 169:12, 173:2, 173:11, 173:17, 174:1, 174:15, 174:21, 174:22, 176:21, 176:23, 177:1, 177:25, 178:10, 178:13, 179:8, 179:13, 179:25, 180:5, 181:17, 183:4, 183:25, 184:1, 185:14, 185:16, 186:1, 186:22, 186:25, 187:1, 187:4, 187:15, 187:20, 187:21, 188:7, 189:14, 192:4, 192:12, 194:14, 194:15, 194:24, 195:4, 195:14, 196:12, 198:7, 199:16, 199:17, 200:14, 201:4, 201:5, 201:6, 201:10, 201:15, 201:18, 202:4, 202:6, 202:13, 203:2, 203:5, 204:4, 204:9, 204:10,

204:18, 205:15, 205:24, 206:5, 206:14, 206:24, 207:14, 210:2, 210:10, 210:12, 210:16, 210:20, 211:2, 211:4, 211:13, 211:17, 212:9, 212:12, 212:16, 212:18, 212:24, 213:5, 213:9, 213:12, 213:19, 213:22, 216:13, 216:14, 216:17, 216:20, 216:25, 217:7, 217:11, 222:10, 222:11, 222:15, 222:18, 223:19, 223:20, 223:22, 223:23, 223:24, 225:4, 225:12, 225:13, 225:15, 227:6, 227:10, 227:21, 228:4, 228:7, 232:5
CITY [1] - 1:6
city [9] - 4:17, 88:1, 147:21, 159:22, 177:10, 205:10, 211:1, 215:15, 217:13
City's [44] - 6:18, 7:6, 10:25, 12:14, 16:15, 18:5, 18:15, 20:2, 20:7, 29:23, 31:12, 43:22, 46:19, 49:22, 49:24, 56:1, 68:1, 68:15, 70:21, 73:15, 147:12, 147:22, 150:6, 150:12, 150:14, 151:21, 175:5, 178:10, 184:24, 186:1, 186:22, 190:20, 193:2, 193:18, 197:14, 197:18, 198:16, 199:6, 203:10, 204:14, 204:16, 205:20, 213:16, 228:19
City-based [1] - 83:19
city-owned [1] - 147:21
CIVIL [1] - 1:5
Civil [4] - 2:5, 5:12, 7:13, 207:21
civil [1] - 3:4
civility [1] - 3:10
claim [2] - 30:15, 31:20
claimed [1] - 213:20
claims [6] - 29:20, 167:10, 171:5, 213:21, 224:20, 228:3
clarification [1] - 28:1
clarified [1] - 162:12
clarify [3] - 41:13, 44:15, 76:10
Clause [1] - 206:19
clause [3] - 203:18, 203:21, 206:23
cleaned [1] - 143:7
cleaning [1] - 205:18

clear [56] - 9:9, 26:18, 47:15, 49:21, 65:25, 95:11, 107:10, 120:19, 127:25, 129:1, 129:3, 129:9, 129:15, 131:22, 133:15, 133:20, 134:10, 136:14, 143:17, 147:12, 147:17, 163:18, 168:8, 170:16, 170:21, 171:2, 184:20, 185:15, 185:16, 187:11, 192:21, 195:15, 195:24, 196:5, 199:20, 200:9, 200:11, 201:23, 206:15, 208:21, 210:20, 211:14, 211:21, 212:24, 213:3, 213:7, 214:6, 214:12, 215:21, 221:11, 224:19, 224:23, 227:9, 228:2, 228:6
cleared [19] - 39:13, 39:15, 61:4, 96:4, 140:25, 143:2, 143:6, 143:7, 147:5, 147:8, 175:8, 176:15, 178:25, 179:3, 182:24, 182:25, 183:2, 184:12, 196:3
clearer [1] - 61:1
clearing [33] - 32:24, 47:5, 47:7, 47:8, 47:9, 47:11, 47:20, 49:19, 50:8, 56:20, 56:21, 56:23, 56:25, 57:3, 63:19, 88:15, 124:20, 125:10, 139:8, 141:11, 142:13, 175:10, 183:1, 190:25, 194:24, 195:18, 211:7, 211:16, 212:10, 213:16
clearly [13] - 5:24, 7:4, 102:12, 110:17, 189:25, 195:25, 213:9, 213:17, 213:18, 217:3, 219:1, 220:8, 221:16
clerical [1] - 2:15
CLERK [29] - 8:23, 9:3, 17:5, 17:10, 33:15, 51:25, 52:3, 52:8, 100:3, 100:6, 100:10, 100:13, 100:17, 110:25, 111:3, 111:7, 122:15, 122:18, 122:23, 129:24, 130:7, 144:16, 144:19, 144:24, 155:14, 155:18, 166:11, 166:15, 166:19
Clerk [3] - 21:10, 21:15, 186:9
clerk [1] - 3:4
client [8] - 10:19, 10:21, 10:22, 11:14, 11:20, 51:12, 155:6, 211:23

clients [1] - 50:25
climate [1] - 65:23
climb [1] - 64:23
close [25] - 18:9, 33:24, 35:18, 45:15, 45:25, 46:3, 47:1, 87:21, 115:18, 115:22, 116:17, 143:6, 145:16, 145:17, 146:21, 178:4, 178:23, 179:12, 198:4, 198:24, 199:7, 203:19, 203:23, 225:1, 230:3
closed [5] - 87:15, 88:5, 179:15, 217:13
closing [78] - 10:11, 19:22, 29:24, 30:2, 31:19, 35:10, 35:24, 39:16, 39:19, 43:8, 43:9, 43:11, 43:23, 43:25, 44:2, 44:7, 45:24, 46:2, 46:14, 46:15, 47:13, 47:18, 49:16, 56:20, 61:4, 63:19, 63:21, 65:10, 76:3, 76:9, 85:2, 88:16, 88:19, 88:22, 88:24, 88:25, 89:9, 95:11, 95:14, 96:2, 116:16, 116:22, 116:23, 127:23, 128:18, 131:25, 133:13, 136:15, 141:4, 141:17, 143:17, 145:18, 146:12, 146:24, 147:3, 147:20, 152:21, 156:23, 167:1, 175:9, 176:5, 179:21, 183:3, 185:17, 191:1, 192:14, 193:1, 193:17, 194:11, 194:13, 198:5, 201:4, 201:11, 201:14, 202:22, 203:13, 210:12, 213:17
cloud [3] - 65:15, 65:20, 189:19
Club [2] - 103:9
CM/ECF [1] - 2:7
Co [1] - 152:23
co [11] - 54:22, 101:16, 101:23, 102:6, 102:7, 102:16, 105:23, 105:25, 106:9, 106:11, 181:10
co-developer [10] - 101:16, 101:23, 102:6, 102:7, 102:16, 105:23, 105:25, 106:9, 106:11, 181:10
co-managing [1] - 54:22
Co-op [1] - 152:23
Coast [1] - 186:17
collapsed [6] - 104:1, 104:2, 104:5, 107:2,

107:19, 108:2
**collapses** [1] - 104:4
**colleague** [1] - 209:23
**collection** [1] - 134:5
**collectively** [1] - 223:23
**colloquy** [1] - 181:11
**color** [1] - 33:5
**combination** [1] -
108:16
**combined** [1] - 103:12
**comfortable** [1] -
116:25
**coming** [3] - 103:14,
104:12, 221:7
**comment** [1] - 153:14
**commercial** [9] - 9:25,
10:8, 54:10, 107:15,
108:15, 108:22, 109:2,
158:17, 159:16
**commercially** [2] -
105:13, 214:1
**Commissioner** [8] -
42:14, 79:17, 79:21,
156:2, 156:4, 204:11,
223:22
**commit** [3] - 115:25,
121:24, 122:2
**commitment** [27] -
82:10, 84:1, 90:16,
90:22, 106:21, 113:11,
113:19, 113:21, 115:19,
115:24, 116:4, 116:9,
116:11, 116:13, 116:14,
116:15, 116:21, 117:7,
120:22, 120:23, 121:7,
121:14, 121:22, 181:24,
198:22, 198:24
**commitments** [6] -
115:23, 145:21, 146:2,
146:6, 146:10, 217:23
**commits** [1] - 145:19
**committed** [5] - 101:25,
105:15, 106:17, 116:8,
207:23
**committing** [3] - 106:2,
106:12, 106:17
**common** [1] - 202:4
**Commonwealth** [1] -
207:6
**Communications** [1] -
207:25
**communities** [2] -
175:14
**Community** [10] -
42:15, 111:13, 145:5,
145:8, 149:6, 155:24,
200:16, 204:10, 223:20,
223:23
**community** [20] - 53:24,
54:2, 54:6, 54:8, 54:12,

54:18, 80:16, 80:17,
162:21, 175:18, 181:7,
181:8, 181:9, 204:2,
204:5, 204:6, 216:20,
219:3, 225:24, 229:6
**companies** [3] - 103:4,
104:24, 189:12
**Companies** [1] - 103:7
**Company** [2] - 170:11,
209:3
**company** [5] - 103:4,
103:8, 126:7, 134:4,
134:7
**comparables** [2] -
151:10, 161:20
**compelling** [1] - 219:19
**compensate** [1] -
186:19
**compete** [1] - 162:22
**competed** [1] - 94:19
**competent** [2] - 97:9,
119:17
**competing** [2] - 171:5,
220:11
**competition** [1] - 94:19
**competitive** [8] - 112:3,
112:4, 112:8, 112:9,
113:14, 113:17, 113:20
**complainant** [1] - 210:4
**complaint** [12] - 33:5,
42:3, 42:11, 57:24, 59:1,
124:11, 164:11, 169:17,
192:17, 204:23, 209:25,
223:13
**complete** [3] - 94:24,
113:4, 232:9
**completed** [13] - 83:24,
112:10, 126:25, 130:15,
146:23, 153:5, 172:10,
195:19, 196:19, 196:22,
196:23, 215:3, 224:11
**completely** [1] - 94:13
**completion** [1] - 102:14
**complex** [2] - 88:1,
158:7
**complexity** [1] - 114:14
**compliance** [1] - 131:15
**complicated** [2] -
65:20, 184:23
**complied** [3] - 54:17,
213:10, 213:19
**comply** [2] - 141:18,
145:19
**component** [4] -
102:17, 105:11, 150:23,
188:24
**components** [1] -
107:11
**comprehend** [1] - 138:9
**comprise** [1] - 124:1

**concentration** [1] - 9:24
**concern** [9] - 33:24,
34:13, 34:22, 34:25,
35:1, 151:13, 152:3,
160:25
**concerned** [4] - 34:5,
34:6, 168:24
**concerning** [6] - 53:18,
65:4, 92:4, 93:2, 95:10,
95:11, 205:13
**concerns** [8] - 42:19,
75:17, 87:8, 87:9, 87:11,
150:25, 151:10, 221:22
**conclude** [1] - 217:2
**concludes** [1] - 219:13
**conclusion** [2] - 87:16,
230:13
**concrete** [1] - 64:16
**concurring** [1] - 209:11
**condemn** [1] - 24:7
**condemnation** [3] -
23:23, 126:24, 201:25
**condensed** [1] - 12:20
**Condition** [1] - 56:11
**condition** [16] - 5:7,
42:19, 46:18, 46:25,
59:10, 62:9, 62:11,
141:7, 143:2, 146:25,
147:3, 148:5, 161:1,
179:21, 184:17, 227:17
**conditionally** [1] -
171:16
**Conditions** [6] - 46:7,
127:19, 127:22, 131:25,
166:23
**conditions** [13] - 12:9,
45:23, 45:24, 46:1,
46:14, 49:15, 59:10,
59:13, 88:10, 119:3,
128:2, 145:18, 146:5
**condominiums** [1] -
101:3
**conduct** [8] - 32:24,
47:20, 56:20, 124:20,
141:11, 142:13, 194:24,
212:10
**conducted** [2] - 214:5,
223:16
**conduit** [3] - 62:4, 62:6,
62:19
**conference** [4] - 118:4,
120:4, 165:16, 229:4
**conferred** [1] - 138:1
**confine** [1] - 65:8
**conjunction** [3] - 53:16,
182:25
**connect** [1] - 203:17
**connection** [13] - 10:22,
11:5, 32:25, 34:17,
47:21, 71:25, 124:21,

125:12, 142:14, 194:25,
206:8, 206:15, 212:11
**connections** [1] -
102:19
**consequences** [1] -
175:4
**consider** [6] - 77:6,
171:4, 171:6, 171:12,
180:10, 207:19
**considerable** [1] -
218:7
**considerations** [2] -
81:18, 219:24
**considered** [3] - 46:16,
161:19, 224:6
**considering** [1] - 182:2
**consist** [2] - 11:9, 64:13
**consistent** [2] - 77:8,
229:14
**consists** [1] - 103:7
**consolidating** [1] -
202:24
**constantly** [1] - 196:11
**constitute** [1] - 232:7
**constraints** [1] - 80:23
**construct** [3] - 134:19,
145:21, 146:2
**constructed** [1] -
142:19
**constructing** [1] - 34:8
**construction** [41] -
38:22, 39:10, 39:14,
46:20, 46:23, 46:25,
47:10, 53:10, 56:16,
60:9, 61:2, 61:3, 62:7,
63:16, 64:5, 64:16,
64:25, 84:1, 111:18,
111:24, 133:22, 135:23,
139:18, 139:24, 140:8,
140:11, 140:16, 141:8,
142:1, 147:11, 148:18,
150:9, 153:2, 153:3,
189:11, 189:13, 215:3,
217:14, 224:12, 224:18,
225:17
**consult** [2] - 116:19,
116:24
**consultant** [6] - 68:2,
68:3, 68:4, 68:6, 73:18,
150:15
**consultants** [1] - 68:1
**contacted** [1] - 112:12
**contacting** [1] - 229:2
**contacts** [1] - 181:7
**contained** [3] - 64:19,
197:5, 212:1
**contemplate** [1] - 133:3
**contemplated** [3] -
133:2, 133:23, 141:5
**contemplating** [1] -

138:2
**contemporaneous** [1] -
191:11
**contemporaneously**
[1] - 19:5
**content** [1] - 203:22
**context** [14] - 57:1,
63:9, 98:12, 98:15,
98:18, 99:14, 168:5,
168:25, 169:10, 172:5,
183:10, 183:11, 188:12,
214:1
**contiguous** [1] - 40:11
**contingent** [1] - 163:1
**continuation** [1] - 2:2
**continue** [8] - 42:16,
86:7, 147:13, 147:17,
173:17, 210:15, 224:1,
226:5
**continued** [1] - 205:14
**continuing** [5] - 62:19,
110:8, 147:19, 164:25,
224:3
**contract** [37] - 4:12,
9:13, 10:14, 30:10,
31:12, 31:21, 32:14,
152:9, 173:2, 173:3,
173:12, 174:20, 176:13,
182:6, 204:8, 204:20,
205:5, 205:8, 205:17,
206:16, 210:1, 210:4,
210:9, 210:10, 210:15,
211:22, 213:1, 213:10,
213:23, 215:11, 217:16,
219:4, 219:6, 223:14,
227:6, 227:16
**Contract** [1] - 204:15
**contract's** [1] - 214:1
**contractor** [1] - 206:21
**contractors** [5] - 53:9,
172:10, 215:3, 224:12,
224:18
**contracts** [7] - 10:15,
11:21, 218:10, 218:24,
225:23
**contractual** [3] - 210:3,
210:5, 218:15
**contradict** [2] - 178:15,
178:18
**contraindication** [1] -
121:20
**contrary** [8] - 20:7,
174:18, 187:3, 190:3,
199:22, 205:22, 210:17,
225:15
**contribute** [2] - 51:20,
101:18
**contribution** [1] - 198:3
**control** [5] - 90:10,
115:10, 201:22, 203:20

**convenience** [1] - 225:8
**conventional** [2] -
77:23, 186:19
**conversation** [2] -
53:23, 147:15
**conversations** [4] -
70:4, 88:5, 148:10, 173:3
**convey** [23] - 6:24, 7:4,
7:5, 7:6, 31:12, 32:9,
44:3, 44:7, 45:16, 50:13,
126:11, 127:8, 127:23,
132:1, 133:13, 133:16,
146:3, 146:20, 156:12,
167:2, 201:5, 201:6,
201:10
**conveyable** [2] - 200:5,
200:17
**conveyance** [5] - 22:22,
38:14, 126:20, 202:16,
203:1
**conveyed** [27] - 14:13,
24:4, 25:13, 36:19,
36:24, 38:6, 38:10,
65:21, 127:1, 128:10,
134:10, 134:17, 141:16,
142:5, 156:21, 167:13,
185:4, 190:23, 193:4,
199:18, 200:4, 200:18,
200:21, 200:22, 202:20,
203:11
**conveying** [1] - 132:15
**convinced** [1] - 87:25
**cooked** [1] - 159:8
**coordinate** [1] - 111:22
**copies** [4] - 12:14,
21:12, 130:2, 130:4
**copy** [7] - 12:15, 17:22,
17:24, 19:4, 27:21,
229:12, 229:13
**corner** [10] - 33:13,
34:7, 34:21, 35:3, 59:23,
62:14, 92:9, 124:5,
137:9, 183:23
**corollary** [1] - 213:13
**corporate** [7] - 8:11,
8:15, 8:17, 9:11, 9:12,
98:1, 98:2
**corporation** [1] - 90:12
**correct** [137] - 2:13,
2:16, 9:22, 10:12, 12:5,
12:7, 12:9, 15:3, 15:15,
16:19, 20:5, 24:12, 26:4,
27:5, 27:6, 27:15, 27:16,
27:23, 29:11, 31:7,
31:16, 31:25, 35:20,
37:14, 38:16, 40:13,
40:24, 41:4, 41:5, 41:15,
41:16, 44:1, 44:5, 44:17,
44:18, 44:20, 44:21,
44:25, 45:4, 45:6, 45:7,

46:4, 47:2, 47:3, 47:4,
47:5, 48:24, 48:25,
49:17, 49:20, 50:5,
50:15, 52:16, 52:24,
54:21, 54:24, 55:11,
55:14, 55:19, 55:23,
56:3, 57:9, 59:16, 60:11,
61:5, 62:8, 63:25, 70:1,
70:16, 71:19, 75:21,
80:2, 84:7, 85:14, 86:15,
86:16, 87:6, 88:16,
88:17, 88:19, 88:23,
90:16, 91:4, 94:16,
94:22, 96:3, 97:23,
105:24, 120:20, 120:21,
122:1, 125:25, 129:9,
129:16, 130:10, 130:18,
130:19, 130:22, 130:23,
131:14, 131:15, 131:18,
131:19, 131:20, 135:3,
135:11, 135:12, 137:1,
138:21, 140:12, 140:22,
141:19, 149:24, 149:25,
153:22, 164:18, 164:21,
168:17, 172:15, 173:18,
176:24, 177:6, 180:22,
182:7, 184:8, 191:7,
192:9, 197:20, 199:23,
199:25, 200:9, 200:12,
200:17, 229:17, 229:20
**correctly** [4] - 16:17,
120:24, 121:9, 221:4
**correspondence** [2] -
93:15, 114:8
**cost** [1] - 107:15
**Costco** [1] - 103:9
**costs** [6] - 151:24,
152:1, 172:17, 172:19,
175:9
**COUNCIL** [1] - 1:6
**Council** [21] - 2:5, 5:17,
8:7, 19:9, 19:13, 24:9,
68:20, 74:14, 79:15,
87:21, 123:6, 123:8,
130:16, 130:17, 131:9,
170:4, 204:9, 208:14,
209:1, 223:19, 232:5
**Councilman** [1] - 79:16
**counsel** [31] - 4:20, 9:3,
11:3, 12:15, 12:19,
21:12, 33:8, 42:7, 45:12,
47:11, 49:1, 52:8, 70:21,
70:22, 73:15, 85:23,
98:10, 100:17, 111:7,
122:23, 144:24, 150:14,
152:8, 155:18, 163:19,
166:22, 181:12, 190:3,
229:2, 229:11, 229:13
**count** [1] - 185:13
**Count** [3] - 204:20,

204:21
**counting** [1] - 20:25
**counts** [1] - 204:19
**couple** [6] - 31:1, 31:3,
40:2, 102:20, 106:3,
114:9
**course** [7] - 47:13,
55:18, 74:6, 80:5, 104:4,
148:9, 199:14
**courses** [1] - 101:3
**court** [29] - 3:5, 3:11,
3:12, 8:12, 12:15,
109:23, 173:11, 173:22,
174:7, 176:18, 176:20,
176:22, 177:9, 181:17,
183:6, 196:11, 204:1,
207:10, 207:23, 209:23,
212:7, 218:3, 218:10,
218:11, 218:14, 218:20,
219:23, 230:2
**COURT** [291] - 1:1, 2:2,
2:15, 2:18, 2:22, 2:25,
3:3, 3:9, 3:18, 3:22, 6:8,
6:13, 6:23, 7:2, 7:12,
7:18, 7:23, 8:1, 8:4,
8:13, 8:18, 8:20, 9:11,
9:17, 12:12, 12:17, 13:4,
13:13, 13:16, 13:19,
17:3, 17:6, 17:11, 17:16,
17:24, 18:1, 21:18,
21:22, 22:1, 22:3, 22:7,
22:10, 24:10, 24:13,
28:1, 28:7, 28:11, 28:14,
28:17, 28:20, 41:7, 42:4,
42:10, 42:13, 44:11,
44:13, 44:19, 44:22,
45:2, 45:5, 45:8, 49:10,
50:17, 51:2, 51:5, 51:11,
51:15, 51:17, 58:3,
58:11, 59:19, 65:13,
66:4, 66:6, 66:13, 66:16,
72:12, 72:18, 72:25,
73:5, 73:9, 80:23, 80:25,
81:6, 81:11, 81:15,
81:21, 82:2, 82:14,
82:20, 84:11, 86:5,
89:19, 89:21, 89:23,
90:24, 91:17, 93:9, 96:9,
97:11, 97:15, 97:25,
98:8, 98:21, 99:12,
99:18, 99:23, 100:2,
100:8, 105:18, 109:8,
109:10, 109:12, 109:19,
109:24, 110:2, 110:4,
110:8, 110:11, 110:16,
114:3, 117:10, 117:15,
118:2, 118:5, 118:13,
118:20, 119:3, 119:6,
119:12, 119:18, 119:21,
119:25, 120:3, 120:12,

120:15, 121:3, 122:4,
122:9, 122:11, 125:3,
128:14, 129:19, 130:1,
130:4, 137:18, 139:13,
141:24, 143:13, 143:23,
144:1, 144:6, 144:8,
144:11, 153:19, 153:24,
154:7, 154:10, 154:14,
154:16, 154:22, 155:1,
155:3, 155:8, 155:11,
163:15, 163:21, 163:23,
164:15, 164:24, 165:5,
165:8, 165:11, 165:14,
165:22, 165:24, 166:4,
166:7, 166:12, 167:16,
167:18, 167:21, 167:23,
168:2, 168:21, 169:18,
169:22, 172:3, 172:5,
172:13, 172:17, 172:23,
173:10, 173:13, 173:22,
173:25, 174:4, 174:11,
175:16, 175:21, 175:23,
176:2, 176:8, 176:13,
176:18, 177:4, 177:7,
177:9, 177:17, 180:7,
180:15, 180:20, 180:23,
181:15, 181:20, 182:1,
182:9, 183:6, 184:4,
184:7, 184:11, 184:13,
186:6, 186:9, 189:6,
190:12, 190:14, 190:16,
191:5, 191:9, 191:14,
191:21, 192:7, 192:10,
192:21, 192:25, 193:8,
193:15, 193:21, 194:3,
194:8, 194:18, 195:3,
195:8, 195:11, 195:13,
195:20, 195:23, 196:9,
196:17, 196:20, 197:7,
197:9, 197:18, 197:21,
199:20, 200:2, 200:7,
200:11, 200:14, 200:20,
200:22, 200:24, 202:5,
203:14, 203:24, 220:20,
220:23, 221:3, 221:6,
221:9, 221:13, 221:15,
222:4, 222:17, 222:21,
226:19, 226:22, 226:24,
227:4, 227:9, 227:19,
228:1, 228:10, 228:12,
228:17, 228:21, 229:11,
229:20, 229:22, 230:11
**Court** [84] - 3:19, 5:18,
5:19, 6:11, 6:12, 12:16,
12:19, 21:6, 21:10,
21:12, 21:15, 22:13,
33:8, 44:13, 45:9, 65:11,
66:14, 81:18, 99:21,
165:20, 167:25, 170:3,
170:6, 170:24, 171:4,
171:8, 171:9, 171:13,

173:10, 176:9, 176:21,
180:7, 180:18, 181:5,
181:13, 181:15, 182:12,
182:15, 183:4, 183:22,
185:23, 186:10, 189:3,
189:6, 189:14, 190:8,
190:9, 190:11, 191:25,
193:22, 203:3, 205:3,
206:10, 207:8, 207:12,
207:19, 208:13, 208:25,
209:5, 211:12, 212:19,
214:9, 215:18, 216:9,
217:17, 219:12, 219:22,
220:1, 220:3, 220:6,
220:7, 223:16, 224:5,
224:19, 225:8, 225:20,
225:25, 226:8, 226:17,
227:3, 227:8, 228:1,
232:16
**court's** [1] - 163:25
**Court's** [8] - 5:17, 65:6,
90:25, 99:7, 181:11,
215:23, 216:3, 218:21
**courtesy** [4] - 3:6, 3:10,
3:13, 222:17
**Courthouse** [1] - 1:23
**courtroom** [8] - 8:10,
8:14, 98:3, 165:17,
165:19, 167:21, 167:24,
188:2
**courtrooms** [1] - 183:7
**courts** [2] - 171:5,
208:24
**covenants** [3] - 128:2,
197:4, 212:1
**cover** [3] - 81:17, 82:3,
153:21
**coverage** [1] - 116:20
**covering** [1] - 156:20
**create** [1] - 136:22
**created** [1] - 67:15
**creates** [1] - 142:22
**credibility** [1] - 73:24
**credible** [1] - 68:7
**credit** [14] - 101:20,
104:6, 104:23, 106:24,
106:25, 107:3, 107:6,
108:10, 158:9, 158:10,
159:5, 159:24, 159:25,
161:8
**creditors** [2] - 133:20,
133:21
**credits** [18] - 148:20,
158:6, 158:8, 158:15,
159:11, 159:12, 159:13,
159:15, 162:19, 162:20,
162:25, 163:1, 163:2,
163:3, 163:7, 163:9,
199:1, 199:2
**crew** [1] - 147:11

**crime** [1] - 206:13
**criminal** [5] - 183:11, 196:11, 212:17, 218:20
**crisis** [1] - 107:18
**criteria** [11] - 110:17, 168:10, 171:21, 172:24, 180:9, 190:10, 214:11, 214:15, 216:1, 219:9, 219:10
**critical** [4] - 102:12, 102:21, 186:22, 187:4
**criticisms** [1] - 187:24
**cross** [3] - 13:2, 82:21, 120:15
**CROSS** [12] - 41:8, 82:23, 105:19, 120:16, 128:15, 164:16, 231:4, 231:7, 231:10, 231:12, 231:14, 231:18
**crossed** [1] - 63:5
**crucial** [4] - 5:2, 7:2, 177:20, 208:19
**crux** [1] - 6:14
**crystallize** [1] - 168:23
**cup** [2] - 100:7, 100:9
**cure** [2] - 50:4, 192:19
**curia** [1] - 222:7
**curiosity** [1] - 23:3
**curiously** [1] - 5:20
**current** [4] - 88:10, 146:7, 146:8, 149:8
**curve** [1] - 181:14
**custom** [1] - 207:12
**cut** [5] - 66:15, 66:16, 68:25, 81:2, 81:6
**cutting** [1] - 81:23
**CVI/Beta** [1] - 207:11

**D**

**D-A-N-I-E-L** [1] - 52:6
**D-A-N-I-E-L-L-E** [2] - 9:1, 166:17
**damage** [2] - 215:6, 215:12
**damaged** [3] - 174:22, 174:23, 175:2
**damages** [6] - 172:11, 214:18, 221:25, 222:3, 224:11, 224:14
**Dan** [1] - 101:14
**dangerous** [1] - 183:4
**Daniel** [5] - 51:23, 52:6
**DANIEL** [2] - 52:1, 231:6
**Danielle** [6] - 7:11, 9:1, 70:6, 165:10, 166:17, 210:25
**DANIELLE** [4] - 8:21,

166:13, 231:3, 231:19
**data** [2] - 75:4, 161:25
**date** [61] - 14:8, 23:1, 23:14, 23:25, 24:23, 25:22, 27:1, 28:4, 28:5, 28:19, 29:24, 30:7, 35:24, 36:10, 41:17, 41:18, 41:19, 41:20, 41:22, 43:24, 48:19, 48:20, 58:9, 58:19, 59:14, 65:10, 66:18, 72:6, 72:15, 76:3, 76:9, 76:13, 76:15, 86:20, 86:25, 89:6, 92:8, 92:10, 93:7, 93:8, 93:13, 97:4, 97:7, 106:15, 107:4, 107:5, 142:16, 143:17, 176:13, 178:3, 178:8, 178:23, 181:3, 193:21, 194:6, 210:18, 210:21
**dated** [11] - 18:24, 23:11, 25:25, 26:10, 27:13, 27:14, 35:12, 37:17, 92:24, 93:22, 95:18
**Davis** [4] - 209:11, 218:10, 218:13, 218:14
**day-to-day** [2] - 53:8, 55:25
**days** [12] - 29:24, 31:19, 35:19, 35:21, 37:5, 50:4, 98:23, 192:20, 199:14, 207:17, 218:23, 226:17
**DC** [3] - 209:5, 209:9, 209:12
**dead** [1] - 178:23
**deadline** [3] - 76:22, 95:24, 187:19
**deal** [16] - 3:22, 11:8, 90:19, 99:15, 159:7, 168:25, 169:9, 169:12, 172:9, 183:16, 184:22, 188:16, 195:23, 212:16, 212:24, 221:24
**dealing** [6] - 4:11, 4:12, 53:24, 98:18, 119:7, 136:18
**deals** [2] - 10:8, 10:11
**debate** [1] - 151:14
**debating** [1] - 7:15
**debris** [42] - 47:11, 57:3, 57:12, 57:18, 57:19, 57:20, 60:3, 60:5, 60:16, 60:21, 60:25, 61:4, 61:9, 61:10, 61:14, 61:20, 61:21, 61:22, 61:24, 62:3, 63:4, 63:23, 64:3, 64:4, 64:5, 64:8, 64:10, 64:13, 64:17, 64:24, 64:25, 139:9,

143:7, 147:5, 147:7, 147:8, 147:9, 147:17, 175:8, 179:2
**debt** [1] - 158:1
**December** [4] - 72:7, 74:21, 89:7, 89:14
**decide** [2] - 152:7, 222:18
**decided** [3] - 213:23, 219:12, 225:6
**deciding** [2] - 219:7, 219:8
**decision** [3] - 113:11, 207:22, 221:21
**decisionmaking** [1] - 117:8
**decisions** [1] - 198:10
**declaration** [4] - 178:1, 180:1, 213:21, 227:24
**declaratory** [3] - 204:21, 210:1, 223:14
**declared** [5] - 179:25, 184:19, 213:22, 225:5, 227:22
**decline** [1] - 87:3
**declined** [2] - 87:5, 87:7
**declining** [1] - 93:23
**deduction** [1] - 138:14
**deed** [25] - 23:1, 25:25, 126:16, 126:19, 126:24, 127:2, 127:24, 131:24, 132:1, 132:2, 132:12, 132:21, 133:14, 134:10, 167:3, 167:6, 167:9, 167:13, 182:15, 185:6, 185:8, 185:10, 185:11, 201:10
**Deed** [1] - 25:5
**deeds** [2] - 132:9, 132:11
**deem** [1] - 50:10
**deemed** [4] - 13:5, 21:24, 58:6, 152:1
**default** [22] - 46:16, 50:1, 50:3, 50:7, 50:11, 50:14, 95:18, 146:11, 178:23, 179:25, 180:1, 180:2, 184:19, 192:19, 199:13, 199:15, 213:22, 225:5, 227:15, 227:22, 227:24
**Default** [1] - 35:12
**defect** [8] - 29:20, 29:22, 30:1, 30:18, 31:21, 31:23, 31:24, 129:2
**defects** [2] - 128:1, 128:7
**Defects** [1] - 29:16
**defendant** [6] - 79:18,

118:9, 171:1, 210:6, 215:20, 216:7
**DEFENDANT'S** [3] - 122:16, 144:17, 155:12
**defendant's** [4] - 33:6, 42:1, 42:2
**Defendant's** [8] - 83:8, 84:10, 85:17, 89:3, 89:18, 97:5, 97:11, 117:18
**defendants** [8] - 19:1, 177:24, 204:9, 204:20, 210:1, 223:19, 223:23, 226:2
**Defendants** [2] - 1:8, 1:18
**defendants'** [1] - 91:22
**Defense** [6] - 5:17, 93:22, 95:8, 170:3, 208:14, 209:1
**defense** [4] - 33:8, 42:9, 95:9, 185:13
**defer** [1] - 47:1
**deferred** [1] - 46:3
**defers** [1] - 203:19
**defies** [1] - 212:21
**defined** [1] - 170:9
**definitely** [5] - 44:17, 170:14, 174:3, 216:21
**definition** [1] - 16:18
**delay** [5] - 99:18, 174:23, 174:24, 217:9, 218:17
**delayed** [5] - 76:5, 98:23, 174:15, 216:22, 216:24
**delaying** [5] - 217:11, 224:22, 227:7, 227:11, 228:4
**delete** [1] - 224:15
**deleterious** [1] - 125:7
**deliver** [2] - 94:13, 140:24
**deliverable** [1] - 142:3
**delivered** [7] - 38:24, 56:17, 63:16, 139:19, 140:9, 141:3, 213:14
**delivery** [2] - 141:4, 141:5
**demolished** [5] - 34:17, 57:4, 57:12, 61:11, 64:17
**demolition** [14] - 47:9, 47:10, 56:19, 56:23, 57:2, 57:21, 61:12, 63:19, 64:15, 65:9, 88:15, 150:5, 175:5, 213:16
**demonstrate** [3] - 145:21, 208:21, 209:21
**demonstrated** [1] -

214:7
**demonstration** [3] - 168:8, 170:17, 205:20
**denied** [3] - 110:16, 174:18, 216:8
**depart** [1] - 96:21
**department** [3] - 67:6, 137:10, 203:6
**Department** [32] - 29:23, 42:15, 67:4, 74:1, 74:7, 74:9, 75:10, 75:16, 76:1, 76:14, 76:23, 79:17, 87:20, 111:13, 145:5, 145:7, 147:12, 148:12, 149:4, 150:11, 152:14, 155:24, 158:4, 197:6, 197:11, 204:10, 204:12, 212:3, 212:6, 223:20, 223:22
**departments** [1] - 226:3
**departs** [1] - 65:12
**dependent** [1] - 189:13
**depict** [2] - 60:23, 63:3
**depicted** [5] - 59:13, 60:16, 61:21, 61:22, 62:18, 62:22
**depicting** [1] - 59:23
**depiction** [1] - 62:3
**depicts** [1] - 59:22
**Depression** [4] - 186:3, 186:4, 186:7, 188:13
**depth** [1] - 171:12
**Deputy** [6] - 42:14, 79:21, 111:21, 156:2, 156:4, 186:9
**deputy** [2] - 79:15, 79:16
**dereliction** [1] - 185:2
**derive** [1] - 180:4
**describe** [3] - 100:24, 105:23, 112:23
**described** [4] - 74:22, 107:19, 135:7, 163:19
**description** [3] - 135:5, 136:2, 136:3
**design** [3] - 54:10, 123:18, 148:13
**designate** [1] - 8:16
**designated** [2] - 145:24, 149:1
**designation** [9] - 68:10, 68:11, 68:14, 149:2, 149:4, 149:7, 149:22
**designee** [5] - 9:10, 127:23, 132:1, 133:14, 167:2
**despite** [1] - 202:5
**detail** [4] - 81:16, 117:5, 205:23, 215:8
**detailed** [3] - 66:7, 74:4,

75:5
**determinative** [1] - 76:13
**determine** [7] - 16:6, 20:20, 36:18, 37:11, 38:4, 53:10, 94:23
**determined** [3] - 146:9, 150:5, 152:8
**determining** [1] - 180:8
**detrimental** [1] - 34:13
**devastating** [1] - 189:4
**develop** [1] - 146:22
**developed** [7] - 101:1, 101:7, 101:8, 108:19, 125:6, 125:14, 183:21
**Developer** [1] - 46:7
**developer** [145] - 14:13, 18:8, 19:14, 19:21, 29:20, 30:4, 30:15, 30:17, 31:18, 31:20, 32:10, 32:14, 32:15, 34:6, 34:16, 38:24, 43:24, 44:2, 44:6, 45:21, 45:25, 46:12, 47:2, 49:25, 50:6, 52:20, 56:17, 63:17, 65:15, 65:21, 65:22, 66:3, 67:24, 87:25, 89:9, 89:11, 94:15, 95:6, 96:14, 101:14, 101:16, 101:23, 102:6, 102:7, 102:9, 102:16, 103:20, 103:23, 105:23, 105:25, 106:2, 106:5, 106:9, 106:11, 108:19, 112:12, 112:14, 112:23, 113:13, 113:23, 114:5, 115:2, 115:9, 115:13, 116:10, 120:23, 121:8, 121:25, 127:9, 127:23, 128:4, 128:10, 132:1, 133:13, 139:19, 140:9, 140:25, 141:3, 142:4, 145:19, 145:23, 146:1, 146:4, 146:5, 146:11, 146:23, 147:19, 148:5, 148:10, 148:14, 148:17, 150:2, 150:8, 151:16, 152:11, 154:3, 156:13, 157:2, 157:4, 157:5, 157:23, 159:17, 161:5, 162:4, 162:6, 162:24, 163:8, 164:3, 167:2, 169:5, 174:17, 174:24, 174:25, 175:19, 175:20, 175:24, 175:25, 177:15, 178:3, 179:20, 181:10, 185:25, 186:11, 186:13, 186:18, 186:23, 187:1, 187:14, 187:16, 187:19, 194:15,

198:14, 199:3, 199:7, 199:11, 199:13, 199:14, 201:3, 201:18, 201:21, 212:22, 217:10, 217:20, 223:12
**developer's** [11] - 46:17, 46:20, 46:22, 108:4, 161:5, 162:2, 162:8, 162:25, 186:21, 203:10, 212:23
**developers** [9] - 94:19, 109:3, 112:16, 112:20, 157:16, 157:18, 162:16, 173:8, 189:18
**DEVELOPMENT** [1] - 1:4
**development** [52] - 11:13, 30:18, 34:14, 53:1, 53:14, 54:11, 55:12, 67:15, 68:11, 88:2, 100:23, 100:25, 102:9, 102:19, 102:23, 104:7, 104:16, 104:20, 105:1, 107:17, 108:5, 108:11, 108:14, 114:14, 115:1, 115:2, 125:9, 128:5, 128:21, 149:22, 153:11, 156:11, 156:22, 157:10, 160:11, 162:21, 173:16, 173:17, 173:20, 176:22, 195:8, 196:13, 206:9, 212:13, 215:13, 216:16, 216:23, 218:1, 219:2, 223:24, 225:17
**Development** [32] - 2:4, 4:13, 11:6, 13:23, 19:12, 19:14, 42:15, 52:14, 52:15, 52:18, 52:20, 97:21, 98:2, 111:14, 124:12, 145:6, 145:8, 145:9, 145:10, 155:25, 156:3, 192:22, 200:16, 204:7, 204:10, 204:15, 205:6, 210:8, 220:2, 223:11, 223:21, 223:23
**developments** [2] - 101:6, 160:24
**diagram** [2] - 48:16, 196:21
**differ** [1] - 15:17
**different** [14] - 13:10, 61:24, 62:21, 62:24, 64:3, 66:1, 112:2, 112:9, 142:12, 148:11, 159:1, 159:18, 168:19, 180:17
**difficult** [7] - 6:15, 107:7, 108:12, 108:14, 147:22, 188:13, 214:18
**difficulty** [1] - 221:10
**diligence** [8] - 10:10,

10:13, 10:15, 101:25, 105:14, 106:3, 106:13, 183:18
**dimensions** [1] - 185:24
**dire** [1] - 117:24
**DIRECT** [15] - 9:4, 52:9, 100:18, 111:8, 122:24, 155:19, 166:20, 231:3, 231:6, 231:9, 231:11, 231:13, 231:16, 231:17, 231:19
**direct** [26] - 12:20, 13:11, 14:2, 18:2, 25:3, 38:17, 41:10, 43:18, 56:10, 65:3, 83:20, 84:17, 90:4, 94:3, 97:5, 124:7, 124:13, 127:11, 134:20, 136:12, 139:10, 139:12, 144:25, 147:24, 166:22, 187:9
**directed** [1] - 47:11
**directing** [1] - 123:23
**direction** [4] - 62:2, 63:7, 80:11, 104:12
**directive** [1] - 65:7
**directly** [6] - 78:7, 78:15, 152:22, 157:8, 160:23
**Director** [4] - 97:21, 104:10, 111:21, 123:11
**disabled** [2] - 83:13, 159:23
**disagree** [4] - 132:12, 132:17, 133:8, 137:17
**disagreeing** [1] - 132:19
**disappeared** [1] - 104:8
**disappointed** [1] - 106:18
**disbelieve** [1] - 20:1
**disbursement** [1] - 111:23
**discipline** [1] - 167:5
**discrete** [1] - 64:10
**discretion** [2] - 207:23, 216:4
**discuss** [6] - 50:18, 65:3, 109:20, 144:1, 154:17, 160:12
**discussed** [4] - 162:12, 206:20, 206:24
**discussing** [5] - 27:18, 30:6, 42:24, 160:13, 209:10
**discussion** [9] - 65:14, 65:18, 66:10, 160:9, 195:24, 208:12, 213:7, 218:12, 223:5
**discussions** [4] - 11:19,

112:19, 113:16, 164:3
**dismissal** [1] - 110:14
**displaced** [1] - 123:17
**disposed** [1] - 165:20
**Disposition** [10] - 4:13, 11:5, 13:23, 19:12, 115:5, 115:6, 124:12, 192:22, 205:6, 210:7
**disposition** [1] - 223:24
**dispute** [23] - 13:3, 13:6, 22:7, 54:19, 87:22, 106:8, 132:5, 172:6, 172:8, 178:12, 178:24, 179:1, 188:2, 196:1, 196:7, 196:10, 206:10, 206:13, 207:5, 213:4, 219:1, 220:9
**disputed** [2] - 35:16, 177:23
**disputes** [1] - 13:6
**disputing** [2] - 133:7, 178:8
**dissuade** [1] - 114:22
**distinction** [1] - 207:4
**distinctive** [1] - 22:4
**distinguished** [1] - 219:15
**distress** [1] - 106:23
**distressed** [1] - 104:13
**DISTRICT** [2] - 1:1, 1:1
**district** [3] - 68:11, 68:15, 149:23
**districts** [1] - 77:10
**divested** [1] - 15:20
**division** [2] - 111:15, 123:7
**DIVISION** [1] - 1:2
**Division** [3] - 111:16, 111:17, 123:9
**divisions** [1] - 226:3
**doable** [1] - 94:14
**docket** [1] - 218:20
**doctrine** [2] - 127:3, 127:10
**document** [28] - 17:1, 22:19, 25:12, 25:22, 26:14, 41:13, 56:6, 79:2, 83:9, 84:12, 84:15, 85:18, 85:25, 86:1, 86:4, 86:11, 86:13, 86:18, 87:17, 89:3, 89:8, 89:25, 92:16, 93:3, 93:7, 97:7, 97:9, 130:3
**documentary** [1] - 178:19
**documentation** [1] - 68:18
**documenting** [1] - 10:10
**documents** [7] - 10:17,

13:6, 13:7, 22:8, 28:24, 36:23, 178:16
**dollar** [2] - 162:4, 199:8
**dollars** [19] - 68:5, 75:3, 85:4, 85:7, 85:10, 101:1, 102:2, 152:2, 152:18, 158:21, 158:24, 159:4, 161:14, 174:9, 175:5, 186:14, 188:20, 189:9
**domestically** [1] - 101:7
**done** [16] - 17:17, 38:4, 71:14, 78:16, 83:16, 102:23, 115:5, 117:3, 121:11, 126:8, 128:23, 195:9, 196:13, 202:20, 202:21, 230:3
**door** [2] - 88:5, 165:15
**doorstep** [1] - 75:8
**dots** [1] - 203:17
**double** [6] - 32:20, 51:4, 51:5, 124:14, 138:6, 230:10
**doubt** [2] - 217:24, 218:1
**down** [25] - 14:11, 33:20, 39:18, 43:21, 46:6, 50:17, 51:18, 51:21, 63:9, 63:20, 105:2, 106:20, 107:23, 109:13, 122:4, 143:23, 154:17, 164:25, 165:16, 165:18, 174:19, 181:21, 183:18, 184:22, 188:15
**Downtown** [1] - 4:17
**downturn** [1] - 206:18
**draft** [5] - 153:13, 220:15, 223:3, 224:3, 227:24
**drafted** [1] - 186:25
**drafting** [2] - 12:4, 136:25
**dramatically** [1] - 103:25
**draw** [1] - 68:15
**drawing** [2] - 33:3, 80:19
**drawn** [1] - 114:1
**dried** [2] - 104:6, 107:3
**drive** [1] - 39:21
**drop** [1] - 178:22
**drug** [8] - 34:2, 34:7, 35:3, 35:8, 137:8, 137:9, 196:6, 218:24
**drugs** [1] - 34:20
**due** [12] - 10:10, 10:13, 10:14, 46:19, 105:14, 106:2, 106:7, 106:13, 151:25, 176:23, 177:3, 183:18
**dumping** [3] - 147:8,

147:16, 175:10
**dunk** [1] - 169:21
**during** [9] - 55:12,
56:19, 63:19, 88:15,
100:25, 103:22, 107:16,
148:25, 193:11
**duties** [2] - 123:22,
157:1
**duty** [7] - 6:18, 6:19,
18:5, 18:6, 18:15, 18:16,
219:23

# E

**e-mails** [3] - 70:4, 70:6,
148:10
**E-N-G-E-L** [1] - 155:17
**eager** [1] - 147:18
**earliest** [1] - 30:1
**early** [3] - 78:4, 78:6,
98:13
**earning** [2] - 215:2,
224:10
**easements** [2] - 30:17,
128:3
**easier** [2] - 121:1, 121:3
**easily** [1] - 214:22
**East** [1] - 186:17
**east** [1] - 152:23
**eastern** [1] - 53:2
**ECF** [2] - 17:4, 17:9
**economic** [9] - 65:23,
107:18, 186:3, 188:13,
203:18, 203:20, 206:18,
215:13, 217:10
**economy** [1] - 106:24
**edges** [1] - 64:24
**edit** [2] - 225:18, 225:19
**edited** [1] - 223:6
**effect** [12] - 13:1, 102:5,
115:16, 117:8, 149:20,
171:6, 174:4, 179:24,
180:2, 182:23, 191:24,
213:7
**effective** [7] - 14:8,
24:23, 41:23, 48:19,
53:10, 179:11
**effectively** [1] - 151:4
**effort** [4] - 98:15, 162:7,
204:16, 221:12
**efforts** [14] - 14:6, 16:5,
29:25, 65:4, 66:22, 78:5,
89:15, 186:21, 187:4,
203:25, 217:20, 219:4,
225:3
**Ehrlich** [1] - 148:25
**Eight** [2] - 25:23, 25:24
**eight** [2] - 104:19,
188:20

**eighteen** [1] - 19:24,
19:25
**either** [21] - 7:19, 8:4,
8:6, 9:11, 37:5, 46:3,
56:19, 57:11, 59:8, 60:2,
60:10, 63:18, 73:22,
74:10, 82:5, 89:15,
117:25, 177:5, 193:9,
218:5, 229:3
**eject** [2] - 15:25, 23:8
**elapsed** [2] - 193:12,
207:17
**elderly** [2] - 83:12,
159:23
**elect** [1] - 50:2
**electric** [2] - 62:4, 62:6
**electronically** [2] -
17:6, 17:13
**elements** [4] - 77:7,
156:10, 171:16, 208:7
**elevator** [1] - 165:18
**eleven** [1] - 10:4
**eligible** [4] - 111:23,
151:16, 152:1, 161:11
**eliminate** [8] - 14:12,
16:12, 16:16, 16:17,
16:20, 18:13, 30:1, 30:11
**eliminating** [1] - 134:18
**embraced** [1] - 30:20
**emerged** [1] - 126:23
**emergency** [1] - 223:18
**emphasize** [1] - 171:13
**emphasized** [2] -
171:13, 218:5
**employed** [9] - 111:10,
111:12, 123:1, 123:3,
145:2, 145:4, 152:8,
155:21, 155:23
**employee** [1] - 97:22
**employees** [2] - 111:22,
200:15
**enable** [1] - 190:7
**enabled** [1] - 149:2
**enabling** [1] - 84:1
**enacted** [1] - 11:25
**enactment** [1] - 11:11
**encompassed** [1] -
112:6
**encumber** [1] - 129:13
**encumbrance** [10] -
29:20, 29:22, 30:1,
129:1, 129:3, 129:4,
129:9, 129:10, 129:13,
129:15
**encumbrances** [2] -
30:16, 127:25
**end** [18] - 33:23, 59:7,
69:6, 79:10, 95:23,
98:14, 104:3, 107:9,
107:21, 108:2, 120:4,

151:8, 151:16, 151:18,
189:4, 214:14, 223:12,
230:5
**enforceable** [1] -
133:11
**enforced** [1] - 218:25
**enforcement** [1] -
225:23
**enforcing** [1] - 218:9
**engage** [6] - 70:21,
71:4, 73:15, 78:8, 173:3,
189:22
**engaged** [3] - 72:9,
78:6, 85:15
**ENGEL** [2] - 155:12,
231:17
**Engel** [27] - 9:9, 42:14,
79:21, 79:23, 80:9,
80:11, 82:6, 94:4, 94:8,
95:4, 114:22, 153:21,
154:21, 155:9, 155:16,
164:3, 164:19, 164:24,
174:13, 185:4, 188:1,
188:7, 191:19, 200:15,
211:10, 220:24
**Engel's** [2] - 153:22,
187:25
**enhancement** [2] -
159:5, 161:8
**enjoined** [1] - 204:18,
226:4
**entail** [1] - 10:13
**enter** [4] - 10:14, 70:14,
115:4, 220:13
**entered** [14] - 4:14,
32:13, 32:14, 34:1,
70:17, 71:7, 71:9, 72:8,
72:15, 74:20, 76:20,
115:8, 205:7, 210:8
**entering** [1] - 219:19
**enterprise** [6] - 77:10,
145:20, 149:14, 149:16,
149:18, 149:20
**entertain** [1] - 165:20
**entire** [9] - 16:7, 33:14,
35:6, 69:5, 81:2, 168:4,
196:13, 204:1, 205:3
**entirety** [2] - 193:1,
193:17
**entities** [2] - 150:15,
159:18
**entitled** [1] - 219:3
**entitlement** [2] - 53:11,
206:25
**entitling** [1] - 220:3
**entity** [2] - 90:10, 114:2
**environment** [2] -
142:22, 188:13
**environmental** [3] -
10:16, 175:7, 217:14

**equities** [15] - 99:4,
168:14, 169:3, 169:5,
169:20, 171:4, 172:23,
173:23, 175:2, 208:10,
216:2, 216:3, 217:3,
220:6, 225:9
**equity** [16] - 101:22,
101:24, 102:3, 102:4,
104:22, 104:25, 106:2,
106:18, 108:24, 158:1,
158:13, 158:16, 181:9,
190:6, 219:23
**equivalent** [1] - 209:2
**era** [1] - 170:10
**erroneous** [1] - 118:21
**erroneously** [1] -
184:18
**error** [3] - 2:16, 59:2,
119:25
**escrowed** [1] - 134:3
**especially** [2] - 104:20,
201:14
**Esquire** [5] - 1:17, 1:17,
1:19, 1:19, 7:11
**essential** [1] - 183:16
**essentially** [29] - 4:10,
4:23, 5:1, 5:4, 21:22,
22:4, 98:15, 104:1,
107:2, 169:25, 170:13,
174:12, 190:19, 191:17,
200:12, 200:16, 201:12,
204:19, 205:2, 205:11,
205:24, 212:6, 216:5,
216:17, 216:18, 217:9,
217:12, 218:15, 218:16
**establish** [3] - 178:17,
208:7, 210:3
**established** [4] - 29:9,
89:1, 189:20, 207:1
**establishing** [1] - 58:14
**estate** [30] - 4:12, 9:25,
10:1, 10:7, 10:8, 10:11,
14:23, 15:5, 19:17,
100:23, 101:2, 103:17,
104:11, 104:16, 114:14,
123:16, 167:5, 181:7,
185:9, 191:15, 191:18,
191:20, 191:21, 199:22,
200:16, 205:5, 211:1,
211:3, 211:5
**Estate** [1] - 204:15
**estimate** [3] - 61:13,
61:17, 63:11
**Estimates** [2] - 68:20,
74:14
**estimating** [1] - 61:18
**et** [1] - 232:5
**ET** [1] - 1:7
**etc** [4] - 53:17, 107:13,
108:20, 167:3

**euphemistically** [1] -
132:9
**evaluate** [4] - 111:25,
112:4, 171:9, 198:16
**evaluating** [2] - 113:2,
207:2
**evaluation** [1] - 216:6
**evening** [1] - 57:7
**event** [13] - 29:9, 46:16,
50:10, 50:18, 51:8,
117:1, 144:2, 154:18,
192:19, 197:3, 211:25,
225:15
**events** [1] - 203:19
**eventual** [1] - 217:11
**eventually** [1] - 202:18
**everywhere** [2] - 104:5,
104:8
**Evidence** [1] - 21:7
**evidence** [20] - 6:11,
13:11, 99:5, 99:9, 100:1,
110:18, 118:9, 118:23,
138:14, 146:6, 146:10,
174:4, 178:15, 187:11,
197:24, 198:18, 199:20,
210:20, 213:17, 224:16
**exact** [2] - 90:1, 91:11
**exactly** [6] - 58:12,
83:6, 195:20, 217:18,
228:24
**examination** [2] - 65:3,
82:21, 94:4, 120:15,
187:9
**EXAMINATION** [38] -
9:4, 41:8, 45:10, 49:12,
52:9, 82:23, 91:19,
96:11, 100:18, 105:19,
111:8, 120:16, 122:24,
128:15, 143:14, 144:25,
155:19, 164:16, 166:20,
231:3, 231:4, 231:4,
231:5, 231:6, 231:7,
231:7, 231:8, 231:9,
231:10, 231:11, 231:12,
231:13, 231:14, 231:14,
231:16, 231:17, 231:18,
231:19
**example** [7] - 13:2,
16:8, 115:20, 116:4,
126:12, 187:6, 199:5
**except** [3] - 108:5,
198:21, 222:23
**exception** [2] - 43:6,
58:4, 156:16
**excess** [2] - 101:1,
186:14
**exchange** [1] - 75:4
**exclusive** [1] - 173:6
**excuse** [4] - 2:21, 47:1,
121:5, 123:2

**excused** [5] - 50:23, 109:19, 122:11, 144:11, 167:19

**executed** [10] - 19:14, 54:20, 55:8, 55:9, 71:5, 72:4, 73:12, 73:14, 150:13, 187:13

**execution** [1] - 55:4

**exempt** [1] - 158:5

**exercise** [2] - 165:15, 216:4

**exhaustive** [1] - 75:2

**exhibit** [25] - 12:14, 12:25, 13:4, 17:15, 33:6, 39:4, 42:2, 47:24, 47:25, 48:1, 48:3, 48:6, 60:19, 62:25, 84:9, 84:11, 89:19, 95:8, 95:9, 95:21, 95:22, 129:22, 130:4, 187:11

**Exhibit** [87] - 13:23, 18:22, 19:1, 19:3, 21:5, 22:12, 23:10, 23:20, 23:21, 24:12, 24:14, 25:4, 25:23, 25:24, 26:8, 26:9, 26:22, 27:8, 27:9, 27:25, 29:14, 32:2, 33:4, 35:11, 36:5, 37:15, 38:18, 41:11, 42:2, 42:5, 42:8, 42:9, 42:10, 43:13, 43:14, 47:24, 54:19, 56:8, 59:21, 60:17, 60:23, 61:6, 61:23, 61:24, 62:12, 62:22, 62:23, 63:2, 71:21, 71:23, 83:8, 84:10, 85:18, 85:23, 86:13, 86:17, 86:20, 86:22, 86:25, 87:2, 87:18, 88:13, 89:2, 89:3, 89:17, 89:18, 91:24, 93:1, 93:21, 93:22, 95:8, 95:17, 95:18, 97:6, 97:11, 97:12, 117:17, 117:18, 117:19, 120:9, 124:8, 124:9, 127:11, 130:6, 147:24

**Exhibits** [4] - 57:23, 57:25, 58:1, 58:13

**exhibits** [13] - 12:18, 12:21, 13:1, 13:2, 33:6, 42:1, 48:1, 58:6, 61:21, 91:22, 97:4, 153:14, 223:15

**exist** [5] - 35:8, 46:3, 60:1, 61:10, 149:8

**existed** [2] - 59:14, 60:3

**existence** [6] - 128:25, 129:8, 131:11, 131:17, 133:17, 134:18

**existing** [5] - 56:18, 57:2, 59:9, 63:18, 221:24

**exists** [4] - 57:19, 60:21, 61:11, 210:5

**expect** [4] - 4:2, 72:10, 188:9, 229:7

**expectation** [1] - 72:15

**expected** [1] - 32:15

**expended** [4] - 172:18, 172:19, 217:20

**expensive** [1] - 150:6

**experience** [13] - 73:1, 88:1, 94:12, 94:15, 94:16, 94:24, 95:5, 100:25, 108:14, 161:5, 198:14, 211:3

**experienced** [1] - 211:1

**experiences** [1] - 65:3

**expert** [1] - 3:12

**explain** [6] - 33:10, 83:6, 133:1, 160:14, 173:9, 188:3

**explained** [1] - 87:19

**exploring** [1] - 103:14

**express** [3] - 113:23, 114:11, 160:19

**expressed** [1] - 103:13

**expression** [1] - 103:11

**extend** [2] - 89:8, 222:17

**extended** [2] - 46:17, 46:21

**extension** [6] - 76:11, 89:6, 95:24, 193:13, 193:14, 199:12

**extensive** [1] - 65:18

**extent** [7] - 65:17, 102:5, 105:1, 107:14, 152:12, 182:3, 227:25

**external** [1] - 87:23

**extinguished** [2] - 203:11, 203:12

**extra** [1] - 149:3

**extraordinary** [1] - 208:2

**extremely** [2] - 150:6, 202:4

**eye** [1] - 63:22

**eyeball** [1] - 59:14

# F

**F.2d** [1] - 170:12

**F.3d** [10] - 5:23, 170:5, 207:6, 207:25, 209:4, 209:9, 209:12, 209:16, 209:18, 214:20

**F.Supp.2d** [1] - 218:12

**fabric** [1] - 142:24

**face** [6] - 22:20, 25:12, 26:14, 106:19, 147:19

**face-to-face** [1] - 106:19

**facets** [1] - 102:9

**facilities** [1] - 215:15

**facing** [1] - 87:23

**fact** [44] - 20:2, 20:4, 32:22, 33:13, 42:20, 46:5, 47:22, 51:19, 55:8, 75:16, 87:14, 106:24, 124:18, 135:2, 135:10, 160:6, 169:7, 178:12, 178:15, 179:10, 180:18, 181:21, 182:18, 185:2, 187:13, 188:6, 191:2, 192:5, 192:11, 193:4, 194:22, 196:2, 198:25, 200:25, 201:24, 202:5, 205:24, 206:2, 212:8, 213:24, 222:18, 225:15, 227:15, 228:8

**factor** [1] - 157:12, 206:24, 216:3, 217:2, 219:18

**factors** [2] - 177:21, 198:9

**facts** [5] - 5:5, 177:23, 178:7, 179:7, 180:3

**fail** [2] - 15:21, 15:23

**failed** [5] - 23:4, 23:5, 46:1, 203:17, 221:21

**failing** [4] - 49:21, 224:23, 224:25, 225:2

**failure** [9] - 43:22, 46:10, 46:19, 110:15, 177:24, 178:10, 178:13, 184:19, 204:14

**Failure** [2] - 46:6, 46:12

**failures** [1] - 108:3

**fair** [3] - 107:5, 108:8, 160:3

**fairly** [3] - 5:9, 107:9, 162:9

**fairness** [2] - 81:18, 219:17

**faith** [3] - 67:4, 177:10, 185:25

**fall** [1] - 149:19

**fallback** [1] - 211:24

**fallow** [1] - 217:5

**familiar** [12] - 4:22, 6:20, 12:8, 55:15, 55:17, 66:8, 86:6, 124:1, 130:13, 147:1, 183:7, 183:8

**familiarity** [1] - 218:22

**family** [1] - 103:4, 181:8, 188:23

**far** [14] - 29:8, 36:25,

60:2, 75:7, 86:6, 99:17, 99:20, 110:19, 163:13, 168:24, 182:5, 183:8, 209:20

**fashion** [1] - 119:22, 226:10, 228:23

**fast** [1] - 28:9

**favor** [7] - 131:4, 208:10, 217:3, 219:19, 220:7, 220:8, 225:9

**favorable** [1] - 197:16

**favors** [4] - 169:5, 169:6, 225:21, 225:22

**FAX** [145] - 2:14, 3:19, 6:10, 6:22, 7:1, 7:10, 7:15, 7:25, 8:3, 8:11, 9:5, 9:15, 9:18, 13:11, 13:21, 17:20, 21:25, 22:2, 22:6, 22:9, 22:11, 28:10, 28:21, 42:7, 42:12, 45:11, 50:23, 51:4, 51:10, 51:14, 51:23, 52:10, 58:16, 59:20, 65:25, 66:5, 66:11, 66:14, 66:23, 72:14, 72:24, 73:3, 73:7, 73:10, 80:24, 81:5, 81:10, 81:14, 81:20, 81:25, 82:4, 82:13, 86:2, 90:17, 90:23, 91:20, 97:8, 97:13, 98:5, 99:1, 99:17, 99:20, 99:25, 100:19, 105:17, 109:6, 109:11, 109:22, 110:1, 110:10, 113:25, 117:9, 117:24, 118:25, 119:15, 119:20, 120:13, 120:17, 122:3, 122:8, 125:1, 128:16, 137:17, 137:20, 137:21, 144:5, 144:7, 153:17, 154:6, 154:15, 154:24, 155:2, 155:5, 155:10, 163:13, 163:20, 164:17, 165:7, 165:10, 165:12, 165:20, 165:23, 166:1, 166:10, 166:21, 167:22, 167:25, 169:15, 169:19, 177:22, 180:13, 180:17, 180:22, 180:24, 181:19, 181:25, 182:7, 182:12, 183:13, 184:6, 184:9, 184:12, 184:14, 186:8, 186:11, 189:7, 203:16, 220:18, 222:20, 226:16, 226:20, 226:23, 227:21, 228:11, 229:19, 230:10, 231:3, 231:4, 231:6, 231:7, 231:9, 231:12, 231:14, 231:18, 231:19

**Fax** [52] - 1:17, 3:18, 4:5, 5:10, 6:4, 6:8, 7:13, 9:14, 13:20, 17:19, 28:2, 41:7, 51:22, 58:3, 65:13, 66:10, 72:13, 72:19, 80:23, 81:2, 91:18, 93:10, 98:4, 98:25, 105:18, 110:9, 120:12, 120:15, 122:4, 128:14, 141:24, 164:15, 168:2, 169:7, 169:10, 169:11, 177:19, 180:9, 181:21, 190:12, 203:15, 203:24, 217:22, 220:17, 222:5, 222:19, 225:18, 226:14, 227:20, 228:10, 229:18, 230:11

**fax** [1] - 51:3

**Fayette** [1] - 59:24

**FCRR** [1] - 1:23

**feasible** [2] - 150:6, 162:1

**February** [6] - 69:17, 69:22, 70:15, 70:18, 71:3, 153:7

**federal** [6] - 3:12, 77:20, 78:23, 158:7, 158:8, 218:3

**Federal** [7] - 5:12, 7:13, 21:7, 207:21, 208:24, 209:4, 218:8

**fee** [56] - 14:19, 14:25, 15:1, 15:8, 15:9, 15:17, 15:20, 16:9, 16:10, 16:14, 16:18, 18:20, 19:18, 20:23, 21:2, 23:12, 23:17, 24:17, 24:25, 26:1, 26:6, 26:24, 27:4, 27:11, 28:4, 29:9, 30:7, 31:13, 41:23, 43:15, 43:16, 44:20, 45:3, 126:9, 126:20, 127:1, 132:3, 132:5, 132:14, 132:21, 133:16, 134:7, 146:20, 162:2, 162:4, 167:9, 177:25, 178:7, 178:11, 182:15, 184:15, 185:11, 194:17, 194:20, 200:10

**fee-simple** [1] - 146:20

**feedback** [1] - 114:15

**fees** [1] - 135:9

**feet** [4] - 61:15, 61:17, 61:19, 62:2

**Feinblatt** [2] - 9:21, 10:3

**fell** [1] - 144:13

**felt** [3] - 80:14, 105:9, 199:12

**few** [8] - 3:19, 16:25,

116:17, 164:18, 166:10, 171:24, 220:14, 223:1
**Field** [1] - 160:23
**field** [5] - 9:24, 60:21, 60:25, 63:4, 64:8
**fifteen** [1] - 10:2
**fifth** [1] - 28:9
**figure** [1] - 75:2
**file** [4] - 3:20, 6:16, 229:13, 230:6
**filed** [19] - 2:4, 2:6, 2:7, 2:19, 3:6, 17:3, 17:6, 17:13, 17:16, 17:18, 92:5, 192:17, 203:6, 204:7, 204:23, 223:8, 223:12, 224:1, 224:5
**filing** [4] - 5:15, 5:16, 28:25, 229:12
**fill** [1] - 157:7
**final** [13] - 35:24, 68:22, 74:17, 82:9, 87:24, 101:25, 106:2, 106:13, 152:13, 160:3, 197:11, 212:3
**finally** [12] - 27:7, 38:17, 49:1, 63:2, 71:14, 81:8, 95:8, 171:9, 193:25, 211:17, 211:18, 217:6
**Finally** [1] - 87:25
**finance** [10] - 68:12, 69:1, 69:11, 104:24, 137:14, 148:17, 149:23, 150:4, 151:17, 162:21
**Finance** [18] - 68:18, 68:19, 68:22, 70:9, 74:2, 74:7, 74:9, 74:16, 75:8, 75:13, 76:12, 76:13, 76:16, 76:22, 150:11, 150:12, 156:2, 187:18
**financeable** [2] - 157:14, 157:15
**financed** [3] - 111:25, 151:18, 152:21
**financial** [15] - 68:1, 68:5, 73:18, 73:22, 74:5, 75:5, 77:7, 106:23, 107:25, 145:21, 150:14, 150:16, 172:15, 181:24, 217:23
**Financing** [7] - 66:25, 67:8, 68:10, 77:4, 112:7, 148:15, 148:17
**financing** [138] - 10:9, 11:15, 11:17, 35:18, 65:5, 65:15, 65:21, 66:22, 67:11, 67:13, 67:14, 67:20, 68:13, 69:12, 69:13, 69:16, 71:25, 72:23, 73:13,

77:1, 77:13, 77:16, 77:19, 77:20, 77:22, 77:23, 78:3, 82:11, 83:4, 85:2, 85:13, 87:5, 101:17, 101:21, 102:11, 104:2, 105:12, 106:6, 107:12, 107:13, 107:14, 107:15, 107:24, 108:11, 108:15, 108:23, 108:24, 109:2, 111:18, 111:23, 111:24, 112:2, 112:5, 112:8, 112:18, 113:1, 113:8, 113:13, 114:14, 114:23, 115:18, 115:25, 116:4, 116:7, 116:8, 116:11, 116:12, 117:6, 117:7, 118:9, 118:23, 120:24, 121:9, 121:12, 121:14, 121:15, 121:16, 121:18, 121:21, 121:24, 122:2, 146:2, 146:6, 146:9, 146:10, 148:5, 148:11, 149:10, 149:11, 149:13, 149:16, 150:9, 152:11, 152:15, 156:10, 157:2, 157:23, 157:25, 158:3, 158:5, 158:7, 158:12, 158:20, 159:1, 159:10, 160:5, 161:6, 163:4, 163:5, 163:8, 164:6, 174:17, 176:1, 176:2, 176:4, 179:20, 180:11, 180:19, 181:1, 181:2, 182:5, 186:2, 186:15, 186:18, 186:19, 186:24, 187:2, 187:7, 187:10, 198:2, 198:7, 198:18, 199:2, 199:7, 205:20, 205:21
**fine** [11] - 7:12, 7:23, 13:19, 66:4, 109:9, 109:25, 114:5, 130:12, 132:23, 163:22
**finish** [2] - 98:13, 144:2
**finished** [1] - 125:22
**firm** [3] - 10:21, 51:19, 211:1
**firm's** [1] - 10:22
**firms** [3] - 51:20, 104:11, 211:2
**First** [1] - 36:7
**first** [51] - 7:11, 11:10, 13:5, 14:5, 18:4, 19:7, 24:6, 28:8, 30:13, 52:3, 56:5, 67:23, 70:3, 70:12, 70:13, 83:25, 86:5, 93:9, 100:10, 103:1, 106:12, 108:13, 110:25, 111:5, 112:15, 115:25, 117:10, 142:9, 144:20, 150:3,

164:8, 164:10, 168:9, 169:1, 169:25, 170:16, 177:22, 180:8, 180:25, 183:21, 187:7, 187:22, 190:18, 192:16, 207:18, 212:22, 214:11, 214:15, 214:25, 217:4, 229:7
**firsthand** [1] - 186:5
**firstly** [1] - 192:16
**five** [24] - 21:3, 42:24, 43:21, 44:14, 44:16, 61:15, 64:12, 126:13, 131:11, 134:21, 135:11, 151:14, 177:25, 178:7, 184:15, 190:21, 192:2, 193:10, 195:25, 205:25, 210:21, 228:22, 230:7, 230:9
**Five** [4] - 18:2, 23:20, 23:21, 24:12
**five-page** [1] - 230:7
**fix** [1] - 162:14
**flesh** [1] - 160:14
**float** [2] - 68:23, 74:18
**floor** [3] - 51:18, 144:14, 165:16
**flowing** [1] - 106:25
**fly** [1] - 107:12
**focus** [7] - 60:6, 66:17, 99:6, 99:7, 102:22, 168:16, 168:22
**focused** [2] - 49:5, 208:19
**focusing** [1] - 218:4
**follow** [2] - 78:17, 112:6
**followed** [1] - 223:7
**following** [4] - 5:18, 67:5, 67:7, 143:16
**follows** [2] - 18:4, 212:8
**footnote** [11] - 32:20, 33:22, 34:10, 35:4, 35:5, 39:15, 43:10, 47:12, 47:13, 47:17, 48:22
**FOR** [1] - 1:1
**Force** [2] - 206:19, 206:22
**force** [4] - 54:15, 80:13, 203:18, 203:21
**force/market** [1] - 54:16
**foregoing** [2] - 67:3, 232:7
**foremost** [2] - 11:10, 30:13
**forgive** [1] - 81:25
**form** [6] - 130:9, 130:11, 130:12, 130:15, 192:3
**forma** [1] - 80:21
**formal** [2] - 3:20, 228:23

**format** [1] - 78:16
**forms** [1] - 203:6
**forth** [10] - 46:18, 51:1, 65:9, 106:7, 128:2, 162:13, 178:6, 188:5, 189:13, 213:10
**forum** [1] - 176:19
**forward** [29] - 5:7, 13:14, 70:10, 75:11, 100:2, 106:9, 120:22, 121:7, 122:1, 144:14, 174:2, 174:15, 176:21, 177:3, 180:19, 181:6, 189:1, 189:13, 190:2, 190:5, 190:7, 199:11, 199:13, 216:21, 217:4, 219:2, 219:4, 221:24, 229:7
**foundation** [1] - 72:12
**founded** [1] - 103:5
**Four** [5] - 23:10, 33:4, 45:14, 47:24, 225:2
**four** [32] - 11:25, 28:8, 32:13, 40:9, 40:18, 40:19, 40:20, 40:23, 43:21, 89:9, 91:8, 96:23, 110:17, 138:24, 168:9, 169:1, 171:16, 177:21, 178:19, 178:24, 184:12, 185:12, 190:10, 190:21, 193:14, 208:7, 208:10, 214:13, 214:15, 215:9, 216:1
**four-month** [1] - 193:14
**Fourth** [18] - 5:19, 170:4, 170:5, 170:12, 207:6, 207:7, 207:24, 207:25, 208:2, 208:4, 208:11, 208:20, 209:6, 214:20, 214:21, 218:10, 218:13
**fourth** [5] - 90:5, 171:9, 171:21, 215:9, 219:9
**frame** [4] - 46:15, 46:17, 46:21, 190:4
**frankly** [5] - 3:3, 4:3, 4:5, 81:24, 200:2
**fraudulent** [1] - 107:24
**free** [13] - 38:24, 56:17, 63:17, 127:25, 133:15, 133:20, 134:10, 139:19, 140:9, 140:25, 144:3, 190:4, 213:14
**Freewill** [1] - 36:7
**freeze** [1] - 190:4
**frequently** [1] - 218:4
**Friday** [6] - 1:11, 222:22, 222:23, 226:12, 229:1, 230:6
**friends** [2] - 108:19,

190:5
**front** [8] - 12:18, 56:5, 91:22, 92:2, 124:8, 147:25, 180:19, 227:5
**fruition** [1] - 11:20
**FTC** [2] - 170:5, 208:4
**fudge** [1] - 182:10
**fulfill** [2] - 204:14, 227:17
**fulfilling** [1] - 46:1
**full** [1] - 128:5
**fully** [8] - 147:5, 173:11, 173:13, 173:17, 174:1, 176:21, 198:2, 199:23
**fund** [3] - 74:18, 104:22, 160:18
**Fund** [1] - 67:17
**fundamental** [1] - 219:16
**funded** [2] - 69:6, 116:8
**Funding** [1] - 149:6
**funding** [14] - 67:7, 69:6, 83:18, 83:19, 108:6, 113:17, 158:16, 159:6, 159:21, 159:22, 160:1, 161:10, 161:11, 160:1, 198:23
**funds** [8] - 75:2, 104:25, 106:2, 106:13, 112:9, 161:24, 224:9
**Furniture** [1] - 170:11
**furtherance** [1] - 67:3
**furthered** [1] - 218:6
**furthermore** [3] - 207:17, 211:20, 213:20
**futile** [1] - 219:20
**future** [5] - 151:4, 172:10, 175:13, 175:16, 189:24

## G

**gain** [1] - 99:15
**gained** [2] - 216:16, 225:16
**gap** [5] - 69:11, 108:22, 157:6, 157:7
**garage** [1] - 151:17, 151:19, 151:20, 151:22
**gather** [4] - 2:15, 3:15, 7:12, 176:18
**General** [1] - 67:17
**general** [4] - 64:9, 67:17, 91:13, 115:21
**generally** [10] - 11:9, 171:25, 210:2, 211:5, 211:10, 221:15, 221:18, 223:4, 226:15
**Generally** [1] - 214:17

**generate** [1] - 151:12
**generated** [1] - 151:20
**generating** [1] - 151:1
**geographic** [1] - 101:5
**geographically** [1] -
33:12
**given** [12] - 12:14,
106:1, 189:19, 193:3,
193:18, 196:5, 205:24,
207:17, 218:6, 219:10,
221:21, 229:12
**glad** [13] - 6:4, 6:8,
66:21, 73:1, 110:19,
168:2, 168:21, 169:3,
177:20, 190:16, 196:9,
221:3, 221:19
**Global** [1] - 209:18
**gloss** [2] - 168:19,
197:16
**golf** [1] - 101:3
**Goods** [1] - 103:8
**Gordon** [2] - 9:21, 10:3
**government** [8] - 78:23,
78:24, 108:6, 108:23,
158:12, 161:7, 177:10,
186:18
**GOVERNMENT'S** [1] -
8:21
**government-
supported** [1] - 108:23
**governmental** [1] -
77:12
**Governor** [1] - 148:25
**governor's** [1] - 149:8
**governs** [1] - 210:9
**grand** [1] - 131:9
**grant** [12] - 7:20,
148:12, 149:5, 168:5,
171:17, 175:3, 189:3,
189:6, 189:7, 190:1,
217:9
**granted** [10] - 76:11,
168:12, 173:1, 215:25,
216:7, 216:12, 219:6,
220:13, 225:13, 226:2
**grantee** [1] - 127:2
**granter** [3] - 167:9,
167:10, 167:11
**granting** [5] - 171:6,
171:10, 190:3, 216:4,
219:23
**grantor** [2] - 36:22, 38:9
**grave** [2] - 170:19,
209:21
**Graziano** [6] - 19:5,
79:17, 79:21, 82:6,
204:11, 223:21
**great** [8] - 100:13,
105:11, 105:16, 107:11,
175:6, 195:23, 205:23,

218:21
**Great** [4] - 186:3, 186:4,
186:7, 188:13
**Greater** [1] - 48:11
**green** [1] - 148:13
**grocer** [4] - 80:19,
80:20, 87:13, 87:21
**grocery** [5] - 87:14,
87:22, 87:23, 94:13,
215:14
**Ground** [7] - 24:16,
26:23, 27:10, 29:1,
41:14, 129:21, 130:9
**ground** [136] - 6:19,
14:13, 14:16, 14:18,
14:20, 14:23, 15:2, 15:7,
15:10, 15:14, 15:22,
15:23, 15:25, 16:12,
16:16, 16:18, 16:20,
18:6, 18:11, 18:13,
18:17, 18:21, 22:17,
22:24, 23:4, 23:6, 23:7,
23:12, 23:15, 24:2,
24:17, 25:8, 25:15,
25:16, 26:24, 27:11,
28:4, 28:15, 28:17,
28:18, 30:12, 36:16,
36:19, 37:6, 37:11, 38:2,
38:6, 41:17, 42:23, 43:4,
44:16, 44:20, 45:3, 49:2,
49:5, 49:8, 50:9, 104:7,
104:25, 107:17, 108:4,
115:1, 115:12, 115:15,
116:12, 116:17, 117:1,
117:2, 117:7, 126:1,
126:6, 126:13, 126:20,
127:5, 128:7, 128:19,
128:25, 129:8, 131:11,
131:17, 131:21, 132:23,
133:8, 133:17, 133:22,
134:2, 134:18, 135:8,
136:4, 136:5, 143:20,
146:16, 153:21, 156:17,
156:24, 164:5, 164:9,
164:12, 167:12, 185:7,
185:15, 185:16, 190:22,
191:3, 191:4, 191:24,
192:2, 192:18, 193:11,
193:23, 193:25, 195:24,
196:2, 197:23, 197:25,
199:19, 199:24, 201:9,
201:20, 202:1, 202:3,
202:6, 202:19, 202:23,
203:3, 203:7, 206:3,
211:6, 211:14, 211:15,
211:18, 213:7
**ground-up** [4] - 104:7,
104:25, 107:17, 108:4
**group** [1] - 111:22
**Group** [1] - 218:12

**guarantee** [1] - 78:1
**guaranteeing** [3] -
176:19, 176:20, 177:12
**guarantees** [1] - 67:6
**Guaranty** [1] - 209:12
**guess** [12] - 6:13,
43:13, 48:2, 49:19,
53:11, 59:25, 95:8,
106:10, 133:11, 141:4,
168:22, 172:7
**guidance** [1] - 112:25
**Guide** [1] - 112:7
**guys** [1] - 121:5

# H

**half** [5] - 25:14, 108:13,
162:2, 162:3, 188:16
**hall** [1] - 8:8
**hallway** [1] - 50:21
**hand** [10] - 33:13,
51:25, 63:5, 92:9, 100:3,
122:15, 144:16, 174:22,
174:23, 209:13
**handed** [3] - 3:15,
12:13, 16:25
**handles** [1] - 150:12
**hands** [1] - 3:4
**handwriting** [1] - 95:9
**happy** [1] - 147:17
**hard** [5] - 48:5, 60:19,
108:5, 159:4, 187:19
**hardship** [1] - 216:7
**harkening** [1] - 181:11
**harm** [22] - 168:12,
169:3, 170:24, 170:25,
171:1, 171:24, 172:1,
172:8, 172:14, 208:8,
214:17, 214:25, 215:16,
215:17, 215:18, 215:19,
215:20, 217:10, 218:17,
219:17, 220:5
**harmed** [7] - 170:22,
171:3, 172:3, 172:5,
205:1, 215:22, 215:24
**Havco** [1] - 147:10
**HCD** [3] - 79:18, 79:19,
80:10
**head** [1] - 91:11
**heading** [1] - 127:19
**hear** [27] - 6:4, 6:8,
6:11, 66:21, 73:1,
110:19, 111:2, 155:9,
165:23, 165:24, 168:3,
168:21, 169:4, 169:22,
171:20, 177:20, 188:1,
188:2, 190:16, 191:23,
196:11, 221:3, 221:19,
222:5

**heard** [15] - 58:7, 89:13,
168:15, 173:14, 185:3,
187:3, 187:25, 188:3,
207:19, 210:25, 211:3,
214:3, 214:4, 227:3,
227:19
**Hearing** [1] - 1:10
**hearing** [33] - 2:2, 2:19,
2:22, 4:10, 4:18, 6:3,
16:25, 19:1, 19:2, 42:8,
50:19, 57:25, 65:7, 65:8,
98:12, 98:21, 99:6, 99:7,
99:16, 99:21, 109:20,
154:19, 165:1, 183:5,
205:2, 205:13, 205:14,
207:18, 214:5, 217:8,
223:16, 226:17, 229:3
**heavily** [2] - 206:20,
206:23
**heavy** [1] - 5:10
**height** [1] - 61:14
**heightened** [1] - 5:14
**held** [5] - 4:18, 168:4,
205:13, 208:20, 208:25
**help** [3] - 112:16,
123:17, 150:15
**helped** [1] - 51:20
**helpful** [4] - 89:11,
89:12, 148:12, 154:11
**helps** [1] - 116:1
**Henderson** [1] - 160:21
**hereby** [6] - 26:15,
130:25, 131:5, 131:8,
226:4, 232:3
**herein** [1] - 225:13
**hereinafter** [1] - 223:11
**hereto** [2] - 197:11,
212:4
**hereunto** [1] - 232:10
**herewith** [1] - 224:5
**herring** [1] - 190:19
**hi** [1] - 105:22
**high** [6] - 7:6, 151:8,
161:12, 161:14, 161:19,
198:12
**higher** [11] - 5:24,
125:8, 170:9, 170:14,
170:18, 171:2, 201:13,
208:15, 208:16, 214:10,
215:20
**hindered** [1] - 164:5
**historic** [1] - 148:20
**Hitchcock** [1] - 114:8
**hold** [5] - 58:3, 81:15,
97:15, 190:14, 224:1
**holder** [4] - 23:4, 23:5,
23:7, 209:17
**holders** [1] - 67:18
**holds** [2] - 117:2,
203:12

**Holland** [1] - 209:3
**Home** [1] - 103:8
**home** [3] - 35:2, 107:22
**Homes** [2] - 157:10,
175:15
**homes** [4] - 40:10,
40:19, 54:12, 107:25
**honest** [1] - 188:4
**honestly** [1] - 92:13
**Honor** [123] - 2:17, 2:20,
2:24, 3:2, 3:8, 3:17, 6:7,
6:10, 7:21, 8:11, 9:9,
9:15, 9:16, 12:13, 13:9,
13:12, 13:18, 17:14,
17:21, 17:22, 19:2, 21:5,
21:20, 24:12, 41:6,
41:10, 42:7, 42:18,
45:12, 49:9, 49:14,
50:23, 51:14, 51:23,
58:8, 59:17, 65:2, 65:6,
65:25, 66:24, 80:24,
81:10, 81:25, 82:13,
82:25, 84:12, 86:2, 86:9,
89:20, 89:22, 90:17,
90:23, 91:16, 91:21,
93:11, 96:8, 96:13, 97:8,
97:14, 98:5, 98:7, 99:2,
105:17, 109:6, 109:11,
109:18, 110:3, 110:10,
110:13, 110:21, 113:25,
117:13, 117:24, 118:7,
120:13, 120:18, 122:10,
125:1, 128:17, 129:18,
129:21, 143:12, 144:7,
144:10, 153:17, 154:6,
154:13, 154:24, 163:13,
163:17, 163:20, 164:18,
164:23, 165:4, 165:10,
167:15, 167:17, 168:20,
169:15, 171:23, 172:7,
172:25, 173:19, 177:2,
177:22, 180:13, 182:7,
186:8, 190:13, 190:17,
191:13, 202:15, 203:16,
203:23, 220:18, 221:2,
221:14, 221:20, 226:16,
227:21, 229:19, 229:21
**honorable** [1] - 182:4
**Honorable** [1] - 1:13
**hope** [1] - 190:1
**hopefully** [1] - 53:25
**hoping** [1] - 106:20
**host** [1] - 84:8
**hotel** [2] - 101:2, 108:20
**hour** [2] - 3:6, 110:5
**hourly** [1] - 51:14
**hours** [1] - 81:12
**house** [1] - 74:18
**houses** [2] - 40:20,
202:3

**Housing** [22] - 18:25, 42:15, 75:10, 75:16, 76:1, 85:24, 111:13, 111:16, 111:17, 145:5, 145:7, 145:12, 147:11, 152:14, 155:24, 155:25, 158:5, 200:16, 204:10, 204:12, 223:20, 223:22
**housing** [16] - 54:16, 80:14, 104:4, 105:10, 150:23, 157:10, 158:6, 159:14, 159:15, 163:2, 163:3, 163:7, 163:9, 199:1, 215:14
**HUD** [40] - 77:16, 77:19, 77:20, 78:3, 78:7, 78:15, 78:16, 78:22, 79:3, 79:5, 80:3, 80:4, 82:7, 82:10, 85:13, 85:21, 86:15, 87:3, 87:5, 87:19, 88:3, 93:23, 94:5, 95:4, 96:25, 157:8, 160:5, 160:11, 160:20, 160:22, 188:1, 188:9, 188:10, 198:6, 198:9, 198:15, 199:9
**HUD's** [4] - 87:16, 198:8, 198:13
**Hughes** [1] - 207:24
**hum** [1] - 90:8
**hundred** [2] - 31:1, 31:3
**hundreds** [2] - 74:5, 189:12
**hurdles** [1] - 74:12
**hypothetical** [1] - 141:23

**I**

**I's** [2] - 204:16, 224:12
**i.e** [1] - 53:25
**IA** [5] - 103:1, 152:17, 159:3, 179:2, 205:16
**Iber** [2] - 87:4, 94:7
**idea** [3] - 7:16, 104:12, 194:11
**identification** [1] - 129:22
**identified** [19] - 14:7, 19:11, 21:1, 32:17, 38:22, 46:14, 48:18, 56:16, 63:16, 80:1, 96:5, 121:15, 121:25, 135:5, 136:3, 139:18, 172:2, 172:9, 193:10
**III** [1] - 73:7
**imagine** [2] - 64:23, 93:15
**immediate** [1] - 204:17
**immediately** [10] -

32:23, 84:1, 124:19, 174:22, 194:23, 205:1, 212:9, 224:7, 225:10, 225:11
**impact** [3] - 34:14, 161:21, 216:6
**impacted** [1] - 160:24
**impeach** [1] - 119:15
**impediment** [4] - 131:12, 131:17, 134:1, 134:2
**impediments** [1] - 134:5
**implement** [2] - 77:7, 123:17
**implementation** [1] - 55:17
**implications** [3] - 182:11, 216:20, 229:5
**implicit** [1] - 216:24
**implied** [1] - 43:17
**implying** [1] - 173:25
**importance** [2] - 182:10, 218:2
**important** [12] - 3:25, 180:9, 191:22, 191:24, 197:1, 204:2, 204:3, 204:4, 204:5, 218:15, 219:18, 228:23
**importantly** [4] - 175:12, 178:21, 178:22, 189:9
**imposed** [2] - 55:21, 180:5
**imposing** [1] - 55:20
**impossible** [1] - 224:11
**improbable** [1] - 187:17
**improperly** [2] - 213:23, 225:6
**improved** [1] - 157:22
**improvements** [9] - 16:3, 34:17, 34:21, 35:1, 35:7, 71:25, 145:22, 146:2, 150:9
**IN** [1] - 1:1
**inability** [3] - 46:17, 186:19, 198:1
**inaccurate** [1] - 107:25, 179:23
**inadequacy** [1] - 179:20
**inadequate** [1] - 214:19
**incalculable** [2] - 215:12, 216:13
**included** [2] - 4:25, 227:21
**includes** [2] - 10:10, 40:18
**including** [12] - 14:22, 37:19, 77:9, 101:2, 104:5, 126:22, 175:15,

181:8, 200:15, 203:20, 205:16, 219:24
**inclusive** [1] - 87:20
**income** [11] - 80:15, 158:6, 158:10, 159:12, 159:14, 161:15, 163:2, 163:3, 163:7, 163:9, 199:1
**inconsistent** [1] - 159:4
**Incorporated** [1] - 37:18
**incorrect** [1] - 135:16
**incorrectly** [1] - 2:10
**increased** [1] - 218:20
**increment** [7] - 11:17, 67:11, 67:12, 67:14, 67:19, 68:13, 72:22
**Increment** [4] - 67:8, 68:9, 148:14, 148:17
**increment/special** [1] - 71:24
**incumbent** [2] - 125:7, 142:18
**incur** [1] - 216:13, 225:12
**incurs** [1] - 175:9
**indecisiveness** [1] - 73:9
**indeed** [6] - 178:9, 207:8, 211:9, 214:21, 217:17, 218:14
**independent** [1] - 31:4
**INDEX** [1] - 231:1
**index** [1] - 12:18
**indicate** [4] - 17:8, 115:7, 136:21, 161:25
**Indicate** [1] - 5:22
**indicated** [2] - 218:11, 230:5
**indicates** [2] - 42:8, 117:25
**indication** [4] - 119:6, 119:8, 121:19, 229:7
**individuals** [2] - 54:13, 83:13
**induce** [1] - 116:1
**indulgence** [2] - 90:25, 163:25
**inferring** [1] - 126:19
**influence** [1] - 125:7
**information** [7] - 20:6, 37:4, 70:23, 78:15, 107:25, 150:10
**informed** [2] - 157:9, 160:10
**informing** [1] - 148:10
**infrastructure** [4] - 151:23, 151:24, 152:1, 152:4
**initial** [1] - 157:25

**initiate** [5] - 70:5, 70:7, 74:21, 74:24, 75:23
**initiating** [1] - 70:2
**injunction** [48] - 98:16, 98:22, 99:7, 99:14, 168:5, 168:25, 169:10, 170:1, 171:10, 171:11, 172:21, 174:14, 174:16, 174:18, 175:3, 189:3, 189:8, 190:1, 190:3, 190:11, 207:3, 207:11, 207:20, 207:22, 208:1, 208:6, 208:10, 208:21, 216:7, 216:8, 218:6, 219:6, 219:11, 219:13, 219:18, 219:25, 220:3, 220:5, 220:13, 221:19, 222:6, 223:2, 224:1, 224:8, 225:9, 225:21, 226:1
**Injunction** [9] - 1:10, 204:25, 205:4, 220:13, 223:10, 223:13, 223:18, 224:4, 226:10
**injunctive** [19] - 98:22, 110:14, 110:17, 168:12, 170:8, 171:17, 204:22, 204:25, 206:25, 207:16, 208:3, 208:16, 215:24, 216:5, 216:11, 217:10, 219:23, 223:14, 225:13
**injured** [3] - 218:6, 224:7, 225:11
**injury** [9] - 99:3, 169:20, 171:6, 204:17, 214:18, 214:21, 216:12, 216:13, 225:12
**input** [1] - 54:6
**inquiry** [1] - 214:15
**inquisition** [6] - 23:11, 23:14, 23:22, 23:25, 24:2, 26:10
**install** [1] - 147:13
**instance** [1] - 180:25
**instead** [2] - 67:16, 76:1
**institutions** [1] - 162:21
**instructed** [1] - 147:10
**instructive** [1] - 199:6
**instrument** [2] - 22:14, 37:17
**instruments** [1] - 38:10
**insurable** [9] - 127:24, 133:15, 133:25, 156:12, 167:3, 192:12, 199:17, 200:3
**Insurance** [1] - 209:24
**insurance** [14] - 79:4, 87:3, 87:7, 90:15, 104:24, 116:16, 126:7, 156:20, 185:5, 200:19,

200:21, 200:22, 200:23
**insure** [2] - 79:3, 225:3
**insured** [4] - 90:7, 126:7, 156:18, 156:19
**insures** [1] - 77:20
**intend** [3] - 157:23, 174:8, 177:2
**intended** [4] - 16:14, 157:25, 158:17, 161:16
**intending** [1] - 81:22
**intends** [10] - 86:7, 173:11, 173:13, 173:17, 174:1, 174:2, 176:21, 176:23, 198:3, 216:21
**intent** [18] - 67:24, 67:25, 70:9, 70:15, 70:17, 71:5, 71:9, 72:2, 72:9, 73:12, 74:20, 76:19, 150:13, 160:10, 182:22, 187:12, 197:15
**intents** [1] - 206:11
**interaction** [1] - 53:19
**interdigital** [1] - 207:24
**interest** [83] - 15:6, 15:18, 16:8, 16:23, 16:24, 22:15, 22:16, 23:4, 23:13, 23:23, 24:3, 24:7, 24:8, 24:17, 25:6, 25:7, 26:1, 26:11, 26:13, 26:15, 26:24, 28:22, 28:25, 29:3, 29:10, 36:8, 36:15, 37:6, 37:12, 37:18, 38:1, 38:3, 38:11, 99:3, 101:15, 103:11, 103:14, 126:6, 127:6, 127:7, 127:8, 129:7, 129:11, 131:9, 132:16, 135:2, 135:10, 135:16, 136:4, 136:5, 137:14, 137:15, 137:23, 146:9, 169:6, 169:20, 171:10, 171:12, 171:14, 176:10, 177:13, 181:17, 182:2, 189:10, 208:11, 213:25, 215:10, 217:1, 217:6, 217:12, 217:15, 217:19, 217:25, 218:5, 218:9, 219:1, 219:5, 219:10, 219:25, 220:8, 225:20, 225:22
**interested** [3] - 123:24, 173:4, 188:18
**interesting** [1] - 191:22
**interests** [3] - 169:2, 175:17, 189:11
**interim** [1] - 225:17
**internal** [3] - 74:9, 87:22, 88:1
**internationally** [2] - 101:8, 104:5

**interpret** [1] - 143:3
**interpretation** [7] -
142:1, 182:14, 197:6,
197:10, 197:12, 212:2,
212:4
**interpretations** [1] -
209:14
**interpreted** [1] - 65:7
**interprets** [1] - 209:6
**interrelationship** [1] -
185:21
**intervention** [1] -
184:24
**introduce** [1] - 12:21
**introduced** [2] - 18:25,
178:16
**introductory** [1] - 131:7
**invalid** [1] - 181:4
**invest** [2] - 104:25,
212:22
**invested** [6] - 174:9,
175:5, 186:14, 189:10,
215:1, 224:9
**investing** [1] - 101:16
**investment** [4] - 74:18,
100:23, 100:25, 108:25
**Investments** [1] -
104:11
**investor** [2] - 101:22,
217:21
**investors** [2] - 183:3,
183:17
**invited** [1] - 78:22
**invoke** [2] - 7:17, 7:25
**involve** [3] - 78:18,
78:25
**involved** [9] - 11:4,
101:22, 103:17, 115:12,
156:4, 156:8, 156:9,
164:19, 182:2
**involvement** [2] -
101:13, 156:7
**involves** [3] - 10:15,
216:5, 218:16
**involving** [1] - 10:8
**irrelevant** [1] - 182:19
**irreparable** [20] - 99:2,
168:11, 169:3, 169:19,
170:24, 171:24, 172:1,
172:14, 204:17, 208:8,
214:17, 214:23, 214:24,
215:5, 215:17, 215:18,
219:17, 220:5, 224:14
**irreparably** [8] - 170:22,
171:3, 205:1, 215:22,
215:24, 224:7, 225:10,
225:11
**issuance** [6] - 19:5,
189:15, 190:10, 225:9,
225:11, 225:21

**issue** [44] - 4:23, 7:2,
13:12, 13:16, 44:16,
46:24, 50:1, 66:1, 66:19,
87:7, 94:16, 99:1, 99:8,
99:9, 99:10, 99:15,
113:11, 116:3, 116:4,
116:9, 121:13, 136:17,
136:18, 152:6, 164:9,
164:10, 168:8, 169:19,
179:19, 194:21, 195:24,
197:19, 197:23, 199:12,
202:23, 203:1, 203:22,
205:15, 207:22, 220:21,
222:6, 222:7, 229:3
**issued** [24] - 27:21,
41:21, 41:22, 50:6,
67:16, 73:23, 116:16,
146:10, 146:14, 153:6,
179:13, 193:7, 193:13,
195:5, 195:9, 195:17,
196:14, 196:24, 199:16,
203:7, 213:2, 224:8,
227:14, 228:7
**issues** [30] - 4:5, 45:5,
50:7, 53:12, 65:8, 65:9,
66:17, 76:8, 88:3, 94:7,
94:8, 110:17, 113:1,
115:22, 136:25, 150:22,
154:12, 155:7, 157:12,
158:9, 160:13, 160:18,
161:4, 162:5, 162:12,
169:21, 182:13, 188:10,
206:13, 218:17
**issuing** [5] - 115:24,
117:6, 121:11, 228:13,
229:23
**items** [4] - 169:1,
169:11, 169:14, 169:16
**iteration** [1] - 91:15
**itself** [12] - 14:23,
36:16, 61:12, 62:5,
67:21, 73:24, 75:6,
125:2, 135:20, 180:1,
180:6, 205:4
**IV** [17] - 32:18, 32:23,
39:7, 124:6, 124:19,
125:11, 140:17, 141:5,
141:14, 142:10, 175:7,
182:24, 190:23, 194:23,
206:7, 212:9

## J

**J-O-H-N** [1] - 111:5
**J-O-N-A-T-H-A-N** [1] -
100:15
**Jack** [1] - 79:15
**jagged** [1] - 64:24
**January** [10] - 69:17,
69:22, 70:15, 70:18,

71:3, 75:23, 108:8,
109:4, 150:8
**January/February** [6] -
71:6, 71:13, 71:18,
75:24, 187:8, 187:10
**job** [4] - 96:24, 102:16,
174:25, 184:25
**jobs** [5] - 157:20,
172:11, 215:4, 224:13,
224:18
**John** [2] - 110:22, 111:5
**JOHN** [2] - 110:23,
231:11
**join** [1] - 106:11
**jointly** [1] - 186:25
**joists** [2] - 61:10, 64:15
**Jonathan** [2] - 98:5,
100:15
**JONATHAN** [2] - 100:4,
231:9
**Judge** [7] - 1:13, 2:8,
4:21, 209:23, 218:10,
218:13, 218:14
**judge** [2] - 4:20, 218:13
**judgment** [4] - 133:20,
173:1, 204:21, 210:1
**judicial** [3] - 206:11,
219:20, 222:8
**July** [80] - 1:11, 3:1,
6:24, 18:24, 20:7, 20:24,
21:2, 23:17, 24:24,
25:25, 26:3, 26:5, 27:3,
27:14, 27:15, 27:20,
28:13, 29:10, 29:12,
29:13, 30:5, 31:3, 35:21,
35:22, 35:23, 36:1, 37:3,
37:13, 38:13, 41:2,
41:18, 63:21, 65:10,
76:3, 76:8, 86:24, 92:12,
92:14, 92:16, 92:18,
92:24, 125:24, 128:10,
134:21, 134:25, 135:11,
135:15, 136:12, 141:18,
146:14, 156:13, 178:1,
178:11, 178:14, 178:21,
178:22, 179:3, 179:9,
180:25, 183:25, 184:4,
184:15, 185:15, 186:1,
187:18, 191:11, 193:4,
193:6, 202:9, 202:10,
210:13, 210:17, 210:21,
213:24, 223:17, 225:7,
226:1, 226:13, 229:2,
232:6
**June** [17] - 2:22, 2:25,
4:11, 4:18, 6:3, 7:3,
24:1, 26:10, 41:21, 66:8,
168:7, 204:8, 205:2,
205:15, 206:21, 214:5,
223:16

**Jurisdiction** [1] - 218:8
**justify** [1] - 108:25
**Justine** [2] - 97:18,
114:6

## K

**keep** [6] - 4:22, 66:11,
67:1, 81:4, 151:19,
151:22
**Kelly** [1] - 207:6
**key** [3] - 7:8, 178:12,
183:23
**kick** [1] - 113:5
**kick-off** [1] - 113:5
**kidding** [1] - 222:24
**kids** [1] - 64:18
**kind** [8] - 60:19, 73:25,
104:3, 108:10, 149:1,
149:3, 157:23, 218:16
**kinds** [2] - 64:24, 72:21
**King** [2] - 4:16, 205:10
**kinks** [1] - 187:23
**knowledge** [3] - 50:8,
50:10, 66:12
**known** [10] - 23:24,
107:5, 108:9, 109:4,
109:5, 131:10, 206:18,
206:22, 208:17, 211:2
**Kraus** [1] - 150:11

## L

**land** [11] - 14:24, 15:6,
15:7, 15:8, 15:11, 20:19,
151:1, 175:10, 175:13,
202:2, 223:24
**Land** [20] - 4:13, 11:5,
13:23, 14:2, 19:12, 21:9,
25:18, 29:7, 36:21, 38:8,
38:13, 115:5, 115:6,
123:9, 124:12, 178:10,
192:22, 194:1, 205:5,
210:7
**landlord** [2] - 15:3, 15:4
**landlord/tenant** [1] -
87:22
**lands** [1] - 206:15
**language** [27] - 14:3,
33:23, 39:12, 43:17,
48:22, 57:1, 131:5,
138:20, 143:3, 171:7,
180:5, 192:25, 193:16,
194:21, 208:22, 212:7,
213:3, 223:5, 223:6,
223:9, 225:18, 226:14,
226:15, 227:5, 228:1,
229:25
**large** [6] - 33:3, 54:11,

103:4, 104:22, 157:6,
161:4
**larger** [3] - 62:3, 64:8,
87:19
**largest** [2] - 103:13,
104:11
**Las** [1] - 101:8
**last** [28] - 19:1, 46:8,
48:2, 52:7, 54:2, 57:5,
57:7, 65:7, 69:19, 72:4,
79:10, 83:23, 87:14,
98:7, 99:7, 106:3, 111:5,
143:16, 144:22, 154:22,
162:18, 179:4, 183:5,
189:25, 193:21, 211:19,
221:7, 225:19
**lastly** [2] - 87:24,
175:12
**late** [8] - 3:13, 5:16,
6:16, 12:2, 104:1,
222:21, 226:14, 229:16
**Law** [2] - 29:23, 223:15
**law** [10] - 10:1, 51:19,
170:12, 172:20, 191:25,
211:1, 211:2, 211:5,
211:15, 214:13
**laws** [2] - 68:20, 74:15
**lawsuit** [2] - 189:17,
204:3
**lawyer** [8] - 19:17,
177:11, 191:19, 191:22,
199:22, 200:15, 211:1,
211:5
**lawyer's** [1] - 51:18
**lawyers** [5] - 3:11,
185:9, 191:15, 191:18,
216:19
**lay** [2] - 72:12, 81:1
**laying** [1] - 176:25
**layman** [1] - 67:13
**LDDA** [75] - 11:10,
11:19, 12:9, 13:3, 18:5,
18:7, 18:12, 18:17,
19:12, 19:22, 29:14,
30:10, 32:1, 34:1, 38:18,
43:8, 43:14, 48:1, 48:6,
48:15, 52:20, 52:23,
54:19, 55:4, 55:8, 55:13,
55:18, 55:20, 56:2, 56:8,
66:2, 66:6, 88:13, 96:14,
135:4, 135:5, 135:25,
136:1, 136:2, 136:13,
138:2, 138:4, 147:25,
148:6, 148:23, 164:19,
166:23, 192:25, 194:21,
199:18, 201:23, 205:6,
205:22, 206:6, 206:19,
210:8, 211:20, 211:24,
213:11, 213:13, 213:19,
215:11, 223:25, 224:1,

224:21, 224:23, 224:25, 225:2, 225:4, 225:5, 225:6, 226:5, 226:6, 227:11, 228:4

**leading** [2] - 152:13, 227:23

**lean** [2] - 117:4, 181:20

**leaped** [1] - 181:15

**lease** [4] - 14:18, 23:7, 167:12

**leasehold** [44] - 14:20, 15:6, 15:13, 15:16, 15:18, 16:8, 16:23, 16:24, 22:14, 22:16, 23:4, 23:23, 24:3, 24:7, 24:8, 25:6, 25:7, 26:11, 26:13, 26:14, 28:22, 28:25, 29:2, 36:8, 36:14, 37:6, 37:10, 37:12, 37:18, 38:1, 38:3, 38:10, 126:9, 127:5, 127:7, 132:7, 132:8, 135:2, 135:10, 135:16, 136:5, 201:19, 203:5

**leaseholds** [1] - 135:9

**leases** [1] - 156:17

**leasing** [1] - 10:8

**least** [13] - 3:6, 21:3, 29:24, 31:18, 37:12, 99:13, 108:9, 116:11, 175:6, 177:11, 186:16, 196:23, 213:17

**leave** [2] - 51:16, 96:21

**left** [4] - 57:20, 63:5, 97:1, 97:2

**left-hand** [1] - 63:5

**Legacy** [1] - 149:6

**legal** [37] - 5:11, 8:13, 11:7, 11:8, 14:6, 16:5, 29:25, 68:2, 68:4, 70:21, 132:5, 136:1, 136:2, 163:21, 170:1, 173:5, 177:15, 178:5, 180:24, 182:13, 191:23, 191:25, 192:7, 192:21, 193:3, 193:16, 193:22, 194:4, 202:12, 206:4, 207:4, 211:6, 211:11, 211:12, 211:15, 213:7

**legally** [1] - 75:3

**legitimate** [3] - 64:16, 187:24, 217:25

**Lehman** [5] - 104:2, 107:2, 107:19, 108:2

**Leiva** [1] - 209:17

**Leiva-Perez** [1] - 209:17

**lend** [1] - 161:18

**lender** [5] - 117:1, 160:14, 160:17, 197:24,

201:22

**lenders** [7] - 34:6, 115:23, 137:14, 137:23, 183:3, 189:18, 213:25

**lending** [1] - 116:1

**lengthy** [3] - 153:25, 214:4

**less** [2] - 16:21, 175:2

**lessee** [4] - 15:10, 15:11, 15:12

**lesser** [1] - 159:6

**letter** [84] - 18:24, 19:4, 19:7, 20:1, 20:8, 27:20, 30:5, 36:1, 42:5, 42:13, 42:18, 42:23, 49:1, 49:3, 67:24, 67:25, 70:9, 70:14, 70:17, 71:4, 71:5, 71:7, 71:9, 71:13, 72:2, 72:8, 73:12, 73:14, 74:20, 76:5, 76:14, 76:19, 87:24, 90:22, 92:20, 92:22, 92:24, 93:17, 93:22, 94:2, 94:5, 94:7, 95:18, 106:1, 106:12, 106:16, 113:11, 115:20, 115:24, 116:5, 116:11, 117:7, 117:25, 118:8, 118:9, 118:14, 118:20, 119:16, 120:1, 159:5, 162:25, 163:5, 163:6, 179:9, 179:11, 179:14, 179:23, 181:4, 184:18, 187:12, 188:11, 190:20, 192:4, 198:9, 198:20, 198:22, 198:24, 210:18

**letters** [6] - 123:23, 146:8, 150:13, 198:4, 213:25

**level** [5] - 101:24, 114:16, 115:9, 115:11, 199:8

**leveled** [1] - 39:14

**levels** [1] - 161:12

**Lexington** [7] - 25:6, 26:2, 26:6, 62:15, 202:8, 206:2, 210:23

**licensed** [1] - 211:5

**lien** [11] - 132:23, 133:1, 133:2, 133:5, 133:7, 133:8, 133:9, 133:11, 133:12, 134:18

**liens** [2] - 127:25, 133:15, 133:19, 133:20, 133:21, 134:10, 134:13

**life** [1] - 222:24

**light** [7] - 5:16, 5:20, 7:5, 169:7, 181:17, 213:24, 229:5

**likelihood** [13] - 99:5,

122:6, 168:16, 169:23, 171:19, 177:19, 180:8, 189:17, 189:19, 189:20, 208:18, 209:15, 219:8

**likely** [20] - 107:7, 168:9, 170:17, 170:22, 208:7, 208:8, 208:21, 209:2, 209:8, 209:15, 213:21, 214:7, 214:9, 215:22, 215:24, 220:4, 224:20, 227:10, 228:2, 228:6

**likewise** [1] - 179:1

**limit** [2] - 81:25, 230:8

**limited** [1] - 77:9

**line** [8] - 19:22, 38:9, 46:8, 116:7, 120:23, 121:8, 199:16, 211:10

**lined** [1] - 190:5

**lines** [1] - 43:21

**lining** [1] - 190:6

**Linnehan** [2] - 97:18, 114:6

**list** [5] - 17:9, 32:8, 70:6, 134:24, 227:2

**listed** [12] - 13:10, 32:23, 33:6, 42:2, 124:19, 135:25, 136:1, 149:16, 162:2, 194:23, 206:7, 212:9

**listen** [2] - 141:15, 141:21

**listening** [1] - 218:18

**lists** [3] - 32:16, 40:16, 67:8

**litany** [1] - 227:23

**literally** [4] - 2:6, 156:21, 165:18, 217:7

**litigation** [5] - 4:7, 170:20, 176:16, 189:20, 209:22

**litmus** [2] - 170:11, 170:14

**live** [1] - 142:20

**lives** [1] - 183:19

**living** [2] - 138:15, 142:23

**Livingston** [7] - 1:17, 4:8, 98:6, 99:23, 144:13, 165:14, 203:17

**LIVINGSTON** [2] - 166:3, 166:5

**LLC** [11] - 1:4, 2:4, 19:14, 90:7, 90:9, 90:10, 98:2, 204:7, 218:12, 220:2, 223:11

**loan** [9] - 115:3, 116:18, 158:5, 159:6, 161:7, 161:9, 161:17, 162:17

**loan-to-value** [1] -

161:17

**Local** [2] - 13:4, 58:4

**located** [11] - 4:16, 32:22, 56:22, 62:20, 63:4, 64:7, 101:11, 124:18, 194:22, 205:9, 212:8

**locating** [1] - 102:15

**location** [2] - 87:16, 105:12

**locations** [1] - 101:7

**logical** [1] - 138:13

**logjam** [1] - 106:21

**LOI** [6] - 68:17, 70:8, 70:10, 89:14, 187:12

**Lombard** [1] - 1:24

**look** [28] - 4:8, 22:12, 26:22, 29:15, 39:6, 40:7, 46:6, 53:9, 56:4, 57:22, 60:18, 60:20, 68:9, 72:4, 77:3, 90:4, 91:21, 91:24, 92:8, 115:23, 121:18, 124:7, 135:4, 140:5, 160:14, 185:24, 188:14, 200:7

**Look** [1] - 188:17

**looked** [6] - 3:14, 64:14, 66:7, 112:15, 150:3, 151:7

**looking** [23] - 13:9, 22:13, 33:12, 38:23, 43:13, 45:13, 59:24, 61:7, 61:9, 61:23, 62:12, 62:15, 62:16, 62:23, 62:24, 78:23, 114:19, 140:2, 148:19, 158:6, 196:20

**looks** [2] - 92:14, 92:16

**loosen** [1] - 101:20

**loosening** [1] - 104:23

**lose** [8] - 16:2, 214:25, 215:2, 215:4, 224:8, 224:10, 224:13, 224:18

**losing** [1] - 172:11

**loss** [3] - 172:8, 172:15, 215:13

**lounge** [1] - 51:18

**low** [9] - 158:6, 158:9, 159:12, 159:14, 163:2, 163:3, 163:7, 163:9, 199:1

**lower** [1] - 80:15

**lucky** [1] - 197:1

**lunch** [4] - 82:15, 98:9, 110:5, 110:6

**luncheon** [1] - 110:7

**Luther** [2] - 4:16, 205:9

**lying** [1] - 217:5

---

**M**

**ma'am** [4] - 8:23, 42:5, 43:3, 43:13

**magically** [1] - 179:4

**mails** [3] - 70:4, 70:6, 148:10

**main** [2] - 32:13, 169:13

**maintenance** [1] - 225:22

**majeure** [2] - 203:18, 203:21

**Majeure** [2] - 206:19, 206:23

**MAJEURE** [1] - 206:23

**major** [6] - 126:8, 181:6, 181:8, 215:15, 217:21, 229:16

**majority** [1] - 158:3

**manage** [4] - 53:4, 53:22, 53:23, 145:11

**management** [3] - 53:7, 53:8, 53:18

**Manager** [2] - 145:9, 145:10

**manager** [1] - 145:14

**Managing** [1] - 104:10

**managing** [5] - 52:14, 54:20, 54:22, 55:25, 111:22

**MANEV** [1] - 111:6

**Maneval** [9] - 110:21, 110:22, 111:5, 111:10, 120:6, 120:18, 122:5, 122:11

**MANEVAL** [2] - 110:23, 231:11

**manner** [4] - 46:21, 232:9

**map** [1] - 62:15

**March** [1] - 59:1

**mark** [1] - 33:16

**marked** [11] - 13:23, 36:4, 58:1, 64:20, 83:8, 84:9, 85:17, 89:2, 89:17, 117:18, 129:22

**market** [18] - 53:17, 68:24, 80:13, 103:25, 104:4, 105:11, 108:17, 157:12, 159:11, 160:24, 161:18, 162:19, 186:3, 186:12, 188:15, 188:19, 188:25, 199:1

**marketability** [3] - 34:22, 87:9, 87:11

**marketable** [8] - 127:24, 133:14, 133:25, 146:20, 156:12, 167:3, 198:11, 199:24

**marketing** [1] - 54:14
**Markets** [2] - 118:14, 209:18
**markets** [10] - 101:20, 104:21, 108:10, 158:8, 159:13, 162:20, 162:25, 163:1, 188:22
**Marshall** [1] - 103:12
**Marshalls** [1] - 103:8
**Martin** [2] - 4:16, 205:9
**Mary** [4] - 1:23, 160:21, 232:3, 232:15
**MARYLAND** [1] - 1:1
**Maryland** [14] - 1:11, 1:24, 10:6, 41:21, 63:8, 111:13, 111:19, 135:9, 148:12, 148:24, 158:4, 205:11, 210:4, 218:3
**massive** [1] - 69:11
**match** [1] - 150:24
**materially** [1] - 210:2
**matter** [52] - 2:4, 3:6, 3:25, 5:2, 6:14, 7:5, 17:16, 17:18, 58:7, 156:23, 168:4, 168:16, 169:23, 171:19, 171:21, 172:14, 175:17, 177:18, 180:24, 182:1, 184:24, 186:24, 191:2, 192:11, 193:22, 194:19, 199:9, 200:25, 204:2, 204:3, 204:4, 204:5, 204:6, 206:9, 207:1, 207:11, 207:18, 207:20, 211:15, 211:16, 211:20, 217:6, 218:25, 221:16, 224:15, 229:1, 232:4, 232:9
**Matthew** [2] - 1:19, 221:5
**Maxx** [2] - 103:7, 103:12
**Mayor** [15] - 2:5, 8:7, 12:2, 19:9, 19:13, 24:9, 106:16, 123:6, 123:7, 130:16, 131:8, 204:9, 223:19, 232:5
**MAYOR** [1] - 1:6
**McGuire** [1] - 68:2
**mean** [42] - 2:22, 3:5, 3:9, 14:22, 14:23, 16:14, 19:16, 22:16, 25:7, 31:23, 32:12, 36:15, 57:1, 64:18, 67:13, 68:14, 69:2, 69:3, 69:7, 81:2, 90:11, 98:17, 99:20, 99:25, 102:10, 110:18, 125:12, 125:13, 132:13, 133:16, 134:9, 154:6, 156:19, 167:8, 172:14, 185:7, 202:15,

202:21, 214:8, 222:3, 230:7
**meaning** [18] - 15:1, 30:14, 39:18, 47:9, 48:22, 69:4, 69:20, 102:4, 132:13, 167:6, 178:5, 185:8, 193:16, 197:3, 198:12, 201:22, 211:25
**means** [13] - 16:7, 16:9, 16:10, 30:15, 132:2, 132:5, 132:15, 132:21, 133:18, 134:17, 140:24, 161:16, 212:13
**meant** [1] - 19:18
**measurable** [1] - 214:22
**meat** [1] - 177:18
**meet** [9] - 5:1, 74:1, 76:15, 76:21, 110:15, 112:16, 112:20, 115:10, 187:18
**meeting** [25] - 74:10, 76:13, 78:22, 79:5, 79:13, 80:1, 80:10, 82:5, 87:19, 94:3, 94:9, 106:19, 112:15, 113:5, 150:11, 160:6, 160:8, 160:10, 160:11, 182:19, 188:1, 188:4, 188:10, 222:8
**meetings** [5] - 84:8, 112:14, 112:17, 112:22, 113:3
**meltdown** [1] - 203:18, 203:20
**member** [3] - 10:5, 52:15, 55:25
**members** [1] - 54:7
**memo** [1] - 162:5
**Memorandum** [1] - 223:15
**memorandum** [1] - 217:7
**mention** [1] - 42:22
**mentioned** [9] - 13:5, 49:18, 70:8, 79:25, 160:21, 161:10, 161:23, 191:3, 203:21
**mentioning** [1] - 159:1
**mentions** [1] - 14:16
**mere** [1] - 227:15
**merely** [1] - 135:7
**merge** [1] - 203:10
**merged** [2] - 127:7, 201:9
**merges** [2] - 203:9
**merit** [3] - 73:21, 211:8
**merits** [2] - 73:25, 99:5, 168:9, 168:17,

169:24, 170:17, 171:20, 177:19, 180:8, 208:8, 208:18, 208:22, 209:2, 209:7, 214:7, 216:14, 219:7, 219:8, 219:12, 220:4, 224:20, 225:14, 227:10, 228:3, 228:6
**met** [10] - 54:2, 98:23, 112:21, 128:9, 143:2, 157:5, 205:18, 213:5, 214:11, 220:2
**metal** [1] - 64:25
**Metals** [4] - 37:18, 37:25, 38:5, 38:10
**Metro** [4] - 37:17, 37:25, 38:5, 38:10
**metropolitan** [2] - 215:5, 218:21
**Miami** [1] - 101:7
**microphone** [6] - 8:24, 52:4, 100:11, 111:1, 122:19, 144:20
**mid** [1] - 107:10
**mid/late** [1] - 75:15
**middle** [6] - 9:2, 46:7, 48:11, 60:1, 60:18, 63:9
**might** [15] - 16:3, 30:17, 30:18, 46:2, 108:25, 113:1, 119:25, 148:11, 149:14, 160:15, 197:16, 218:5, 218:6, 229:4, 229:7
**Miller** [1] - 218:7
**million** [27] - 85:4, 85:7, 85:10, 91:4, 91:10, 91:12, 91:14, 102:1, 102:2, 152:2, 152:18, 158:21, 158:23, 159:4, 162:3, 174:8, 175:5, 186:14, 188:20, 189:9, 198:4, 199:8, 205:21, 215:1
**mind** [1] - 99:6, 215:23
**mindful** [1] - 65:6
**minds** [1] - 182:20
**minimum** [1] - 74:1
**minority** [1] - 145:19
**minute** [4] - 90:4, 117:22, 178:6, 221:8
**minutes** [7] - 2:19, 3:7, 3:19, 16:25, 82:17, 217:9, 228:22
**misrepresentation** [1] - 179:11
**miss** [1] - 179:23
**mistake** [1] - 226:21
**mistaken** [2] - 2:10, 141:13
**misunderstood** [1] - 120:20

**mix** [1] - 54:16
**mixed** [2] - 7:15, 88:2
**mixed-use** [1] - 88:2
**Model** [1] - 48:11
**model** [1] - 223:7
**moment** [12] - 4:12, 17:21, 73:1, 120:13, 144:5, 165:7, 200:3, 202:12, 220:22, 220:23, 222:5, 229:14
**moments** [2] - 220:14, 223:1
**Monday** [1] - 35:22, 35:23, 36:1, 226:13
**monetary** [2] - 214:18, 214:22
**money** [13] - 16:1, 23:5, 74:25, 102:4, 151:4, 157:17, 171:25, 172:13, 172:20, 172:22, 212:22, 212:23
**monitor** [2] - 111:23, 147:13
**month** [5] - 46:16, 108:9, 161:14, 179:22, 193:14
**months** [33] - 19:24, 19:25, 24:24, 24:25, 45:15, 45:16, 71:15, 71:17, 89:9, 101:15, 101:19, 104:19, 106:4, 108:22, 113:19, 113:22, 146:1, 151:14, 153:13, 176:6, 178:3, 179:12, 179:14, 179:17, 181:4, 188:17, 189:16, 192:4, 193:2, 193:12, 193:18, 194:6, 210:14
**moreover** [1] - 181:1
**morning** [17] - 2:6, 3:1, 3:23, 5:15, 6:18, 9:6, 9:7, 9:19, 9:20, 17:18, 42:24, 52:11, 52:12, 82:25, 83:2, 217:7
**mortgage** [11] - 77:21, 78:6, 78:8, 78:9, 79:3, 85:15, 85:20, 86:14, 87:3, 87:7, 129:14
**mortgages** [2] - 107:22, 133:20
**most** [13] - 62:14, 113:16, 141:13, 151:8, 158:14, 162:10, 168:7, 180:9, 188:12, 208:19, 219:19, 228:22
**motion** [5] - 110:14, 168:25, 207:9, 223:16
**Motion** [10] - 2:3, 4:18, 17:1, 18:3, 204:23, 204:24, 205:4, 220:12,

223:8, 223:12, 224:4
**motion's** [1] - 110:16
**motions** [1] - 205:14
**movant's** [1] - 110:15
**move** [15] - 6:15, 13:14, 35:22, 70:10, 153:25, 154:14, 163:15, 177:3, 177:17, 189:1, 190:5, 190:7, 217:4, 229:7
**moving** [4] - 5:7, 75:10, 180:19, 181:5
**MR** [313] - 2:14, 2:17, 2:20, 2:24, 3:2, 3:8, 3:17, 3:19, 6:7, 6:10, 6:22, 7:1, 7:10, 7:15, 7:21, 7:25, 8:3, 8:11, 8:15, 8:19, 9:5, 9:8, 9:15, 9:16, 9:18, 13:9, 13:11, 13:15, 13:18, 13:21, 17:14, 17:20, 21:20, 21:25, 22:2, 22:6, 22:9, 22:11, 28:10, 28:21, 41:9, 42:7, 42:12, 42:17, 44:12, 45:11, 49:13, 50:23, 51:4, 51:10, 51:14, 51:23, 52:10, 58:8, 58:16, 59:20, 65:25, 66:5, 66:11, 66:14, 66:23, 72:11, 72:14, 72:17, 72:24, 73:3, 73:7, 73:10, 80:24, 81:5, 81:10, 81:14, 81:20, 81:25, 82:4, 82:13, 82:24, 86:2, 86:8, 89:20, 89:22, 89:24, 90:17, 90:20, 90:23, 90:25, 91:2, 91:20, 96:12, 97:8, 97:13, 97:14, 97:17, 98:5, 98:20, 99:1, 99:17, 99:20, 99:25, 100:19, 105:17, 105:20, 109:6, 109:9, 109:11, 109:18, 109:22, 110:1, 110:3, 110:10, 110:13, 110:21, 111:9, 113:25, 114:4, 117:9, 117:13, 117:16, 117:24, 118:7, 118:18, 118:22, 118:25, 119:1, 119:5, 119:10, 119:13, 119:15, 119:20, 119:23, 120:2, 120:5, 120:13, 120:17, 122:3, 122:8, 122:10, 122:13, 122:25, 125:1, 128:16, 134:16, 137:16, 137:17, 137:20, 137:21, 139:12, 143:15, 144:5, 144:7, 144:10, 144:15, 145:1, 153:17, 153:23, 154:1, 154:6,

154:9, 154:13, 154:15, 154:21, 154:23, 154:24, 155:2, 155:5, 155:10, 155:20, 163:13, 163:16, 163:20, 163:22, 163:25, 164:2, 164:17, 165:4, 165:7, 165:10, 165:12, 165:20, 165:23, 166:1, 166:3, 166:5, 166:10, 166:21, 167:17, 167:22, 167:25, 168:19, 169:15, 169:19, 171:23, 172:4, 172:7, 172:16, 172:19, 172:25, 173:12, 173:19, 173:24, 174:3, 174:6, 174:12, 175:20, 175:22, 175:25, 176:3, 176:12, 176:15, 177:2, 177:6, 177:8, 177:16, 177:22, 180:13, 180:17, 180:22, 180:24, 181:19, 181:25, 182:7, 182:12, 183:13, 184:6, 184:9, 184:12, 184:14, 186:8, 186:11, 189:7, 190:13, 190:17, 191:7, 191:13, 191:19, 192:6, 192:9, 192:11, 192:24, 193:6, 193:9, 193:20, 194:2, 194:7, 194:9, 195:2, 195:7, 195:10, 195:12, 195:16, 195:22, 196:8, 196:15, 196:19, 196:22, 197:8, 197:10, 197:20, 197:22, 200:1, 200:6, 200:10, 200:13, 200:18, 200:21, 200:23, 200:25, 202:15, 203:16, 220:18, 220:22, 220:25, 221:2, 221:5, 221:7, 221:10, 221:14, 221:20, 222:16, 222:20, 226:16, 226:20, 226:23, 227:2, 227:5, 227:13, 227:21, 228:9, 228:11, 228:16, 228:20, 229:19, 229:21, 230:10, 231:3, 231:4, 231:4, 231:5, 231:6, 231:7, 231:7, 231:8, 231:9, 231:10, 231:11, 231:12, 231:13, 231:14, 231:14, 231:16, 231:17, 231:18, 231:19
**Mt** [1] - 36:7
**Multi** [1] - 214:19
**Multi-Channel** [1] - 214:19
multifamily [1] - 160:22
**Multifamily** [4] - 85:24, 111:16, 111:17, 112:6
**multiple** [1] - 64:7

**Muni** [8] - 68:1, 73:15, 73:17, 73:18, 75:1, 75:4, 75:5, 150:15
**Muni-Cap** [8] - 68:1, 73:15, 73:17, 73:18, 75:1, 75:4, 75:5, 150:15
**municipal** [1] - 128:3
**must** [19] - 56:23, 103:2, 170:16, 170:21, 171:4, 171:5, 171:6, 171:9, 171:16, 179:12, 193:1, 193:17, 208:6, 208:21, 210:4, 214:14, 214:15, 215:9, 215:21
**mystified** [1] - 4:1

**N**

**nails** [2] - 64:15, 64:24
**name** [27] - 5:22, 8:24, 8:25, 9:2, 52:5, 52:7, 100:14, 111:3, 111:4, 111:5, 111:6, 114:2, 114:7, 122:19, 122:20, 144:20, 144:21, 144:23, 155:15, 155:16, 166:16, 210:2, 221:4
**named** [1] - 5:20
**namely** [4] - 177:24, 224:21, 227:10, 228:3
**national** [1] - 5:21
**Natural** [2] - 148:13, 149:5
**natural** [4] - 5:17, 170:3, 208:13, 209:1
**NaturaLawn** [1] - 218:11
**nature** [15] - 53:12, 53:21, 54:1, 105:10, 106:8, 107:7, 112:3, 112:19, 132:23, 150:20, 153:12, 156:7, 173:16, 173:20
**Nayden** [10] - 1:19, 6:5, 221:3, 221:4, 221:5, 222:4, 226:25, 228:1, 228:15, 229:23
**NAYDEN** [13] - 221:2, 221:5, 221:7, 221:10, 221:14, 221:20, 222:16, 227:2, 227:5, 227:13, 228:9, 228:16, 228:20
**near** [5] - 24:8, 34:7, 152:20, 157:10
**neat** [1] - 33:18
**necessarily** [5] - 40:21, 88:6, 132:4, 202:21, 209:10
**necessary** [16] - 7:22,

14:12, 18:13, 68:21, 74:16, 85:2, 115:8, 126:24, 128:4, 131:8, 131:21, 156:22, 169:16, 189:22, 202:19, 217:14
**NEDs** [6] - 83:12, 91:24, 159:12, 159:21, 159:24, 161:10
**need** [49] - 6:13, 7:8, 7:23, 8:23, 17:6, 21:18, 21:19, 31:22, 49:15, 51:8, 52:4, 65:16, 72:12, 72:19, 81:16, 91:14, 99:9, 99:25, 100:10, 102:1, 109:13, 110:25, 114:1, 115:22, 116:3, 126:1, 126:17, 130:5, 153:25, 155:5, 158:10, 159:5, 160:13, 162:10, 165:17, 175:8, 180:9, 180:10, 180:14, 183:2, 196:13, 202:13, 215:13, 215:14, 219:20, 220:14, 230:7
**needed** [16] - 35:6, 50:21, 50:24, 68:12, 76:12, 77:7, 79:1, 149:23, 151:19, 161:25, 183:2, 190:25, 199:7, 199:12, 215:4, 227:17
**needs** [8] - 17:16, 53:24, 74:1, 142:24, 144:8, 198:5, 201:21, 201:22
**negotiated** [5] - 55:12, 138:21, 182:20, 185:10, 185:20
**negotiating** [1] - 11:10
**negotiation** [2] - 10:10, 164:19
**negotiations** [6] - 11:15, 34:10, 47:21, 138:3, 182:17, 182:21
**neighborhood** [30] - 4:16, 33:1, 33:24, 33:25, 57:6, 124:22, 136:17, 136:19, 136:22, 138:12, 138:13, 138:16, 142:17, 142:18, 142:19, 142:20, 142:21, 142:22, 142:24, 195:1, 195:14, 196:5, 196:12, 196:25, 205:9, 206:8, 212:12, 215:12
**Network** [1] - 207:24
**never** [17] - 11:20, 51:5, 88:25, 113:6, 114:16, 142:6, 142:16, 143:9, 158:18, 159:19, 160:3, 160:10, 162:16, 179:19, 179:22, 183:10, 199:3

**New** [5] - 52:16, 101:7, 101:12, 183:18, 209:3
**new** [33] - 4:7, 38:22, 39:10, 39:14, 56:16, 60:9, 61:2, 62:6, 63:16, 64:5, 108:16, 139:18, 139:24, 140:8, 140:11, 140:16, 141:7, 154:3, 158:8, 159:11, 159:13, 162:19, 162:20, 162:25, 163:1, 170:2, 174:24, 174:25, 177:15, 199:1, 208:14, 208:25, 215:17
**next** [23] - 17:9, 23:9, 40:11, 51:22, 70:18, 70:19, 70:21, 98:4, 99:19, 99:23, 122:12, 124:11, 124:14, 129:23, 154:20, 154:21, 196:18, 211:13, 222:8, 226:12, 229:1, 230:6
**nice** [2] - 230:4, 230:12
**night** [1] - 179:4
**Nine** [2] - 26:8, 26:9, 43:22
**nine** [2] - 113:19, 176:6
**Ninth** [2] - 209:14, 209:16
**NO** [1] - 1:5
**nobody** [1] - 35:2
**non** [8] - 83:12, 112:4, 112:9, 113:14, 113:17, 133:2, 159:23, 175:3
**non-competitive** [4] - 112:4, 112:9, 113:14, 113:17
**non-elderly** [2] - 83:12, 159:23
**non-grant** [1] - 175:3
**non-lien** [1] - 133:2
**nonetheless** [1] - 225:16
**normal** [1] - 230:11
**normally** [1] - 17:17
**north** [4] - 59:24, 61:8, 62:15, 62:23
**North** [17] - 21:4, 22:15, 23:13, 23:18, 27:12, 28:3, 28:11, 41:14, 42:25, 59:24, 202:7, 202:9, 206:1, 210:22, 210:23
**northeast** [2] - 124:5, 183:23
**northern** [1] - 62:14
**NORTHERN** [1] - 1:2
**northern-most** [1] - 62:14
**note** [6] - 177:22, 206:17, 209:13, 211:12,

213:13, 226:7
**noted** [21] - 5:15, 58:4, 97:3, 97:4, 150:3, 203:3, 207:8, 207:24, 208:2, 208:11, 208:15, 209:22, 209:23, 209:25, 210:22, 214:12, 214:13, 218:14, 219:16, 219:22, 226:20
**notes** [5] - 28:2, 112:15, 114:7, 134:25, 200:8
**nothing** [13] - 5:22, 50:16, 59:8, 91:16, 109:9, 120:11, 128:13, 137:10, 143:22, 154:13, 164:14, 178:18, 203:11
**notice** [40] - 18:7, 30:19, 31:13, 31:22, 33:5, 35:17, 49:8, 49:25, 50:1, 50:3, 50:6, 50:12, 145:24, 146:1, 146:10, 146:14, 146:22, 190:20, 191:11, 192:4, 193:7, 194:14, 194:15, 199:13, 199:16, 201:13, 201:16, 201:18, 203:2, 206:11, 207:9, 207:14, 210:12, 210:13, 210:18, 227:14, 228:7, 228:13, 229:24
**Notice** [2] - 29:16, 35:12
**notices** [1] - 148:9
**notification** [1] - 31:18
**notify** [2] - 19:9, 30:4
**noting** [1] - 217:12
**notion** [1] - 211:15
**notwithstanding** [6] - 32:22, 64:1, 124:18, 142:11, 152:10, 187:13
**Notwithstanding** [2] - 194:22, 212:8
**November** [7] - 79:10, 79:11, 87:1, 93:22, 94:2, 194:5, 198:8
**nowhere** [3] - 175:20, 175:23, 175:25
**nugatory** [1] - 179:24
**number** [26] - 13:1, 17:4, 17:7, 17:8, 17:9, 20:24, 32:17, 63:12, 84:11, 89:19, 91:11, 94:19, 95:20, 112:2, 114:13, 114:25, 129:23, 130:1, 140:5, 161:4, 161:14, 161:18, 175:22, 176:3, 180:17, 190:17
**Number** [2] - 2:5, 17:11, 17:12, 86:13, 131:7
**Number(s** [1] - 232:5
**numbered** [2] - 12:18, 142:9

numbers [2] - 48:7, 159:8

numerous [3] - 54:4, 115:5, 214:25

# O

oath [4] - 82:21, 181:22, 217:21, 217:24

Obama [5] - 5:20, 5:22, 5:23, 170:5, 208:4, 208:12, 208:23, 209:22

object [1] - 139:12

objecting [2] - 86:3, 86:4

objection [23] - 2:13, 2:14, 9:13, 9:15, 54:25, 58:5, 72:11, 72:17, 86:2, 90:17, 90:23, 97:8, 109:6, 110:2, 113:25, 117:9, 125:1, 134:16, 137:16, 153:17, 154:6, 163:20, 201:1

objectionable [1] - 73:4

objections [5] - 75:25, 76:3, 76:6, 76:19, 76:20

objective [1] - 198:9

objects [1] - 64:25

obligate [1] - 136:14

obligated [11] - 30:4, 31:4, 31:11, 66:2, 180:25, 185:15, 185:16, 187:1, 195:14, 201:15, 212:18

obligation [17] - 30:13, 31:17, 45:13, 45:15, 45:22, 45:25, 46:3, 47:1, 95:11, 179:21, 179:23, 202:20, 203:19, 210:5, 210:6, 212:16, 213:6

obligations [13] - 5:1, 49:22, 49:24, 55:21, 55:22, 56:2, 66:20, 88:18, 202:17, 204:14, 205:18, 210:3, 218:15

observe [3] - 56:1, 109:23, 147:16

observed [2] - 183:5, 217:24

obtain [24] - 65:4, 65:15, 66:22, 69:13, 69:15, 73:12, 77:12, 78:3, 82:10, 85:13, 90:21, 109:2, 137:14, 137:15, 137:23, 149:4, 157:2, 164:6, 174:17, 180:11, 186:2, 186:19, 198:2, 208:6

obtained [6] - 20:6,

21:9, 90:15, 92:6, 149:5, 186:2

obtaining [11] - 65:5, 66:3, 67:7, 77:22, 107:14, 107:24, 108:11, 109:3, 148:5, 150:2, 199:7

obvious [2] - 65:23, 81:3

obviously [13] - 3:20, 5:9, 7:7, 8:14, 26:3, 27:3, 27:15, 51:12, 65:14, 80:9, 94:15, 106:3, 181:6

occasion [2] - 39:21, 218:19

Occupancy [7] - 125:17, 125:19, 125:20, 136:20, 138:15, 153:6, 195:17

occupancy [6] - 195:5, 195:9, 196:14, 196:24, 212:15, 213:1

occupied [1] - 125:18

occupy [1] - 142:23

occur [6] - 108:1, 112:17, 190:25, 193:1, 193:17, 216:8

occurred [2] - 95:14, 107:19

occurs [3] - 133:19, 141:4, 175:11

October [4] - 22:25, 37:17, 38:5, 153:3

OF [2] - 1:1, 1:7

off-price [1] - 103:13

offer [5] - 59:17, 67:22, 100:6, 115:19, 118:10

offered [3] - 117:19, 198:19, 212:13

office [5] - 54:8, 84:16, 101:10, 112:13, 226:13

Office [5] - 4:3, 21:9, 123:11, 157:9, 160:23

officer [8] - 147:15, 173:11, 173:22, 174:7, 176:18, 176:20, 176:22, 177:9

officers [1] - 226:3

offices [1] - 90:21

official [3] - 204:11, 223:21, 232:8

Official [1] - 232:16

officially [1] - 88:25

officials [3] - 80:3, 80:4, 211:4

often [4] - 112:16, 115:25, 157:16, 214:22

old [2] - 5:25, 29:7

Olive [1] - 36:7

once [15] - 10:14, 35:1, 72:8, 73:12, 73:14, 74:20, 145:25, 159:24, 166:16, 212:13, 212:14, 215:3, 224:11

One [23] - 13:22, 13:23, 19:1, 24:6, 27:25, 29:14, 32:2, 38:18, 43:14, 54:19, 56:7, 56:8, 88:13, 124:8, 124:9, 124:10, 127:11, 147:24, 204:20, 224:21, 228:4, 228:12

one [86] - 7:8, 8:9, 8:16, 9:11, 17:22, 18:18, 33:5, 33:7, 33:8, 37:19, 40:1, 40:7, 43:21, 43:22, 44:13, 44:15, 46:25, 51:19, 58:3, 61:14, 64:4, 64:7, 67:19, 68:1, 73:9, 76:25, 77:17, 86:5, 86:12, 87:9, 87:11, 87:12, 94:12, 97:15, 98:9, 98:24, 103:3, 103:6, 103:15, 104:11, 105:8, 107:8, 110:5, 114:7, 114:20, 118:3, 119:7, 130:1, 130:3, 138:1, 142:10, 143:10, 145:18, 149:15, 149:16, 157:20, 160:22, 165:13, 171:25, 172:3, 172:5, 174:22, 175:19, 176:9, 176:10, 176:11, 177:1, 177:20, 182:3, 186:6, 189:15, 190:14, 198:19, 202:7, 203:16, 207:20, 208:7, 211:1, 211:4, 217:19, 218:19, 220:22, 222:13, 226:16

one-hour [1] - 110:5

ones [2] - 62:24, 115:25

ongoing [2] - 53:23, 189:20

online [6] - 20:19, 20:20, 29:7, 36:21, 37:1, 38:13

op [1] - 152:23

open [3] - 56:7, 105:2, 113:21

opening [1] - 6:12

opine [3] - 117:12, 154:8, 211:10

opined [1] - 185:6

opining [1] - 211:6

opinion [25] - 5:17, 5:18, 101:17, 132:24, 138:17, 163:24, 167:14, 170:4, 170:12, 207:7, 207:12, 207:25, 208:5, 208:13, 208:14, 209:4,

209:10, 209:11, 209:12, 209:16, 209:18, 214:20, 214:21, 218:11

opportunities [3] - 101:21, 104:7, 104:20

opportunity [12] - 3:20, 35:8, 76:7, 94:23, 96:14, 101:22, 105:12, 112:23, 154:4, 172:9, 192:19, 222:9

Opportunity [1] - 83:21

opposed [3] - 194:20, 207:15, 224:4

opposing [3] - 181:11, 207:9

opposite [1] - 217:18

Opposition [2] - 17:1, 18:3

Optical [1] - 207:12

oral [3] - 165:20, 165:23, 165:24

order [27] - 5:12, 73:12, 98:19, 120:21, 121:6, 131:21, 137:14, 137:15, 137:23, 143:5, 145:16, 183:3, 186:18, 187:18, 190:11, 191:1, 198:5, 207:2, 207:10, 219:19, 220:14, 220:18, 221:17, 226:18, 227:17, 229:6, 230:5

Order [9] - 2:3, 4:19, 17:2, 18:3, 204:24, 223:8, 223:10, 223:19, 226:10

ordered [3] - 226:1, 226:2, 226:7

ordering [1] - 223:25

orders [1] - 167:25

ordinance [1] - 11:12

ordinances [2] - 11:12, 11:25

organized [1] - 52:23

orient [1] - 33:2

orientation [1] - 33:11

original [7] - 21:8, 21:10, 21:14, 21:15, 54:17, 229:11

originally [1] - 47:22

otherwise [4] - 93:19, 186:20, 202:16, 217:17

ought [1] - 20:16

ourselves [2] - 70:7, 221:11

outlined [1] - 162:5

outset [1] - 185:2

outside [3] - 70:4, 100:21, 203:20

outstanding [2] - 25:8, 126:20

outweigh [3] - 170:25, 171:1, 215:20

overall [3] - 57:1, 171:10, 202:17

overruled [1] - 139:14

oversee [1] - 88:1

oversight [1] - 53:8

overwhelmingly [1] - 220:8

own [17] - 14:8, 15:18, 15:22, 24:25, 26:6, 27:4, 38:1, 74:9, 90:10, 108:18, 115:24, 121:22, 148:15, 178:10, 181:8, 188:23, 198:10

owned [7] - 15:8, 15:9, 31:13, 42:21, 50:11, 147:21, 151:3

owner [11] - 14:19, 14:25, 15:1, 15:8, 15:9, 15:13, 15:19, 15:23, 15:25, 23:6, 52:18

owners [1] - 123:24

ownership [5] - 5:6, 15:12, 15:16, 15:17, 30:16, 36:16, 159:18, 202:2

owns [8] - 14:21, 14:25, 15:2, 15:7, 15:10, 37:11, 203:5

# P

P-E-T-E-R [1] - 155:16

p.m [3] - 110:7, 229:10, 230:13

pace [2] - 67:1, 80:25

package [3] - 69:11, 78:14, 160:3

Package [1] - 112:11

Page [47] - 14:1, 14:2, 18:2, 29:15, 32:2, 32:3, 32:6, 32:16, 35:5, 38:19, 39:3, 39:7, 39:15, 43:18, 45:14, 47:12, 56:10, 66:25, 67:9, 77:1, 77:2, 83:20, 84:18, 97:6, 124:13, 124:14, 127:14, 136:13, 139:10, 139:15, 139:16, 139:22, 139:23, 140:3, 140:6, 140:7, 140:14, 142:11, 166:23, 182:23, 183:14, 194:12, 194:21, 206:6, 211:21, 213:11

PAGE [1] - 231:2

page [18] - 22:22, 24:6, 24:7, 26:17, 39:6, 48:2, 48:4, 72:4, 90:5, 92:9,

93:9, 127:16, 130:24,
138:6, 140:7, 194:12,
197:8, 230:7
  **pages** [5] - 32:6, 74:5,
140:5, 230:9, 232:7
  **paid** [1] - 74:25
  **paper** [4] - 2:6, 17:11,
144:13, 153:15
  **Paper** [1] - 17:12
  **papers** [2] - 203:22,
224:5
  **Paragraph** [15] - 14:2,
16:7, 18:7, 24:6, 43:15,
43:21, 58:25, 66:25,
88:13, 96:6, 127:12,
128:9, 147:25, 194:16,
197:2
  **paragraph** [13] - 16:15,
18:4, 26:20, 26:21, 46:5,
46:8, 83:21, 83:23,
84:18, 95:24, 142:2,
192:22, 197:7
  **parcel** [3] - 42:20,
115:2, 206:12
  **parcels** [8] - 114:25,
115:1, 115:7, 174:9,
176:16, 201:20, 202:24,
202:25
  **pardon** [5] - 9:8, 85:8,
172:4, 175:21, 175:23
  **paren** [2] - 22:2, 223:12
  **Park** [4] - 48:11, 63:8,
90:7, 90:9
  **park** [1] - 90:10
  **parking** [3] - 151:17,
151:18, 151:20
  **parse** [1] - 129:4
  **part** [42] - 19:20, 31:18,
43:7, 47:1, 47:21, 48:1,
48:16, 55:21, 55:22,
61:20, 69:10, 79:1, 84:5,
98:12, 102:15, 102:25,
120:19, 124:4, 124:6,
137:14, 137:15, 140:7,
140:18, 140:19, 142:7,
142:20, 157:1, 159:21,
162:13, 163:4, 163:11,
170:7, 175:6, 179:20,
182:4, 182:23, 182:24,
183:4, 183:23, 190:23,
202:16, 215:15
  **parted** [1] - 211:10
  **participant** [1] - 182:16
  **participate** [1] - 119:4
  **participated** [5] - 12:4,
12:6, 83:4, 84:15, 101:5
  **participating** [4] -
101:15, 118:25, 119:16,
199:22
  **participation** [1] -

**101**:24
  **particular** [14] - 43:23,
80:20, 86:9, 86:11,
111:15, 114:17, 123:7,
159:23, 167:6, 197:2,
201:9, 203:3, 206:14,
218:4
  **particularly** [4] - 4:7,
159:13, 204:1, 216:15
  **parties** [28] - 4:14,
10:14, 34:11, 72:4, 72:9,
74:6, 123:24, 136:25,
137:13, 137:22, 170:25,
173:4, 182:22, 183:2,
183:14, 197:11, 197:16,
205:1, 205:7, 207:5,
210:8, 210:10, 212:4,
215:19, 222:9, 224:6,
226:9, 229:5
  **partner** [3] - 9:21,
102:5, 102:6
  **partners** [7] - 96:15,
96:21, 96:25, 97:2,
108:19, 116:1
  **partnership** [2] - 89:12,
106:11
  **parts** [1] - 158:11
  **party** [11] - 36:24,
53:17, 74:17, 138:3,
171:6, 182:21, 207:9,
208:20, 211:10, 216:6,
219:17
  **passed** [1] - 146:11
  **past** [1] - 100:25
  **Pat** [1] - 96:20
  **patent** [1] - 211:9
  **patience** [1] - 100:21
  **Paul** [2] - 204:11,
223:21
  **pause** [8] - 91:1,
120:14, 164:1, 165:9,
166:2, 166:6, 190:15,
221:1
  **pay** [5] - 15:19, 15:23,
23:4, 23:6, 67:25
  **payable** [2] - 22:25,
25:14
  **paying** [2] - 67:16, 68:7
  **payment** [4] - 14:20,
15:21, 22:24, 25:13
  **pending** [5] - 136:7,
136:9, 136:20, 189:17,
205:13
  **pension** [1] - 209:11
  **people** [15] - 34:20,
55:9, 80:5, 107:24,
108:25, 109:1, 123:16,
138:15, 142:20, 142:23,
189:12, 190:5, 191:14,
202:3

**per** [1] - 146:22
  **percentage** [1] - 12:22
  **perception** [1] - 107:23
  **Perez** [1] - 209:17
  **perfectly** [2] - 65:23,
81:3
  **perform** [4] - 52:23,
125:8, 126:10, 189:1
  **performance** [8] -
55:18, 55:21, 55:22,
56:2, 204:16, 217:14,
224:1, 226:6
  **performed** [4] - 56:24,
88:19, 125:15, 219:6
  **performing** [1] - 215:11
  **perhaps** [4] - 72:19,
106:1, 215:8, 222:4
  **period** [18] - 44:9,
45:21, 55:3, 103:16,
103:18, 103:22, 107:16,
122:22, 146:11, 154:5,
176:17, 179:22, 187:5,
189:15, 193:12, 194:5,
210:14, 214:5
  **permanent** [2] - 204:22,
216:12
  **permissible** [1] -
139:13
  **permission** [1] - 106:11
  **permit** [2] - 190:2,
226:5
  **permits** [5] - 184:23,
195:5, 195:9, 196:14,
213:1
  **permitted** [2] - 182:6,
217:16
  **person** [3] - 15:1,
114:2, 154:9
  **personally** [1] - 11:4
  **personnel** [1] - 12:15
  **persons** [1] - 226:3
  **perspective** [2] - 73:22,
108:4
  **persuade** [1] - 221:21
  **PETER** [2] - 155:12,
231:17
  **Peter** [4] - 42:14, 80:9,
154:21, 155:16
  **Phase** [124] - 4:25, 6:24,
19:10, 19:19, 20:3,
20:17, 20:24, 27:18,
27:23, 30:21, 30:22,
32:18, 32:23, 32:25,
33:11, 33:19, 33:20,
34:7, 34:18, 35:1, 35:10,
39:7, 43:4, 43:7, 44:17,
47:21, 48:2, 48:6, 48:8,
48:15, 48:22, 48:23,
60:9, 61:3, 62:7, 62:20,
63:13, 64:5, 66:20, 84:1,

84:21, 85:2, 85:3, 88:11,
91:9, 91:10, 95:25,
103:1, 124:6, 124:19,
124:21, 125:11, 125:12,
125:14, 125:16, 125:18,
125:24, 126:2, 126:12,
130:21, 138:13, 140:17,
141:5, 141:13, 141:14,
141:17, 142:3, 142:7,
142:9, 142:10, 142:14,
143:6, 143:20, 145:24,
146:3, 146:12, 146:25,
148:20, 148:21, 151:2,
152:17, 156:13, 158:19,
158:20, 158:22, 158:23,
159:3, 175:6, 175:7,
178:2, 179:2, 182:24,
183:1, 183:21, 183:22,
184:14, 190:23, 191:1,
194:10, 194:23, 194:25,
195:25, 196:15, 196:17,
205:17, 205:25, 206:7,
206:8, 206:9, 210:17,
212:9, 212:11, 225:1,
226:21
  **phase** [29] - 18:9,
43:23, 43:24, 43:25,
44:3, 44:4, 44:8, 46:20,
48:7, 83:25, 121:16,
140:19, 142:12, 183:21,
193:1, 193:3, 193:17,
193:19, 194:16, 201:4,
201:5, 201:7
  **phases** [7] - 32:11,
32:12, 32:13, 47:25,
91:6, 91:8, 158:10
  **phasing** [4] - 56:21,
141:12, 142:8, 142:9
  **phone** [2] - 50:25,
148:10
  **photo** [9] - 59:11, 60:3,
60:18, 60:25, 61:1, 61:8,
62:18, 63:5, 63:6
  **photocopies** [1] - 21:13
  **photograph** [4] - 13:14,
59:22, 59:23, 60:17
  **photographs** [9] -
13:10, 58:2, 58:7, 58:15,
58:17, 59:4, 59:6, 59:13,
59:15
  **phrase** [6] - 43:15,
43:16, 124:23, 213:4,
225:19, 229:23
  **phraseology** [1] -
212:19
  **physical** [6] - 54:9,
68:16, 70:5, 75:3, 76:6,
86:11
  **physically** [2] - 68:23,
152:20

**pick** [1] - 228:20
  **picked** [1] - 149:14
  **picture** [1] - 60:1
  **piece** [6] - 102:12,
102:25, 151:1, 159:24,
161:10, 199:24
  **pieces** [4] - 156:10,
157:19, 159:2, 159:9
  **pile** [6] - 61:14, 61:20,
61:21, 61:22, 61:24,
62:3, 64:4, 64:5
  **piles** [6] - 57:20, 60:3,
60:5, 64:7, 64:10, 64:25
  **place** [13] - 64:21, 65:1,
120:6, 136:23, 148:25,
149:1, 153:15, 159:9,
161:8, 174:16, 187:19,
199:18
  **placed** [4] - 177:11,
197:6, 197:10, 212:2
  **placement** [5] - 118:10,
118:11, 118:19, 198:20
  **Places** [1] - 148:24
  **places** [1] - 170:18
  **Plaintiff** [3] - 1:16,
223:10, 223:11
  **plaintiff** [70] - 2:12, 5:1,
5:10, 5:24, 8:7, 8:16,
10:18, 90:13, 90:15,
98:3, 110:9, 110:19,
118:9, 120:1, 144:4,
168:12, 170:9, 170:15,
170:16, 170:18, 170:19,
170:21, 170:23, 171:1,
171:18, 171:23, 172:2,
172:9, 172:15, 173:5,
174:18, 174:19, 174:20,
174:23, 174:25, 190:20,
192:13, 193:13, 197:17,
198:6, 198:7, 198:19,
199:17, 199:21, 203:12,
204:3, 204:7, 204:13,
204:23, 204:25, 205:19,
206:17, 208:6, 209:20,
210:14, 210:16, 210:18,
213:20, 214:6, 215:7,
215:19, 215:21, 215:24,
215:25, 216:8, 217:3,
220:2, 220:17, 222:12,
223:7
  **plaintiff's** [8] - 18:23,
33:4, 129:22, 163:19,
189:9, 198:1, 207:15,
209:25
  **PLAINTIFF'S** [4] - 52:1,
100:4, 110:23, 166:13
  **Plaintiff's** [11] - 19:2,
23:10, 32:1, 35:11, 36:5,
41:11, 43:14, 58:13,
95:17, 95:18, 124:9

**Plan** [4] - 11:13, 11:23, 112:7, 128:6

**plan** [12] - 54:10, 56:21, 141:12, 142:8, 142:9, 146:23, 148:21, 186:22, 197:5, 198:11, 212:2, 220:11

**planned** [1] - 11:13

**planning** [2] - 102:10, 102:11

**plans** [8] - 46:20, 46:23, 46:25, 54:9, 80:19, 102:11, 189:10, 220:9

**plate** [1] - 189:21

**play** [3] - 11:23, 64:18, 64:21

**player** [1] - 181:6

**players** [1] - 190:6

**playing** [2] - 64:19, 157:12

**plus** [3] - 30:22, 30:23, 30:25

**pocket** [1] - 189:8

**Poe** [2] - 157:10, 175:15

**point** [42] - 17:17, 20:5, 21:8, 28:1, 48:15, 49:6, 51:11, 65:2, 65:16, 76:7, 80:20, 101:18, 105:8, 106:7, 106:22, 107:8, 109:16, 114:7, 118:13, 141:15, 142:4, 143:16, 144:4, 146:3, 151:14, 162:18, 163:21, 168:17, 169:8, 174:14, 183:20, 190:1, 194:10, 199:10, 199:20, 201:7, 201:21, 203:16, 220:16, 224:17, 226:25, 228:19

**Point** [1] - 127:14

**pointed** [2] - 141:10, 147:9

**pointing** [1] - 48:14

**points** [4] - 49:10, 91:18, 96:10, 190:18

**pole** [4] - 62:5, 62:6, 62:19, 62:21

**poles** [13] - 59:25, 60:7, 60:8, 60:19, 60:20, 60:25, 62:24, 63:1, 63:9, 139:9, 184:20, 184:21, 184:22

**police** [3] - 137:10, 147:15, 147:23

**policies** [1] - 90:2

**policy** [7] - 90:1, 90:2, 90:15, 90:21, 97:16, 119:13, 119:14

**political** [1] - 5:21

**pool** [1] - 116:2

**Poppleton** [127] - 2:4,

4:16, 4:24, 10:18, 10:19, 10:21, 10:22, 11:4, 11:8, 19:11, 19:13, 27:18, 33:3, 35:17, 36:12, 37:23, 45:16, 52:15, 52:18, 52:20, 52:23, 53:6, 54:2, 54:23, 55:1, 55:6, 55:9, 55:12, 55:18, 55:21, 55:25, 57:5, 57:13, 61:3, 63:20, 69:13, 69:15, 69:24, 70:14, 71:10, 72:1, 74:21, 76:2, 76:7, 76:21, 77:12, 78:3, 80:5, 82:7, 82:10, 90:11, 90:12, 94:8, 94:18, 94:21, 94:24, 95:1, 96:25, 98:2, 101:13, 102:24, 105:9, 105:15, 112:12, 112:19, 113:7, 113:23, 114:23, 123:20, 124:2, 126:12, 141:17, 145:13, 145:15, 149:1, 149:19, 152:20, 152:23, 154:4, 156:5, 173:17, 189:4, 189:8, 189:10, 190:2, 190:4, 190:7, 204:7, 204:16, 204:17, 205:9, 213:22, 214:8, 214:24, 215:5, 215:10, 216:11, 216:12, 216:15, 217:11, 219:2, 220:2, 220:4, 220:7, 223:11, 223:18, 223:25, 224:7, 224:8, 224:10, 224:12, 224:13, 224:19, 225:1, 225:5, 225:10, 225:16, 225:24, 226:5, 227:22, 228:2, 232:4

**POPPLETON** [1] - 1:4

**Poppleton's** [1] - 19:17

**populace** [1] - 225:16

**population** [1] - 94:14

**portion** [5] - 4:15, 33:3, 158:13, 159:16, 205:8

**position** [49] - 6:20, 7:19, 47:16, 52:13, 56:1, 66:2, 109:5, 123:13, 132:6, 145:7, 173:4, 177:11, 177:15, 180:4, 185:14, 185:17, 185:18, 186:4, 187:17, 188:25, 192:7, 192:21, 193:3, 193:6, 193:16, 195:3, 195:16, 195:21, 196:11, 197:19, 198:8, 198:13, 198:14, 198:16, 199:6, 199:10, 201:6, 202:5, 202:14, 206:14, 211:7, 211:24, 212:6, 213:8,

216:17, 221:11, 222:10, 222:13

**positions** [2] - 222:9, 226:11

**positive** [1] - 82:6

**possess** [1] - 4:24

**possessed** [1] - 205:16

**possession** [2] - 14:21, 16:2, 23:8

**possible** [5] - 30:2, 152:12, 158:16, 161:24, 219:5

**possibly** [2] - 147:13, 153:15

**posted** [3] - 37:4, 222:12, 222:14

**posting** [1] - 226:8

**potential** [3] - 103:2, 107:22, 112:5, 113:1, 172:15, 173:7, 183:17, 201:8

**potentiality** [2] - 118:15, 180:10

**POTTER** [152] - 2:17, 2:20, 2:24, 3:2, 3:8, 3:17, 6:7, 7:21, 8:15, 8:19, 9:8, 9:16, 13:9, 13:15, 13:18, 17:14, 21:20, 41:9, 42:17, 44:12, 49:13, 58:8, 72:11, 72:17, 82:24, 86:8, 89:20, 89:22, 90:20, 90:25, 91:2, 96:12, 97:14, 97:17, 98:20, 105:20, 109:9, 109:18, 110:3, 110:13, 110:21, 111:9, 114:4, 117:13, 117:16, 118:7, 118:18, 118:22, 119:1, 119:5, 119:10, 119:13, 119:23, 120:2, 120:5, 122:10, 122:13, 122:25, 134:16, 137:16, 139:12, 143:15, 144:10, 144:15, 145:1, 153:23, 154:1, 154:9, 154:13, 154:21, 154:23, 155:20, 163:16, 163:22, 163:25, 164:2, 165:4, 167:17, 168:19, 171:23, 172:4, 172:7, 172:16, 172:19, 172:25, 173:12, 173:19, 173:24, 174:3, 174:6, 174:12, 175:20, 175:22, 175:25, 176:3, 176:12, 176:15, 177:2, 177:6, 177:8, 177:16, 190:13, 190:17, 191:7, 191:13, 191:19, 192:6, 192:9, 192:11, 192:24, 193:6, 193:9,

193:20, 194:2, 194:7, 194:9, 195:2, 195:7, 195:10, 195:12, 195:16, 195:22, 196:8, 196:15, 196:19, 196:22, 197:8, 197:10, 197:20, 197:22, 200:1, 200:6, 200:10, 200:13, 200:18, 200:21, 200:23, 200:25, 202:15, 220:22, 220:25, 229:21, 231:4, 231:5, 231:7, 231:8, 231:10, 231:11, 231:13, 231:14, 231:16, 231:17

**pOTTER** [1] - 89:24

**Potter** [63] - 1:19, 2:15, 3:12, 4:1, 5:15, 6:5, 6:6, 6:14, 7:13, 7:20, 8:14, 9:17, 13:7, 13:17, 17:12, 21:19, 41:7, 42:16, 44:11, 49:11, 58:4, 82:22, 86:7, 90:19, 91:17, 98:17, 105:18, 109:17, 110:2, 110:11, 110:20, 117:12, 118:5, 122:12, 143:13, 144:8, 153:20, 154:8, 154:20, 163:23, 165:3, 167:16, 168:15, 169:4, 169:22, 171:22, 175:17, 176:25, 181:15, 190:12, 190:16, 191:14, 196:7, 199:23, 200:2, 202:14, 203:15, 211:23, 216:18, 217:22, 220:21, 229:20

**Potter's** [1] - 6:17

**pour** [1] - 100:9

**practical** [1] - 156:23

**practice** [2] - 10:7, 211:5

**practicing** [1] - 10:1

**pre** [4] - 105:1, 107:14, 109:3, 113:3

**pre-application** [1] - 113:3

**precedent** [9] - 5:7, 46:2, 46:14, 46:18, 145:18, 146:5, 148:6, 179:21, 184:17

**precise** [1] - 173:20

**preface** [1] - 141:22

**prefer** [1] - 228:5

**preliminarily** [1] - 110:13

**Preliminary** [9] - 1:10, 204:24, 205:4, 220:12, 223:10, 223:13, 223:18, 224:4, 226:10

**preliminary** [37] - 98:15, 98:22, 99:14, 168:5,

168:25, 169:10, 170:1, 170:22, 171:11, 189:3, 189:7, 190:10, 204:22, 207:1, 207:3, 207:11, 207:20, 207:22, 208:1, 208:6, 208:9, 208:20, 216:5, 219:11, 219:13, 219:18, 220:3, 220:5, 220:13, 221:18, 222:6, 223:1, 224:8, 225:9, 225:21, 226:1

**premature** [1] - 228:7, 228:13, 229:23

**premise** [2] - 141:20, 141:23

**premises** [2] - 88:11, 201:23

**preparation** [1] - 11:5

**prepare** [4] - 123:23, 150:16, 153:12, 226:9

**prepared** [6] - 71:5, 81:12, 84:16, 140:24, 168:24, 220:15

**prepares** [1] - 154:9

**preparing** [4] - 84:15, 151:15, 154:2, 173:7

**presence** [9] - 82:5, 95:4, 115:15, 117:7, 146:16, 164:5, 175:12, 197:25

**present** [9] - 79:7, 79:13, 80:3, 104:15, 138:20, 213:18, 222:9, 222:10, 222:12

**presentation** [2] - 84:6, 182:5

**presentations** [1] - 168:7

**presented** [11] - 104:20, 110:9, 110:12, 110:19, 136:24, 174:5, 198:23, 212:7, 213:17, 215:6, 223:7

**presenting** [3] - 99:2, 99:3, 99:4

**presently** [1] - 43:4

**preserve** [1] - 219:11

**president** [1] - 87:21

**President** [3] - 5:22, 52:14, 79:15

**pressure** [1] - 216:18

**pressured** [3] - 216:19, 217:22

**presume** [1] - 180:11

**pretty** [8] - 33:18, 34:5, 104:8, 108:15, 112:20, 163:13, 170:13, 182:5

**prevail** [2] - 99:9, 99:11

**prevails** [2] - 216:14, 225:14

**prevent** [4] - 43:24, 115:2, 146:17, 219:20
**prevented** [1] - 215:11
**preventing** [1] - 219:17
**previously** [9] - 5:25, 61:22, 63:1, 127:1, 170:23, 206:20, 207:8, 208:16, 209:21
**price** [1] - 103:13
**primary** [1] - 219:10
**principal** [1] - 52:18
**Priority** [1] - 148:24
**priority** [1] - 149:1
**private** [7] - 104:22, 118:11, 118:19, 158:1, 158:13, 169:5, 198:20
**pro** [1] - 80:21
**problem** [10] - 7:7, 72:18, 137:9, 147:19, 147:21, 152:6, 157:11, 159:11, 185:24, 190:4
**problems** [11] - 34:8, 73:9, 150:17, 150:18, 150:20, 152:10, 160:16, 161:2, 162:14, 162:15, 187:23
**procedurally** [1] - 220:16
**Procedure** [3] - 5:13, 7:13, 207:21
**procedures** [1] - 112:17
**proceed** [11] - 6:2, 6:5, 22:10, 46:15, 96:14, 99:12, 106:6, 146:23, 173:13, 174:1, 212:18
**proceeded** [1] - 185:25
**proceeding** [6] - 4:9, 23:23, 43:25, 186:13, 201:25, 225:17
**proceedings** [4] - 2:1, 5:4, 232:4, 232:8
**Proceedings** [1] - 230:13
**proceeds** [1] - 151:17
**process** [30] - 68:16, 69:5, 69:15, 69:25, 70:2, 70:5, 70:7, 70:10, 72:10, 72:16, 74:21, 75:2, 75:7, 75:8, 75:22, 75:24, 78:19, 84:6, 94:17, 98:23, 121:19, 151:21, 162:9, 162:13, 173:6, 174:17, 176:6, 187:7, 219:20
**processed** [1] - 163:12
**processes** [1] - 112:17
**processing** [2] - 121:16, 156:9
**procure** [1] - 105:12
**procured** [1] - 148:12

**procurement** [1] - 94:17
**procuring** [1] - 5:11
**produce** [2] - 35:18, 74:5
**product** [1] - 34:10
**professional** [1] - 52:13
**professionals** [1] - 185:9
**Professor** [1] - 219:15
**proffer** [1] - 181:23
**proffered** [1] - 120:8
**proffering** [3] - 118:5, 118:7, 118:16
**proffers** [1] - 173:14
**program** [8] - 77:16, 77:17, 77:20, 148:23, 148:24, 158:7, 162:22, 186:23
**programs** [2] - 112:2, 113:1
**Project** [2] - 85:25, 156:2
**project** [130] - 6:24, 11:1, 11:12, 19:11, 30:22, 32:9, 32:15, 33:4, 34:9, 34:23, 53:11, 53:14, 53:24, 54:13, 54:21, 55:5, 57:13, 65:5, 67:4, 67:16, 68:7, 68:10, 68:12, 69:1, 72:1, 73:21, 73:24, 73:25, 75:6, 75:10, 77:8, 78:2, 78:6, 78:24, 79:3, 80:12, 80:15, 82:7, 83:25, 84:21, 87:10, 88:2, 91:7, 91:14, 94:24, 95:1, 96:21, 96:22, 96:24, 101:18, 102:12, 102:14, 102:18, 102:21, 105:10, 105:15, 105:16, 105:23, 106:14, 106:17, 107:6, 107:10, 107:11, 107:16, 108:17, 112:24, 113:16, 113:18, 114:13, 115:8, 115:14, 116:1, 116:7, 117:6, 121:15, 124:2, 124:4, 130:22, 145:13, 145:14, 145:15, 148:9, 148:13, 148:16, 148:18, 148:22, 149:17, 149:22, 149:23, 150:5, 150:24, 151:6, 151:11, 152:22, 156:9, 157:2, 157:6, 157:11, 158:10, 159:12, 159:18, 159:22, 160:9, 160:12, 160:13, 160:14, 160:19, 160:25, 161:6, 161:15, 161:22, 181:10, 181:12, 186:20, 189:25,

196:16, 212:23, 212:24, 215:1, 215:3, 216:21, 216:23, 217:4, 221:23, 224:9, 224:11
**projections** [1] - 74:6
**projects** [20] - 53:1, 67:23, 78:16, 101:2, 108:6, 111:23, 111:24, 111:25, 112:4, 112:21, 114:20, 115:5, 126:8, 145:11, 152:20, 158:15, 162:22, 162:23
**prompt** [1] - 217:1
**promptly** [1] - 98:9
**prongs** [1] - 215:9
**pronouncing** [1] - 221:4
**proof** [2] - 35:18, 110:15
**properly** [2] - 17:18, 123:17
**properties** [174] - 4:25, 6:24, 10:9, 14:7, 14:13, 16:6, 18:8, 18:14, 19:10, 19:19, 20:3, 20:16, 20:17, 20:21, 20:24, 21:1, 27:7, 27:17, 27:22, 27:23, 28:8, 30:6, 30:20, 31:3, 31:14, 32:8, 32:17, 32:24, 32:25, 34:16, 36:2, 38:22, 42:25, 43:23, 44:4, 44:7, 44:14, 44:16, 45:2, 45:16, 47:8, 47:10, 47:19, 47:20, 47:22, 48:8, 48:18, 48:21, 56:15, 56:16, 56:23, 57:12, 57:16, 59:15, 63:16, 66:18, 66:19, 83:25, 84:21, 92:6, 92:19, 92:21, 95:25, 96:5, 108:20, 123:20, 124:1, 124:18, 124:20, 124:21, 125:5, 125:6, 125:11, 125:13, 125:14, 125:16, 125:18, 125:23, 126:2, 126:12, 127:1, 127:25, 128:5, 128:10, 134:22, 134:24, 135:11, 135:18, 135:24, 135:25, 136:1, 136:14, 139:3, 139:17, 141:14, 142:3, 142:5, 142:12, 142:13, 142:14, 142:15, 142:19, 143:1, 143:6, 145:24, 145:25, 146:3, 146:14, 151:9, 156:13, 156:21, 176:15, 177:25, 178:2, 178:4, 178:7, 178:11, 178:14, 178:20, 178:24, 179:10, 179:13,

179:16, 184:1, 184:2, 184:9, 184:12, 184:15, 192:2, 193:2, 193:10, 193:18, 193:23, 194:11, 194:16, 194:22, 194:24, 194:25, 195:15, 195:17, 195:25, 196:4, 201:5, 201:6, 201:11, 201:16, 202:11, 202:19, 205:16, 205:25, 206:3, 206:6, 210:11, 210:13, 210:17, 210:21, 210:22, 212:8, 212:10, 212:11, 218:1, 224:22, 224:25, 227:7, 227:12, 227:16, 228:5, 228:8, 228:13, 229:24
**Property** [3] - 41:23, 56:12, 123:11
**property** [84] - 5:6, 6:19, 10:16, 10:17, 14:19, 14:21, 14:22, 14:25, 15:4, 15:6, 15:13, 15:16, 15:17, 15:21, 15:22, 15:24, 15:25, 16:2, 16:9, 16:10, 18:6, 18:10, 18:16, 22:17, 23:13, 23:15, 23:24, 24:9, 24:18, 24:19, 25:21, 26:2, 26:15, 27:4, 28:2, 28:4, 28:9, 28:11, 28:14, 28:22, 29:10, 29:21, 29:25, 30:11, 30:17, 31:5, 32:22, 34:17, 37:19, 38:1, 38:3, 44:15, 44:22, 44:23, 47:5, 47:7, 49:19, 49:21, 107:21, 123:25, 126:7, 129:7, 131:10, 132:16, 133:6, 133:9, 133:15, 134:17, 135:5, 135:6, 141:7, 143:17, 147:21, 151:2, 151:4, 151:5, 190:25, 193:4, 199:24, 201:15, 202:1, 213:14, 213:18
**property's** [2] - 25:12, 127:4
**Proposal** [1] - 153:12
**proposal** [1] - 189:23
**Proposals** [3] - 153:9, 174:2, 216:23
**proposals** [1] - 149:18
**proposed** [14] - 71:24, 90:7, 112:23, 114:14, 148:17, 151:15, 151:17, 151:23, 151:24, 152:3, 152:6, 152:15, 186:23, 198:11
**prospect** [2] - 215:2, 224:10

**prospective** [3] - 103:4, 112:21, 115:9
**protect** [1] - 219:24
**protected** [1] - 116:25
**provide** [7] - 21:16, 46:2, 67:25, 93:24, 111:18, 114:15, 220:19
**provided** [6] - 46:16, 112:25, 114:21, 197:12, 210:13, 212:4
**provides** [7] - 31:21, 78:1, 148:19, 205:8, 211:24, 213:11, 213:14
**providing** [3] - 107:22, 121:24, 157:21
**provision** [4] - 69:9, 69:10, 77:13, 197:2
**provisions** [3] - 185:21, 197:4, 212:1
**Public** [1] - 147:13
**public** [37] - 21:7, 21:11, 68:24, 99:3, 157:10, 158:4, 159:1, 169:2, 169:6, 169:20, 171:10, 171:12, 171:13, 175:4, 175:17, 176:10, 176:19, 177:13, 181:17, 182:2, 199:2, 208:11, 215:10, 217:6, 217:12, 217:15, 217:19, 218:5, 218:9, 218:17, 218:25, 219:5, 219:10, 219:24, 220:8, 225:20, 225:21
**publicize** [1] - 153:16
**publicly** [1] - 151:18
**PUD** [2] - 53:12, 53:13
**pull** [1] - 74:15
**pulled** [1] - 108:20
**purchase** [2] - 126:23, 202:6
**purchased** [5] - 28:14, 184:8, 193:4, 193:25, 196:3
**purport** [2] - 58:9, 66:6
**purports** [1] - 118:10
**purpose** [8] - 35:4, 35:6, 54:5, 142:2, 150:25, 180:20, 182:8, 219:11
**purposes** [24] - 11:8, 19:2, 21:16, 33:1, 33:23, 40:16, 42:8, 43:8, 43:9, 57:25, 124:22, 138:11, 142:17, 150:7, 156:21, 165:1, 195:1, 195:14, 196:5, 202:24, 205:17, 206:8, 206:11, 212:12
**pursuant** [9] - 14:18, 23:22, 24:16, 26:23, 27:10, 30:3, 56:24,

77:13, 94:17
**pursue** [1] - 152:11
**pursued** [1] - 152:12
**pursuing** [1] - 148:15
**put** [22] - 3:11, 13:11,
56:6, 99:9, 100:1, 102:4,
107:4, 114:25, 115:21,
148:24, 154:24, 159:3,
162:22, 169:16, 169:19,
188:5, 188:12, 188:19,
189:23, 212:23, 220:10,
229:25
**putting** [3] - 114:15,
157:18, 174:10

# Q

**qualifications** [1] -
10:25
**qualified** [5] - 45:19,
45:21, 90:18, 117:11,
154:8
**Qualified** [1] - 112:7
**qualify** [5] - 68:12,
72:19, 161:25, 171:25,
191:16
**Quarles** [2] - 2:8, 4:21
**quarter** [1] - 187:22
**question's** [1] - 117:10
**questionable** [1] -
161:20
**questioned** [1] - 80:18
**questions** [33] - 41:6,
44:11, 44:14, 45:8, 49:9,
51:9, 75:17, 81:5, 81:14,
82:1, 82:13, 86:4, 92:4,
93:2, 93:23, 93:25,
95:10, 95:12, 96:8,
105:17, 119:20, 122:3,
143:12, 154:15, 164:18,
164:23, 165:13, 166:10,
167:15, 167:17, 173:15,
187:15
**quick** [3] - 81:16,
175:16, 175:17
**quickly** [4] - 76:8,
165:18, 219:4, 220:9
**quite** [7] - 3:3, 3:24, 4:3,
4:5, 81:24, 120:19, 200:2
**quo** [3] - 179:5, 219:12,
225:22
**quote** [6] - 18:7, 18:9,
18:12, 33:23, 33:24, 60:9
**quote-unquote** [1] -
60:9
**quoted** [1] - 208:12
**quotes** [1] - 18:12

# R

**rails** [1] - 64:19
**raise** [7] - 42:23, 51:25,
75:16, 100:3, 122:15,
144:16, 160:13
**raised** [3] - 4:5, 4:6,
42:19, 54:25, 76:20,
88:3, 94:7, 143:2,
162:12, 164:10, 192:16,
206:13, 206:25
**raises** [1] - 187:15
**range** [1] - 161:13
**rate** [3] - 51:14, 54:16,
75:25
**rate/work** [1] - 80:13
**rather** [2] - 35:15,
139:14
**ratio** [1] - 161:17
**raw** [1] - 14:22
**RDB-12-1904** [2] - 1:6,
232:6
**RDB-12-194** [1] - 2:5
**re** [1] - 78:14
**re-underwrite** [1] -
78:14
**reach** [2] - 121:23,
180:14
**read** [44] - 3:14, 3:18,
3:19, 4:4, 14:5, 19:7,
19:16, 29:18, 32:21,
33:22, 39:15, 43:10,
46:10, 56:14, 66:6, 67:1,
67:2, 83:23, 84:20,
87:24, 91:15, 95:9,
117:22, 121:1, 124:17,
127:20, 131:4, 131:6,
133:24, 134:9, 138:7,
138:9, 138:17, 140:8,
143:9, 194:11, 223:4,
227:3, 228:5, 229:14,
229:15, 229:17
**reading** [4] - 138:6,
138:10, 182:17, 197:14
**reads** [1] - 18:4
**ready** [6] - 8:20, 147:3,
153:14, 166:8, 228:12
**real** [33] - 4:12, 7:7,
9:25, 10:1, 10:7, 10:8,
10:11, 14:22, 15:5,
19:17, 63:8, 100:23,
101:2, 103:17, 104:11,
104:16, 114:14, 123:16,
167:5, 181:7, 185:9,
191:15, 191:18, 191:19,
191:21, 199:22, 200:15,
205:5, 211:1, 211:3,
211:5, 222:3
**Real** [9] - 5:19, 5:23,

41:22, 170:5, 204:15,
208:4, 208:12, 208:23,
209:22
**realistic** [1] - 182:4
**Really** [1] - 81:6
**really** [28] - 3:11, 6:17,
13:16, 15:18, 65:19,
81:7, 81:23, 98:14,
98:21, 99:13, 104:7,
109:14, 114:9, 117:4,
148:25, 154:10, 157:13,
159:8, 162:1, 168:16,
172:13, 177:18, 188:4,
195:5, 202:12, 205:22,
206:23, 221:24
**realm** [1] - 113:22
**reappeared** [1] - 147:9
**reapproached** [1] -
105:4
**reason** [21] - 20:1, 49:4,
49:7, 50:22, 87:21,
93:19, 98:18, 109:16,
113:24, 114:11, 114:18,
122:5, 144:4, 144:8,
180:12, 182:9, 183:13,
190:9, 199:11, 219:19,
222:11
**reasonable** [5] -
105:13, 194:13, 214:1,
225:3, 230:8
**reasons** [4] - 93:24,
170:7, 180:18, 220:12
**rebuttal** [6] - 50:24,
154:25, 165:5, 165:12,
185:7, 203:15
**receive** [2] - 19:4,
125:16
**received** [13] - 19:25,
27:21, 85:6, 118:1,
146:8, 149:2, 151:24,
156:20, 159:19, 162:15,
163:5, 163:6, 203:13
**receives** [2] - 14:19,
207:9
**receiving** [1] - 210:12
**recent** [1] - 5:14
**recently** [2] - 54:7,
208:2
**recess** [11] - 82:14,
82:16, 82:18, 82:19,
110:5, 110:7, 166:7,
222:25, 228:21, 229:9,
229:10
**recognition** [1] - 137:22
**recognize** [5] - 97:10,
114:1, 197:1, 218:9,
221:20
**recognized** [4] -
136:25, 137:13, 183:15
**recollect** [2] - 114:9,

117:3
**recommended** [1] -
152:5
**record** [42] - 5:21, 8:25,
12:13, 17:3, 17:7, 17:17,
17:18, 19:8, 21:17,
23:21, 24:10, 26:18,
29:18, 32:21, 33:23,
38:12, 42:7, 46:10,
47:15, 51:11, 52:5,
52:13, 56:14, 74:22,
84:20, 100:14, 100:21,
111:4, 118:4, 122:20,
127:21, 135:19, 137:16,
144:21, 155:15, 166:16,
178:13, 178:19, 187:11,
205:13, 228:25, 229:12
**recordation** [1] - 29:2
**recorded** [7] - 24:22,
27:14, 41:18, 41:19,
41:24, 128:4, 232:3
**records** [10] - 20:19,
20:20, 21:7, 21:11,
36:25, 37:1, 37:9, 37:10,
37:11, 178:9
**Records** [8] - 21:9,
25:18, 29:7, 36:21, 38:8,
38:13, 178:10, 194:1
**recovered** [1] - 172:20
**recross** [2] - 49:10,
96:9
**RECROSS** [4] - 49:12,
96:11, 231:5, 231:8
**red** [1] - 190:19
**redeem** [6] - 6:19,
14:12, 16:11, 18:6,
18:13, 18:16, 126:1,
202:19, 211:17
**redeemed** [19] - 18:21,
28:18, 41:17, 41:20,
43:5, 128:19, 143:19,
156:17, 156:24, 164:12,
191:4, 191:5, 191:9,
191:10, 191:12, 192:3,
192:15, 193:11, 211:19
**redeems** [1] - 127:5
**redefined** [1] - 171:16
**Redemption** [7] - 24:16,
26:23, 27:10, 29:1,
41:14, 129:21, 130:9
**redemption** [7] - 18:11,
41:21, 126:22, 134:2,
136:9, 193:22, 203:7
**redevelop** [1] - 154:4
**redevelopment** [9] -
77:9, 131:12, 131:18,
145:11, 156:5, 205:8,
217:1, 217:11, 225:23
**Redevelopment** [1] -
152:24

**REDIRECT** [6] - 45:10,
91:19, 143:14, 231:4,
231:7, 231:14
**redirect** [3] - 91:17,
109:10, 143:13
**reduce** [1] - 161:15
**reduced** [1] - 160:15
**reduces** [1] - 161:15
**refer** [2] - 148:23,
210:20
**reference** [5] - 58:13,
119:21, 206:6, 208:5,
218:19
**referenced** [2] - 58:6,
212:25
**referred** [6] - 132:9,
134:1, 142:8, 157:6,
192:25, 205:6
**refers** [1] - 199:19
**reflect** [6] - 5:21, 12:13,
17:7, 51:11, 178:10,
228:25
**reflected** [1] - 38:13
**refuge** [1] - 213:11
**refused** [1] - 75:13
**refusing** [1] - 219:21
**regard** [39] - 6:21, 27:7,
43:3, 46:5, 50:9, 60:15,
88:10, 88:18, 97:3, 99:1,
99:10, 102:22, 103:11,
123:19, 145:13, 150:1,
153:8, 160:5, 161:1,
175:4, 181:14, 182:13,
186:15, 190:20, 194:10,
194:14, 197:22, 197:23,
198:10, 198:13, 198:14,
198:17, 201:25, 203:18,
211:9, 213:12
**regarding** [11] - 33:25,
71:10, 93:23, 102:23,
178:13, 181:12, 182:22,
186:21, 187:25, 197:3,
211:25
**regardless** [2] - 160:18,
199:8
**regards** [1] - 209:7
**regulations** [1] - 112:5
**rehabilitation** [1] -
148:21
**reinstated** [3] - 170:7,
174:20, 175:1
**reject** [1] - 211:14
**rejected** [2] - 198:6,
209:14
**relate** [1] - 33:19
**related** [7] - 10:17,
10:25, 11:15, 30:16,
54:15, 65:9, 148:20
**relates** [2] - 33:25,
125:13

**relation** [2] - 48:23, 59:15
**relationship** [3] - 53:19, 53:22, 210:9
**relationships** [2] - 104:22, 104:23
**relatively** [3] - 16:1, 159:21, 161:19
**released** [1] - 144:7
**releasing** [1] - 206:21
**relevance** [1] - 153:18
**relevant** [2] - 30:12, 202:24
**relied** [1] - 185:25
**relief** [23] - 98:22, 110:15, 110:18, 168:12, 170:8, 170:22, 171:7, 171:17, 204:22, 204:25, 206:25, 207:16, 208:3, 208:9, 208:16, 215:25, 216:5, 216:12, 217:10, 219:23, 223:14, 225:12, 225:13
**relocated** [1] - 123:17
**Relocation** [1] - 123:12
**rely** [4] - 115:4, 177:23, 179:7, 180:3
**relying** [3] - 21:6, 92:22, 115:12
**remain** [7] - 8:10, 8:12, 105:15, 109:14, 122:5, 167:21, 167:23
**remainder** [1] - 184:14
**remaining** [1] - 34:23
**remains** [2] - 65:12, 167:12
**remarks** [1] - 65:7
**remediation** [2] - 175:7, 217:15
**remedied** [1] - 196:13
**remedy** [5] - 15:23, 23:6, 23:7, 199:14, 208:2
**remember** [2] - 45:17, 201:19
**reminded** [1] - 203:17
**remote** [1] - 172:12
**removal** [1] - 131:21
**remove** [1] - 56:22
**removed** [19] - 34:16, 35:7, 56:19, 57:11, 57:12, 57:16, 60:2, 60:10, 61:4, 62:7, 63:12, 63:18, 63:24, 88:14, 134:2, 137:24, 143:7, 175:8, 178:25
**rendered** [1] - 219:20
**renderings** [1] - 53:9
**renewable** [1] - 14:18
**renewal** [2] - 197:5, 212:2

**Renewal** [3] - 11:13, 11:23, 128:5
**renovation** [1] - 111:18
**rent** [67] - 6:19, 14:17, 14:18, 14:20, 15:2, 15:7, 15:10, 15:14, 15:19, 15:22, 15:23, 15:25, 18:6, 18:17, 22:17, 22:24, 23:4, 23:12, 23:15, 24:2, 24:17, 25:8, 25:13, 25:15, 25:16, 26:24, 27:11, 28:5, 28:15, 28:17, 28:18, 30:12, 35:2, 36:16, 37:6, 37:11, 41:17, 44:16, 44:20, 45:3, 127:5, 128:25, 129:8, 131:9, 131:11, 131:17, 131:21, 132:23, 133:9, 133:17, 133:22, 134:2, 134:3, 134:6, 134:18, 136:4, 161:15, 185:7, 191:24, 192:2, 199:24, 201:9, 202:1, 203:7, 211:6, 211:15, 213:7
**Rent** [7] - 24:16, 26:23, 27:10, 29:1, 41:14, 129:21, 130:9
**rental** [2] - 105:10, 159:15
**renter** [1] - 15:2
**rents** [65] - 14:13, 14:16, 16:12, 16:16, 16:18, 16:20, 18:11, 18:13, 18:21, 42:24, 43:4, 49:2, 49:5, 49:8, 50:9, 80:13, 115:1, 115:12, 115:15, 116:12, 116:17, 117:2, 117:7, 126:2, 126:6, 126:13, 126:20, 128:7, 128:19, 135:8, 136:6, 143:20, 146:17, 150:24, 156:24, 161:12, 164:5, 164:9, 164:12, 185:15, 185:17, 190:22, 191:3, 191:4, 192:18, 193:11, 193:23, 193:25, 195:25, 196:2, 197:23, 197:25, 198:1, 198:12, 199:19, 201:20, 202:4, 202:6, 202:19, 202:23, 203:3, 206:3, 211:14, 211:18
**repaid** [1] - 158:14
**repay** [3] - 67:15, 73:23, 158:16
**repaying** [1] - 67:18
**repayment** [1] - 78:1
**repeat** [4] - 116:21, 120:25, 121:2, 121:4

**repeatedly** [1] - 175:10
**Reported** [1] - 1:22
**Reporter** [2] - 232:16
**reporter** [1] - 121:1
**REPORTER'S** [1] - 232:1
**reports** [4] - 10:16, 53:17, 68:6, 156:8
**represent** [4] - 21:6, 32:5, 32:7, 65:11
**representation** [10] - 11:7, 20:2, 20:7, 92:5, 93:2, 118:15, 121:8, 133:7, 179:9, 186:1
**representations** [1] - 181:16
**representative** [8] - 8:11, 8:16, 8:17, 9:12, 74:25, 98:2, 164:25
**representatives** [3] - 8:13, 79:6
**represented** [4] - 183:25, 198:4, 205:21, 216:18
**representing** [14] - 27:21, 31:23, 79:13, 173:10, 173:16, 173:25, 176:8, 176:9, 176:20, 176:22, 177:1, 177:7, 177:13, 188:7
**repudiate** [1] - 218:16
**reputation** [2] - 214:21, 215:6
**reputational** [3] - 172:11, 189:10, 224:14
**Request** [2] - 153:9, 153:12
**request** [7] - 10:25, 46:22, 106:19, 150:10, 205:20, 207:3, 207:15
**requested** [8] - 71:6, 88:25, 106:18, 150:9, 171:7, 171:18, 225:12, 229:25
**requesting** [1] - 207:20
**Requests** [2] - 174:1, 216:22
**requests** [1] - 204:21
**require** [5] - 107:11, 116:8, 124:24, 134:7, 209:15
**required** [24] - 35:17, 44:2, 44:6, 49:25, 50:2, 56:22, 60:9, 73:11, 75:1, 159:25, 163:18, 170:23, 170:24, 170:25, 181:3, 187:20, 201:3, 208:17, 215:18, 215:21, 221:16, 221:17, 221:18, 222:19
**requirement** [10] - 64:1,

170:19, 171:12, 171:14, 179:17, 206:15, 209:19, 209:20, 215:16, 221:11
**requirements** [7] - 112:22, 115:10, 145:20, 171:15, 180:5, 213:10, 214:14
**requires** [4] - 21:15, 47:17, 88:14, 184:24
**requiring** [3] - 209:7, 215:19, 225:1
**requisite** [2] - 88:1, 179:14
**rescheduled** [1] - 2:25
**reserve** [1] - 163:7
**reserved** [1] - 116:7
**residential** [4] - 101:2, 101:3, 107:21, 151:9
**Residential** [2] - 129:21, 130:8
**residents** [3] - 159:23, 216:15, 219:3
**resolution** [1] - 219:1
**resolve** [1] - 76:8
**resolved** [4] - 115:18, 115:22, 176:16, 179:3
**resolving** [1] - 220:9
**resort** [1] - 101:3
**Resources** [7] - 5:17, 123:9, 148:13, 149:5, 170:3, 208:13, 209:1
**respect** [41] - 4:15, 5:11, 11:7, 11:14, 27:17, 31:18, 32:25, 45:19, 47:20, 53:6, 59:6, 66:22, 124:21, 137:18, 142:13, 173:15, 177:18, 179:8, 181:23, 183:9, 184:14, 191:23, 194:25, 196:4, 198:2, 206:5, 206:21, 206:22, 206:25, 208:15, 208:18, 210:19, 211:16, 211:20, 211:21, 212:11, 217:23, 221:16, 221:17, 222:10, 222:13
**respective** [2] - 170:25, 215:19
**respond** [4] - 76:2, 76:14, 169:12
**responded** [1] - 187:20
**response** [5] - 3:21, 162:15, 181:13, 186:22, 188:9, 201:2, 211:3
**responsibilities** [7] - 53:7, 53:18, 102:7, 123:13, 123:15, 123:19, 153:8
**responsibility** [3] - 53:21, 53:22, 147:18
**responsible** [2] -

136:18, 147:22
**rest** [2] - 62:20, 203:22
**restraining** [7] - 2:3, 5:12, 98:19, 207:2, 207:10, 221:17, 223:19
**Restraining** [6] - 2:3, 4:19, 17:2, 18:3, 204:24, 223:8
**restrictions** [1] - 128:2
**restrictive** [2] - 197:4, 212:1
**result** [2] - 203:9, 205:2
**resulting** [1] - 213:16
**resworn** [1] - 166:11
**retail** [11] - 101:4, 102:15, 102:17, 102:18, 102:23, 102:25, 103:4, 105:11, 181:7, 183:3, 190:6
**retailer** [1] - 103:13
**retailers** [2] - 102:19, 188:23
**retake** [2] - 16:1, 23:8
**retrieve** [1] - 98:7
**return** [1] - 98:1
**revenue** [2] - 67:18, 151:2, 151:11
**revenues** [7] - 151:4, 151:5, 151:19, 151:22, 172:10, 215:2, 224:10
**review** [6] - 59:15, 113:5, 115:11, 148:14, 150:15, 152:14
**Review** [1] - 29:16
**reviewed** [2] - 116:20, 224:5
**reviewing** [5] - 10:15, 10:16, 11:21
**revolved** [1] - 113:17
**revolves** [1] - 168:8
**rezoning** [1] - 11:12
**RFP** [4] - 154:2, 173:7, 189:16
**RFQ** [2] - 10:23, 10:24
**Richard** [1] - 1:13
**rid** [2] - 134:6, 134:7
**right-hand** [2] - 33:13, 92:9
**rights** [2] - 67:22, 128:2
**ripen** [1] - 127:2
**ripens** [1] - 127:6
**rises** [1] - 115:9
**risk** [2] - 160:15, 221:23
**road** [2] - 174:19, 189:5
**robustly** [1] - 180:19
**rock** [1] - 187:19
**role** [3] - 111:21, 145:13, 198:1
**rolled** [1] - 64:25
**Room** [1] - 1:23

**room** [1] - 165:16
**rose** [1] - 114:16
**roughly** [3] - 79:10,
91:10, 161:17
**route** [1] - 113:20
**Route** [1] - 205:12
**routinely** [2] - 128:20,
131:14
**row** [3] - 40:10, 40:19,
40:20
**RPR** [1] - 1:23
**rubble** [3] - 57:20,
61:11, 64:16
**Rule** [16] - 5:12, 7:12,
8:5, 13:4, 21:7, 21:22,
21:23, 22:3, 22:5, 58:4,
139:13, 169:25, 207:21,
219:19, 221:15
**rule** [3] - 7:17, 7:25,
168:24
**rules** [2] - 112:5, 112:6
**Rules** [3] - 5:12, 7:13,
207:21
**ruling** [5] - 58:5,
165:25, 214:8, 222:18,
226:8
**run** [3] - 44:9, 45:21,
75:5

**S**

**S-M-I-T-H** [1] - 144:23
**S-T-A-G-E-R** [2] - 9:2,
166:18
**S-T-E-R-N** [1] - 100:16
**safe** [4] - 64:18, 64:21,
179:5, 183:16
**safety** [19] - 33:1, 33:24,
33:25, 124:22, 136:17,
136:19, 136:24, 137:25,
138:11, 142:17, 142:18,
142:25, 195:1, 195:15,
196:5, 196:25, 206:8,
212:12, 225:3
**sale** [3] - 126:23,
195:11, 202:22
**Sam's** [1] - 103:9
**sanction** [1] - 185:18
**sand** [1] - 64:16
**Saratoga** [50] - 23:24,
24:11, 24:20, 24:25,
26:11, 26:13, 26:25,
27:4, 36:8, 36:12, 36:15,
37:6, 37:20, 37:22, 38:7,
38:14, 39:7, 39:13,
39:22, 40:17, 42:20,
42:25, 43:1, 44:15,
44:23, 44:24, 45:1,
62:17, 130:19, 130:21,

131:10, 139:24, 140:11,
140:16, 140:25, 141:9,
141:16, 163:18, 193:24,
202:11, 203:4, 206:1,
206:2, 210:23, 210:24
**sat** [1] - 63:20
**satisfied** [10] - 45:23,
45:24, 49:15, 146:5,
146:6, 171:17, 184:18,
190:10, 214:14, 215:25
**Satisfy** [1] - 46:7
**satisfy** [4] - 46:12,
46:18, 110:17, 148:5
**saw** [3] - 62:10, 93:8,
159:2
**scared** [1] - 183:19
**scattered** [1] - 179:2
**schedule** [2] - 32:5,
32:7
**Schedule** [22] - 14:7,
19:11, 32:2, 38:22,
38:23, 40:16, 48:18,
56:16, 139:18, 140:2,
140:3, 140:6, 140:7,
140:9, 140:11, 140:18,
140:19, 140:20, 140:22,
141:6, 141:7
**scheduled** [1] - 88:24
**scheme** [1] - 33:3
**Schroeder** [18] - 21:4,
22:15, 23:13, 23:18,
27:12, 28:3, 28:12,
41:14, 42:25, 43:1,
59:24, 62:14, 202:7,
202:9, 206:1, 210:22,
210:23
**scope** [3] - 100:24,
139:12, 207:18
**scores** [1] - 114:20
**Scott** [1] - 1:17
**scratch** [2] - 37:20,
189:16
**screen** [3] - 33:3, 33:9,
33:15
**SDAT** [4] - 20:20,
126:22, 136:9, 203:4
**seaboard** [1] - 53:2
**search** [9] - 20:19,
20:20, 25:18, 29:2, 31:4,
36:21, 37:2, 38:7, 38:8
**seat** [2] - 100:6, 144:19
**seated** [8] - 4:11, 8:23,
52:3, 79:23, 110:25,
122:18, 155:14, 166:15
**Sebelius** [1] - 209:9
**second** [25] - 18:4,
22:3, 22:22, 24:7, 26:17,
26:20, 26:21, 58:3, 73:3,
87:12, 87:13, 88:14,
95:23, 95:24, 97:15,

98:24, 117:11, 118:3,
158:8, 171:21, 178:12,
190:14, 215:25, 220:20,
224:2
**Second** [3] - 209:13,
209:17, 209:19
**secondly** [3] - 170:21,
172:2, 198:12
**Section** [29] - 16:4,
18:5, 18:12, 26:20,
26:21, 29:15, 30:14,
30:19, 38:18, 39:12,
45:13, 46:14, 46:18,
48:17, 56:11, 56:24,
77:1, 77:3, 131:24,
133:12, 166:23, 203:19,
206:19, 211:24, 213:11,
218:8, 225:2, 225:4,
228:14
**section** [8] - 16:11,
29:19, 30:3, 30:21,
38:19, 38:21, 77:2,
213:19
**sections** [1] - 218:22
**Sections** [3] - 224:23,
224:24, 227:12
**secure** [1] - 192:12
**secured** [1] - 133:21
**securing** [3] - 101:17,
102:11, 102:20
**security** [1] - 205:18
**see** [69] - 13:24, 14:3,
14:9, 14:14, 17:12,
17:22, 25:22, 29:16,
32:3, 32:18, 35:13,
38:19, 38:21, 38:25,
39:6, 39:8, 39:24, 40:7,
40:20, 43:18, 46:6, 48:5,
48:9, 48:11, 48:13, 56:8,
56:12, 57:11, 59:25,
60:3, 60:5, 60:21, 61:1,
63:4, 63:7, 64:11, 67:9,
77:4, 77:10, 86:6, 92:8,
93:11, 95:19, 95:23,
95:25, 99:12, 101:15,
101:21, 104:23, 116:3,
120:22, 121:7, 124:11,
127:13, 130:25, 133:24,
139:11, 139:17, 139:20,
148:2, 151:13, 153:17,
155:6, 159:9, 162:7,
167:1, 188:18, 229:16,
230:5
**seeing** [2] - 102:14,
119:21
**seek** [6] - 12:21, 67:4,
116:6, 185:1, 187:10,
190:8
**seeking** [3] - 98:22,
208:20, 213:21

**seeks** [3] - 204:21,
210:1, 223:18
**seem** [1] - 168:6
**sees** [1] - 183:22
**selected** [3] - 94:18,
94:21, 95:5
**selection** [1] - 53:9
**self** [2] - 21:23, 22:5
**self-authenticating** [1]
- 22:5
**self-authentication** [1]
- 21:23
**sell** [1] - 202:3
**selling** [3] - 10:8, 34:20,
107:21
**semi** [1] - 14:20
**semi-annual** [1] - 14:20
**seminal** [1] - 208:3
**send** [3] - 68:19,
123:24, 146:1
**sending** [2] - 118:14,
216:22
**senior** [1] - 145:9
**Senior** [1] - 145:10
**sense** [7] - 61:13, 63:8,
81:7, 81:11, 81:21,
81:24, 201:14
**sent** [7] - 68:22, 92:20,
106:16, 117:25, 148:9,
192:4, 210:18
**sentence** [16] - 14:5,
14:9, 14:11, 18:4, 19:7,
19:16, 46:6, 46:11, 67:2,
83:23, 87:24, 88:14,
127:20, 131:7, 133:22,
133:24
**separate** [9] - 6:19, 7:5,
18:6, 18:16, 40:21,
40:23, 61:21, 103:8,
158:10
**separately** [1] - 18:11
**separating** [1] - 159:18
**September** [8] - 4:14,
19:14, 23:11, 23:16,
107:2, 202:7, 205:7,
210:9
**sequence** [1] - 142:9
**sequentially** [1] - 12:19
**sequester** [1] - 7:23
**sequestration** [5] -
7:14, 7:19, 7:20, 8:2, 8:4
**series** [4] - 68:17,
74:12, 75:17, 112:5
**serious** [7] - 82:17,
137:8, 170:19, 181:6,
181:23, 204:6, 209:21
**seriously** [3] - 176:8,
177:23, 183:14
**seriousness** [1] -
217:23, 218:2

**served** [3] - 177:14,
218:9, 219:1
**serves** [1] - 111:21
**service** [2] - 11:21,
119:2
**services** [3] - 117:19,
118:10, 120:8
**serving** [1] - 159:23
**session** [1] - 109:15
**set** [14] - 21:10, 21:13,
27:7, 46:18, 70:9, 78:16,
95:24, 128:2, 150:10,
170:3, 175:6, 207:5,
208:14, 213:10
**setting** [1] - 183:11
**settings** [1] - 218:23
**settled** [1] - 159:8
**settlement** [4] - 89:6,
95:24, 96:2, 134:4
**Seven** [1] - 25:4
**seven** [7] - 57:20,
63:14, 102:1, 102:2,
113:19, 188:19, 188:20
**several** [7] - 54:3, 64:3,
103:1, 106:19, 112:14,
150:4, 217:5
**severity** [1] - 216:6
**shall** [25] - 14:6, 16:5,
18:7, 29:22, 29:25,
43:24, 44:2, 46:15,
46:17, 46:21, 51:16,
67:6, 127:23, 131:25,
133:13, 167:1, 194:14,
197:11, 197:12, 212:3,
212:4, 213:14, 226:1,
226:5, 226:8
**shape** [3] - 157:14,
162:10, 192:3
**sharp** [1] - 64:24
**Sherley** [1] - 209:9
**SHERLEY** [1] - 209:9
**shift** [3] - 65:2, 103:16,
185:1
**shifted** [2] - 103:25,
104:10
**shoehorns** [1] - 187:16
**shooting** [2] - 62:1,
63:6
**shots** [1] - 64:4
**show** [21] - 7:4, 36:4,
48:7, 58:9, 62:3, 83:8,
84:9, 85:17, 85:24,
86:17, 89:2, 89:17,
117:17, 129:20, 146:1,
160:11, 170:19, 180:18
**showed** [1] - 161:5
**showing** [10] - 38:14,
61:9, 63:9, 170:21,
171:2, 208:21, 215:21,
224:20, 227:9, 228:2

**shown** [3] - 47:22, 48:1, 198:5

**shows** [1] - 61:10

**shut** [2] - 105:2, 107:23

**side** [12] - 3:15, 4:17, 7:19, 8:4, 9:11, 56:6, 60:2, 63:5, 104:16, 152:23, 173:14, 205:10

**sides** [3] - 82:2, 89:12, 89:16

**sign** [2] - 126:23, 228:24

**signature** [3] - 123:24, 131:2, 232:11

**signed** [11] - 12:2, 19:5, 48:20, 55:9, 67:24, 89:14, 105:25, 185:10, 187:21, 229:11

**significance** [14] - 178:5, 181:16, 182:14, 191:25, 192:8, 193:22, 194:4, 194:19, 206:4, 211:6, 211:11, 211:13, 211:16

**significant** [4] - 64:4, 75:4, 78:15, 190:24

**significantly** [1] - 198:18

**simple** [41] - 15:17, 16:9, 16:10, 16:14, 16:18, 18:20, 19:18, 20:23, 21:2, 23:12, 23:18, 25:1, 26:1, 26:6, 27:11, 28:4, 30:7, 41:23, 43:16, 65:16, 126:9, 126:20, 127:2, 132:3, 132:5, 132:14, 132:21, 133:16, 146:20, 167:9, 177:25, 178:8, 178:11, 182:15, 184:15, 184:21, 185:11, 194:17, 194:20, 200:10

**simply** [12] - 169:16, 182:17, 194:12, 201:15, 202:1, 202:2, 202:22, 203:5, 203:12, 220:10

**sincere** [1] - 217:25

**single** [1] - 230:10

**sit** [4] - 8:8, 105:14, 109:22, 165:1

**site** [20] - 36:25, 37:2, 59:5, 63:11, 63:22, 64:17, 102:10, 115:9, 123:18, 131:12, 131:18, 145:25, 147:5, 147:8, 147:12, 147:14, 147:15, 157:10, 201:22, 201:23

**sites** [2] - 115:14, 175:8

**sits** [1] - 124:5

**situation** [1] - 190:19

**six** [12] - 57:19, 61:19, 64:12, 101:19, 102:1, 102:2, 104:19, 162:2, 176:6, 188:16, 188:20, 220:11

**slam** [1] - 169:21

**slightly** [2] - 66:1, 168:19

**slot** [1] - 116:7

**small** [4] - 16:1, 23:5, 158:13, 159:21

**smaller** [2] - 54:11, 103:3

**SMITH** [2] - 144:17, 231:15

**Smith** [16] - 79:22, 79:25, 82:6, 96:20, 144:15, 144:22, 144:23, 145:2, 154:2, 154:16, 156:8, 161:23, 173:9, 174:6, 175:9, 187:8

**Smith's** [1] - 195:4

**social** [2] - 142:24, 222:23

**Solicitor** [1] - 4:3

**solid** [1] - 198:24

**solve** [1] - 160:16

**someone** [3] - 108:8, 161:18, 185:19

**sometime** [1] - 92:14

**sometimes** [1] - 222:23

**somewhat** [4] - 5:20, 12:20, 66:20, 191:10

**somewhere** [2] - 85:4, 91:13

**soon** [1] - 100:1

**sophisticated** [2] - 198:10, 213:6

**sorely** [1] - 215:4

**sorry** [40] - 10:24, 11:16, 18:23, 21:25, 23:14, 29:13, 36:4, 37:20, 39:2, 39:7, 40:4, 44:12, 47:6, 58:24, 60:15, 61:24, 68:25, 71:2, 71:16, 72:24, 77:2, 79:12, 80:24, 83:7, 83:15, 84:11, 87:18, 89:21, 95:9, 123:14, 124:9, 132:10, 139:22, 158:23, 166:4, 184:7, 189:7, 200:20, 221:7, 226:19

**sort** [13] - 31:21, 105:9, 106:4, 108:7, 116:6, 117:5, 121:18, 161:8, 201:7, 202:2, 216:16, 229:4, 229:8

**sorts** [1] - 115:4

**sought** [6] - 71:4,

186:2, 186:17, 186:18, 187:6, 225:13

**sound** [1] - 207:23

**source** [2] - 83:18, 83:19, 121:25, 149:10, 152:11, 158:12, 198:23

**sources** [9] - 67:5, 67:7, 148:11, 157:7, 157:18, 158:4, 158:17, 161:7, 198:25

**South** [1] - 101:9

**south** [2] - 62:24, 205:11

**southern/western** [1] - 63:7

**space** [3] - 54:10, 230:10

**spacing** [1] - 230:11

**speaking** [1] - 4:20

**speaks** [1] - 125:1

**special** [21] - 77:9, 127:24, 131:24, 132:1, 132:2, 132:7, 132:8, 132:12, 132:21, 133:14, 134:9, 139:5, 167:2, 167:5, 167:10, 167:13, 182:15, 185:6, 185:8, 185:10, 194:20

**specialized** [1] - 157:17

**specific** [3] - 34:15, 86:1, 107:8

**specifically** [11] - 4:13, 29:4, 34:14, 147:25, 159:14, 193:24, 194:21, 203:21, 205:14, 205:25, 210:22

**specifics** [1] - 150:19

**specified** [1] - 158:18

**speculation** [1] - 72:25

**speculative** [2] - 154:11, 172:12

**speed** [3] - 75:25, 176:23, 177:3

**spell** [8] - 8:25, 52:5, 100:14, 111:3, 122:20, 144:20, 155:15, 166:16

**spelled** [1] - 122:21

**spent** [3] - 204:1, 205:3, 211:13

**spin** [1] - 182:18

**split** [2] - 54:15, 208:24

**spoken** [2] - 94:8, 119:8

**spring** [1] - 20:11

**Square** [1] - 90:7, 90:9, 90:10

**square** [7] - 175:18, 176:9, 176:10, 176:11, 182:3, 189:15, 217:19

**squarely** [1] - 59:25

**stable** [1] - 157:11

**stack** [1] - 108:16

**staff** [5] - 115:11, 123:23, 204:1, 222:22, 230:2

**Stage** [1] - 68:17

**stage** [2] - 113:6, 115:17

**Stager** [2] - 9:1, 166:17

**stairway** [1] - 165:15

**stakeholders** [1] - 173:4

**stamp** [1] - 92:9

**stand** [9] - 50:19, 51:9, 51:24, 82:21, 122:7, 144:3, 154:18, 180:16, 228:22

**standard** [21] - 3:12, 5:11, 5:14, 5:25, 112:20, 162:9, 170:1, 171:2, 201:12, 207:2, 207:4, 208:15, 208:16, 208:17, 209:1, 214:10, 215:17, 215:20, 216:9

**standards** [6] - 4:2, 72:21, 170:2, 170:8, 170:9, 170:10

**standing** [1] - 62:14

**standpoint** [5] - 53:23, 55:5, 74:19, 102:19, 108:18

**stands** [1] - 67:12

**start** [8] - 21:4, 60:3, 60:20, 70:11, 81:23, 98:9, 175:18, 217:8

**started** [3] - 104:20, 105:2, 217:4

**starting** [10] - 3:13, 46:12, 55:3, 56:14, 67:2, 81:23, 107:23, 108:1, 161:4, 189:16

**starts** [1] - 32:3

**State** [21] - 41:20, 111:19, 112:1, 118:12, 118:24, 118:25, 119:8, 119:10, 119:11, 119:22, 119:23, 120:6, 120:8, 121:6, 121:22, 135:8, 162:3, 163:5, 199:4, 203:6

**state** [33] - 8:24, 10:5, 52:4, 52:13, 100:13, 111:3, 118:10, 118:16, 118:17, 118:19, 119:1, 119:2, 119:3, 119:12, 119:13, 119:19, 121:12, 122:19, 130:11, 130:12, 144:20, 149:3, 155:14, 161:7, 161:9, 162:17, 166:15, 176:5, 198:25, 199:3, 222:2

**statement** [10] - 6:12, 18:15, 18:19, 84:4, 88:7, 124:15, 132:17, 135:23, 142:11, 194:12

**statements** [1] - 114:2

**STATES** [1] - 1:1

**states** [1] - 43:22

**States** [3] - 5:19, 186:16, 209:5

**status** [8] - 28:2, 28:12, 133:2, 146:7, 146:8, 179:5, 219:11, 225:22

**statute** [1] - 134:6

**stay** [11] - 8:14, 28:7, 50:20, 51:3, 51:8, 51:21, 98:3, 109:13, 109:16, 110:4, 182:6

**stayed** [1] - 5:4

**stenographically** [1] - 232:4

**step** [18] - 50:17, 67:23, 70:3, 70:12, 70:13, 70:19, 70:21, 98:24, 106:12, 109:13, 122:4, 143:23, 154:17, 164:25, 185:23, 187:7, 189:21

**stepped** [1] - 106:4

**steps** [1] - 11:24, 14:12, 18:13, 20:18, 68:17, 73:11, 73:14, 165:17, 202:6, 202:13, 202:18

**Stern** [2] - 98:6, 100:15

**stern** [15] - 98:11, 100:16, 100:20, 105:21, 109:12, 109:13, 109:16, 109:19, 180:15, 181:6, 181:21, 188:14, 188:15, 198:3, 217:24

**STERN** [2] - 100:4, 231:9

**Stern's** [2] - 180:20, 182:10

**stern's** [3] - 181:4, 186:17, 198:22

**Steve** [1] - 150:11

**Steven** [1] - 1:19

**still** [33] - 22:17, 28:5, 32:1, 37:5, 39:25, 40:25, 42:20, 51:2, 54:7, 57:19, 59:10, 59:14, 60:1, 60:12, 60:14, 62:1, 62:19, 63:23, 82:21, 101:22, 116:17, 126:21, 133:9, 138:24, 140:22, 149:19, 153:21, 157:5, 173:6, 176:6, 189:17, 213:5, 213:18

**stipulate** [1] - 21:20

**stipulated** [1] - 13:1

**stop** [2] - 81:8, 81:13
**stopped** [2] - 3:14, 75:10
**stopping** [1] - 177:14
**store** [3] - 87:14, 94:13, 188:23
**stores** [1] - 215:14
**straight** [2] - 108:15, 165:16
**strange** [1] - 217:18
**strategies** [2] - 123:18, 126:21
**street** [7] - 34:21, 35:3, 60:24, 63:6, 152:22, 196:20, 212:17
**Street** [49] - 1:24, 21:5, 22:15, 23:13, 23:18, 23:24, 24:11, 24:20, 24:25, 25:6, 26:2, 26:6, 26:11, 26:13, 26:25, 27:4, 27:12, 28:3, 28:12, 36:9, 36:12, 36:15, 37:6, 37:21, 37:22, 38:14, 39:7, 39:13, 39:22, 40:17, 41:15, 42:20, 44:15, 44:25, 59:24, 62:15, 130:19, 130:21, 131:10, 139:24, 140:11, 140:16, 140:25, 141:9, 141:16, 152:23, 163:18, 193:24, 193:25
**streets** [1] - 217:13
**stretch** [1] - 109:2
**stricter** [2] - 209:6, 209:20
**strike** [1] - 17:22
**strong** [4] - 66:12, 102:18, 104:21, 211:9
**strongly** [1] - 225:22
**structures** [10] - 38:25, 56:18, 57:2, 63:17, 139:20, 140:10, 141:1, 202:1, 213:15, 224:24
**studies** [2] - 53:17, 217:20
**stuff** [1] - 112:20
**Sub** [4] - 4:25, 225:1, 226:21
**sub** [9] - 43:23, 43:24, 43:25, 44:3, 44:4, 44:8, 90:12, 201:4, 222:7
**sub-corporation** [1] - 90:12
**sub-phase** [7] - 43:23, 43:24, 43:25, 44:3, 44:4, 44:8, 201:4
**Sub-Phase** [4] - 4:25, 225:1, 226:21
**subcontractors** [4] - 172:11, 215:4, 224:13,

224:18
**subject** [23] - 15:6, 15:14, 15:22, 22:17, 22:24, 24:2, 25:13, 28:14, 36:16, 46:20, 58:14, 66:18, 66:19, 92:6, 96:5, 101:25, 105:14, 106:2, 106:13, 128:1, 136:5, 185:4, 229:24
**Subject** [1] - 28:17
**submission** [5] - 3:14, 6:17, 85:20, 112:18, 113:4
**Submission** [1] - 112:11
**submissions** [1] - 86:15
**submit** [13] - 68:18, 70:22, 75:13, 76:12, 76:15, 78:15, 113:7, 174:1, 181:3, 184:3, 184:17, 185:23, 190:9
**submits** [2] - 162:11, 213:25
**submitted** [13] - 3:5, 5:5, 74:7, 84:5, 84:6, 84:23, 114:12, 114:17, 118:8, 152:13, 152:14, 217:7
**submitting** [3] - 83:4, 112:22, 173:7
**Subphase** [3] - 205:16, 210:11, 210:21
**subphases** [1] - 205:21
**Subsection** [3] - 29:18, 56:14, 77:3
**substantial** [6] - 161:14, 198:3, 216:25, 221:23, 221:25, 224:9
**substantially** [1] - 216:24
**substantively** [1] - 202:23
**succeed** [8] - 208:7, 208:22, 213:21, 220:4, 224:20, 227:10, 228:3, 228:6
**success** [16] - 67:6, 99:5, 168:9, 168:17, 169:24, 170:17, 171:20, 177:19, 180:8, 208:18, 209:2, 209:7, 209:8, 209:15, 214:9, 219:8
**successful** [4] - 174:19, 214:7, 214:8, 217:1
**successfully** [1] - 163:5
**suffer** [6] - 204:18, 208:8, 214:24, 215:5, 220:5, 224:13

**suffered** [1] - 214:18
**suffice** [2] - 228:10, 228:15
**sufficient** [5] - 95:5, 126:9, 187:23, 211:12, 224:17
**suggest** [3] - 12:25, 73:3, 181:5
**suggesting** [1] - 65:8
**suit** [2] - 66:12, 204:13
**sum** [1] - 158:25
**Sunday** [1] - 35:22
**supermarket** [2] - 53:25, 198:13
**supervisors** [1] - 160:22
**Supp** [1] - 207:12
**supply** [1] - 162:23
**support** [27] - 68:10, 68:14, 68:15, 68:16, 69:2, 69:3, 78:23, 79:1, 79:2, 79:3, 80:11, 80:13, 89:15, 93:24, 107:12, 121:21, 125:8, 149:22, 159:25, 160:11, 160:19, 162:7, 169:17, 185:18, 187:2, 187:4, 223:15
**Support** [1] - 66:25
**supported** [3] - 108:6, 108:23, 223:13
**supportive** [2] - 54:7, 54:13
**supports** [2] - 160:18, 199:6
**suppose** [1] - 12:24
**supposed** [5] - 60:1, 89:13, 145:16, 188:4
**Supreme** [5] - 5:16, 5:18, 170:3, 170:6, 171:8, 171:13, 208:13, 216:9, 219:22
**surface** [1] - 220:11
**surprise** [1] - 188:10
**surrounding** [1] - 139:5
**suspect** [1] - 51:6
**sustained** [11] - 72:12, 72:18, 73:5, 90:18, 90:19, 90:24, 97:15, 97:16, 114:3, 117:10
**swear** [1] - 155:11
**sweat** [1] - 189:22
**swift** [1] - 219:1
**SWORN** [8] - 8:21, 52:1, 100:4, 110:23, 122:16, 144:17, 155:12, 166:13
**sworn** [2] - 100:2, 144:14

      **T**

**T-I-F** [1] - 67:12
**T.J** [2] - 103:7, 103:12
**tab** [2] - 23:9, 23:20
**Tab** [5] - 13:22, 21:5, 36:5, 36:6, 56:7
**table** [5] - 98:1, 165:2, 188:5, 188:23, 189:19
**talks** [1] - 48:17
**tall** [1] - 61:15
**target** [1] - 80:16
**task** [2] - 125:8, 126:10
**Tax** [5] - 40:14, 67:8, 68:9, 148:14, 148:17
**tax** [40] - 11:17, 40:2, 40:4, 40:5, 40:6, 40:18, 67:11, 67:12, 67:14, 67:17, 67:19, 68:5, 68:13, 71:24, 72:22, 77:9, 148:20, 151:2, 151:4, 151:5, 151:11, 158:5, 158:6, 158:8, 158:9, 158:15, 159:11, 159:12, 159:14, 159:24, 159:25, 162:19, 163:2, 163:3, 163:7, 163:9, 199:1, 202:24
**taxes** [1] - 67:15
**taxing** [2] - 67:21, 67:22
**teasing** [1] - 186:9
**technical** [2] - 132:13, 150:22
**telephone** [12] - 59:25, 60:8, 60:25, 62:4, 62:5, 62:6, 62:19, 62:21, 62:24, 62:25, 63:9, 139:9
**telephonic** [1] - 229:4
**temporary** [6] - 2:3, 5:11, 98:18, 207:2, 207:10, 221:17
**Temporary** [6] - 2:3, 4:19, 17:1, 18:3, 204:24, 223:8
**ten** [4] - 3:7, 63:14, 82:17, 152:2
**tenant** [6] - 14:21, 14:24, 15:19, 23:8, 102:20, 103:14
**tenants** [8] - 102:15, 102:20, 103:2, 103:3, 137:24, 181:9, 183:3, 183:17
**term** [12] - 14:16, 16:7, 16:13, 48:23, 69:2, 131:24, 132:2, 132:5, 132:13, 132:21, 167:5, 185:8
**terminate** [3] - 173:12,

204:16, 217:16
**terminated** [2] - 213:24, 225:7
**terminates** [2] - 173:2
**terminating** [2] - 223:24, 226:5
**termination** [2] - 173:1, 174:21
**terms** [59] - 9:13, 12:9, 13:8, 13:13, 22:7, 55:15, 56:25, 58:5, 58:12, 64:3, 66:17, 72:20, 72:25, 73:22, 80:12, 85:2, 105:13, 110:18, 117:6, 128:1, 128:22, 146:25, 153:8, 154:11, 169:2, 169:25, 170:8, 172:7, 172:14, 174:21, 175:2, 178:5, 178:6, 180:7, 186:13, 187:1, 188:14, 189:24, 191:22, 191:25, 196:6, 196:10, 196:17, 199:1, 202:16, 202:17, 203:1, 214:17, 214:22, 215:10, 215:12, 215:17, 216:2, 217:3, 219:10, 229:23
**territory** [1] - 81:17
**test** [2] - 170:11, 170:14
**testified** [22] - 49:14, 85:12, 88:10, 94:3, 106:23, 137:20, 174:13, 181:22, 183:15, 185:7, 185:13, 187:6, 187:9, 188:14, 191:15, 199:22, 199:23, 200:4, 200:7, 200:17, 201:2, 217:21
**testify** [4] - 7:14, 97:9, 119:17, 182:22
**testifying** [3] - 43:14, 153:22, 217:25
**testimony** [56] - 26:5, 37:7, 50:18, 63:21, 65:11, 89:13, 99:2, 99:3, 109:20, 120:19, 134:20, 135:15, 135:17, 136:15, 137:18, 144:1, 153:18, 154:17, 161:1, 166:9, 169:17, 173:14, 177:4, 178:8, 178:16, 178:19, 180:21, 181:5, 182:8, 182:10, 183:9, 183:11, 183:15, 185:19, 186:17, 186:21, 187:3, 187:25, 188:2, 188:6, 188:16, 195:4, 196:5, 196:11, 199:25, 200:12, 200:13, 207:19, 210:19, 210:25, 211:4, 211:9, 212:13, 214:4, 218:2, 218:18

**text** [1] - 32:18
**THE** [352] - 1:1, 1:1, 2:2,
2:15, 2:18, 2:22, 2:25,
3:3, 3:9, 3:18, 3:22, 6:8,
6:13, 6:23, 7:2, 7:12,
7:18, 7:23, 8:1, 8:4,
8:13, 8:18, 8:20, 8:22,
8:23, 9:1, 9:3, 9:11,
9:17, 12:12, 12:17, 13:4,
13:13, 13:16, 13:19,
17:3, 17:5, 17:6, 17:10,
17:11, 17:16, 17:24,
18:1, 21:18, 21:22, 22:1,
22:3, 22:7, 22:10, 24:10,
24:13, 28:1, 28:6, 28:7,
28:11, 28:13, 28:14,
28:16, 28:17, 28:18,
28:20, 33:15, 41:7, 42:4,
42:10, 42:13, 44:11,
44:13, 44:18, 44:19,
44:21, 44:22, 45:1, 45:2,
45:4, 45:5, 45:7, 45:8,
49:10, 50:17, 51:2, 51:5,
51:11, 51:15, 51:16,
51:17, 51:25, 52:2, 52:3,
52:6, 52:8, 58:3, 58:11,
59:19, 65:13, 66:4, 66:6,
66:13, 66:16, 72:12,
72:18, 72:25, 73:5, 73:9,
80:23, 80:25, 81:6,
81:11, 81:15, 81:21,
82:2, 82:14, 82:20,
84:11, 86:5, 89:19,
89:21, 89:23, 90:24,
91:17, 93:9, 96:9, 97:11,
97:15, 97:25, 98:8,
98:21, 99:12, 99:18,
99:23, 100:2, 100:3,
100:5, 100:6, 100:8,
100:10, 100:12, 100:13,
100:15, 100:17, 105:18,
109:8, 109:10, 109:12,
109:19, 109:24, 110:2,
110:4, 110:8, 110:11,
110:16, 110:24, 110:25,
111:2, 111:3, 111:5,
111:7, 114:3, 117:10,
117:15, 118:2, 118:5,
118:13, 118:20, 119:3,
119:6, 119:12, 119:18,
119:21, 119:25, 120:3,
120:12, 120:15, 121:3,
122:4, 122:9, 122:11,
122:15, 122:17, 122:18,
122:21, 122:23, 125:3,
128:14, 129:19, 129:24,
130:1, 130:4, 130:7,
137:18, 139:13, 141:24,
142:1, 143:13, 143:23,
143:25, 144:1, 144:6,
144:8, 144:11, 144:16,

144:18, 144:19, 144:22,
144:24, 153:19, 153:24,
154:7, 154:10, 154:14,
154:16, 154:22, 155:1,
155:3, 155:8, 155:11,
155:13, 155:14, 155:16,
155:18, 163:15, 163:21,
163:23, 164:15, 164:24,
165:5, 165:8, 165:11,
165:14, 165:22, 165:24,
166:4, 166:7, 166:11,
166:12, 166:14, 166:15,
166:17, 166:19, 167:16,
167:18, 167:20, 167:21,
167:23, 168:2, 168:21,
169:18, 169:22, 172:3,
172:5, 172:13, 172:17,
172:23, 173:10, 173:13,
173:22, 173:25, 174:4,
174:11, 175:16, 175:21,
175:23, 176:2, 176:8,
176:13, 176:18, 177:4,
177:7, 177:9, 177:17,
180:7, 180:15, 180:20,
180:23, 181:15, 181:20,
182:1, 182:9, 183:6,
184:4, 184:7, 184:11,
184:13, 186:6, 186:9,
189:6, 190:12, 190:14,
190:16, 191:5, 191:9,
191:14, 191:21, 192:7,
192:10, 192:21, 192:25,
193:8, 193:15, 193:21,
194:3, 194:8, 194:18,
195:3, 195:8, 195:11,
195:13, 195:20, 195:23,
196:9, 196:17, 196:20,
197:7, 197:9, 197:18,
197:21, 199:20, 200:2,
200:7, 200:11, 200:14,
200:20, 200:22, 200:24,
202:5, 203:14, 203:24,
220:20, 220:23, 221:3,
221:6, 221:9, 221:13,
221:15, 222:4, 222:17,
222:21, 226:19, 226:22,
226:24, 227:4, 227:9,
227:19, 228:1, 228:10,
228:12, 228:17, 228:21,
229:11, 229:20, 229:22,
230:11
**themselves** [3] - 13:7,
101:21, 202:25
**theoretical** [2] - 192:13,
201:1
**theoretically** [1] - 74:11
**theory** [1] - 191:23
**thereafter** [1] - 82:5
**therefore** [4] - 178:3,
179:11, 179:24, 225:25

**thereon** [3] - 197:6,
197:10, 212:3
**thereto** [1] - 223:15
**they've** [7] - 57:3,
78:16, 139:2, 142:4,
184:4, 214:11
**third** [12] - 14:11, 51:18,
53:17, 67:2, 74:17,
94:12, 130:24, 165:16,
171:4, 171:21, 172:24,
216:2
**thirdly** [1] - 198:13
**thompson** [1] - 229:12
**Thompson** [7] - 8:20,
17:4, 17:8, 186:6, 186:9,
190:14, 222:23
**thoroughness** [1] -
230:2
**thoughts** [2] - 54:9,
226:25
**threat** [2] - 137:25
**three** [22] - 6:11, 7:10,
43:21, 80:4, 87:8, 87:11,
93:24, 94:10, 96:23,
105:2, 134:3, 134:6,
152:2, 153:13, 169:11,
169:14, 169:15, 185:12,
185:24, 191:10, 204:19,
208:9
**Three** [9] - 21:5, 22:12,
29:15, 38:19, 56:10,
204:21, 224:25
**threshold** [1] - 74:1
**throughout** [5] - 53:2,
55:3, 62:19, 148:9, 179:2
**thrust** [1] - 6:17
**TIF** [66] - 11:16, 67:12,
67:14, 67:23, 68:8, 69:5,
69:11, 69:13, 69:15,
70:5, 70:7, 71:10, 72:10,
72:16, 73:12, 75:17,
75:18, 83:5, 84:5, 84:6,
85:5, 85:7, 85:10, 89:13,
89:14, 91:3, 91:9, 91:10,
107:13, 108:17, 116:3,
120:23, 121:9, 121:11,
121:18, 121:21, 149:23,
150:2, 150:3, 150:5,
150:9, 150:12, 150:16,
150:17, 150:18, 150:20,
150:22, 150:25, 151:17,
151:21, 151:25, 152:16,
152:17, 158:3, 158:12,
159:7, 161:2, 161:24,
162:16, 186:24, 187:2,
187:7, 187:10, 187:11,
199:8
**TIFs** [1] - 67:22
**timeframe** [2] - 94:18,
113:12

**timeframes** [1] - 206:22
**timely** [2] - 46:20,
224:23
**timetable** [1] - 214:2
**timing** [1] - 113:21
**tips** [1] - 208:10
**Tire** [1] - 209:3
**Titan** [1] - 209:3
**Title** [5] - 29:16, 127:19,
127:22, 131:25, 166:24
**title** [116] - 4:24, 5:2,
6:18, 7:4, 7:5, 7:7,
10:15, 14:19, 14:25,
15:8, 15:9, 15:20, 18:5,
18:8, 18:10, 18:16,
18:20, 19:10, 19:18,
23:18, 24:3, 24:8, 26:14,
27:11, 28:3, 29:20,
31:13, 36:24, 41:23,
44:19, 50:11, 50:13,
65:15, 65:20, 65:21,
66:18, 90:1, 90:2, 90:15,
92:6, 92:19, 93:5, 93:14,
97:16, 99:8, 111:20,
115:21, 116:16, 116:20,
123:10, 125:23, 126:3,
126:7, 127:2, 127:3,
127:4, 127:10, 127:24,
128:1, 128:7, 129:1,
129:2, 129:3, 129:9,
129:14, 129:16, 131:9,
131:22, 133:15, 133:25,
134:4, 134:7, 134:21,
134:24, 135:15, 135:21,
135:22, 146:20, 156:1,
156:12, 156:16, 156:20,
167:3, 167:9, 167:12,
167:13, 185:4, 186:2,
192:12, 192:13, 194:15,
194:17, 199:17, 199:24,
200:9, 200:10, 200:11,
200:23, 201:16, 201:19,
203:9, 203:10, 203:12,
205:16, 210:11, 210:13,
210:16, 210:20, 211:7,
211:16, 213:8
**titled** [3] - 14:2, 29:15,
29:16
**TJX** [1] - 103:7
**today** [37] - 55:4, 79:23,
98:12, 103:13, 105:14,
135:21, 138:7, 141:13,
142:2, 154:12, 165:25,
168:8, 178:15, 178:20,
179:5, 179:6, 184:16,
188:14, 190:9, 203:25,
205:3, 205:14, 205:23,
206:20, 206:24, 207:19,
208:19, 210:19, 212:7,
213:5, 214:6, 215:9,

217:22, 218:18, 219:7,
222:6
**together** [12] - 74:15,
114:16, 114:25, 157:19,
158:9, 159:3, 163:12,
174:10, 188:5, 189:23,
223:15, 229:6
**tomorrow** [1] - 181:13
**ton** [1] - 70:22
**tonight** [1] - 81:1
**took** [6] - 31:15, 58:19,
59:4, 183:14, 185:13,
185:14
**tool** [1] - 150:6
**top** [5] - 91:11, 92:9,
124:6, 183:23, 211:2
**topic** [5] - 66:9, 73:2,
119:18
**torn** [1] - 39:18
**total** [5] - 44:19, 69:11,
85:7, 158:19, 158:25
**totality** [1] - 133:24,
214:3, 220:1
**totally** [1] - 211:7,
212:20, 213:2
**touch** [1] - 33:15
**touche** [1] - 186:8
**towards** [4] - 30:18,
60:2, 62:17, 63:6
**town** [1] - 54:11
**track** [3] - 113:13,
113:14, 113:15
**traffic** [1] - 35:8
**trafficking** [1] - 34:2
**transaction** [3] - 88:22,
121:11, 158:19
**transactions** [3] -
72:22, 107:24, 211:3
**transcribed** [1] - 232:8
**transcript** [1] - 232:8
**transfer** [1] - 131:21
**transferred** [2] - 2:13
**treat** [2] - 205:4, 207:10
**treated** [1] - 18:10
**trial** [9] - 165:1, 168:9,
170:17, 207:10, 207:23,
208:22, 214:7, 224:21,
228:3
**tried** [7] - 69:24, 75:23,
99:6, 99:7, 114:15,
166:5, 187:14
**trigger** [4] - 19:20,
179:12, 181:3, 194:5
**triggered** [5] - 19:22,
104:3, 108:3, 179:23,
195:5
**trouble** [3] - 60:5, 60:6,
186:14
**truck** [1] - 60:21
**true** [17] - 41:20, 42:19,

43:3, 44:22, 44:23, 84:3, 84:4, 84:24, 84:25, 116:13, 123:21, 128:20, 135:13, 135:17, 138:22, 143:19, 184:19

**truth** [1] - 31:6

**Truth** [7] - 5:20, 5:23, 170:5, 208:4, 208:12, 208:23, 209:22

**try** [8] - 66:11, 70:14, 77:12, 78:18, 81:1, 114:21, 147:16, 199:14

**trying** [18] - 3:25, 6:15, 28:7, 43:15, 69:15, 80:16, 81:6, 81:16, 119:15, 152:11, 154:12, 157:7, 162:14, 168:22, 173:9, 174:6, 195:20, 217:3

**turn** [31] - 13:22, 14:1, 18:22, 21:5, 23:9, 23:20, 24:14, 25:23, 26:8, 27:8, 29:15, 32:16, 35:11, 36:5, 37:15, 48:17, 56:7, 57:22, 60:23, 61:6, 62:22, 66:24, 71:20, 93:21, 95:17, 130:24, 139:15, 175:18, 187:5, 188:8

**turn-around** [1] - 175:18

**turned** [2] - 188:15

**turning** [2] - 188:19, 188:25

**TV** [1] - 214:19

**Two** [8] - 14:1, 14:2, 18:22, 19:3, 26:20, 26:21, 204:20, 224:23

**two** [37] - 33:7, 33:21, 37:2, 43:21, 44:13, 45:2, 60:19, 60:20, 72:9, 81:5, 81:14, 82:1, 94:10, 98:9, 130:4, 139:3, 145:18, 151:8, 152:1, 153:13, 155:5, 162:3, 165:13, 169:23, 178:13, 184:9, 191:5, 191:9, 191:11, 192:2, 193:23, 196:2, 205:21, 208:8, 211:19, 226:17

**type** [11] - 54:13, 80:12, 103:10, 106:6, 108:11, 115:6, 117:19, 118:23, 149:16, 173:20, 216:21

**typed** [1] - 228:23

**types** [5] - 61:10, 159:1, 161:6, 171:24, 199:2

**typically** [4] - 113:10, 126:8, 163:11, 172:20

**typographical** [1] - 59:2

**U**

**U.S** [4] - 1:23, 170:4, 208:14, 216:10

**ultimate** [1] - 199:11

**ultimately** [4] - 202:6, 202:10, 216:14, 225:14

**um-hum** [1] - 90:8

**unacceptable** [1] - 29:21

**unanimity** [1] - 7:18

**uncertain** [1] - 175:13

**uncompleted** [1] - 201:24

**under** [71] - 5:12, 5:25, 7:12, 8:5, 13:4, 15:5, 18:4, 18:6, 18:17, 19:22, 21:22, 21:23, 22:5, 30:19, 38:2, 39:7, 41:22, 43:8, 43:18, 49:22, 49:24, 52:20, 56:2, 56:11, 58:4, 68:9, 82:21, 83:21, 95:20, 119:3, 124:13, 126:21, 127:1, 127:2, 127:10, 128:22, 139:13, 149:8, 149:19, 149:21, 151:21, 152:8, 159:25, 167:11, 169:25, 170:2, 170:10, 171:11, 181:22, 187:1, 187:20, 201:17, 202:17, 204:14, 206:18, 206:22, 207:21, 212:6, 212:19, 213:22, 214:3, 214:12, 215:16, 216:18, 217:21, 217:24, 220:1, 221:15, 221:24, 225:5

**undermining** [1] - 188:7

**underneath** [2] - 36:19, 38:6

**understood** [7] - 27:20, 51:10, 65:6, 102:1, 120:21, 121:5, 121:6

**undertake** [1] - 78:5

**undertaken** [1] - 212:14

**underway** [1] - 220:10

**underwrite** [1] - 78:14

**undeveloped** [1] - 175:13

**undisputed** [5] - 192:5, 210:7, 211:17, 212:16, 212:25

**unfolded** [1] - 75:24

**unfortunately** [1] - 183:8

**unimproved** [1] - 135:6

**uninsurable** [2] - 29:22, 200:1

**unique** [2] - 108:5, 136:24

**unit** [3] - 11:13, 53:14, 159:23

**United** [3] - 5:19, 186:16, 209:5

**UNITED** [1] - 1:1

**units** [7] - 138:24, 152:25, 153:1, 159:25, 161:13, 161:14, 195:11

**University** [2] - 63:7, 205:11

**unlawful** [1] - 204:16

**unless** [8] - 13:5, 18:21, 44:3, 135:6, 167:25, 173:2, 179:4, 215:24

**unlike** [2] - 171:10, 171:15

**unlikely** [1] - 154:18

**unmarketable** [1] - 29:21

**unquote** [1] - 60:9

**unreasonable** [8] - 197:12, 197:15, 201:17, 212:5, 212:20, 212:21, 213:2, 213:8

**unrecorded** [1] - 128:4

**unredeemed** [16] - 115:1, 115:15, 116:12, 116:17, 126:13, 128:7, 146:16, 164:5, 164:9, 190:22, 191:3, 192:18, 193:11, 197:23, 197:25, 201:9

**unresolved** [1] - 201:24

**unsafe** [1] - 65:1

**unsecured** [1] - 133:21

**unspecified** [1] - 158:14

**unto** [1] - 127:2

**unusual** [1] - 114:19

**up** [38] - 30:16, 35:3, 62:1, 62:2, 62:17, 94:4, 98:8, 101:20, 103:13, 104:6, 104:7, 104:25, 105:3, 107:3, 107:17, 108:4, 108:15, 108:24, 142:16, 143:7, 143:16, 150:11, 150:24, 151:18, 152:13, 165:17, 165:18, 170:13, 178:15, 189:21, 190:5, 190:6, 190:24, 194:5, 221:7, 227:23, 228:20

**update** [1] - 105:9

**upkeep** [2] - 147:22, 175:10

**upper** [2] - 33:13, 124:5

**ups** [1] - 33:7

**urban** [6] - 104:21,

105:11, 175:13, 206:12, 212:17, 212:25

**Urban** [2] - 11:13, 11:22

**urge** [1] - 229:5

**uses** [9] - 68:5, 130:9, 151:15, 151:16, 151:23, 152:3, 152:4, 161:23

**utilities** [15] - 11:21, 56:18, 56:22, 57:12, 57:16, 63:12, 63:18, 63:22, 88:14, 128:3, 147:6, 179:1, 184:23, 213:15, 213:18

**utility** [4] - 139:9, 184:20, 184:21, 184:22

**utilize** [1] - 67:19

**V**

**vacant** [4] - 142:20, 147:23, 175:12

**vacated** [1] - 170:6

**valid** [1] - 225:23

**valuable** [1] - 151:9

**valuation** [1] - 161:19

**value** [3] - 151:5, 151:7, 161:17

**varied** [1] - 158:21

**various** [6] - 11:11, 107:11, 126:21, 157:6, 157:17, 185:21

**vast** [1] - 158:3

**Vegas** [1] - 101:8

**vendors** [1] - 189:11

**Ventures** [1] - 207:11

**verified** [6] - 42:3, 42:11, 57:24, 59:1, 169:17, 223:13

**verify** [1] - 59:8

**version** [1] - 33:5

**versus** [5] - 2:4, 54:11, 80:15, 87:22, 209:9

**vest** [1] - 41:23

**vested** [3] - 24:9, 26:15, 179:22

**viability** [4] - 53:10, 80:18, 101:17, 173:15

**Victor** [1] - 111:6

**view** [16] - 8:5, 30:12, 30:18, 47:16, 51:12, 109:17, 144:4, 168:17, 169:4, 179:19, 185:6, 189:25, 220:17, 221:21, 227:1, 228:19

**viewed** [1] - 214:23

**views** [4] - 7:16, 131:20, 188:5

**vigorously** [1] - 207:15

**violation** [7] - 179:25,

224:22, 224:24, 225:2, 225:4, 227:12, 228:14

**Virginia** [2] - 10:6, 207:6

**visit** [2] - 63:11, 63:22

**visited** [1] - 57:5

**voir** [1] - 117:24

**Volume** [1] - 218:7

**vote** [1] - 74:15

**W**

**W-A-L-L-A-C-E** [1] - 52:7

**W-I-L-L-I-A-M** [1] - 122:22

**wait** [4] - 99:12, 166:8, 220:10, 229:1

**waiting** [2] - 98:11, 153:21

**walk** [3] - 3:5, 78:7, 165:17

**walked** [2] - 3:15, 61:8

**walking** [2] - 60:24, 183:19

**walks** [1] - 3:4

**Wallace** [2] - 52:6, 52:7

**wants** [4] - 7:19, 8:4, 65:17, 66:15

**Warns** [1] - 209:24

**warrant** [1] - 186:20

**warranted** [1] - 219:13

**warrantied** [1] - 132:8

**warranties** [1] - 132:7

**warranty** [17] - 127:24, 131:24, 132:1, 132:2, 132:12, 132:21, 133:14, 134:10, 167:2, 167:6, 167:10, 167:13, 182:15, 185:6, 185:8, 185:10, 194:20

**waste** [1] - 200:8

**water** [1] - 100:8

**wave** [2] - 104:3, 108:3

**ways** [2] - 157:6, 214:25

**web** [2] - 36:25, 37:2

**week** [4] - 151:24, 222:8, 226:12, 229:2

**weekend** [2] - 230:4, 230:12

**weeks** [1] - 106:19

**weight** [1] - 218:7

**Welch** [1] - 79:16

**welcome** [2] - 51:19, 110:4

**West** [63] - 1:24, 23:24, 24:10, 24:20, 24:25, 25:6, 26:2, 26:6, 26:11, 26:13, 26:25, 27:4, 36:8,

36:12, 36:15, 37:6,
37:20, 37:22, 38:7,
38:14, 39:7, 39:13,
39:22, 40:17, 42:20,
42:25, 43:1, 44:15,
44:23, 44:24, 45:1,
59:24, 130:19, 130:21,
131:10, 139:24, 140:10,
140:16, 140:25, 141:9,
141:16, 163:18, 183:8,
183:9, 183:12, 193:24,
202:8, 202:11, 203:3,
203:4, 206:1, 206:2,
210:23, 210:24, 218:12,
218:22, 218:25

**west** [4] - 4:16, 4:17,
205:9, 205:10

**westerly** [2] - 61:9, 62:2

**Westlaw** [1] - 209:24

**Westpac** [4] - 54:22,
54:23, 55:1, 96:18

**whereas** [2] - 187:20,
216:13

**Whereof** [1] - 232:10

**whole** [5] - 30:22,
99:15, 151:14, 168:16,
227:22

**Wholesale** [1] - 103:9

**wide** [1] - 61:19

**William** [2] - 122:13,
122:21

**WILLIAM** [2] - 122:16,
231:13

**willing** [4] - 188:19,
188:21, 189:21, 222:17

**Winter** [11] - 5:17,
170:3, 171:8, 171:12,
171:16, 208:13, 208:25,
209:1, 214:13, 214:14,
216:9

**wishes** [3] - 6:11, 6:12,
109:22

**withheld** [1] - 58:6

**withhold** [1] - 226:8

**withholding** [1] - 171:7

**witness** [41] - 7:11,
7:17, 8:6, 8:9, 9:9, 9:13,
12:14, 42:3, 50:19,
50:23, 51:9, 51:22,
58:12, 80:1, 81:22,
82:20, 86:2, 90:18, 98:4,
98:7, 99:19, 99:24,
109:25, 117:14, 117:25,
118:16, 119:7, 119:20,
122:5, 122:6, 122:12,
125:4, 144:3, 154:7,
154:18, 154:20, 154:21,
154:22, 155:11, 163:24,
180:16

**Witness** [1] - 232:10

**WITNESS** [47] - 8:21,
8:22, 9:1, 28:6, 28:13,
28:16, 28:18, 44:18,
44:21, 45:1, 45:4, 45:7,
51:16, 52:1, 52:2, 52:6,
100:4, 100:5, 100:12,
100:15, 110:23, 110:24,
111:2, 111:5, 122:16,
122:17, 122:21, 142:1,
143:25, 144:17, 144:18,
144:22, 155:12, 155:13,
155:16, 166:13, 166:14,
166:17, 167:20, 231:3,
231:6, 231:9, 231:11,
231:13, 231:15, 231:17,
231:19

**witnesses** [14] - 6:12,
7:10, 7:14, 7:24, 8:5,
110:8, 110:10, 110:11,
110:20, 155:3, 165:3,
165:5, 185:13, 191:16

**wonder** [1] - 197:24

**wood** [3] - 61:10, 64:15,
64:24

**Woods** [1] - 68:2

**word** [6] - 31:15, 43:11,
46:8, 47:13, 106:25,
129:4

**wording** [1] - 194:19

**words** [7] - 107:12,
107:23, 132:12, 138:8,
138:9, 138:18, 182:15

**workers** [1] - 34:7

**Works** [1] - 147:13

**works** [2] - 151:1,
200:15

**world** [1] - 103:13,
170:2, 186:16

**worst** [1] - 186:2

**wrapped** [1] - 190:24

**Wright** [2] - 218:7,
219:16

**writing** [2] - 19:9, 29:24

**written** [2] - 18:7,
194:15

**wrongdoing** [1] -
227:23

**wrongful** [1] - 227:23

**wrongfully** [3] - 213:22,
225:5, 227:22

**wrote** [3] - 42:5, 84:2,
88:9

## Y

**year** [22] - 20:11, 22:25,
37:3, 58:20, 58:24,
69:18, 69:19, 75:23,
76:1, 76:6, 76:20, 79:10,

104:19, 112:9, 187:13,
187:14, 187:21, 188:16,
191:12, 194:5, 209:23,
211:13

**yearly** [1] - 25:14

**years** [21] - 5:14, 10:2,
10:4, 20:4, 54:3, 96:23,
100:25, 102:10, 105:2,
106:24, 114:9, 121:13,
134:3, 134:6, 137:7,
150:4, 175:22, 176:4,
217:5, 219:22, 220:11

**yesterday** [17] - 39:21,
41:3, 57:8, 57:9, 59:5,
59:14, 60:13, 60:14,
62:9, 62:11, 63:12,
63:13, 63:22, 64:6,
64:11, 64:14, 138:24

**yield** [1] - 169:7

**York** [4] - 52:16, 101:8,
101:12, 183:18

**Young** [1] - 79:15

**yourself** [6] - 8:24,
52:4, 100:11, 105:23,
111:1, 122:19

## Z

**Z-O-L-L-E-R** [2] - 9:2,
166:18

**Zajac** [3] - 1:23, 232:3,
232:15

**zero** [1] - 177:20

**zeroing** [1] - 102:22

**Zoller** [38] - 7:11, 9:1,
9:6, 9:21, 13:22, 18:2,
19:4, 22:12, 33:15,
41:10, 42:14, 42:18,
44:14, 45:12, 49:14,
50:17, 51:5, 51:17,
53:12, 70:6, 72:20, 73:2,
109:14, 137:20, 155:5,
155:9, 165:10, 166:17,
166:22, 167:18, 167:21,
167:23, 182:21, 183:15,
185:7, 199:21, 201:2,
210:25

**ZOLLER** [4] - 8:21,
166:13, 231:3, 231:19

**Zoller's** [2] - 178:16,
185:19

**zone** [3] - 149:14,
149:18, 149:20

**zones** [2] - 77:10,
149:16